August 21, 2015

To the Office of the Court Clerk,

Please find herein an **AMENDED COMPLAINT**, which I'm

resubmitting as per a conversation with the a Clerk of the Court during

which it was determined that this AMENDED COMPLAINT was mistakenly

returned to me without having been considered as an amended version of the

INITIAL COMPLAINT that I submitted at the end of July and which was

confirmed to be in possession of the Clerk.

With respect to the question of Local Rule 5.1 raised by the Clerk and

discussed to some extent, I have assumed that the Summons would be served

through the respective Agencies for each respective CIA, etc., officer whose

identity is classified upon a determination thereof during *in camera* pretrial

proceedings or the like. I've not found any related precedents that would help

me ascertain the proper procedure, but assume that such would be the most

efficient approach, as I don't expect the US Marshall to be travelling to Tokyo

to serve summons to CIA officers.

RECEIVED
Mail Room

AUG 2 8 2015

In the *"Additional Statement on Finances, etc., for Appending to*

*Application to Proceed in District Court without Prepaying Fees or Costs"*

attached to the WAIVER APPLICATION submitted with the INITIAL

COMPLAINT, I have provided some links to webpages related to several of

the Defendants that demonstrate the difficulties in tracking covert CIA

officers even if you know their respective identities. If the Judge deems it

necessary that such information pertaining to the situation with respect to

Local Rule 5.1 should be incorporated into the body of the Complaint proper,

I am prepared to do so.

The *Additional Statement* contains the following passages, for

example.

> Plaintiff has to provide for his family, and cannot
> reasonably be expected to serve summons to the well-funded
> globally mobile group of CIA officers listed as Defendants.
> Attention should be drawn to the fact that the
> Executive Branch of the US government could preemptively
> consider using the above-described circumstance in order to
> evade scrutiny of alleged misconduct of its agents and officers
> by the Judicial Branch, knowing full well that a plaintiff such
> as me would simply not be capable of serving summons to
> CIA officers that have violated his rights protected by the US
> Constitution. That would be patently unacceptable in light of

the gravity of the Constitutional questions at issue in the
Complaint, including the Plaintiff's right to seek redress
before the Judicial Branch for violations by federal officials of
his rights protected by the US Constitution. Accordingly, I
humbly requests that this petition requesting to proceed
without paying fees to be granted.

Note that I do not intend to pursue claims related to
any allegation against individual[s] that are listed as CIA
officer Defendants should it be revealed through *in camera*
pre-trial proceedings or the like that any such individuals are
not CIA officers or proxies thereof (including officials of any
other federal agency). I do not expect any such individuals to
be found on the list of Defendants; however, I would strike
any the names from the list of any such individuals listed as
Defendants. I have purposely left the list shorter than it
could have been, leaving of at least one Japanese national
who is an attorney for a large law firm in Tokyo and on the
bar in the state of New York, focusing only on the incidents
and offenders that seem to have the most direct import with
respect to the law as well as those prolonging the ongoing
conspiracy....


Lastly, please note that the returned AMENDED COMPLAINT

included revisions related to the circumstances described to some extent in

the "Attachment 1" added to the AMENDED COMPLAINT. In submitting

the present AMENDED COMPLAINT, I have taken the opportunity to make

further corrections and revisions according to the progress I've made in

reading through the AMENDED COMPLAINT since submitting it. Though I

have been extremely busy with continual insomnia and side-effects of the

medication, significant corrections (and improvements in readability, etc.)

have been made to the text, so I have reprinted the AMENDED

COMPLAINT in its entirety, and signed it dated today, August 21, 2015. I

have maintained in my possession the original ORDER dated 8/13/2015

along with the returned (stamped) AMENDED COMPLAINT.

Respectfully Submitted,

Darren Vasaturo

UNITED STATES DISTRICT AND BANKRUPTCY COURTS

FOR THE DISTRICT OF COLUMBIA

DARREN R. VASATURO

502 SUN LOTUS IKEJI,

217 OWARICHO, NAKAGYOKU

KYOTO, JAPAN 604-0934

VS.                              CIVIL ACTION NO. (                    )

<u>Suspected CIA Officers:</u>

Sasha Peterka

(Believed to reside in the Berkeley, CA, and Lawrence, KS areas)

Jamie Roughan

(Believed to reside in the Tokyo, Japan, and Chiba, Japan areas)



1

"Mike" (referred to by Plaintiff as "Falun Gong Mike", last name unknown)

(Believed to reside in Kyoto, Japan)

Glenn Paquette

(Believed to reside in the Seattle, WA area)

Anthony Blackman

(Believed to reside in the Fushimi area of Kyoto, Japan)

Dave Dalsky

(Believed to reside in Kyoto, Japan)

A.J. Dickinson

(Believed to reside in Kyoto, Japan)

Dan Douglass

(Believed to reside in Kyoto, Japan)

Eric Bray

(Believed to reside in the Kyoto, Japan, and Mie, Japan areas)

Dawn O'Day

(Believed to reside in Kyoto, Japan)

Michael Wessel

(Believed to reside in the Minneapolis-St. Paul, MN area)

Peter Laverne

(Believed to reside in the Kyoto, Japan area)

Yahiya Abdelsamad

(Believed to reside in the New York, NY area)

Seth Yarden

(Believed to reside in Cambridge, MA, and to maintain a residence in Kyoto, Japan)

Preston Houser

(Believed to reside in Kyoto, Japan)

Chris Betros

(Believed to reside in Tokyo, Japan)

Kevin Turner

(Believed to reside in Kyoto, Japan)

Bruce W. Taylor

(Resides in the San Francisco Bay Area, CA)

Dan Kiely

(Believed to reside in Redbank, NJ)

Sean Lotman

(Believed to reside in the Los Angeles, CA, and Kyoto, Japan areas)

Colin Zimbleman

(Believed to reside in the Ventura, CA, and Kyoto, Japan areas)

Suspected CIA officers with official cover as Foreign Service Officers:

Gary Schaefer (U.S. Department of State)

Believed to reside in Tokyo

Marc Snider (U.S. Department of State)

Whereabouts unknown

Sylbeth Kennedy (U.S. Department of State)

Whereabouts unknown

Appointed Officials:

David Petraeus (CIA)

(Former) Director of the CIA

Central Intelligence Agency

Washington, D.C. 20505

Believed to reside in the New York area

John Brennan (CIA)

Director of the CIA

Central Intelligence Agency

Washington, D.C. 20505


David Buckley (CIA)

Office of Inspector General

Central Intelligence Agency

Washington, D.C. 20505


John Kerry (DOS)

Secretary of State

U.S. Department of State

2201 C Street NW

Washington, DC 20520


Eric Holder (DOJ)

(Former) Attorney General

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

Believed to reside in Washington DC


Mark Kappelhoff (DOJ)

(Former) Chief of the Criminal Section, Civil Rights Division

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

Believed to reside in Minnesota area


Keith Alexander (NSA)

National Security Agency

Fort Meade, MD 20755-6711

Believed to reside in Washington DC


Michael Rogers (NSA)

6

National Security Agency

Fort Meade, MD 20755-6711


<u>DOJ Officials:</u>

Kevin Callahan

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001


<u>Other:</u>

Congresswoman Barbara Lee

1301 Clay Street Suite 1000-N

Oakland, CA 94612


Elaine McKellar (case worker on the staff of Congresswoman Lee)

1301 Clay Street Suite 1000-N

Oakland, CA 94612

# TABLE OF CONTENTS

| Title | Page |
|---|---|
| Complaint (Amended) | 9 |
| I. Parties | 10 |
| II. Jurisdiction and Venue | 20 |
| III. Operable Facts | 24 |
| IV. First Cause of Action (Bivens 1) | 46 |
| V. Second Cause of Action (Conspiracy) | 52 |
| VI. Third Cause of Action (Honest Services Fraud) | 117 |
| VII. Fourth Cause of Action (Bivens 2) | 134 |
| VIII. Fifth Cause of Action (Bivens 3: Monell 1) | 136 |
| IX. Sixth Cause of Action (Bivens 4: Monell 2) | 172 |
| X. Seventh Cause of Action (Obstruction Of Justice) | 176 |
| XI. Eighth Cause of Action (Bivens 5) | 193 |
| XII. Attachment 1 | 222 |
| XIII. Relief Requested | 224 |

AMENDED COMPLAINT

(For Damages for Violations of Civil Rights, Violations of Honest Services Fraud,

Obstruction of Justice, and Request for Jury Trial)

I

PARTIES

1. Plaintiff Darren Vasaturo, is and was at all times mentioned herein, a private

American citizen residing in Kyoto, Japan. Plaintiff has resided in Japan since 1997,

holds permanent residency status in Japan, and is married to a Japanese national with

whom he has two children, ages 2- and 4-years-old.

2. Defendant Sasha Peterka (hereinafter "Peterka") was an acquaintance of

Plaintiff's at UC Berkeley, and is a suspected officer in the Central Intelligence Agency

(hereinafter "CIA"); believed to reside in the Berkeley, CA, and Lawrence, KS areas

3. Defendant Jamie Roughan (hereinafter "Roughan") was an acquaintance

from UC Berkeley and a suspected officer in the CIA; believed to reside in Tokyo

4. Defendant is known to me only by his first name, Mike (hereinafter "Mike"),

and is a suspected CIA officer to whom I was introduced by Peterka at the Starbucks in

Kyoto. I have generally referred to Mike as "Falun Gong Mike" because I don't know

his last name and in light of the fact that he practices Tai Chi by the river and once

10

defended Falun Gong at the Starbucks when a young American was handing out flyers

promoting Falun Gong. He is believed that to reside in Kyoto part of the year, and has

mentioned that he spends time in Vietnam.


5. Defendant Glenn Paquette (hereinafter "Paquette") is a suspected CIA

officer Plaintiff met in Kyoto at the Starbucks, where he was introduced to me by Sasha

Peterka. Paquette is apparently teaching physics in the Seattle area and operating a

translation company.


6. Defendant Anthony Blackman (hereinafter "Blackman") is a suspected CIA

officer Plaintiff met in Kyoto at the Starbucks, where he was introduced to me by

Paquette; believed to reside in Kyoto


7. Defendant Gary Schaefer (hereinafter "Schaefer") is a suspected CIA case

officer operating under official diplomatic cover in the DOS whom Plaintiff met when

he visited the American Consulate in Osaka (hereinafter "Consulate"); believed to

reside in Tokyo

11

8. Defendant Marc Snider (hereinafter "Snider") is a suspected CIA case officer operating under official diplomatic cover in the DOS; whereabouts unknown

9. Defendant Sylbeth Kennedy (hereinafter "Kennedy") is a suspected CIA case officer operating under official diplomatic cover in the DOS; whereabouts unknown

10. Defendant Dave Dalsky (hereinafter "Dalsky") is a suspected CIA officer Plaintiff met in Kyoto at the elementary school where his daughter and my son were enrolled, and at the Kamogawa river near our residences; believed to reside in Kyoto

11. Defendant David Petraeus (hereinafter "Petraeus") is a former Director of the CIA.

(Former) Director of the CIA

Central Intelligence Agency

Washington, D.C. 20505

Believed to reside in the New York area

12. Defendant A.J. Dickinson (hereinafter "Dickinson") is a suspected CIA

officer Plaintiff met at the Starbucks in Kyoto; believed to reside in Kyoto

13. Defendant Kevin Callahan (hereinafter "Callahan") is a paralegal in the

Civil Rights Division of the U.S. Department of Justice (hereinafter DOJ).

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

14. Defendant Mark Kappelhoff (hereinafter "Kappelhoff") was the Deputy

Attorney General of the Civil Rights Division of the DOJ.

(Former) Chief of the Criminal Section, Civil Rights Division

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

Believed to reside in Minnesota area

15. Defendant Dan Douglass (hereinafter "Douglass") is a suspected CIA

officer Plaintiff met at the Villa Tonodan in Kyoto, believed to reside in Kyoto.

16. Defendant Eric Bray (hereinafter "Bray") is a suspected CIA officer

Plaintiff met in Kyoto; believed to reside in Kyoto

17. Defendant Dawn O'Day (hereinafter "O'Day") is a suspected CIA officer

Plaintiff met at the Starbucks in Kyoto; believed to reside in Kyoto

18. Defendant Michael Wessel (hereinafter "Wessel") is a suspected CIA

officer Plaintiff met at the Starbucks in Kyoto; believed to reside in the Minneapolis-St.

Paul, MN area

19. Defendant Peter Laverne (hereinafter "Laverne") is a suspected CIA officer

Plaintiff met in Kyoto; believed to reside in the Kyoto area

20. Defendant Yahiya Abdelsamad (hereinafter Abdelsamad) is a suspected

CIA officer Plaintiff met at the Starbucks in Kyoto; believed to reside in the New York

area

14

21. Seth Yarden (hereinafter "Yarden") is a suspected CIA officer Plaintiff met

in Kyoto; believed to reside in Cambridge, MA


22. Defendant Preston Houser (hereinafter "Houser") is a suspected CIA officer

Plaintiff met at the Starbucks in Kyoto; believe to reside in or near Kyoto


23. Defendant John Kerry (hereinafter "Kerry") is the U.S. Secretary of State.

Secretary of State

U.S. Department of State

2201 C Street NW

Washington, DC 20520


24. Defendant Keith Alexander (hereinafter "Alexander") is a former Director

of the National Security Agency (hereinafter NSA).

(Former) Director of NSA

National Security Agency

Fort Meade, MD 20755-6711

15

Believed to reside in Washington DC

25. Defendant Michael Rogers (hereinafter "Rogers") is the Director of the

NSA.

Director of NSA

National Security Agency

Fort Meade, MD 20755-6711

26. Defendant Eric Holder (hereinafter "Holder") is the former U.S. Attorney

General.

(Former) Attorney General

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

Believed to reside in Washington DC

27. Defendant John Brennan (hereinafter "Brennan") is the Director of the

CIA; believed to reside in the DC area

Director of the CIA

Central Intelligence Agency

Washington, D.C. 20505


28. Defendant Chris Betros (hereinafter) is a suspected CIA officer I met online through the JapanToday CIA media front; believed to reside in Tokyo


29. Defendant Kevin Turner (hereinafter "Turner") is a suspected CIA officer Plaintiff encountered at the Starbucks in Kyoto; believed to reside in Kyoto


30. Defendant Bruce Taylor (hereinafter "Taylor") is a former friend from the US Army suspected to have joined the CIA in the 1990s before being stationed in Thailand and, eventually Tokyo. He currently resides in the San Francisco Bay Area.


31. Defendant Dan Kiely (hereinafter "Kiely") is a former friend from the US Army suspected to have joined the CIA in the 1990s before being stationed in Thailand, and is believed to currently reside in Redbank, New Jersey.

32. Elaine McKellar (hereinafter, "McKellar) is a case worker on the staff of House of Representatives Congresswoman Barbara Lee; believed to reside in the San Francisco Bay Area

33. Congresswoman Barbara Lee

1301 Clay Street Suite 1000-N

Oakland, CA 94612

34. Sean Lotman (hereinafter "Lotman") is a suspected CIA officer Plaintiff learned about through a CIA propaganda piece in the Japan Times; believed to reside the Los Angeles, CA, and Kyoto areas

35. Colin Zimbleman (hereinafter "Zimbleman") is a suspected CIA officer Plaintiff was indirectly introduced to through his wife (sister-in-law to Lotman); believed to reside the Ventura, CA, and Kyoto areas

36. David Buckley (hereinafter "Buckley") is the recently retired CIA Inspector General; believed to reside in the Washington DC area

Office of Inspector General

Central Intelligence Agency

Washington, D.C. 20505

37. Plaintiff believes that other Federal agents, officers, and employees assisted

and/or aided and abetted the named Defendants or further participated in the unlawful

conduct complained of herein, and Plaintiff will seek leave to amend this complaint to

add the names of those persons once the same become known to Plaintiff through

discovery.

II

JURISDICTION AND VENUE

38. This suit is brought pursuant to the Fourth Amendment of the United States

Constitution under the authority of *Bivens (Bivens v. Six Unknown Named Agents Of*

*The Federal Bureau Of Narcotics* (1971), 403 U.S. 388) allowing a personal civil suit

brought by Plaintiff's aggrieved by Fourth Amendment violations by Federal agents and

officers acting under color of law.

39. This suit is also brought pursuant to pursuant to the Fifth Amendment of

the United States Constitution and the Fourteenth Amendment of the United States

Constitution under the authority of *Bivens* allowing a personal civil suit brought by

Plaintiffs aggrieved by Fifth Amendment violations and Fourteenth Amendment

violations committed by state actors (i.e., Federal agents and officers) under color of

law.

40. Further, this suit is also brought pursuant to the Fourth Amendment of the

United States Constitution, the Fifth Amendment of the United States Constitution, and

20

the Fourteenth Amendment of the United States Constitution under the authority of

*Bivens* allowing a personal civil suit brought by Plaintiff's aggrieved by Fourth

Amendment violations, Fifth Amendment violations, and Fourteenth Amendment

violations facilitated or caused by official policy, custom or practice, as presented in the

form of *Monell* claims (Monell v. Department of Soc. Svcs., 436 U.S. 658 (1978)).

41. Still further, this suit is also brought pursuant to the Fifth Amendment of

the United States Constitution and the Fourteenth Amendment of the United States

Constitution under the authority of *Bivens* allowing a personal civil suit brought by

Plaintiff's aggrieved by violations of Plaintiff's rights to procedural due process and

substantive due process secured by the Fifth Amendment of the U.S. Constitution and

Fourteenth Amendment of the U.S. Constitution facilitated or caused by official policy,

custom or practice, as presented in the form of a *Monell* claim.

42. Moreover, this suit is further brought pursuant to 18 USC 1341, 18 USC

1342, 18 USC 1343, 18 USC 1346, and 18 USC 1349 with respect to the corresponding

unlawful conduct of federal officials in at least two, and more likely three to four,

federal departments and agencies, including the DOJ, the CIA, the NSA, and the DOS

that have, through fraudulent misrepresentations and the like, violated Plaintiff's right

and entitlement to receive honest services from public officials as protected by said

statutes.

43. Further, this suit is brought pursuant to 18 USC § 1512 and 18 USC § 1514

with respect to both tampering with Plaintiff as a victim of violations of rights protected

by the U.S. Constitution by CIA officers as well as harassment of Plaintiff as a victim of

violations of rights protected by the U.S. Constitution by CIA officers and their proxies

conducting covert operation in Kyoto, Japan; in addition, this suit is also brought

pursuant to pursuant to 18 USC 1505 and 18 USC 1519 in conjunction with other

aspects related to Obstruction of Justice by federal officials that have violated Plaintiff's

rights protected by said statutes.

44. In addition, this suit is brought pursuant to the First Amendment of the

United States Constitution and the Ninth Amendment of the United States Constitution

under the authority of *Bivens* allowing a personal civil suit brought by Plaintiff's

aggrieved by First Amendment violations and Ninth Amendment violations committed

by Federal agents and officers acting under color of law.

45. Thus, this suit involves a Federal question (28 USC § 1331) and questions arising under the United States Constitution and laws of the United States. Here, it further bears noting that the right to judicial review of the unlawful actions of the federal agencies and officials and employees thereof in question as described herein is also provided for under title 5 of the United States Code section 702.

46. Venue is appropriate in the District of Columbia, where a number of the Defendants are believed to reside, which is also the location of the DOJ and nearby the headquarters of the CIA and NSA, where one or more of the acts alleged herein took place.

III

OPERABLE FACTS

47. If it is determined that venue lies in some other Federal Court in the United States, then the matter should be transferred to that District Court pursuant to 28 USC § 1406(a).

48. Plaintiff Vasaturo is an American citizen that served in the U.S. Army Signal Intelligence Corps as a Voice Intercept Operator qualified in the Korean language for four years, during which time Plaintiff held a TS/SCI security clearance.

49. After receiving an honorable discharged from the army, Plaintiff re-entered college at the University of California, Berkeley, in January 1987, where he became acquainted with two of the named defendants and others, and completed the requirements for a Bachelor's degree in Interdisciplinary Studies in Social Sciences in 1994 with a focus on East Asian history and politics; more specifically, 20th century developments with a focus on Korea as a concrete historical example against which to apply a theoretical framework encompassing "modernity and identity".

50. In light of the inevitable further disclosure of the identities of covert CIA officers, "intelligence sources and methods" and the like, Plaintiff requests, in advance, that the Court adopt CIPA-like procedures for conducting the proceedings in the instant case, as per the precedent set by the decision of the appeal to the DC Circuit Court (CASE NO. 09-5311) in relation to the Horn v. Huddle case heard before this Court (CASE NO. 1 : 94-CV-0 1756-RCL).

51. Plaintiff is not aiming to expose legitimate national security information falling outside of the purview of the likes of the information he has posted on his blog (started in 2010, "Kyoto inside out": http://kyoto-inside-out.blogspot.jp/) in relation to events and persons that have had a direct impact on his life or are engaged in covert operations that pose a direct or indirect threat to the plaintiff and his family as well as civil society in Kyoto, Japan.

52. It goes without saying that the incidents detailed in this Complaint are not considered by Plaintiff to represent legitimate national security information, but federal crimes committed in violation of the U.S. Constitution by rogue CIA officers and

federal agents/officials, in addition to official policies, customs and practices, which have facilitated the commission of said crimes and have been implemented by federal officials in supervisory positions or with policy making authority. Plaintiff understands that the identities of covert CIA officers are classified and that such state secrets are at issue, wherefore Plaintiff has proposed, in advance, that the Court adopt CIPA-like procedures.

53. Plaintiff has submitted Privacy Act requests to the CIA and NSA that have been denied on the basis of national security exceptions. Plaintiff also has a Privacy Act request pending with DOS (Case Control Number P-2014-09239), which is projected to be finalized in September 2015. Plaintiff also submitted a Privacy Act request to the DOJ and received a packet of documents in response thereto; however, said packet of documents consisted solely of documents that the plaintiff himself had faxed to the DOJ, absent the emails Plaintiff had sent to the Special Litigation Department, some of which were subsequently received via a further request. The DOJ disclosed no information related to its internal procedures and actions taken in the processing of the complaint Plaintiff submitted to the Civil Rights Division of the DOJ.

54. Peterka was an acquaintance from UC Berkeley. In 2001 or thereabouts, Plaintiff moved into the Villa Tonodan apartment building, which he later came to understand was densely populated with intelligence officers, who accounted for approximately 50% of the total occupancy.

55. One day while Plaintiff was in Berkeley when visiting the USA, in 2001 or thereabouts, Peterka showed up in the Whole Foods market on that day, and we exchanged email contacts. As Peterka was in graduate school at UC Berkeley at the time, Plaintiff did not find it exceedingly unusual to bump into him by coincidence at a shopping center near the campus. Peterka contacted Plaintiff a couple of years later out of the blue, and said he was planning to visit Japan. Plaintiff had some space at his apartment, so Plaintiff invited Peterka to stay there, if he wanted to visit Kyoto.

56. Peterka told Plaintiff he was coming to Japan to visit some friends in Tokyo, including another individual from Berkeley named Robert, whose last name Plaintiff can't recall but who had been employed at Lehman Brothers in Tokyo before the crash and had majored in Japanese at UC Berkeley. Plaintiff became acquainted with Robert through Peterka and in relation to taking the Japanese Language proficiency test around

27

the year 1999 or 2000, but had not known him at UC Berkeley. The other individuals

Peterka was visiting in Tokyo were employed at Goldman Sachs, and Plaintiff does not

know how he was connected to those people, though Plaintiff came to suspect that an

individual named John to whom he introduced me was a CIA officer. Peterka told me

that John had worked in the architectural field in Hong Kong before leaving to join

Goldman Sachs in Tokyo, where he was engaged in evaluating commercial real estate

investment opportunities for the firm.


57. Roughan was also an acquaintance from UC Berkeley. Roughan showed up

at a bus stop in Kyoto, in another apparent coincidence, though one which Plaintiff did

register as unusual. We exchanged contact information, and would socialize when

Roughan visited Kyoto occasionally. He had also asked Plaintiff to do some short

translation projects for his employer, Mizuho Finance. Plaintiff did translate a couple of

short documents for which he requested translation. It should be noted that Roughan

had also told Plaintiff that he'd worked at Lehman Brothers prior to Mizuho.


58. Like Peterka, Roughan tried to convince Plaintiff that his fortune awaited

him in Tokyo, but Plaintiff made it amply clear that he wasn't interested in returning to

Tokyo. Subsequently, Plaintiff visited Roughan in Tokyo during a trip to see Plaintiff's

music teacher perform at the National Theater with other top-level performers,

including one designated as a Living Cultural Treasure. During that trip Plaintiff stayed

at Roughan's place for one night, but the hospitality was somewhat cold comfort.

Moreover, though he'd ample space, he said that he couldn't lodge me for more than

one night, which was fine, but Roughan seemed to suddenly be acting somewhat out of

character. Everything about the interaction during that trip, starting with the continued

sales pitch to Plaintiff on Tokyo coupled with the less-than-welcoming hospitality, had

seemed incongruous.


59. Plaintiff had also met another former acquaintance during that trip, a former

romantic interest that is presently a partner at a major American law firm in Tokyo.

Plaintiff believes that she, too, is working for the CIA (or perhaps the MI6), but does not

find anything of relevance to the instant case to present about her at this point. Should

discovery reveal any pertinent information pertaining to her involvement, Plaintiff may

seek to amend the complaint accordingly.


60. Paquette and Mike were introduced to Plaintiff by Peterka at the Starbucks

in Kyoto.

61. Asaho Kudo (hereinafter "Kudo") is a former girlfriend of Plaintiff's who is suspected of having been recruited by the CIA (most likely Peterka) and deployed against Plaintiff years later in a scheme to undermine Plaintiff's life in Kyoto, said scheme constituting one episode in a continuum comprising related schemes all having the objective of displacing Plaintiff from Kyoto.

62. Prior to lodging a complaint with the American Consulate in Osaka, Plaintiff submitted an online application to the CIA offering to serve as an independent contractor, stipulating the condition that he would maintain continuity in the lifestyle he'd been leading, and not interrupt or undermine the various scholarly and cultural pursuits in which he was actively engaged.

63. The decision to submit the application was not made out of the blue, that is to say, without prompting, but on the basis of prompting in the form of a surreptitious intimation by Paquette that he was acquainted with a close friend whom Plaintiff did assume had entered the CIA. That friend (to be named in a subsequent sealed filing) had

visited Plaintiff in Japan in the year 1998 or 1999 while Plaintiff was living in Tokyo.

After the problems with CIA officers in Kyoto escalated to the point of my having to

report them to the DOJ, Plaintiff cc'd said friend's old Hotmail account a number of

emails sent to the Consulate and the DOJ. It appears that he deactivated that Hotmail

account within a year or so after the first such cc'd email.


64. In retrospect, it has become clear that Paquette may have had more than one

motivation for encouraging Plaintiff to submit an application to the CIA; in particular,

with respect to the electronics communications provisions related to applicants for

employment with the CIA found in Executive Order 12333, and triggering a clause

therein that could be seen to authorize electronic eavesdropping and the like against

Plaintiff.


65. After Plaintiff submitted the aforementioned application, he received no

reply from the CIA, which wasn't surprising. However, it was not clear to Plaintiff what

the actual disposition of the CIA was in light of developments on the ground, which

oscillated between the projection of empathy from CIA officers and positive signs that

there might be an effort being made to integrate me into the local intelligence network,

on the one hand, and continued harassment, on the other.

66. The first evidence of a concrete example demonstrating that such

oscillation had been adopted as a tactic by the rogue CIA officers against Plaintiff after

he'd submitted the application to the CIA is found in emails exchanged during

Plaintiff's interaction with Blackman. Blackman was an American teaching English

whom Paquette introduced to Plaintiff with a subterfuge related to translation work.

Blackman had claimed to be running a translation company called TSA, which Plaintiff

eventually learned didn't exist. That represented the first blatant falsehood to be

exposed in the ruse, which was intended to interfere with Plaintiff's pursuit of a lawful

livelihood, and diverting Plaintiff's time and effort into a fraudulently represented

non-existent enterprise.

67. The collaborative effort between Paquette and Blackman to entangle

Plaintiff in a humiliating and demoralizing pursuit of a fraudulently represented offer of

work represents the first incident with respect to which Plaintiff presented material

evidence (i.e., the aforementioned emails) to U.S. government officials demonstrating

that rogue CIA officers were harassing him, with the ultimate aim of displacing him

from Kyoto. There is no possibility that the acts involved could be construed to be part

of a recruiting process by the CIA; they can only be construed as an unwarranted

intrusion and harassment.

68. Having already endured several years of such harassment, after waiting

approximately five months without receiving a formal response from the CIA to the

online application, the above-described collaborative harassment operation by Paquette

and Blackman was the last straw; it became obvious to Plaintiff that he would have to

lodge a complaint of some sort to forestall further trouble with locally stationed CIA

officers and their proxies.

69. Plaintiff therefore decided upon a course of action of telephoning the

American Consulate in Osaka to make an appointment to meet personally with consular

officials to lodge the complaints. Plaintiff was able to do so and spoke with Schaeffer,

who subsequently represented himself as the Chief of the American Citizen Services

Section, sometime in the first week of September 2009, as is evident from follow-up

emails Plaintiff sent to Schaeffer as well as Schaefer's eventual reply.

70. Before continuing, it bears noting that on two occasions Plaintiff was

driven to the point of resorting to making allusion to violence to Paquette due to

Paquette's incessant harassment of Plaintiff at the Starbucks. Plaintiff did report that,

even exaggerated it, to the Consulate. As an example of the sort of behavior at issue in

terms of harassment, Plaintiff quotes a passage from an email he sent to the Schaeffer et

al. on January 7, 2011:

> *This particular action relates to a series consisting of a first*
>
> *occasion when he basically insinuated that I was a latent*
>
> *homosexual, and on another occasion during a brief conversation*
>
> *with him and Falun Gung Mike that occurred while I was waiting to*
>
> *receive a coffee at the Starbucks. During that conversation he*
>
> *mentioned the gays in San Francisco, asking me if I'd ever had any*
>
> *problems with them. I replied that I hadn't, for the most part, as*
>
> *people basically had a live and let live attitude there. He then*
>
> *asserted that Mike had been accosted by some gays in San*
>
> *Francisco, to which Mike gave him a sidelong glance, with no reply.*
>
> *This happened around a time when the yakuza had basically stopped*

*sending hostess types to the cafe to try to lure me out, and were*

*instead sending people to occupy seats next to me and harass me,*

*males exhibiting what could only be described as behavior and body*

*language intended to be homo-erotic.*

*What Mr. Paquette intended to insinuate, I gather, was that I*

*was in danger of being assaulted by the males exhibiting homosexual*

*tendencies he was sending to harass me in the cafe…*

71. Schaeffer was less than forthcoming with the email reply confirming the

nature and content of our above-described meeting. In fact, Plaintiff had to take the

initiative and raise that point explicitly in an initial email Plaintiff sent Schaeffer

despairing of his non-responsiveness and imploring him to reply. In his eventual reply,

he stated:

*"Rest assured that I have taken your concerns on board and will*

*pass them on through the appropriate channels".*

72. During the meeting with Schaeffer Plaintiff mentioned incidents such as

being set up to be physically attacked, in addition to those described above. We

discussed other topics relevant to the instant case as well, such as the friend that

Paquette had intimated he knew in order to encourage me to apply to the CIA in the first

place.

73. In the numerous emails Plaintiff had occasion to send Schaeffer during his

tenure as Chief of the American Citizen Services Unit at the American Consulate in

Osaka, Plaintiff again mentioned having been physically assaulted, and Plaintiff

indicated that he thought that the individuals he'd reported to Schaeffer needed to be

subjected to discipline by the (CIA) "IG". Plaintiff had been aware of the existence of

the existence of an administrative organ called the IG while serving in the Army.

Furthermore, Plaintiff sent Schaeffer a series of emails exchanged with Roughan

demonstrating that Roughan had access to information about Plaintiff that he could not

possibly have known other than through electronic eavesdropping or through a human

intelligence network involved in physical surveillance of Plaintiff and his wife-to-be.

That, in turn, also indicated that the hostile actions of Roughan had been allowed to

continue despite the fact that Plaintiff had reported him for same to the Consulate

previously.

74. Here, it should be noted that the above-described collaborative operation between Paquette and Blackman is representative of a pattern that persisted even after Plaintiff complained to Schaeffer. There would be a lull in harassment, leading me to believe that the complaint had been effective in exposing wrongs that were corrected. There were also continual surreptitious signs that maybe the CIA was about to make me an offer at any time, but that was all smoke and mirrors, aimed to throw me for a loop; meanwhile, further operations against Plaintiff were afoot.

75. Over the years the CIA has continually introduced a succession of new individuals into Plaintiff's immediate surroundings in a manner such as to establish a quasi-cordial relationship with Plaintiff, implying that there was some process underway toward reconciling the situation. Otherwise, given my complaints to the American Consulate, it was more than obvious that Plaintiff wanted nothing to do with the CIA and considered them hostile. Such individuals subsequently included Laverne, Dickinson, and O'Day", all of whom with Plaintiff exchanged emails on the basis of various pretenses presented by said individuals socializing with me at Starbucks.

76. Peterka introduced Plaintiff to Mike, who in turn introduced Plaintiff to Paquette, Yoshiyuki, Motez, etc., at Starbucks (Sanjo-Ohashi location). Plaintiff was subsequently set up to be attacked at a sports bar where he'd agreed to meet Yoshiyuki for a drink. The attacker was subsequently purported to be a Moroccan by Douglass, who seemed to be encouraging Plaintiff to aggressively pursue the incident as a conflict needing to be resolved by vengeful violence. Plaintiff did visit the local 'police box', accompanied by Yoshiyuki, after the manager at the bar had refused to call the police, but Plaintiff relented with respect to filing a formal complaint when the police officers informed him that he would have to go a hospital and get a medical report written up, etc.

77. The Starbucks is a social networking focus of the CIA et al., who for the most part seemed conspicuously out of place in Kyoto, and had a lifestyle that permitted them to frequent the Starbucks every day to wither away the hours on top of that.

78. Plaintiff became acquainted with Dalksy at the nursery school in Plaintiff's neighborhood where both our children were enrolled. Dalksy has a PhD in psychology and teaches social psychology at Kyoto University. Plaintiff became acquainted with

Bray after Bray approached Plaintiff one day in the neighborhood in which both lived.

According to his resume, which is posted online, he has a BA in psychology, and a PhD

in education, and teaches English at a local college. Dalsky and Bray were focused on

activities in Plaintiff's neighborhood, as opposed to recruiting spies at the Starbucks, for

example.

79. Plaintiff encountered Turner with Dickinson and Mike at the Starbucks.

Turner markets himself as a new age shaman and operates a website through which he

markets videos and classes.

80. Apparently, as an area specialist with fluency in the Japanese language,

Plaintiff represented a type of individual that stood in stark contrast to the

sports-bar/college-fraternity group ethos being projected by the CIA et al. as

representative of Americans/Westerners in Kyoto in general. None of the CIA officers

Plaintiff encountered were area specialists knowledgeable of Japanese history, and

fewer than 10% of them were fluent in the Japanese language.

81. Accordingly, when Plaintiff had tried to socialize with the individuals at the

Starbucks that turned out to be CIA officers, it was clear that there was a disjuncture.

Plaintiff had already surmised that Peterka and the aforementioned individuals were

CIA officers, etc., but had not discerned what exactly their objectives were. Suffice it to

say that the combination of the sports-bar/Irish-pub dumb-it-down telos evident in the

group ethos projected by the CIA et al. at the Starbucks were palpably incongruent in

the cultural capital of Japan, Kyoto, which, incidentally, has many traditional and

modern Japanese drinking establishments, though few cafes that are well lit and stay

open late. Peterka must have realized that it wouldn't be long before Plaintiff had a

better grasp of the scenario.


82. The fact that there was a religion angle being cultivated by the CIA et al.

came into stark relief when Plaintiff connected Preston Houser and John Dougill, whom

could be found among the patrons in the days of the Sanjo-Ohashi Starbucks, with

articles they had published in the Kansai Time Out (hereinafter "KTO"). They stopped

frequenting the Starbucks, however, after Plaintiff had questioned Dougill about an

article he'd published about a renowned rebel figure associated with the Meiji

Restoration. Plaintiff had read the seminal monograph (1961) on said figure (Sakamoto

Ryoma) by deceased Princeton professor Marius Jansen, a world-renowned historian of

Japan, and introduced that book to Dougill. After a brief discussion, during which

Dougill attempted to introduce notions associated with Shamanism—traces of which

were also evident in the article as well, in interpreting Japanese mythology—it soon

became apparent to Plaintiff that Dougill knew next to nothing about Japanese history.

Any student of Japanese history would have been familiar with the subject matter that

the CIA and MI6 were attempting to exploit in a preposterous manner for obvious and

extremely dubious political purposes. Such disinformation operations can hardly be said

to be "covert", except insofar as they are not acknowledged to be the product of the

government of the United States and its closest Western allies disseminated through

jointly produced and distributed local English media publications. In any case, Plaintiff

had made the purported authors of such disinformation aware of the fact that he knew

they were frauds disseminating propaganda.


83. Yarden is an individual that Plaintiff recalls meeting out and about in

Plaintiff's old neighborhood, which was not far from where Yarden resided.


84. More recently, Plaintiff was contacted by suspected CIA officer,

psychologist Colin Zimbleman (hereinafter, "Zimbleman")—via his wife, Misako

Inaoka (hereinafter, "Inaoka")—and invited to participate in a literature discussion

group (the "Monkey Shoulder Gang", named after a whisky bottle; hereinafter "MSG")

including a number of suspected CIA officers as well as officers of other Western

countries' intelligence agencies, some of whom Plaintiff had already blogged about.


85. The first such individual is Zimbleman's brother-in-law, Lotman, who is a

founding member of MSG and on the mailing list and about whom Plaintiff posted a

blog entry approximately two years early

(http://kyoto-inside-out.blogspot.jp/2013/05/who-is-sean-lotman-just-some-connected.h

tml), suspecting him of being a CIA officer in relation to an unduly high-profile in the

media, including the Japan Times (i.e., a promotional article written by another

suspected CIA officer, Kris Kosaka (hereinafter, "Kosaka"), exaggerating Lotman's

essentially non-existent accomplishments as a writer), and the sudden appearance of a

contingency of similarly disposed people (style- and attitude-wise, a veritable affinity

group) in Plaintiff's immediate vicinity, which is a vicinity in which they were

obviously out of place. Other members of the group on the mailing list include

additional suspected intelligence officers about whom I've blogged (e.g., Canadian, Eric

Luong, (hereinafter, "Luong")). Suspected CIA 'agent' (i.e., non-US national proxy on

the CIA payroll) Ariya Sasaki (hereinafter, "A. Sasaki"), who has been on Plaintiff's

radar in association with suspected CIA fronts and CIA connected business in the area,

and in association with Luong

(http://www.pechakucha.org/presentations/debunking-kyotos-myths), etc., also appears

on the list.


86. Another individual on the list, suspected CIA officer Mike Barr (hereinafter,

"Barr"), has appeared in the event called "The Flame" held at a suspected CIA-front

café named Papa John's operated by suspected CIA officer Charles Roche (hereinafter

"Roche") that serves as an venue for promotes Western intelligence officers stationed in

Kyoto and about which Plaintiff has blogged

(http://kyoto-inside-out.blogspot.jp/2015/01/the-flame-brought-to-you-by-charles.html).


87. In fact, many of the above-described individuals were first encountered at

one of two Starbucks that Plaintiff frequents. The above-mentioned individuals all

evidenced a degree of frustration with regard to my presence at Starbucks. On the other

hand, unlike other suspected CIA officers that would simply leave, the above-named

individuals not only persisted in coming to the café but of doing things like advising me

against suing the government of the United States, for example (O'Day), in or around

November 2014.

88. Another recent incident involved a somewhat hostile exchange about

Chinese medicine with Dickinson, who had (mis?)represented himself as a former

university teacher that taught aspiring medical students at medical schools about

Chinese medicine. A new individual named Peter (last name unknown) that had recently

appeared on the scene and described himself as a "medical anthropologist" was present

at the exchange. It exposed the hostile subterfuge engaged in by AJ Dickinson and a

couple of other CIA officers passing themselves of as esoteric wise men, shamans, etc.,

apparently as another face of the CIA's strategy to infiltrate and divide-and-conquer

Japanese civil society using religion (or a proximity thereof).

89. Peter was an articulate individual, and his story believable, but it was not

believable that he attempted to add credibility to AJ Dickinson's cover story by

pretending to acknowledge Dickinson in association with academic scholarship in the

relevant field. Plaintiff had long since looked into Dickinson's background on the

Internet and ascertained that the academia story was suspect, to say the least, as there

was not a single mention of an "AJ Dickinson", etc., in relation to said topics. Plaintiff

subsequently described Peter in a report to the Consulate, and all of the above-named

individuals, in addition to Turner, whose online pseudo-shamanism CIA-front Plaintiff

had long since discovered.


90. Plaintiff would have thought that such individuals such as Dickinson and

Mike (whom Plaintiff has posted a photo of on his blog) should have been removed

from Plaintiff's surroundings immediately after he'd complained to the Consulate, but

that was not the case. Some of the people were removed temporarily, but then

reintroduced later. Circumstances compelled Plaintiff to escalate the complaints, and

eventually raise his concerns in a letter to President Obama, followed by a couple of

emails to the White House.


91. Plaintiff has come to understand that the Starbucks at Sanjo-Ohashi in

Kyoto has been the epicenter of Western intelligence agency efforts to recruit Japanese

as spies in Kyoto to act against their own society and country, which Plaintiff now

makes his home.

IV

FIRST CAUSE OF ACTION

(*Bivens* 1: Fourth Amendment of the United States Constitution)

92. Plaintiff incorporates herein as though fully set forth, all of the allegations contained in paragraphs 1 through 91, above, as though fully set forth.

93. All of the actions and activities taken by the Defendants were taken under color of law and were without lawful authority and were accomplished in violation of clearly established law.

94. The unlawful interception of Plaintiff's electronic communications and/or the dissemination thereof, all of which were performed without Plaintiff's permission, in addition to the unlawful dissemination of information gathered through human intelligence networks, which were presumably involved in providing for the physical protection of Plaintiff and his family (including Plaintiff's wife-to-be, who was pregnant with their first child at the time of the illicit contact from Roughan), violated Plaintiff's rights protected under Fourth Amendment of the U.S. Constitution.

95. As a result of the unlawful misconduct by the Defendants, Plaintiff has suffered humility, embarrassment, loss of personal privacy, emotional distress, and is entitled to compensatory damages in an amount according to proof, but in excess of the minimal amount for this Court's jurisdiction. The Defendants acts were willful, malicious and intentional entitling Plaintiff to punitive damages.

96. Plaintiff's computer has been hacked a number of times, causing the loss of data, damage to hard disk drives, etc. Some of the email exchanges between Plaintiff and Paquette, some of said exchanges discussing the CIA, were deleted from Plaintiff's Hotmail email account, presumably in conjunction with said hacking. Such deletions are tantamount to the premeditated destruction of evidence that would be important to a subsequent investigation or the like related to the allegations against Paquette et al. set forth in this Complaint, and therefore represent a violation of 18 USC 1519 against tampering with evidence, in addition to violating Plaintiff's rights protected by the Fourth Amendment of the U.S. Constitution.

97. Plaintiff has studied EO 12333 and discerned therein two authorities that

the government could possibly cite as basis for legitimating the interception of Plaintiffs

electronic communications and the carrying out of physical surveillance of Plaintiff and

his family. However, even assuming that a limited scope of authorities per EO 12333

were applicable, said authorities would not allow for the diversion for unlawful use of

information obtained during the course of the above-mentioned activities within the

scope authorized by EO 12333. Thus, any unlawful diversion and use of such

information would constitute a violation of the Plaintiff's rights protected under Fourth

Amendment of the U.S. Constitution.


98. Roughan had contacted Plaintiff out of the blue (yet another coincidence)

by email after approximately a year's absence of communication at a timing shortly

after Plaintiff's then girlfriend had become pregnant with our son and visited the

neighborhood maternity clinic a couple of times. In said contact, Roughan informed

Plaintiff of his wife's pending childbirth, but Plaintiff was suspicious of the coincidental

contact in light of the circumstances, and did not inform Roughan that his girlfriend was

pregnant.


99. Next, Roughan sent a second email, but there was a substantial discrepancy

between the time frame described in his first email and the timing at which he reported

his wife as being in the hospital for delivery. That confirmed Plaintiff's suspicion that

Roughan had gained access to information about Plaintiff's private life that he should

not have had access to, and that his purpose of contacting Plaintiff was to ply Plaintiff

for further information in a manner that can only be described as attempting to "spy" on

Plaintiff. What Roughan specifically thought he stood to gain thereby is unclear;

however, Plaintiff was aware of the fact that Roughan had expressed envy at Plaintiff's

life in Kyoto and given the strong impression that he also wanted to live in Kyoto.

100. It is not clear as to whether Roughan obtained the information regarding

the possibility that Plaintiff's girlfriend had become pregnant (after the CIA proxy Kudo

who was sent to disrupt Plaintiff's life had an abortion) via electronic communication

interception or human intelligence network involved in physical surveillance, but it was

apparent that he had come to be in possession of information about Plaintiff's private

life that he should not have had. Moreover, there would be no reason whatsoever for

Roughan to have access to information pertaining to Plaintiff obtained through

interception of electronic communications or physical surveillance of Plaintiff under EO

12333. Roughan was not involved in the physical surveilling of Plaintiff for providing

physical protection, nor would he have had any connection to Plaintiff's application for

employment, which had effectively been rejected by that point as far as Plaintiff is

concerned. Plaintiff assumes that Roughan acted on his own in his individual capacity

as a rogue CIA officer colluding with other rogue CIA officers in violating Plaintiffs

rights protected under the Fourth Amendment of the U.S. Constitution.


101. Furthermore, there should be some reasonable limits to the respective time

frame of each applicable clause of EO 12333, particularly with respect to the clause

related to applicants for employment with the CIA. Plaintiff has stated in emails to

Schaeffer et al. that he has hereby withdrawn his application, etc. As the text of EO

12333 states, the stipulations set forth therein are not intended to serve as justification

for CIA officers, NSA officials and the like to violate the Constitution of the United

States of America.


102. It bears emphasizing here that the events described above occurred: after

Kudo, who'd been recruited by the CIA as an agent and deployed to act against Plaintiff,

had become pregnant (with Plaintiff's child) and unilaterally decided to undergo an

abortion; and after Plaintiff had already reported Roughan to the American Consulate in

Osaka as a rogue CIA officer harassing Plaintiff. Plaintiff assumes that he should not

have been contacted again by Roughan after lodging such a complaint against him

through official government channels. *Bivens* provides a cause of action against such

violations.


103. Plaintiff Vasaturo is also entitled to court costs as well as reasonable

attorneys' fees, should he henceforth be represented by an attorney before this Court.

V

SECOND CAUSE OF ACTION

(Conspiracy)


104. Plaintiff incorporates herein, as though fully set forth, all of the allegations

contained in paragraphs 1 through 103, above, as though fully set forth.


105. Plaintiff alleges that it was not, in fact, a coincidence that Peterka

appeared one day while Plaintiff was visiting Berkeley and subsequently made several

trips to Japan while still a graduate student at UC Berkeley, ostensibly, to visit me and

his friends at Goldman Sachs in Tokyo. Plaintiff has supplied the email (with header

information) from 2003 in which Peterka gave Plaintiff directions to the residence in

Tokyo of his friends working at Goldman Sachs, etc., to the CIA/OIG.


106. Similarly, Plaintiff alleges that it was not, in fact, a coincidence that

Roughan appeared out of the blue at a bus stop while Roughan was visiting Kyoto in or

around 2004. Plaintiff does not know when the conspiracy to displace him from Kyoto

was launched or by whom, but will seek leave to amend the complaint on the basis of

evidence revealed during discovery. Roughan eventually requested Plaintiff to do some translation work for Mizuho Finance—Roughan's employer at the time—toward the end of 2005 or thereabouts.

107. The severally named CIA field officers, including Peterka, Roughan, Paquette, Blackman et al. conspired among themselves and with others to undertake actions intended to undermine Plaintiff's ability to lead a productive life in Kyoto, targeting Plaintiff's social life as well as livelihood, and thereby violated Plaintiff's privacy and liberty interests protected by the Fourth Amendment, the Fifth Amendment, and the Fourteenth Amendment of the Constitution of the United States of America (*Griswold v. Connecticut*, 381 U.S. 479).

108. Plaintiff suspects that Peterka recruited Kudo, to whom I'd introduced him along with her brother before she moved to Tokyo. Her brother had been living in England at the time and was home for a visit. Plaintiff vaguely recalls Peterka exchanging contact information with one or both of Kudo and her brother. Kudo was subsequently deployed (years later) in an operation aimed at breaking up a somewhat long-term relationship Plaintiff was in at the time that was fairly stable, but not flawless.

Kudo decided to return to Kyoto from Tokyo, where she'd gone to pursue an employment opportunity, in order to enter graduate school and, expressly, to be with Plaintiff. Plaintiff had become comfortable with Kudo again, and allowed the relationship with his then girlfriend to flounder. Kudo's mission was basically part of the scheme to undermine Plaintiff's life in Kyoto, with the ultimate objective of displacing him from Kyoto.

109. Though Kudo did seductively succeed in convincing Plaintiff that he should let the relationship he was in flounder and get back together with her, when she subsequently became pregnant with Plaintiff's child and unilaterally decided to undergo an abortion—something she had earlier insisted she would never do, going so far as to claim it was against her religion—the false pretense was irrefutably exposed.

110. Plaintiff was devastated by the turn of events and loss. The fact that the CIA recruited Kudo as an agent to infiltrate Plaintiff's life with the implied intent of marriage and the abort Plaintiff's child is conduct that should shock the conscience of the court, and such acts violate Plaintiff's rights secured by the Fifth Amendment of the U.S. Constitution. Here, Plaintiff makes references to United States Supreme Court case

Meyer v. State of Nebraska, (1923), No. 325.

> 'No state ... shall deprive any person of life, liberty or
>
> property without due process of law.'
>
> While this court has not attempted to define with exactness
>
> the liberty thus guaranteed, the term has received much consideration
>
> and some of the included things have been definitely stated... the right
>
> of the individual to contract, to engage in any of the common
>
> occupations of life, to acquire useful knowledge, to marry, establish a
>
> home and bring up children...

111. Kudo's behavior prior to the abortion had made Plaintiff suspicious that she had been recruited by the CIA, with Kudo once even making an out of context comment about having "needed the money", but despite those suspicions, Plaintiff would not have believed it beforehand that she would go through with an abortion as described above.

112. Moreover, after the abortion, she tried yet again to interfere with a

relationship Plaintiff was building with a woman Plaintiff had subsequently met

(Plaintiff's future wife). Kudo appeared out of nowhere near Plaintiff's dwelling while

Plaintiff was in the company of his new girlfriend, whereupon Kudo asserted that she

(Kudo) was still Plaintiff's girlfriend, etc., in front of Plaintiff's new girlfriend, blatantly

trying to break up our budding relationship on false pretense.


113. Kudo's recruitment by Peterka et al. occurred in the early 2000s, and her

abortion in 2009, in a continuum of conspiratorial attempts to undermine Plaintiff's life

in Kyoto that continues to this day. The conspiratorial acts described herein have

violated Plaintiff's rights secured under the Fourth Amendment, Fifth Amendment,

Ninth Amendment, and Fourteenth Amendment of the U.S. Constitution. *Biven's*

provides a private cause of action against such violations.


114. Upon information and belief, Plaintiff alleges that the Defendants, and

others, not yet known, conspired between and amongst themselves to unlawfully

intercept wire and oral communications of the Plaintiff and disclose said

communications to others within the United States Government and elsewhere for

personal reasons connected to the objective of displacing Plaintiff from Kyoto.

56

115. Plaintiff further alleges that his computer was hacked and emails exchanged between Plaintiff and CIA officers, in particular, Paquette, were deleted. It is highly probable that said emails would implicate Paquette, for example, in relation to violations alleged herein against him by Plaintiff. Defendant Paquette subsequently closed his long-held personal email account with CompuServe, presumably to prevent the deleted emails from being revealed through the servers hosting that account.

116. The eavesdropping, etc., continued even after Plaintiff had initiated complaints related thereto through official U.S. government channels, starting with Schaeffer at the American Consulate in Osaka. It is almost certain that the eavesdropping continues to this day. Plaintiff does not know how many instances of the unlawful eavesdropping, etc., in violation of Plaintiff's rights guaranteed under the Fourth Amendment, etc., of the U.S. Constitution have occurred; accordingly, Plaintiff will seek leave to amend this Complaint upon becoming apprised of evidence revealed through discovery.

117. Plaintiff has suffered physical assault, been humiliated and embarrassed

and suffered emotional distress, and is entitled to compensatory and punitive damages

in an amount according to proof, including reasonable attorneys' fees (should Plaintiff

obtain services thereof henceforth) and costs.


118. In light of the contents of the reply Plaintiff received from the DOS Office

of the Inspector General (hereinafter "DOS/OIG"), which seem to imply that Schaeffer

was in fact a CIA officer posted to the position of American Citizen Services Officer,

and corresponds to an apparently well-established practice of providing covert CIA

officials ("case officers") with "official cover" (which affords said officers diplomatic

immunity), Plaintiff adduces that Schaeffer and the other named consular officials (i.e.,

Snider and Kennedy) with whom Plaintiff personally exchanged emails (hereinafter, the

three are collectively referred to as "Schaeffer et al.") were CIA "case officers" whose

responsibilities may have included coordinating the CIA "field officers" (i.e., covert

CIA officials without official cover and diplomatic immunity) that were the perpetrators

of the unlawful acts with respect to which Plaintiff had visited the Consulate to

complain about in the first place. In addition, it is also possible that Schaeffer et al.

could have shielded the individual rogue CIA officials about whose misconduct Plaintiff

had made protestation from scrutiny by the CIA/OIG by not reporting Plaintiff's

allegations "through the appropriate channels" after receiving the complaints.

119. Initially there was a complete absence of responsiveness, on the part of Schaeffer, and Plaintiff was compelled to prod a response from Schaeffer on Plaintiff's own initiative, eventually receiving an email reply from Schaeffer stating,

> *"Rest assured that I have taken your concerns on board and will pass them on through the appropriate channels".*

120. Here, attention should be drawn to the fact that the instant case involves an unusual situation in which a federal official (CIA case officer) had been stationed under the guise of impersonating another federal official (DOS American Citizen Services Section Chief); wherein, the public office occupied by the impersonating CIA officer encompasses a fiduciary duty to American citizens overseas, such as Plaintiff, commensurate therewith. That is to say, the CIA officer has been caused to assume a false title and impersonate the role associated with the fictitious title while actually conducting CIA business. Plaintiff alleges that in the instant case, though the misleading representations by Schaeffer et al. were made by "email" instead of postal mail, said

CIA practice of causing its covert officers to assume of the false title of "Chief, American Citizen Services Section", has thereby resulted in violations of the spirit, if not the letter, of 18 USC 1432.

121. Moreover, the instant case presents circumstances demonstrating that in posting covert CIA officers to the post of American Civil Services Officer in order to secure diplomatic immunity for said CIA officers to protect them from being held accountable for violations of Japanese law committed in the course of carrying out the covert operations with which they have been tasked to oversee, the CIA has facilitated the subversion of the Department of State's office of American Citizen Services Officer at the Consulate in Osaka by affording said covert CIA officer an excessive degree of discretionary power. That is evident in light of the apparently misleading response—and deliberate withholding of otherwise necessary information from Plaintiff, (e.g., need to report directly to CIA/OIG, etc.)—with respect to remedying the misconduct of rogue CIA officers described in the protestations made by Plaintiff.

122. Not only did Schaeffer et al. deny Plaintiff the services incumbent upon his office, thereby failing to fulfill his fiduciary duty to Plaintiff, he conspired with

others to deny said services in a purposeful manner to serve personal and political

interests. The situation was perpetuated by the failure of Schaeffer et al. to inform

Plaintiff that such complaints against CIA officers are required to be filed directly with

the CIA/OIG, causing Plaintiff repeatedly file further complaints with the Consulate,

though the complaints were frustratingly ineffective, causing Plaintiff substantial

emotional duress over a period extending into years.


123. Plaintiff alleges that Schaeffer et al. conspired to deflect Plaintiff's

complaints, thereby denying Plaintiff his entitlement and right as an American Citizen

to receive the services commensurate with said office, for personal reasons associated

with promoting their careers in the CIA, etc., intentionally and conspiratorially abusing

the undue discretionary power afforded to them under the circumstances.


124. As is evident from the above-described interactions with Peterka and

Roughan, a plan had already been launched by rogue CIA officers aiming to displace

Plaintiff from Kyoto years before Schaeffer was assigned to the Consulate in Osaka.

Peterka and Roughan both had connections to the finance sector in Tokyo: Peterka was

sent to displace me from Kyoto partly by trying to lure me back to Tokyo to work for

Goldman Sachs; and Roughan, who worked in the finance sector in Tokyo, had also

repeatedly informed Plaintiff of job opportunities there, etc., after Plaintiff had

performed the aforementioned small translations projects for Mizuho Finance. In fact,

Roughan contacted Plaintiff in January of 2012 mentioning that his wife wanted to talk

to Plaintiff about some translation work. Plaintiff discussed the document and market

rates, but didn't do the translation. Roughan last contacted Plaintiff by email in October

of 2012 to complain about Plaintiff's blog postings about Roughan's suspected status as

a CIA officer, etc.

125. As described above, Plaintiff has since come to understand that almost all

of the Westerners Plaintiff has interacted with personally in Kyoto over the years have

been intelligence officers (CIA, MI6, etc.). In fact, the scale of the CIA-coordinated

operations of Western intelligence agencies in Kyoto made it apparent that the CIA et al.

constituted a veritable class unto themselves. Plaintiff was virtually surrounded by

Western intelligence officers from the day he moved into the Villa Tonodan apartments.

Under the circumstances, there was absolutely no possibility that Plaintiff would not

daily come into contact with covert CIA officers in his daily life.

126. As a student of East Asian history and languages, it appears Plaintiff was to be excluded from that class because the knowledge Plaintiff had acquired informed Plaintiff's interests and provided Plaintiff with a bond of affinity that was intrinsically opposed to the readily apparent operations aimed at subverting civil society and rending the social fabric in the ancient cultural and religious capital of Kyoto. The arbitrary acts against Plaintiff by rogue CIA officers and proxies acting on behalf of said officers and in the pay of the Executive Branch of the government of the United States of America should shock the conscience of the court. It is likely that CIA officials in supervisory roles have acted so as to cover up the unlawful acts of the rogue CIA officers reported by Plaintiff, and have thereby facilitated further such violations, said covering up being carried out for personal and political purposes. It is clear that political objectives, such as promoting Osaka Mayor Toru Hashimoto (hereinafter "Hashimoto"), of rogue CIA officers are not necessarily compatible with the foreign policy being pursued by the United States, which raises the question as to the degree to which certain aspects of the agenda being pursued by CIA officers Plaintiff has encountered and exposed coincides with the official foreign policy of the United States. It is clear, however, that Plaintiff was targeted in a conspiratorial manner by rogue CIA officers and continues to be so into the present, as demonstrated by the recent course of events described herein.

127. In short, Plaintiff has been purposefully targeted by rogue members of a

veritable colonizing class of CIA officers intent on displacing Plaintiff from Kyoto

because said officers wished to infiltrate and control the spaces inhabited by Plaintiff in

his normal everyday existence in Japanese civil society in the city of Kyoto. It is clear

that Plaintiff was considered to be an obstacle impeding the achievement of the

corresponding personal goals of each respective rogue CIA officer described herein, and

continues to be so to this day. It is almost certain that other rogue CIA officers culpable

in the violations set forth in this Complaint will be revealed during discovery. Such

targeting, etc., represents a flagrant attempt to deprive Plaintiff of his rights secured by

the Fifth Amendment of the U.S. Constitution ((*Snyder v. Massachusetts, 291 U.S. 97*

*(1934)*); (*Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183

(1952)); ( *Palko v. Connecticut,* 302 U.S. 319, 325-326, 58 S.Ct. 149, 152, 82 L.Ed. 288

(1937))) as well as the Fourteenth Amendment of the U.S. Constitution.


128. Several aspects of that agenda involve religion-and-the-state, as

documented on Plaintiff's blog, and are pointedly at odds with the American

Constitutional doctrines of separation of Church and State as well as the protection of

freedom of religion. Not only has Plaintiff been accosted by CIA officers attempting to

hide their pernicious attempts to misappropriate the Christian religion for use against

Japanese civil society, but has met with personal affronts in relation to his appreciation

of Buddhism, in particular.


129. When Plaintiff settled in Kyoto, the CIA et al. were concurrently

operating two prominent local English language print publications: Kansai Time Out

(hereinafter "KTO"), and Kyoto Journal (hereinafter "KJ"). Plaintiff considers said

publications to have served two basic functions: first, they served as vehicles through

which Western intelligence agencies promoted individual intelligence officers that were

part of the sprawling "intelligence community" network and provided them cover as

photojournalists; and second, they served as vehicles through which disinformation and

propaganda could be spread. Said disinformation and propaganda was generally

intended to (dis)inform public opinion, on the one hand, and propagate a representative

paradigm of Americans and American culture ('Anglo cultural', generally speaking)

tailored to project an intelligibility aimed at furthering the interests of the individual

CIA officer's involved.


130. The Japan Times article this link points to demonstrates the interlinkage

between the intelligence networks and the English language media":

http://www.japantimes.co.jp/community/2011/05/03/issues/its-innovate-or-die-in-today

s-mad-mag-world/#.VaZ3UvntlBd

131. That is, said article features interviews with three (and discusses one

more) intelligence officers Plaintiff has had cause to identify on his blog due to obvious

disinformation they've published, etc.: CIA officer, Eric Johnston (hereinafter

"Johnston "; now a staff columnist with the Japan Times, formerly a KTO contributor),

suspected Irish foreign intelligence service (hereinafter "G2") officer Michael Lambe

(hereinafter "Lambe"; operates blog called "Deep Kyoto", does PR for KJ, etc.), and

suspected CIA officer Colin Buchan Liddell (aka "C.B Liddell"; hereinafter "Liddell";

Japan Times columnist, and author of KTO article (2008) on Japanese Freemasonry,

which Plaintiff has posted on his blog).

132. Plaintiff adduces that Plaintiff's presence broke the mold, so to speak, of

the uniform paradigm the CIA sought to present, as he provided a stark contrast,

demonstrating both fluency in the language, familiarity with history, and an affinity for

some manifestations of Japanese culture. Apparently, that made him a target for

exclusion by the non-Japanese-speaking, imposter Christians, etc., that the CIA (and MI6, G2, France's DGSE, etc.; hereinafter "CIA et al.") had infiltrated into Kyoto in numbers so large as to shock the conscience of the court. The conspiracy described herein has had the objective of displacing Plaintiff from Kyoto as its recurrent theme.

133. At one point, Plaintiff took the opportunity to question suspected MI6 officer John Dougill, who had published a substantial amount of disinformation, including a piece in KTO about Sakamoto Ryoma that Plaintiff found incomprehensibly dubious. Houser had also published in the same magazine, which shut down in 2007 with its website being sanitized from the Internet, and the blog Deep Kyoto being created at the same time, ostensibly by Lambe, apparently aiming to fill the void, etc.

134. Dougill and Houser stopped going to the Starbucks shortly after Plaintiff discussed Dougill's article with him and introduced Dougill to historian Marius Jansen. Plaintiff has discussed some published writings of Dougill and Houser on his blog, and has gone so far as to post copies of a couple of not readily accessible KTO articles, including the aforementioned article by Dougill as well as another on the history of Freemasonry in Japan by Liddell, in their entirety.

(http://kyoto-inside-out.blogspot.jp/2012/04/who-is-preston-houser.html,

http://kyoto-inside-out.blogspot.jp/2012/04/cia-meddling-in-japans-political.html,

http://kyoto-inside-out.blogspot.jp/2012/04/ciami6-led-pincer-assault-on-civil.html,

http://kyoto-inside-out.blogspot.jp/2014/08/why-i-have-written-about-freemasons-3.htm

l).

135. Plaintiff has gone to the trouble of illustrating the above-described

connections because the extent of the CIA's activity here in Japan is so conspicuous that

it should shock the conscience of the court. The blatant promotion of intelligence

operatives through intelligence network operated/influenced media outlets, including

the country's leading English language newspaper, and otherwise high-profile activities

of CIA officers are so readily apparent to an educated eye as to leave one dumbstruck,

and could not be missed unintentionally. The intelligence officers must have been aware

of that.

136. More recently, the CIA et al. have moved into social media, such as

Facebook, attempting to enable the ludicrous number of officers stationed in Kyoto, for

example, to present themselves as normal citizens to civil society. Furthermore, they are

promoting CIA-front businesses on Facebook as well, such as "Deep English",

ostensibly owned and operated by Douglass and Aaron Campbell (hereinafter

"Campbell"), another veteran of CIA-front Global College Friends World who appears

in screenshots from archived webpages posted on Plaintiff's blog. The CIA does not

seem to care that I have exposed Douglass and Campbell; they have simply recycled

them.


137. Plaintiff has examined a few pieces published in the Japan Times, which

contained outlandishly fallacious (dis)information or promotional material pertaining to

other intelligence officers, on his blog and duly exposed the CIA officers whose names

were on the by-line. The first such piece was by Johnston, and purported to be about the

history of the first capital of Japan, Nara:

(http://kyoto-inside-out.blogspot.jp/2011/10/who-is-eric-johnston.html). The second

piece was by an associate professor of law at Doshisha University, Colin P.A. Jones

(hereinafter "Jones") that included blatant misrepresentations of the Japanese

agricultural co-op and a conspicuous absence of discussion about the highly subsidized

American agribusiness sector, lacking even the semblance of balance, and representing

a propaganda piece promoting the Trans-Pacific Partnership:

(http://kyoto-inside-out.blogspot.jp/2014/10/who-is-colin-p-jones.html). The third was

by suspected CIA officer Kris Kosaka (hereinafter "Kosaka"), and was a purely

promotional piece on suspected CIA officer Lotman, and aimed to impart Lotman's

personage with a false stature as a literary figure/photographer, belying a scheme to

promote his false ascent in Japanese civil society:

(http://kyoto-inside-out.blogspot.jp/2013/05/who-is-sean-lotman-just-some-connected.h

tml). Lotman has a substantially non-existent history—let alone career—as a writer, and

Plaintiff had previously noted other suspect promotional pieces by Kosaka.


138. There is a particular significance to Plaintiff regarding the article by

Kosaka, because Lotman had married a woman whose family runs a noodle shop in

Plaintiff's neighborhood, and the article was published subsequent to Plaintiff's

protestations filed with Schaeffer et al. regarding Dalsky and Bray, and blog posts about

Bray and Dalksy that addressed issues specific to Plaintiff's neighborhood. Plaintiff's

neighborhood has been intensively targeted by the CIA. Plaintiff had considered naming

Kosaka as a defendant in the instant case, but has decided to wait until further evidence

regarding the objectives of the false promotional piece she published about Lotman are

revealed through discovery. Plaintiff has only seen Lotman once in Kyoto; however, in

light of the recent developments related to Zimbleman, Plaintiff expects substantial

evidence to come to light during discovery.

139. Another example of an attempt to establish a covert CIA officer active in

Plaintiff's immediate surroundings as a high-profile member of civil society can be seen

in the case of Blackman. After Plaintiff had reported Blackman to the Consulate in

relation to the fraudulent offer of translation work, the CIA had him right back to work

nearby; Blackman describes himself online as having "co-founded" "the largest English

language school (English Buffet) in Kyoto" in 2010

(http://anthonyblackman.brandyourself.com/). Granted, as that is self-promotion,

perhaps it simply reflects a degree of desperation on the part of Blackman himself.

Blackman subsequently left that school (which is not far from Plaintiff's residence)

shortly after Plaintiff posted a blog post including evidential emails and documenting

his reappearance. Blackman currently appears to be teaching at a school near his

residence

(http://www.eieigo.net/%E3%83%9B%E3%83%BC%E3%83%A0/%E8%AC%9B%E5

%B8%AB%E7%B4%B9%E4%BB%8B/). In any case, the school English Buffet is yet

another 'intelligence community' front, and Plaintiff can confirm that he has met,

several times at the Starbucks, a suspected MI6 officer named Andy Couzens who

teaches there (Couzens is also a presenter at suspected CIA et al. front PechaKucha,

which is organized by Luong and Sasaki, and the France-sponsored Kyoto Nuit Blanche

event).

140. Prior to lodging a complaint with the American Consulate in Osaka,

Plaintiff submitted an online application to the CIA offering to serve as an independent

contractor, stipulating the condition that he would maintain continuity in the lifestyle

he'd been leading, and not interrupt or undermine the various scholarly and cultural

pursuits in which he was actively engaged.

141. The decision to submit the application was not made out of the blue

without prompting, but on the basis of prompting in the form of a surreptitious

intimation by Paquette that he was acquainted with a close friend whom Plaintiff did

assume had entered the CIA. That friend (to be named in a subsequent sealed filing) had

visited Plaintiff in Japan in the year 1998 or 1999 while Plaintiff was living in Tokyo.

After the problems with CIA officers in Kyoto escalated to the point of Plaintiff's

having to report them to the DOJ, Plaintiff cc'd said friend's old Hotmail account a

number of emails sent to the Consulate and the DOJ. Said Hotmail account appears to

have been deactivated within a year or so after the first such cc'd email.

142. In retrospect, it has become clear that Paquette may have had more than

one motivation for encouraging Plaintiff to submit an application to the CIA; in

particular, with respect to the electronics communications provisions related to

applicants found in Executive Order 12333, and triggering a clause therein that could be

seen to authorize electronic eavesdropping and the like against Plaintiff.

143. Plaintiff received no reply from the CIA and had not expected to receive a

positive reply from the CIA to his offer. However, the actual disposition of the CIA was

not clear in light of developments on the ground, which oscillated between the

projection of empathy from CIA officers amid positive signs that there might be an

effort afoot to integrate Plaintiff into the local intelligence network, on the one hand,

and continued harassment, on the other.

144. The first concrete evidence of such oscillation occurring after Plaintiff

submitted the application to the CIA appears in the form of emails Plaintiff exchanged

with Blackman. Blackman was introduced to Plaintiff by Paquette for the purpose of

making Plaintiff a fraudulent offer of translation work. After much pointless wrangling

about rates and discussion of various potential projects, it became clear that Blackman

was attempting to manipulate Plaintiff, whereupon Plaintiff decided to call the Japanese

client at his company's office (information provided by Blackman), and discovered that

the proposed job had already been done. Plaintiff also learned that the translation

company called TSA Blackman claimed to be running did not exist. Plaintiff confronted

Blackman in an email and accused him of being a CIA officer and harassing Plaintiff.

Plaintiff also confronted Paquette, who denied complicity and placed the blame on

Blackman in terms of a profit motive.

145. The above-described interaction with Blackman represented a blatant ruse

aimed at interfering with Plaintiff's pursuit of a lawful livelihood, and caused Plaintiff

to divert his time and effort in pursuit of a fraudulently represented job offer with a

non-existent enterprise. Moreover, the collaborative effort between Paquette and

Blackman was a conspiracy intended to entangle Plaintiff in a humiliating and

demoralizing pursuit of said fraudulently represented offer of work, and presented

Plaintiff with the first material evidence, in the form of emails, that Plaintiff could

submit to U.S. government officials, which Plaintiff assumed were the proper

authorities, in order to demonstrate, with proof, harassment by rogue CIA officers.

146. The further mention of an offer of work by Paquette without following

through as well as same from Roughan led Plaintiff to consider including a RICO claim,

but considering the scope and lack of material damages, Plaintiff decided against that.

Plaintiff was not sure whether other acts could be tied together with those, such as

Kudo's abortion, for example. Should evidence be revealed during discovery that

indicates that violations of RICO may have occurred, Plaintiff may seek leave to add a

RICO claim to the complaint.

147. Another incident involving Roughan, after the emails he had sent Plaintiff

regarding his wife's pregnancy—which had demonstrated the existence of a conspiracy

as far as Plaintiff was concerned—involved a threatening series of emails Roughan send

Plaintiff trying to intimidate Plaintiff into removing blog posts Plaintiff had made about

Roughan and his suspected status as a CIA officer and connection to the network of

intelligence officers in Kyoto. Furthermore, Roughan also accused Plaintiff of operating

"an illegal business". Roughan's malicious accusation (and implied threat of retaliation)

clearly demonstrates a preoccupation on Roughan's part with Plaintiff's livelihood.

Roughan chose to threaten and attempt to intimidate Plaintiff instead of simply filing a

civil suit for defamation, which was basically the false accusation he was making.

148. Moreover, the above-described two incidents involving Roughan both

occurred after Plaintiff had reported him for harassment to the American Consulate in

September 2009, as evidenced by the initial email exchange with Schaeffer. Apparently,

the CIA believes that harassment does not constitute an invasion of the right to privacy

of a private American citizen residing overseas as secured by the U.S. Constitution.

149. Wessel had been another CIA officer that frequented the Starbucks and

had attempted to convince Plaintiff that Kyoto wasn't the place for him. A woman that I

later learned was his girlfriend, named Ai, had apparently been used as a proxy against

Plaintiff. She also appears to have been removed from Kyoto at this juncture.

150. Further, it appears that two individuals Plaintiff was friends with while

serving in the U.S. Army—Taylor and Kiely—have been indirectly involved in

the-above described conspiracy to displace Plaintiff from Kyoto. The primary indication

of their involvement was the appearance in Kyoto of an individual that went by the

name of Scott Harris (hereinafter "Harris"), who claimed to be from Canada and

subsequently visited Kyoto several times from Thailand, where he claimed to be

working as an English teacher. Plaintiff doesn't know if Harris provided his true name,

or if he actually was Canadian, and suspects that Harris may have been a CIA officer.

Meanwhile, it would not appear to be unusual for the CIA to have used a proxy from

Canadian intelligence. Plaintiff may seek leave to amend the complaint with respect to

Harris, as appropriate, based upon evidence revealed through discovery.


151. Harris tried to sell me on Thailand as a desirable destination, but Plaintiff

made it clear to him that Plaintiff wasn't interested in going to Thailand. Plaintiff

indicated to Harris that Plaintiff thought Kyoto was the nicest city in Asia, and had

reasonably clean air to boot. Plaintiff further emphasized the fact that he was a specialist

in East Asian languages who translated patent specifications professionally, and was a

student of Japanese history and culture. It appeared to Plaintiff that Harris was partly on

a recruiting mission, and partly spying on Plaintiff. Plaintiff has reported the suspected

involvement of Taylor, Kiely and Harris to the CIA/OIG in conjunction with the

investigation of the complaints set forth herein, though Plaintiff has not yet produced

the many pages of emails he exchanged with Harris over a period of several years.

152. Both Taylor and Kiely appear to have joined the CIA and subsequently been stationed in Thailand for many years starting in the 1990s, with Taylor subsequently doing a stint in Tokyo. Taylor had tried to sell me on the idea of Thailand before he eventually made it to Tokyo. He never visited me in Kyoto during his three-year stint, despite saying that he would and wanting to visit the city. Plaintiff did visit Taylor and his family once or twice in Tokyo.

153. Plaintiff suspect that Taylor and Kiely were involved in dispatching Harris to Kyoto because the best they could do as low-level CIA operatives was to try and convince Plaintiff to leave by offering an alternative, at the behest of their co-conspirator CIA cohorts. Plaintiff has kept in touch with Taylor over the years, and assumes that he was also acting to protect an old friend. Plaintiff thinks that such practices on the part of the CIA should shock the conscience of the court, and it is with heavy heart that he finds no adequate alternative to naming said individuals as defendants.

154. Scott Harris showed up in Kyoto in 2007, and the first email Plaintiff has from him are dated to June 2007; the last, April 2012. Plaintiff conveyed to Taylor via email complaints about being set up to be physically assaulted at a local bar Plaintiff had arranged to meet a CIA proxy named Yoshiyuki whom Plaintiff had met through Mike and Paquette, and other harassment by CIA officers and other intelligence officers and proxies. In Taylor's reply of December 12, 2007 to one such email, he stated, "Sounds like you need to find a new crowd in Kyoto". Normally, that might sound like reasonable advice, but under the circumstances, that would simply require Plaintiff to avoid all public venues, such as cafes, bars and the like, frequented by covert CIA officers and their proxies, which constitute a group that has collectively sought to colonize civil society in Kyoto.

155. While Plaintiff is not aware as to whether or not Taylor reported, as apparently is required under EO 12333, Plaintiff's allegation that he had been subject to a criminal attack encompassing a conspiracy involving rogue CIA officers. Plaintiff has noted the correspondence between the appearance of Harris from Thailand and his attempts to encourage Plaintiff to leave Kyoto for Thailand, and the fact that Taylor and Kiely had been stationed in Thailand for many years. Furthermore, the various time

frames at issue coincide.

156. Here, Plaintiff cites a paragraph from an email addressed to Snider that

Plaintiff sent on October 20, 2011 to the American Consulate in Osaka, the email

having subsequently been provided to the DOJ as well:

> *After being attacked in the bar called the HUB, the next time I*
>
> *was in there I was talking to a guy named Marcus, a German doing*
>
> *something at Kyoto University in the Science, and obviously an*
>
> *intelligence dweeb. We were talking about the attack when I was*
>
> *compelled to come out and say loudly that Glenn was in the CIA,*
>
> *whereupon Marcus tried to deny that and quickly change the subject to*
>
> *the guy who had attacked me, telling me he was Moroccan and trying to*
>
> *get me interested in other information. More recently, after the topic*
>
> *again came up with a Dan Douglass assuming a higher profile,*
>
> *apparently more time to spend at the café after losing his job, whereupon*
>
> *he also tried to put me on the trail of the Moroccan guy, telling me the*
>
> *guy was studying martial arts and that Dan, too, had found him to be an*

*individual with a chip on his shoulder. In summary, both Marcus and*

*Dan tried to steer me onto a revenge trail against my attacker in order to*

*divert my attention from analyzing the setup and those behind it.*

157. At the time, Plaintiff had been under the impression that many of the CIA officers were Freemasons, for various reasons, including his study of history. On the other hand, Plaintiff would also refer to Freemasons as a euphemism for Judeo-Christian co-religionists when discussing Buddhism and the Western intelligence agencies and officers in Kyoto, as can be seen in the title of an email exchange with Paquette from 2007, only a trace of which remains:

*"republicans, free masons and buddhism, and more!!!!*

*TABOO =_= DELEEEEET_..."*

158. Plaintiff had begun discussing related aspects with Paquette, in particular, starting around 2005 or thereabouts. For example, Plaintiff showed Paquette a book he had read by Malcom Barber, a British Medievalist, the book being "The Trial of the Templars", in which Barber examines the trial by Philip the Fair of France of the "Poor Knights of Christ of the Temple of Solomon", along with another book Plaintiff was

reading, "Counsel to the President", an autobiographical book by Clark Clifford (with

Richard Holbrooke) recounting Clifford's stint as counsel for President Truman. Those

books served as a basis for discussing religion and the state, the military industrial

complex and President Eisenhower, etc., with the focus eventually being brought

around to Japan and Kyoto. One juxtaposition that Plaintiff recalls using in a

conversation with Paquette—and perhaps in the deleted email—in regard to the

crusading Templars and Freemasons in the CIA was that the only "temples" that

Plaintiff thought Kyoto needed were Buddhist temples. Paquette did not seem to find

that analogy very amusing. Plaintiff eventually posted a brief entry on his blog (circa

2012) with some of the relevant references:

http://kyoto-inside-out.blogspot.jp/2012/07/eisenhower-philip-of-france-truman-war.ht

ml


        159. Another reason, however, that Plaintiff broached the question of

Freemasons was the connection that materialized out of nowhere between Abdelsamad

and David Chapman (hereinafter, "Chapman"), a friend from Berkeley with whom

Plaintiff had remained in contact to some extent. Chapman is married to a Japanese

national, and he proclaimed to Plaintiff a number of years ago that he was considering

moving to Japan. Plaintiff is as certain as a non-Freemason can be that Chapman is a

Freemason in light of various circumstances and occurrences during our personal

interactions over the years, upon which Plaintiff can elaborate, as necessary. In short,

the connection between Chapman and Abdelsamad and the subsequent impact thereof

on Plaintiff (upon which Plaintiff will elaborate in due course, as appropriate) are

evidence of Abdelsamad's role in the conspiracy. Plaintiff, as a matter of course,

presumes that the connection between Chapman and Abdelsamad was based on

Freemasonry (i.e., that both are Freemasons), but, even more importantly, that

Abdelsamad was a CIA officer, which Plaintiff believes that evidence revealed during

discovery will prove. Abdelsamad was a student at Kyoto University, at which Glenn

Paquette had been teaching, and he also frequented the Sanjo-Ohashi Starbucks,

occasionally in the company of a woman he said was his wife. It should be noted that

the article in the Kansai Timeout about Freemasonry in Japan had been published in

May, 2008. Aside from the fact that Plaintiff believes that Abdelsamad was involved in

a conspiracy in which he undermined Plaintiff's friendship with Chapman for personal

reasons related to his desire to remain in Kyoto, like the other CIA officers that sought

to displace Plaintiff from Kyoto, on the outside chance that Abdelsamad is (was) not an

officer or agent of the CIA (or MI6 proxy, etc.), it would only be because he is a

Freemason.

160. Another disturbing aspect about Paquette was that he had been dating female college students that were working as hostesses, and had attempting to discuss the plight of one or two of such women with Plaintiff. However, as Plaintiff mentioned in complaints to Schaeffer et al., Paquette appeared to be intent on promoting the adult entertainment industry businesses operated by Japanese organized crime groups in the neighborhood, and attempted to accost Plaintiff when he didn't exhibit an inclination to be supportive of that sort of attempted misappropriation of the Starbucks.

161. It should be noted that, in the interim, historically significant measures have been implemented by the Japanese Government that have bearing on the instant case; more specifically, the "Organized Crimes Exclusion Ordinances" that came into effect on April 1, 2011 in Kyoto. In short, the Ordinances are aimed at excluding organized crime groups from civil society. Plaintiff has encountered a number of instances in which the CIA/MI6 et al. appeared to be operating on the premise of cultivating contact with individuals/groups associated with said organized crime groups. Meanwhile, considering that the CIA et al. have endeavored to present themselves as an

"expat community" and constitute a virtual class unto themselves, insofar as the CIA et

al. have been seeking to colonize civil society in Kyoto, the association of covert

officers of the CIA et al. with persons associated with Japanese organized crime groups

can be said to have served an enabling role with respect to the activities of said persons

into Japanese civil society in Kyoto.


162. For example, Plaintiff has disclosed his findings related to the so-called

"college" at which Plaintiff's long-term neighbor Douglass had been working, but with

respect to which Douglass had been deceptively secretive about. The Wikipedia entry

for LUI Global describes it as "a discrete educational entity of Long Island University",

which has since removed all information regarding the "Japan center" from their

website, and the Wikipedia article describes it as "suspended". A web-archive page

(http://web.archive.org/web/20071217023809/http://www.brooklyn.liu.edu/globalcolleg

e/about/history.htm) of the former website of the "Japan center" shows the following

paragraph in the introduction.


*Founded by the New York Yearly Meeting of the Society of*

*Friends (Quakers) in 1965, Friends World (now Global College),*

*became nonsectarian in the mid 1970s. In the 1991-92 academic year,*

*Friends World affiliated with Long Island University. Long Island*

*University is accredited by the Commission on Higher Education of*

*the Middle States Association of Colleges and Schools*

163. Here, it should be noted that Plaintiff had posted a link on his blog to a

video, which was available on YouTube at the time, which has subsequently been

denoted as "private". Given the nature of the situation, Plaintiff decided to post on his

blog the version of that video that he had personally downloaded and archived. Plaintiff

is fairly certain that every individual featured in said video is an intelligence officer in

the CIA et al.

164. In fact, the "Japan Center" of LIU Global College Friends World was a

CIA-front organization at which one CIA officer (Houser) had been teaching a course of

which the syllabus seems to demonstrate a sympathetic disposition to the situation of

the former outcaste class of people known as the Burakumin in Japan, who are

predominately found in the Kansai area in which Kyoto is located. According to

Japanese police statistics, Burakumin account for 60% of Japanese organized crime

groups, ethnic Koreans 30%, with the remaining 10% being Japanese not of Burakumin

descent. The "Japan center" was closed in December, 2009

(http://web.archive.org/web/20110824104645/http://www2.brooklyn.liu.edu/globalcolle

ge/worldwide.html). On this web-archive page, it can be seen that their website hosted

links to other CIA et al.-front groups, such as English languages publications KTO,

Deep Kyoto, Kansai Scene, and the Kyoto Visitors Guide.


165. The Starbucks at Sanjo-Ohashi is located approximately one mile north of

the corporate headquarters of the largest organized crime group in Kyoto. The group

operates numerous drinking establishments and sex shops in the vicinity, the latter being

opened after an elementary school in the neighborhood had been closed under

questionable circumstances in 1995. One aspect of the Starbucks is that it has been

targeted by the proprietors of such businesses to fish for clients.


166. Douglass had also been employed at said "Global College", which in fact

consisted merely of a rented small two-floor house in a residential district inaccessibly

far up in the hills to the northwest of the city center. I had known Douglass for many

years, as he had lived two doors down in the same apartment building, Villa Tonodan,

where Plaintiff had resided for approximately ten consecutive years. In retrospect,

Plaintiff has come to understand that the occupancy of Villa Tonodan was comprised of

at least 1/2 intelligence officers from the CIA/MI6 et al. Said individuals include, for

example, John Benson, Frank Carter, Paul Crouse, Ryan Buttigieg, and several others

with whom I'd been personally acquainted but no longer recall their names. Plaintiff

was virtually surrounded by Western intelligence officers while residing in that

building.

167. With regard to the scope of the CIA's operations here in Kyoto, there are

other networks that I have exposed only to a limited extent. One is the network

associated with suspected CIA officer John Einarsen (hereinafter "Einarsen") and the

KJ, which has become a digital only publication in recent years, and another to the

event called The Flame held at Papa John's café operated by Roche. Both of those

networks are long established, with the two named individuals having first arrived in

Kyoto in the 1970-80s, I believe. Plaintiff is aware of still other veteran CIA officers

that have been active in Kyoto whom he can identify, etc., as appropriate.

168. Brian Schultz (aka Brian Uneme, a suspected South African intelligence

officer; hereinafter, "Schultz") was a suspected CIA proxy connected to the KJ network

who had been studying the shakuhachi, a Japanese bamboo flute that I also study. He

sometimes took lessons from Houser, whom I suspect may have been operating behind

the scenes coordinating Schultz efforts to interest me in the KJ group, etc. Schultz had

invited me to join a monthly meeting of the KJ crowd held by Wachs at a small temple

(as I recall) near the Yoshidajinja shrine. I declined, as I was fully engaged with my

own scholarly and cultural pursuits, and mentioned that I considered the KJ to be a form

of superficial, glossy photo-journalism that was basically incompatible with the pursuit

of genuine scholarship.

169. Here it bears noting that the network established by the CIA et al.

basically seems to have one or more officers involved in every cultural pursuit that is

found in Kyoto (a not insignificant number); that is to say, the CIA and cohort

intelligence agencies appear to be attempting to monopolize the social scene in civil

society by establishing a comprehensive network encompassing the entirety thereof.

Accordingly, said CIA et al. are effectively engaged in a strategy that is premised on

creating networks that are dependent on the ability of the intelligence officers to exclude

(or incorporate) private citizens such as Plaintiff that happen thereupon in the normal

course of their activities.

170. In this regard, the case of Houser is illustrative with respect to Plaintiff's

plight, as both of us study the same form of traditional Japanese music associated with

Zen Buddhism and are familiar with its history. That is part of the reason that Plaintiff

felt compelled to expose Houser after discovering in his published writings some

misrepresentations of the history of the musico-religious tradition which had political

import. That is a common tactic I've illustrated elsewhere, as described above with

respect to disinformation on the history of Nara in the Japan Times, for example.

171. Furthermore, with respect to Houser, it will now be necessary for Plaintiff

to explain all of this to Houser's teacher, who was a student of Plaintiff's teacher.

Plaintiff has made polite excuses why he has been unable to accept the open invitation

to visit Houser's teacher at his residence in Kyoto because of this situation, though

Plaintiff has performed ensemble pieces with Houser's teacher's wife, who plays string

instruments, in a couple of practice sessions, and met Houser's teacher occasionally at

musical events.

172. Plaintiff notes that he has never personally had any problems with Houser, and has interacted with him on a superficial basis in civil society in a cordial manner. Accordingly, Plaintiff's allegations against Houser have to do with whether he was involved in coordinating the activities of a proxy from South Africa who was an occasional student of his, Brian Schultz (aka Brian Uneme). The same is true for Wachs, whom Plaintiff has never met, but heard about through Schultz.

173. It bears drawing out the fact that an individual interested in culture, tradition and history for their intrinsic value would have to go against their conscience to engage in the type of betrayal of the tradition by disseminating disinformation about it for political purposes, such as in the case of Houser. Meanwhile, because Houser was not a scholar of East Asian history and language when he joined the CIA, he would have been more receptive to the notion at the time of his deployment to Japan. Plaintiff has repeatedly made it clear to a succession of CIA officers as well as government officials at multiple agencies that he did not approve of the pernicious sociopathic activity of the sort he has documented on his blog; therefore, it is obvious that Plaintiff would not act against his conscience to partake in depraved acts. Moreover, any attempt by a state actor, such as a covert CIA officer, to coerce Plaintiff to act against his

91

conscience would amount to a violation of Plaintiff's rights protected by the First

Amendment of the U.S. Constitution.


174. Over the course of the past five years since first visiting the American

Consulate in Osaka to make protestations in person about harassment by rogue CIA

officers, a succession of newly introduced or re-introduced individual CIA officers and

proxies have appeared at the Starbucks and attempted to engage Plaintiff in a cordial

manner, apparently with the aim of further spying on me and/or delaying Plaintiff's

efforts to draft this Complaint by leading Plaintiff to believe that the CIA was about to

accept his earlier offer to serve in the capacity of independent contractor. Plaintiff

attempted to engage such individuals in good faith, but their disposition would

sometimes change suddenly, becoming overtly hostile at times, belying a subterfuge or

ulterior motive.


175. CIA officers that were newly introduced after Plaintiff had initiated his

complaints with Schaeffer et al. include, for example, Dalksy and Bray. Plaintiff first

encountered Dalsky at the Kamogawa river where Plaintiff practices the shakuhachi (a

Japanese woodwind instrument) and takes his children to play. Dalsky was there with

his daughter one day when Plaintiff had come down with a virulent cold. Dalsky made a

somewhat untoward snidely comment when Plaintiff told him Plaintiff was sick.

Plaintiff played off the remark as a joke, but was immediately put on guard.

176. The next time Plaintiff saw Dalsky was at the nursery school with respect

to which Plaintiff had to sue the city administration in order to gain admission. Dalsky's

daughter had only been granted a one-day a week attendance at the time, as the school

has a wait list. Under the circumstances, it seemed in order to mention to Dalsky that

Plaintiff had been compelled to sue the city of Kyoto to get his son into the nursery

school. That discussion worked its way around to the topic of history and Kyoto, and

Plaintiff mentioned Marius Jansen's book on the Meiji Ishin. Plaintiff also offered to

send Dalsky and another guy (suspected MI6 officer David Chandler, associate

professor at Doshisha University; hereinafter, "Chandler")) whose daughter was

attending the same nursery school a link; here, the response—this time from both

individuals—was that neither of them wanted to exchange email addresses, and that

seemed rather unusual, not to mention unsociable.

177. The next time Plaintiff talked to Dalsky Plaintiff mentioned that the mayor

of Kyoto had lost a pair of civil suits that had been brought against him for the illicit

provision funds to companies affiliated with Japanese organized crime groups

consisting primarily of Burakumin, and mentioned that Plaintiff was having problems

with some CIA officers. Dalsky seemed somewhat taken aback, and Plaintiff didn't see

him around for a couple of weeks.

178. When Dalsky did show up, once again along the banks of the Kamogawa

river, his disposition was noticeably altered, and after talking for a few minutes, during

which he brought the conversation around to his situation at Kyoto University and some

problems he had there, he revealed to Plaintiff that Dalsky was suffering from bipolar

disorder. Plaintiff offered his sympathies, and Dalsky started talking about his

medications, saying that they helped take the edge off. He offered the medications (three

types) to Plaintiff, saying that they helped take the edge off. Plaintiff responded that he

needed his edge, and politely declined, but accepted a few pills from him when he

insisted, with Plaintiff saying that Plaintiff would look the pills up on the Internet to see

what they were.

179. The conversation then turned to a specific episode that Dalsky described

as having occurred at Kyoto University. He started by mentioning that there was an

intramural sports team that was called "the gangsters", and claimed that he had once

pulled a fire alarm near his office because he thought that the Chinese occupying in the

next room were spying on him. He presented the story in a convincing manner, evincing

a palpable degree of emotional instability and edge, but Plaintiff always had the

impression that Dalsky was engaged in some sort of impromptu performance, and

recalls thinking that Dalsky might be a decent spy, if he had a legitimate target.


180. Plaintiff played along with the skit, asking Dalsky why the Chinese would

want to spy on him, whereupon his countenance changed expression, and he said, "that's

just it, they weren't, I was delusional", or words to that effect. Plaintiff then mentioned

that there certainly were problems at Kyoto University, and described his experience in

dealing with Paquette. Plaintiff explained how Paquette appeared to have been

recruiting his students and colleagues at the university as agents for the CIA, and

deploying some them against Plaintiff at the Starbucks. As it had become obvious that

Dalsky was trying to convey the message that Plaintiff might be clinically delusional,

Plaintiff also mentioned that he suspected Paquette might also be a Freemason that had

infiltrated the CIA, etc. Dalsky professed his faith (Christian, Plaintiff presumed), and

asked Plaintiff if Plaintiff was a religious person.

181. At this point, Dalsky said something to insinuate that when Plaintiff talked

about the CIA and what not Dalsky thought that maybe Plaintiff was demonstrating that

he was out of touch with reality. Plaintiff responded that he was certainly not delusional,

and emphasized that he had to resort to filing a complaint with the DOJ to have

Paquette removed. Dalksy became reflective for a moment, and eventually asked that

Plaintiff return his medications, claiming that they were expensive, and that his wife

didn't give him much pocket money since they had bought a condominium. He then

emphasized that he was "all in, man", which Plaintiff subsequently learned was a phrase

that echoed a statement made by President Obama regarding the so-called "pivot to

Asia" as well as the title of Petraeus' ill-fated biography.

182. Plaintiff attempted to report Dalsky to the Japanese police, but was told

that since I had returned the drugs, there was no proof, and that the exact nature of the

drugs would be at issue. Plaintiff also attempted to report the incident to the

administration of Kyoto University, to no apparent effect.

183. Plaintiff subsequently looked up Dalsky's email address at the university and sent the following email discussing religion—which he had raised—and various connections between religion, intelligence agencies (including the CIA) and organized crime as well as scholarship, including links to specific works, while the encounters were fresh in mind. Dalsky did not send Plaintiff a reply to the following email, even though Plaintiff provided the social psychology professor who had attempted to manipulate Plaintiff psychologically in part by making an appeal to religion, and in part by insinuating that he was delusional, plenty of material with which to follow through in relation to those maneuvers in rhetorical space. It was apparent that Dalksy was not going to present Plaintiff with any emails which might subsequently serve as evidence, but the following email illustrates important context as well as the good faith efforts Plaintiff has continually made to engage the CIA officers with respect to the matters at hand.

*Please excuse the sudden intrusion via email.*

*My mind is a little blunted at present due to whatever*

*physical ailment I have, which seems to be affecting my brain a little,*

97

*so your big question about religion wasn't processed as quickly as it might otherwise have been.*

*Anyway, you asked me if I was religious, and I thought I should write this out while it was on my mind. I certainly can't say that I am religious compared to some people—like Muslims that pray five times a day—though I guess I'm more religious than others. I am not necessarily against religion per se. On the other hand, with respect to the religion in which I am currently most interested—Mahayana Buddhism—one important teaching relates to the accommodation of the thoughts of others, including religious beliefs. In that manner, Buddhism is a fairly open religion, and what is sometimes referred to as a "doctrine of accommodation" is an aspect of Buddhism that contributed to the development of a syncretic belief system in Japan. There is, perhaps, a built-in recognition (some might call it an insight) of the anthropological origins of religion, in that doctrine. Maybe that is an aspect in which I find resonance.*

*At any rate, you seem to show a little aversion to my talking critically about the incomprehensible publishing of highly flawed*

*research by Americans that are putting out a bigoted agenda against*

*Buddhism, sometimes anti-Japan overall. Anyway, here is a link to the*

*now retired professor whose book I recommended to you.*

*http://www.umich.edu/~iinet/media3/cjs/10-11/borgen_20101014/*

   *Maybe I'm stereotyping, but it seems likely to me that he is*

*Jewish. I've met many Jews in academia. As I mentioned though, he is*

*a normal scholar whose research does not reflect a warped*

*epistemology or attempt to manipulate the reader by withholding*

*information, etc. His work has opened up the horizon [f]or students of*

*the relevant subject matter, and in a manner that critically examines*

*the misuse of superstition and lies by what was in effect a politically*

*powerful priest caste family against a scholar. That is also noteworthy,*

*because the pseudo-scholars I am trashing would seem intent on*

*fashioning themselves as a sort of priest caste.*

   *Anyway, the point is that religious bias probably has no place*

*in scholarship. That is not to say that research supporting or*

*elaborating a certain belief system is not valid. That is not the type of*

*content that I am addressing with respect to the three individuals*

99

*connected to Columbia University. And I have already addressed*

*some similar problems in the work of a PhD from Oxford, so there is a*

*pattern. That guy is a British MI6 agent, who recently published a*

*book on Christians in Japanese history. His PhD is in Slavic studies,*

*however, so it is little wonder that his knowledge of Japan is limited.*

*Incidentally, there used to be a problem in Kyoto with*

*transient Israelis selling cheap jewelry, etc., on the streets, working*

*through an Israeli guy that was connected to the yakuza. They were*

*eventually shut down about 6-7 years ago. I don't know if you had*

*arrived in Kyoto before they were already gone. They had basically*

*colonized the walkways, glad to see them gone.*

*By the way, here is another link, to the talk by the other*

*author, Robert Whiting on the yakuza, the CIA, etc.*

*http://fora.tv/2012/02/16/Tokyo_Underworld_2012_An_Evening_with*

*_Robert_Whiting*

*The historical connection between the CIA and the yakuza /*

*right wing nationalists is also not something that I have imagined.*

184. Dalsky has subsequently approached me once or twice along the river, the last time a couple of months ago, when he muttered something about belonging to the IRS, not the CIA, and that Plaintiff shouldn't mess with the IRS.

185. Bray had also approached Plaintiff during approximately the same time frame. Apparently, Bray lived in the same neighborhood, and seemed to be trying to convince Plaintiff to leave. Bray indicated that he was divorced from his wife, who was Japanese, but that they had a son who went to the same schools in the neighborhood that my son would attend. He indicated that the schools didn't measure up to the hype of their reputation, which Plaintiff knew nothing about beforehand. Bray also said that his son was working a lousy job at a local restaurant (El Fogon), and had decided to go to go to college in the USA.

186. Bray seemed to be trying to convey that the path he had chosen was a dead end, but that there was still hope for Plaintiff if Plaintiff didn't make the same mistakes as him, such as educating my children at the local schools.

187. Plaintiff talked a fair amount about his experience in having to sue the city

to get his son into the nursery school, and Bray suggested that Plaintiff didn't really

want to send his kids to that school and should drop the suit. Bray said that there were a

lot of "rich people" in the neighborhood, and he complained that after NHK—the

national public broadcaster—had done a documentary on the outstanding school system

in the neighborhood, a lot of apartment buildings were built and people started moving

in for the schools.

188. Plaintiff was in shock, but silently. Bray seemed to be saying: "There

went the neighborhood!" It hadn't dawned on him, perhaps, that he was, to some extent,

talking about Plaintiff. Although Plaintiff hadn't known that there had been a

documentary made about the schools there, etc., Plaintiff was one of the people living in

an apartment building, and certainly couldn't be bracketed into the economic class of

"rich people", considering that the apartment Plaintiff lives in is, in fact, rent-subsidized.

Plaintiff didn't bother to follow through with emailing Bray, though he provided

Plaintiff with his business card.

189. Other such individuals that Plaintiff encountered, and then encountered

again (and sometimes again, etc.), include Dickinson (last emails 2010), Laverne (last

emails 2013), and O'Day, last emails 2014).

190. Plaintiff has described interactions with O'Day to a limited extent in a

report to the CIA/OIG, the most recent of which occurred subsequent to Plaintiff having

lodged protestations in the form of emails to the American Citizen Services Officer (or

other Consular officials monitoring the email) regarding her spying on me, etc., at the

Starbucks, with one case of her explicitly advising me against filing a lawsuit against

the U.S. government. Plaintiff also suspects O'Day of having been involved in a plot to

recruit the attorney Plaintiff hired when it became necessary to file a lawsuit against the

city government of Kyoto for refusing to admit Plaintiff's son to the neighborhood

nursery school, where the children of CIA officer Dalsky, and MI6 officer David

Chandler, and a couple of French foreign intelligence officers.

191. After O'Day resurfaced and evidenced further suspect conduct (described

below), Plaintiff did some research on her online and discovered that she was associated

with the network of intelligence officers (CIA, MI6, G2, etc.) connected to the Kyoto

Journal, and had been promoted as a photographer herself in an event held in 2002.

Plaintiff has posted a link (http://kyotokawaraban.boo.jp/ibento/) to the event held in

2002 in Kyoto in which O'Day was exhibiting her photography along with a long list of

other intelligence officers, including: Aaron Berman, Albie Sharpe, Dylan Rice, Jacoba

Akazawa, John Ashburne, Einarsen, Lisa Mahoney Beltran, Micah Gample, Paul

Crouse, Robert Kowalczyk, and Tom Collins. Paul Crouse had been a resident at the

Villa Tonodan at the time, and Plaintiff was acquainted with him and his wife. Plaintiff

has already mentioned Einarsen and the KJ, with which others listed above were also

associated, and should further indicate that he has posted a blog entry on John Ashburne,

who has published sponsored propaganda pieces in the Wall St. Journal promoting the

policies of the now infamous mayor of Osaka, Hashimoto.


192. Dickinson, meanwhile, had also introduced Plaintiff, while Plaintiff's wife

was pregnant with our son, to a Japanese woman, Kuniko Sato (hereinafter "Sato", that

was planning to go to graduate school in the United States. Dickinson appeared to be

attempting to interest me in the woman romantically, deliberately trying to sabotage

Plaintiff's marriage and family.


193. Here, Plaintiff cites the Supreme Court case Moore v. City of East

Cleveland 431 U.S. 494 (1977):

> *Our decisions establish that the Constitution protects the*
>
> *sanctity of the family precisely because the institution of the family is*
>
> *deeply rooted in this Nation's history and tradition. It is through the*
>
> *family that we inculcate and pass down many of our most cherished*
>
> *values, moral and cultural.*

194. Plaintiff exchanged email addresses with Sato and helped her with the 'statement of purpose' she was preparing to append to her application to the Maxwell School at Syracuse University, learning what he could about her before she disappeared, apparently because Plaintiff did not show a romantic interest. Like Kudo, Sato has no presence on the Internet.

195. Plaintiff is aware of the fact that CIA officers are trained to deceive, and although the CIA has no police powers, it is not clear as to how CIA officers are trained to handle incidental contact and interaction with private American citizens in an overseas area in which they are conducting a covert operation. It is clear, however, even

from Executive Order 12333 (hereinafter EO 12333) and the like, that CIA officers are

expressly prohibited from engaging in acts that violate the rights of American citizens

overseas protected by the Constitution.

196. The planning and execution of the various plots against Plaintiff, starting

with the contrivance of having Peterka pretend to coincidentally bump into Plaintiff in

Berkeley, California and then travelling to Japan to try to convince Plaintiff to pursue a

career in the finance sector in Tokyo with Goldman Sachs, clearly represent part of a

conspiratorial pattern of activity aimed at displacing Plaintiff from Kyoto,

encompassing various schemes and ploys over many years through to the present.

197. Bringing the narrative into the present, most recently, Plaintiff was

contacted by suspected CIA officer, psychologist Zimbleman, and invited to participate

in the literature discussion group, MSG, including a number of suspected CIA officers

as well as suspected officers of other countries' intelligence agencies, some of whom

Plaintiff had already blogged about.

198. The first such individual is Zimbleman's brother-in-law, Lotman, who is a

founding member of MSG and on the mailing list, and about whom Plaintiff has posted

a blog entry (approximately two years ago), as described above.


199. Here, it should be noted that Plaintiff had met Zimbleman's wife, Inaoka,

after leaving the "Kodomo Miraikan", which is a children's play center/library, etc.

Plaintiff and his wife and children had visited, with our children in tow on the way to

the park along with another mother from the nursery school and her children, including

a classmate of Plaintiff's son. Inaoka seems to have been acquainted with the other

mother, who introduced us. Inaoka gave Plaintiff her business card, on which she first

wrote her email address and the name of her husband and son as well as her mobile

number. Plaintiff emailed her, and received a reply from Zimbleman.


200. Other members of the group on the MSG mailing list include additional

suspected intelligence officers about whom Plaintiff has blogged (e.g., Canadian, Eric

Luong) as well as suspected CIA officer Barr, who has appeared at least twice in an

event held at a CIA front café that features and promotes Western intelligence officers

stationed in Kyoto and about which Plaintiff has blogged

(http://kyoto-inside-out.blogspot.jp/2015/01/the-flame-brought-to-you-by-charles.html).

Another member, A. Sasaki has also been on Plaintiff's radar in association with CIA

fronts and connected business in the area and in association with Luong

(http://www.pechakucha.org/presentations/debunking-kyotos-myths), etc.


     201. Plaintiff has only communicated with Zimbleman through email, with the

planned meeting having been cancelled due to Zimbleman's coming down with the

"flu", which later was said to have been diagnosed as pneumonia, whereupon the

meeting was cancelled for the entire summer. Shortly thereafter, however, Plaintiff saw

Zimbleman at the nursery school, whereupon Zimbleman averted his eyes from Plaintiff

and continued a discussion he was having with a mother of a toddler enrolled at the

school. Plaintiff noted that Zimbleman looked healthy, and noted that in a followup

email sent in succession to an email to which Zimbleman had failed to respond. The

encounter appears to represent another possible instance of attempting to bait Plaintiff

by holding out the possibility of reconciliation, etc., and the CIA coming to terms with

Plaintiff. Such incidents have been a continual distraction to Plaintiff, diverting his

energy from researching the law and court precedents related to the drafting of this

Complaint, and been a source of continual emotional distress to Plaintiff.

202. Furthermore, there were two other occurrences that share respective tangential connections with the encounter with Zimbleman. Plaintiff suspects that those encounters were staged in coordination with the encounter with Zimbleman.

203. Within a day or two of contact from Zimbleman, Plaintiff was approached in the Sanjo-Ohashi Starbucks by an individual calling himself "Steve" and claiming to be an Englishmen that had been residing in Australia for fourteen years who was in Kyoto as a volunteer through his church, being affiliated with a Filipino Evangelical church in Kyoto called Assembly Kyoto Church as well as some Koreans, including a professor at Doshisha University (a Christian university: https://www.doshisha.ac.jp/en/information/history/neesima/neesima.html). He basically tried to missionize Plaintiff, inviting him to Bible studies and the like, and sought to gain Plaintiff's agreement to his missionary presence and activities, ignoring to hear what Plaintiff taught him about Japanese religion and Christianity in Japan (and Korea), and not emailing Plaintiff in relation to books regarding which Plaintiff had offered to send links. He appeared again even more determined with an equally intransigent disposition, trying to evangelize Plaintiff.

204. Plaintiff is convinced that Steve was an intelligence officer acting as a proxy on behalf of someone, but the precise reasons are not clear. Plaintiff notes that his blog post on Lotman also describes Lotman cohort and suspected CIA officer Manny Santiago, who claims to be an ordained Christian minister, and apparently has incorporated as such, though his activity as demonstrated though his presence online evinces nothing connected to Christianity.

205. Plaintiff suspects that it may have been connected to an attempt to recruit Plaintiff on the basis of gaining Plaintiff's ascension to participate in the Christianizing cause of Doshisha University. However, with respect to EO 12333, for example, if the above-described scenario (i.e., coordinated recruitment attempt) were true, it would represent a bad faith attempt, at the very least, because it would run against Plaintiff's conscience and values, which have been clearly and emphatically set forth on Plaintiff's blog and in emails, etc., to the Consulate, DOJ, etc. To be clear, while Plaintiff would not object to teaching at Doshisha, for example—were he qualified to do so—but Plaintiff would not agree to do so under the stipulation that his pedagogy promote a version of history, etc., biased in favor of Christianity or any other ideological priority of the CIA. Obviously, that would not be compatible with academic freedom, etc., and

would represent an attempt to subvert the goals of higher education with a pedagogy

based on a religious and/or political subterfuge. That does seem to represent part of the

CIA's agenda; accordingly, it should have been obvious that Plaintiff would not be

interested, and the above-described acts involving Zimbleman and/or occurring in a

time frame in close proximity with the contact by Zimbleman would thus represent

harassment, in the form of an overture made in bad faith.


206. Meanwhile, considering that Plaintiff does not have a PhD, and that

Doshisha is not a university that would not necessarily be compatible—let alone

optimal—with respect to Plaintiff's scholarly interests if Plaintiff were to pursue a PhD

at this stage in life, being 53 years old and having a family to support, the nature of such

a stealth overture to enter the CIA circle associated with Doshisha is unclear. Moreover,

it should be noted that for approximately thirteen years Plaintiff has been studying a

form of music associated with the Rinzai school of Zen, the head temple of which,

Shokokuji, is located directly north of the old imperial palace grounds. The Doshisha

campus itself was built on grounds appropriated from Shokokuji temple during the early

Meiji era when Buddhism was subject to persecution with the "restoration" of the

emperor as sovereign. Accordingly, in as much as Plaintiff can be considered to practice

Buddhism, it is possible that the harassment he has been subjected to also violates his

rights protected under the First Amendment of the U.S. Constitution.


207. Another possible coordinated ploy can be seen in the random contact

Plaintiff received via Facebook from a young woman with a Chinese name (沈铭钦)

residing in Kyoto who had started a Facebook account during the same time frame, and

invited me to be her friend on June 12, 2015. Plaintiff checked her friend list, because

he didn't recognize her name, and noticed that Frank Carter (hereinafter "Carter")—a

CIA officer that was a resident of Villa Tonodan whom Plaintiff has mentioned in that

regard on his blog and who is also a friend of suspected CIA officer, Doshisha

University professor Tim Craig, etc.—and suspected CIA officer Fanon Wilkins

(hereinafter "Wilkins"), an associate professor of American Studies at Doshisha

University whom Plaintiff has noticed at the Starbuck on occasion and who appears in

this photo

(http://3.bp.blogspot.com/-5uDf1L59Y0I/U09oinwg1xI/AAAAAAAAIKg/GKHLdi_U-

FQ/s1600/2014-04-15+16.54.06.jpg) of an English bible study meeting at Doshisha (to

which Steve invited Plaintiff), were on her Friends list, so Plaintiff accepted her

invitation to see what was in store. At present, there are at least nine people on her

friend list noting their affiliation with Doshisha University.

208. Though Plaintiff had seen Wilkins at the café before as he appears on his Doshisha profile, Wilkins showed up in the guise in which he appeared on his Facebook page (since changed), with sunglasses and a baseball cap covering his bald head, etc. Plaintiff does not believe that was another coincidence, and considered it to form part of a continuum he considered to be an overture starting with the meeting with Inaoka, followed by the email from her husband, Zimbleman. Plaintiff has contacted Wilkins through Facebook messaging, and Wilkins has denied being a CIA officer.

209. Accordingly, assuming that there is a connection between the above-described series of events (Chinese woman with connections to the Doshisha network befriending me on Facebook, Zimbleman/Lotman, Steve the evangelical missionary) seems to represent yet another unwarranted intrusion into Plaintiff's life, and is tantamount to being a form of psychological warfare ('harassment' doesn't adequately capture the scope and sophistication). Plaintiff has suffered emotional distress to the point of distraction, but eventually has pieced together the likely scenario as presented above.

210. Given the involvement of suspected CIA officer Lotman and Canadian intelligence officer Luong about whom Plaintiff had blogged prior to the encounter with Zimbleman, the fact that Zimbleman is the brother-in-law of Lotman and works at Doshisha, and that Plaintiff has submitted two reports to the CIA/OIG and disclosed his blog, Plaintiff can only question the functioning of the CIA/OIG. Under the circumstances, Plaintiff presumes that Zimbleman is a CIA officer; therefore, he should not have been permitted to approach me, even indirectly.

211. Plaintiff would expect, on the basis of his reports to the CIA/OIG and the DOJ, that such encounters would have been proscribed as a result of Plaintiff's allegations as well as the information contained in Plaintiff's blog. Plaintiff should be well-known to all CIA officers and proxies thereof in Kyoto, including Zimbleman, Barr and the suspected CIA proxy A. Sasaki, who are on the emailing list of the literature discussion group. Several of the names are new to Plaintiff, but there is reason to suspect that they may be CIA officers, MI6 officers or respective proxies thereof: Jeremy Rappleye, William Hall, Kaylie Palmer, Hallam Udell, and Maana Sasaki.

212. Plaintiff has blogged about Jones, who teaches at Doshisha University, because of blatant propaganda he has published in the Japan Times, but has long been aware of other suspected CIA officers that are professors at Doshisha University, such as Susan Pavloska, who is also associated with the Kyoto Journal.

213. Aside from the continual non-responsiveness and deception of the consular officials at the American Consulate in Osaka, it appears that said consular officials were actually CIA "case officers" operating under diplomatic cover, with a high likelihood of involvement in coordinating the covert operations of the CIA "field officers" in Kyoto about whose unlawful acts Plaintiff had complained. Accordingly, they may bear responsibility for their actions in a supervisory role in the conspiracy.

214. The above-described harassment of Plaintiff in Kyoto commenced in approximately 2003 and continues to this day. The numerous complaints and protests Plaintiff has made regarding the continual violation by rogue CIA officers of Plaintiff's civil rights protected under the Constitution of the United States of America, including violations of Plaintiff's rights secured by the Fourth Amendment and Fifth Amendment of the Bill of Rights of the U.S. Constitution as well as Plaintiff's civil rights secured by

115

the Fourteenth Amendments of the U.S. Constitution, have been met with deception and

non-responsiveness by federal officials conspiring to cover up the alleged violations as

well as the allegations themselves. The authority of *Bivens* provides for a private cause

of action with respect to such violations.

VI

THIRD CAUSE OF ACTION

(Honest Services Fraud, pursuant to 18 USC 1341/1342/1343/1346/1349)


215. Plaintiff incorporates herein, as though fully set forth, all of the allegations

contained in paragraphs 1 through 214, above, as though fully set forth.


216. Plaintiff first made allegations to the U.S. government about the alleged

violations of Plaintiff's rights secured by the U.S. Constitution by visiting the American

Consulate in person, after making an appointment therefor in advance with the express

intent to directly make protestations to the responsible Consular official (Schaeffer)

about harassment by CIA officers in Kyoto and their proxies, including allegations that

Plaintiff's civil rights corresponding to rights protected by the Fourth, Fifth, and

Fourteenth Amendments of the U.S. Constitution had been violated.


217. In a reply Plaintiff eventually received from Schaeffer to a follow-up

email Plaintiff sent to Schaeffer complaining about non-responsiveness with respect to

an initial email Plaintiff had sent to Schaeffer requesting acknowledgement regarding

the matters raised by Plaintiff during the in-person consultations with him at the

Consulate, said follow-up email including a list of names of CIA officers and proxies

thereof alleged to have committed the violations, Schaeffer emailed Plaintiff a reply

stating,

> *"Rest assured that I have taken your concerns on board*
>
> *and will pass them on through the appropriate channels".*

218. In the light of continuation of the harassment and other events that

transpired after the aforementioned visit to the Consulate (and over the course of the

succeeding five years into the present), Plaintiff adduces that either:

- Schaeffer deliberately decided not to report the allegations "through the proper

  channels";

- Schaeffer did report the complaints through the proper channels, but his superiors

  receiving said complaints, whom I presume would include "senior officials of the

  Intelligence Community", such as the Director of the CIA, did not report the

  allegations to the CIA/OIG;

- Schaeffer's superiors did report the allegations to the CIA/OIG, but the OIG failed

to conduct an investigation and/or find that corrective measures were required by

law; or

·  The CIA/OIG received the report of the allegations, conducted an investigation and

ordered corrective measures in accordance with the law, but the implementation

thereof was deliberately obstructed.

219. Schaeffer et al. (i.e., CIA officials posing as American Citizen Services

Officers) appear to have been duty-bound by law (including the Memorandum of

Understanding between the CIA and DOJ on reporting federal crimes (hereinafter

"MOU") as well as Executive Order 12333 (hereinafter "EO12333") to report the

alleged federal crimes committed by covert CIA officers as reported by Plaintiff to

Schaeffer et al.

220. Due to the continued harassment after the aforementioned visit to the

Consulate, Plaintiff was compelled to continually submit emails to the American Citizen

Services officer (Schaeffer et al.) for years, detailing further violations of Plaintiff's

rights protected by the Fourth, Fifth, and Fourteenth Amendments of the U.S.

Constitution.

221. Accordingly, due to the failure of the Executive Branch to cause its CIA

officials to cease harassing Plaintiff, Plaintiff adduces that the continued

non-responsiveness from Schaeffer et al. is indicative that they were not treating the

allegations with the requisite levity according to the law. In fact, not once was Plaintiff

told that he should report such allegations directly to the CIA/OIG, for example, which

Plaintiff later discovered was the required action. Accordingly, the representation by

Schaeffer regarding "pass[ing] along" of "[my] *concerns*" "through the appropriate

channels" is considered by Plaintiff to be a fraudulent representation of the actual

course of action taken by Schaeffer, and the pattern of (non)responsiveness thereinafter

by Schaeffer et al. to represent a further manifestation of the deliberate course of

inaction that had been adopted by Schaeffer et al., in violation of the law.


222. The "concerns" of Plaintiff referred to by Schaeffer correspond to federal

crimes committed by federal officials against Plaintiff—an American citizen residing

overseas pursuing lawful employment in an allied state with a Constitutional

Democracy (based on a U.S.-imposed Constitution, in fact) as the form of government

and a free-market economy. Aside from the fact that the CIA has no police powers to

begin with, Plaintiff's right secured by the Fourth, Fifth, and Fourteenth Amendments of

the U.S. Constitution are inviolable.


223. Moreover, it is possible that the non-responsiveness and deception on the

part of the Schaeffer et al. was part of a deliberate ploy aimed at the gathering of

"intelligence" on Plaintiff —by encouraging Plaintiff's continued submission of

complaints directly to the Consulate, causing Plaintiff to disclose details of his private

life, inner thoughts, etc.—as opposed to having Plaintiff submit the complaints directly

to the CIA/OIG (i.e., "through the appropriate channels"), said 'intelligence' being used

to formulate further schemes of harassment by the CIA and its proxies aimed at

displacing me from Kyoto.


224. In this regard, it must be emphasized that the CIA has deployed against

Plaintiff numerous officers—who in turn have deployed proxies—said CIA officers

including three psychologists and another with a degree in psychology: Dalsky has a

PhD in psychology, Zimbleman has PhD in psychology, O'Day is working on her PhD

in psychology, and Bray has an undergraduate degree in psychology. A succession of

such schemes has been conducted against Plaintiff one after another over a period

spanning more than ten years, some of which are detailed herein and others (some

described on Plaintiff's blog or in emails to DOS/DOJ) for which leave will be sought

to amend this petition as further evidence thereof comes to light during discovery.

225. Furthermore, with respect to Defendants Schaeffer et al., who appear to

have been CIA case officers stationed at the American Consulate in Osaka under

diplomatic (official) cover as American Citizen Services Officers, it is not clear whether

each of said Defendants should also be sued as a Department of State Official acting in

their respective capacities as officials and/or individuals in addition to being sued as

rogue CIA officers acting as individuals. Suffice it to say that the custom of such

posting of covert CIA officers as American Citizen Services Officers and practices

associated therewith are a subject of this Complaint in a subsequent cause of action

presented in a *Monell* claim, but there would appear to be an entangled confluence of

*Bivens*, Honest Services Fraud and perhaps Obstruction of Justice issues that may be

clarified with evidence revealed during discovery, whereupon Plaintiff may seek leave

to amend the Complaint, as appropriate. Plaintiff has filed an FOIA request with the

DOS, as described elsewhere herein, but is not capable of ascertaining at this point

whether Schaeffer et al. were acting in a manner such as to deliberately violate official

policies (e.g., DOS regulations pertaining to the handling of allegations by an American

citizen overseas of federal crimes committed by CIA officers against an American

citizen) or whether said official policies (customs and practices) were culpably

inadequate (or, in the case of aforementioned regulations, nonexistent).


226. The failure to adequately remedy the situation after Plaintiff made

protestations in person followed by continual submission of further complaints to the

Osaka Consulate prompted then promoted Plaintiff to try contacting his congressional

representative in the House of Representatives, Congresswoman Barbara Lee. The

response Plaintiff received from the staffers in Congresswoman Lee's offices in

Oakland California and Washington DC was unsatisfactory, and disappointing, to say

the least, with the case worker I'd been assigned, Elaine McKellar, eventually asking

me just what it was that I wanted them to do during a final telephone call Plaintiff made

to the Congresswoman's office. Plaintiff believes that, with respect to elected officials

such as Congresswoman Lee, too, it would seem that an American should expect to be

able to turn to their Congressional representative as much as an American Citizen

Services Officer to receive the proper information as to the manner in which to proceed

with making such allegations; that is to say, to report the allegations directly to the