CIA/OIG.

227. Plaintiff was dumbfounded at the response he received from McKellar. It should be noted that McKellar was one of several of the congresswoman's staffers with whom Plaintiff exchanged emails, etc. Accordingly, Plaintiff has attempted to request a remedy that would ensure that all Congressional Representatives and members of the Senate are aware of the fact that the CIA/OIG is the destination to which allegations against CIA officers should be made and required to inform their constituents thereof.

228. The runaround Plaintiff received through Congresswoman Lee's staffers was an utter waste of time and effort, causing no small degree of emotional duress to Plaintiff. Plaintiff believes that it is necessary for the Court to examine whether the office of Congresswoman Lee had been aware of the information related to the necessity to file a report directly with the CIA/OIG that Plaintiff received from the office of Senator Feinstein, in order to ensure that American citizens overseas facing a situation such as that faced by Plaintiff are provided with accurate information from the offices of their Congressional representatives in a timely manner about the required administrative steps to take.

229. Accordingly, Plaintiff then took the course of action that seemed to be the

logical next step in contacting the Civil Rights Division of the DOJ. The misleading

response and misdirection Plaintiff met with from the DOJ served to prolong the

harassment, while leading Plaintiff to believe that relief in the form of an investigation

was underway. In fact, Plaintiff encountered intensified harassment over the course of

the ensuing eleven months before receiving the brief and dismissive written response (a

scanned image of the response has been posted on Plaintiff's blog -

http://kyoto-inside-out.blogspot.jp/2012/07/response-from-usa-department-of-justice.ht

ml), dated May 8, 2012, that went so far as to mischaracterize the allegations.


230. The blithe reply from Kappelhoff (signed by Kappelhoff, written by

Callahan) of the DOJ that was mailed to me includes several baffling statements that

belittled and mischaracterized my complaints, and would appear to have been aimed at

discouraging my further pursuit of the matter as being misguided and baseless, and

attempted to misdirect me. As a matter within the scope of common legal knowledge

that an attorney at the DOJ working in relation to civil rights, it should have been

obvious to Mr. Kappelhoff that CIA officers have demonstrated a propensity to abuse

their office and violate the rights of American citizens overseas protected by the U.S.

Constitution. Plaintiff has learned of numerous Bivens actions, for example, that have

been filed against CIA officers heretofore, and even of cases in which American citizens

overseas have been murdered by local CIA proxies, allegedly with the approval of their

CIA officer handlers: for example, the cases of Charles Horman and Frank Teruggi (and

another which I noted in a report to the DOS).

231. The letter that Kappelhoff mailed Plaintiff describes the scope of civil

rights abuses in an excessively narrow manner, apparently with the aim of excluding

consideration of the federal crimes committed by the CIA officers described in the

evidence Plaintiff submitted to the DOJ. That is, though it should have been readily

apparent that at the very least Plaintiff had alleged violations of his rights secured under

the Fourth Amendment, Fifth Amendment, and Fourteenth Amendment of the U.S.

Constitution. Said violations had been perpetrated by CIA officials in violation of

clearly established federal law, and were therefore obviously actionable under Bivens.

232. Plaintiff was nonetheless treated in a manner such as to suggest that he

had submitted unintelligible, uneducated and unfounded complaints with no basis in the

law.

233. The written reply signed by Kappelhoff implies that because the CIA officers were not "law enforcement officers", there were no violations of Plaintiff's civil rights. However, Plaintiff is aware of the fact that violations of rights protected under the Bill of Rights of the U.S. Constitution as well as substantive due process rights protected under the Fourteenth Amendment of the U.S. Constitution represent violations of "civil rights". Kappelhoff did not describe a viable excuse not to launch an investigation, he simply deflected Plaintiffs allegations in a dishonest manner with the intention to deceive Plaintiff and deny him of his right to seek justice.

234. The evidence Plaintiff submitted may have been acted on in a secretive way by the Executive Branch in, for example, removing Paquette from Plaintiff's immediate surroundings, but no criminal investigation was launched and injuries suffered by Plaintiff were not remedied; in fact, Plaintiff was humiliated and embarrassed by the written reply signed by Kappelhoff, further compounding Plaintiff's injuries, and Plaintiff was abandoned by his government to cope with the CIA sociopaths about whose misconduct he'd complained and whose mere presence was

menacing.

235. Furthermore, Callahan had intentionally misled Plaintiff into believing

that an investigation would be conducted when he provided Plaintiff with an email

address (as mentioned by Plaintiff on his blog shortly thereafter:

http://kyoto-inside-out.blogspot.jp/2012/04/non-responsive-doj-new-influx-of-cia.html)

to the Special Litigation Department of the Criminal Division for the purpose of making

further submissions of evidence or detailing complaints. However, Plaintiff

subsequently discovered that the violations alleged in his complaints do not fall under

the remit of said Department in the first place, as shown on their webpage on the DOJ

website (http://www.justice.gov/crt/about/spl/):

> *"The Special Litigation Section is one of several Sections in*
>
> *the Civil Rights Division. We work to protect civil rights in the*
>
> *following areas: 1) the rights of people in state or local institutions,*
>
> *including: jails, prisons, juvenile detention facilities, and health care*
>
> *facilities for persons with disabilities; 2) the rights of individuals with*
>
> *disabilities to receive services in their communities, rather than in*

*institutions; 3) the rights of people who interact with state or local*

*police or sheriffs' departments; 4) the rights of youth involved in the*

*juvenile justice system; 5) the rights of people to have safe access to*

*reproductive health care clinics; and 6) the rights of people to practice*

*their religion while confined to state and local institutions. We can*

*also act on behalf of people at risk of harm in these areas."*

236. Moreover, Plaintiff never received a single response to any of the multiple

emails he sent to said email address detailing relevant events, personages, etc.

Accordingly, the provision of said email address to the Special Litigation Department of

the Criminal Division of the DOJ in and of itself represents a deliberate act of

misdirection, as that office is not tasked with handling complaints such as those

presented by Plaintiff.

237. Here, Plaintiff notes that the FBI's response to his Privacy Act request

indicated that there had been no investigation by the FBI, as there were no records

whatsoever indexed to Plaintiff's name.

238. Meanwhile, Paquette, who had been one of the primary sources of harassment and recurrent trouble, appeared to have met with disciplinary action, as Plaintiff does not recall having seen him for several months before he radically altered his emailing habits, including the cancellation of his long-standing email account. Plaintiff subsequently discovered that his Hotmail account had been hacked and significant emails exchanged with Paquette prior to 2007 deleted, emails in which Plaintiff had discussed the CIA, etc.

239. Insofar as Kappelhoff et al. not only refused to launch an investigation of the alleged violations, but belittled and humiliated Plaintiff for having submitted a complaint in the first place, and denigrated the import of the alleged violations detailed in the complaint, instead of serving to put an end to the violations of Plaintiff's civil rights, Kappelhoff et al. and the DOJ became parties thereto.

240. Aside from the fraudulently misleading written response Plaintiff received from the DOJ misrepresenting the facts Plaintiff had presented in the complaints he's submitted to the DOJ, the DOJ also failed to provide notification to the effect that Plaintiff should submit further allegations of violations by CIA officers of hiss rights

protected by the U.S. Constitution directly to the CIA/OIG. Accordingly, the instant

case poses not only a question as to the scope of discretion pertaining to the decision as

to whether or not to launch an investigation in relation to allegations made by Plaintiff,

but also a question as to the status of the acts of intentional misrepresentation made by

federal officials to Plaintiff with the intent to deceive Plaintiff, despite his entitlement to

receive honest services from said DOS (i.e., nominally DOS officials, actually CIA

officers operating under diplomatic cover) and DOJ officials.


241. While the CIA officers that are subjects of the instant complaint were

acting as rogues in their respective capacity as individuals, the DOJ officials were acting

in their official capacity, and perhaps as rogue individuals as well, depending on the

apparently classified Procedures established by the Attorney General according to the

MOU between the DOJ and CIA described below. In the case of inter-agency collusion

among officials occupying supervisory positions, as posited below, the extent of the

conspiracy described above takes on new proportions that should shock the conscience

of the court. The interface where official policy becomes conducive to covering up

violations by CIA officers of the rights of Americans overseas as protected by the U.S.

Constitution is another issue that is addressed under a separate cause of action with

reference to *Monell*.

242. Furthermore, Plaintiff notes that Buckley did make public responses in relation to the recent scandalous conduct of CIA officials involved in illegally accessing the computers of Senate staffers attached to the Senate Select Committee on Intelligence. Meanwhile, Plaintiff has not even received acknowledgement of receipt of complaints (two) filed.

243. The written reply signed by Kappelhoff that Plaintiff was mailed by the DOJ was a fraudulent reply intended to deceive Plaintiff into believing that his complaints had no basis in the law. The misdirection by Callahan's providing an email address to a department not responsible for handling such complaints was also a fraudulent indication that an investigation would be launched or was underway. The statement by Schaeffer that Plaintiff's complaints of civil rights violations would be reported "through the appropriate channels" was a fraudulent representation, and the repeated failure to inform Plaintiff that he should submit such complaints directly to the CIA/OIG was a deliberate attempt to prevent Plaintiff's complaints from reaching the CIA/OIG. Finally, the DOS decision to implement an automated reply system in 2014,

instead of continuing to reply directly to Plaintiff's emails, represents an attempt to

evade accountability for further culpability as well as a continuation of the refusal to

provide honest services. Again, the American Citizen Services Officers (Schaeffer et

al.) never once advised Plaintiff to submit his complaints directly to the CIA/OIG. Had

Schaefer et al. informed Plaintiff of the need to submit a report of such allegations to the

CIA/OIG, Plaintiff would have immediately stopped sending emails reporting

harassment and the like to the Consulate, reserving such communications for leaving an

official record or the like when deemed necessary, and submitted a more comprehensive

report directly to the CIA/OIG. 18 USC 1341, 18 USC 1342, 18 USC 1343, 18 USC

1346, and 18 USC 1349 provide respective private rights of action for such violations.

244. Plaintiff notes that he has submitted a FOIA request to the DOS (Case

Control Number F-2014-21617) regarding regulations and standard operating

procedures pertaining to the handling by American Citizen Services Officers of

complaints from an American citizen overseas alleging violations by CIA officers of the

rights of an American citizen overseas secured under the U.S. Constitution, with an

estimated completion date of December 31, 2015.

VII

FOURTH CAUSE OF ACTION

(*Bivens* 2: Deprivation of right and entitlement to honest services from public officials;

Bill of Rights, the Fourteenth Amendment, etc., of the Constitution of the United States

of America)

245. Plaintiff incorporates herein, as though fully set forth, all of the allegations

contained in paragraphs 1 through 244, above, as though fully set forth.

246. It is clear from the foregoing description in relation to violations of 18

USC 1346 that each of the aforementioned officials acting in their official capacity was

also acting in their individual capacity in a manner demonstrating that they could only

have been fully cognizant of the violations of Plaintiff's right secured by the

Constitution that they were intentionally committing as they were committing said

violations, yet they committed said violations nonetheless. Such acts include acts

constituting violations defined in terms of "equal protection" and "due process", as

protected by the Fourth Amendment of the U.S. Constitution, the Fifth Amendment of

the U.S. Constitution, and the Fourteenth Amendment of the U.S. Constitution (*Bolling*

*v. Sharpe*, 347 U.S. 497 (1954)). This is brought into stark relief against the background of the state of affairs (as described below in more detail) created by the CIA in which the CIA officers in Kyoto, due to their sheer numbers and scale of their so-called "covert operation" represent a veritable class of people unto themselves, and Plaintiff has been discriminated against because he not only was not a part of that class, but because of his initially implicit and subsequently explicit refusal to participate in what Plaintiff has explicitly characterized and publically denounced as sociopathic behavior that is obviously against both American values and Plaintiff's conscience.

247. Accordingly, in addition to the above-cited federal statute 18 USC 1346 pertaining to Honest Services Fraud, Plaintiff's right and entitlement to receive honest services from federal officials is secured by the U.S. Constitution. Therefore, considering that Plaintiff is a Pro Se litigant and is not well-versed in case law related to the extra-territoriality of federal statutes, including 18 USC 1346, Plaintiff invokes *Bivens,* which provides a cause of action with respect to the above-described violations.

VIII

FIFTH CAUSE OF ACTION

(*Bivens* 3, *Monell* 1: Fourth Amendment, Fifth Amendment, and Fourteenth

Amendment of the Constitution of the United States of America)

248. Plaintiff incorporates herein, as though fully set forth, all of the allegations

contained in paragraphs 1 through 246, above, as though fully set forth.

249. The policies of the various departments and agencies of the Executive

Branch described below as well as the customs and practices of the CIA, DOJ, and DOS

have facilitated or directly caused violations of Plaintiffs civil rights, including the right

to privacy, protected by the U.S. Constitution.

250. The custom of the CIA of posting covert CIA officers under official

diplomatic cover as American Citizen Services Officer has facilitated and resulted in the

violation by federal officials acting under the color of law of Plaintiffs rights, including

Plaintiff's due process rights, secured by the U.S. Constitution. More specifically, the

protestations Plaintiff made in person with the American Consulate in Osaka, Japan,

continually over a period of approximately five years from 2009 to 2014 since first

visiting the Consulate in person were repeatedly ignored, or dealt with in an ad hoc

manner so as to deceive and misdirect Plaintiff.

251. The deception encompasses the deliberate withholding of the fact that

Plaintiff should have been filing such protestations directly with the CIA/OIG, even

after the Plaintiff had mentioned in an email to the Consulate that he believed the CIA

officers whose conduct was at issue needed to be disciplined by the (CIA) IG. Plaintiff

had learned of the existence of an administrative office called the Inspector General

while serving in the U.S. Army, but had no detailed understanding thereof relevant to

the federal agencies at issue in the instant case.

252. Said deliberate withholding of vital information from the Plaintiff

constitutes a practice that violates Plaintiffs due process rights protected by the U.S.

Constitution.

253. Plaintiff has submitted a FOIA request to the DOS (Case Control Number

F-2014-21617) regarding regulations and standard operating procedures pertaining to

the handling by American Citizen Services Officers of complaints from an American

citizen overseas alleging violations by CIA officers of the rights of an American citizen

overseas secured under the U.S. Constitution, with an estimated completion date of

December 31, 2015. Plaintiff assumes that respondent documents will shed light on

whether there exist regulations and the like prescribing the appropriate handling of such

situations. Plaintiff further expects that said respondent documents may shed light on

the issue of supervisory responsibility and the like, both with respect to the conduct of

Schaeffer et al. as well as the "field officers" (e.g., Paquette) Schaefer et al. were

presumably involved with managing. Plaintiff has only partially examined the past

record of CIA abuses committed against American citizens overseas, and expects that

there is much more to be revealed in that regard, wherefore Plaintiff adduces that it is

only reasonable to expect that a body of corresponding regulations and the like have

been established in relation to the handling by CIA officers of incidental contact and

interaction with private American citizens overseas. Plaintiff may seek leave to amend

the complaint, as appropriate, on the basis of the facts revealed in documents respondent

to said FOIA request.

254. The implications of the above-described customs and practices facilitating

violations of rights of Americans overseas as protected by the U.S. Constitution are

manifold. First, regarding the CIA, the unlawful conduct of CIA and other Executive

Branch officials embodies an implicit a message to the effect that, "We are the CIA on

official government business, and we don't care if you don't like what we're doing here

in the country of your residence; moreover, we will continue to harass you because you

are impeding the progress of our presidentially authorized covert operation(s)" is

implied by the practice of ignoring complaints and permitting the offending officers and

their proxies to continue to carry on as if nothing had happened, their very presence a

menace to Plaintiff.


255. Secondly, the attempt to deflect Plaintiff's allegations into channels where

they would not be heard or registered (i.e., prevent the relevant authorities from

becoming aware of the complaints) enabled the CIA officers about whose misconduct

Plaintiff had made allegations to continue, unabated, as if the complaints had not been

made. Such deliberate and planned non-responsiveness was an attempt to facilitate the

perpetuation of the conditions enabling the misconduct that was the subject matter of

the complaints, and by extension, the continuance of the types of harassment described

in said complaints as well. Such deliberate failure to rectify the conditions that had

given rise to the need to file the complaints in the first place not only further prolonged,

but compounded the injuries inflicted suffered by Plaintiff due to the presence of rogue

CIA officers whose misconduct had not been checked.


256. The mere presence of said rogue CIA officers and/or proxies is a

menacing cause of continuous psychological distress to Plaintiff, and the U.S.

governments' brazen ignoring of the complaints made by Plaintiff as an American

citizen alleging misconduct against its officials has served to compound the distress.

Apparently, the Executive Brach deems that it is permitted to engage in such brazen

conduct due to the need to "protect intelligence sources and methods", which serves as a

preemptive meme permitting the implementation of policies that pose an inherent risk to

the health and welfare of its own citizens overseas.


257. In this regard, Plaintiff has endured, over the course of approximately ten

years, the menacing presence of a cast of covert CIA officers openly occupying a

diverse range of stations in civil society under obviously under false pretenses, a cast so

large it should shock the conscience of the court. The last five years of harassment

Plaintiff has endured can be attributed to the failure of the Executive Branch to

immediately respond to the allegations Plaintiff laid out, in person, to Schaeffer in 2009, and so forth. The policies, customs and practices promulgated by the Executive Branch in relation to the CIA, the DOJ, the DOS and other federal agencies are at least partially to blame for said failure, and by extension, the injuries suffered by Plaintiff due to the alleged violations of Plaintiff's rights secured by the U.S. Constitution.

258. An obvious and inherent conflict of interest arises when a covert CIA officer, such as Schaeffer, for example, is posted to the position of Chief of Citizen Services Section at a consular facility and an American citizen overseas has had cause to report violations by CIA officers and their proxies of his rights protected by the Constitutional of the United States to said consular facility. Under such circumstances, a CIA officer such as Schaeffer would be motivated by personal and political interests to seek to promote his work as a CIA officer and the agenda of the CIA in order to further his own career, etc., especially if he were a "case officer" that had been involved in coordinating the activities of the CIA "field officers" and proxies thereof against whom the American citizen has made allegations in the first place. Plaintiff is under the impression that the career interests of Schaeffer et al. corresponds to a financial interest as defined under 18 USC 208, and that any dishonest act alleged herein deemed to be

coordinated with a career advancement/preservation goal would therefore concurrently

constitute corresponding violations of that 18 USC 208 as well. Plaintiff will seek leave

to amend the complaint accordingly, on the basis of evidence revealed during discovery.

259. Accordingly, the custom of posting CIA case officers under official cover

as American Citizen Services Officer should be prohibited generally, and particularly in

developed, allied, constitutional democracies with a thriving civil society. The

deliberate failure to rectify the problems related to complaints made through

protestations by Plaintiff should shock the court as much as the expansive scope of

covert CIA operations in Kyoto that Plaintiff has only partially documented on his blog

to date.

260. Because there is a publically documented history demonstrating the

existence of a clear and present danger arising where the respective spheres of activity

of private American citizens overseas and covert CIA officers overlap, there exists a

corresponding and obvious conflict of interest arising between the government's

assigning of a covert intelligence operative (e.g., a CIA "case officer") to fill an official

post encompassing a fiduciary duty to American citizens (i.e., American Citizen

Services Officer). Not only has the Executive Branch deliberately ignored said danger and refuse to implement remedial measures—such as proscribing the stationing of CIA officers under official cover as American Citizen Services Officer—on the basis of incidents such as those described above (i.e., Charles Horman, Frank Teruggi), but implemented policies aimed at facilitating the covering up of an incidents that might result due to said deliberate negligence.

261. That is to say, the danger posed to the health and welfare of American citizens overseas by adopting the above-described customs and practices related to the stationing of covert CIA officers to the post of American Citizen Services Officer was intentionally ignored during the planning and implementation of relevant policies, and the purposeful ignoring of said danger by the Executive Branch was facilitated by the implementation of secondary policies enabling the Executive to cover up its activities in the case that said activities result in the violation of the rights of American citizens overseas protected by the U.S. Constitution. The existence of the aforementioned conflict of interest is readily attested to by the succinct reply Plaintiff received from the Ms. Pam Young of the DOS/OIG regarding the non-responsiveness, misdirection and the like of Schaeffer et al, as follows.

Dear Mr. Vasaturo:

The OIG has reviewed your complaint and we have determined that
the appropriate agency to address your concerns is the Central
Intelligence Agency, Office of Inspector General (CIA/OIG).   Your
information has been forwarded to that office for action; reference
number H20141106.

Please contact CIA/OIG for any future inquiries regarding this matter,
reference hotline number H20141106.   You may contact the agency
by mail at:

    Office of Inspector General

    Central Intelligence Agency

    Washington, D.C. 20505


Thank you for bringing this matter to our attention.



OIG Hotline Staff

*U.S. Department of State*

*Office of Investigations*

*800-409-9926*

*This email is UNCLASSIFIED.*

262. Such customs were adopted with deliberate disregard of the inherent threat posed to Americans overseas due to the clear and present danger of a conflict arising in the overlapping spheres of activity between private American citizens and covert CIA officers targeting the civil society of Japan, in the instant case, or another constitutional democracy with a free-market economy. Such overlapping spheres of activity present an obvious condition under which a CIA officer aiming to exclude the private American citizen from his or her sphere of activity in order to carry out covert operations unhindered would commit acts violating of the rights said private American citizen protected by the U.S. Constitution, as per numerous examples of past abuses committed by CIA officers against American citizens overseas, including private individuals as well as federal officials assigned to other agencies, such as the Drug Enforcement Agency (DEA). Therefore, such customs (and associated practices) should

have been proscribed, in advance.

263. Furthermore, the implementation of policies that can be seen to embody

preemptive countermeasures aimed at deflecting, through various bureaucratic and other

means, complaints such as those lodged by Plaintiff alleging federal crimes committed

by CIA officers, thereby perpetuating the conditions giving rise to the alleged violations,

conditions resulting from the adoption of policies, customs and practices that should not

have been under consideration in the first place, represents a violation of Plaintiff's due

process rights protected by the U.S. Constitution. Such policies add a layer of

supervision and control over such government activities related to the handling of

allegations pertaining to the commission of federal crimes by federal officials, etc.

Plaintiff has no way of surmising what violations that might further entail, but will seek

leave to amend the complaint as evidence comes to light through discovery.

264. As of October, 2013, the Consulate ceased communicating with Plaintiff

directly (i.e., through responses from individual American Citizen Services Officers),

and instead deployed an automated response system with a standardized message text in

subsequent replies. The sender of the last email I received informing me that Kennedy

was no longer assigned to the Consulate did not identify themselves. That was more

than likely owing to the fact that I had posted some of the email correspondence

identifying Schaeffer et al. When Plaintiff subsequently requested the identities of the

consular officials that have held the post of Citizen Services Officers since the departure

of Kennedy, which   Plaintiff was informed of in October of 2013, Plaintiff   was told

to submit a FOIA request to the State Department. The adoption of such practice

represents an attempt to evade responsibility as well as scrutiny for deliberate refusal to

dutifully provide necessary information to which Plaintiff was entitled, and perhaps an

attempt to "protect intelligence sources and methods" in the form of the covert identities

of the CIA officers stationed under diplomatic cover at the Consulate.


265. Here, the DOS (actually, the CIA, which appears to have coopted the

agency of "American Citizen Services Officer" at the American Consulate in Osaka,

based on response Plaintiff received from DOS/OIG) deliberately adopted a course of

non-communication presumably deemed to be justifiable on the basis of the need to

protect "intelligence sources and methods", in this case, extending to the identities of

CIA officers stationed under official cover at the American Consulate in Osaka. Again,

it bears repeating that such course was adopted without any official at the Consulate

even suggesting that Plaintiff report the alleged violations to the CIA/OIG, which,

gathering from reply Plaintiff received from the office of Senator Dianne Feinstein,

appears to have been necessary information to which Plaintiff was entitled to be

informed of by the American Citizen Services Officer, i.e., Schaeffer et al.

266. The fact that the above-described customs and practices may themselves

be said to correspond to "intelligence sources and methods" by the Executive Branch,

and therefore to require protection as "state secrets", is not a valid basis upon which to

grant immunity to the federal government against the liability it bears for violations

committed by its officials of the rights of American citizens overseas protected by the

U.S. Constitution.

267. The actions of Schaefer et al. (nominally (officially) actions of the DOS;

actually, actions of covert officers of the CIA) as well as the refusal thereof

demonstrated by the deliberate indifference to Plaintiffs plight served to facilitate

further harassment by CIA officers and their proxies. Said deliberate actions and

inactions of the DOS (i.e., Schaefer et al.; accordingly, actually actions and inactions of

covert officers of the CIA facilitated by the practice of stationing said respective covert

CIA officers under official cover as American Citizen Services Officer) constitute a

deprivation of Plaintiff's rights to due process in violation of the Fifth Amendment of

the U.S. Constitution. The deprivation of Plaintiff's due process rights facilitated further

violations of Plaintiff's right to privacy secured under the Fourth Amendment as well as

the Fourteenth Amendment of the U.S. Constitution. *Bivens* provides the authority to

bring a civil action for said violations.

268. The promulgation by the Executive branch of EO 12333 and the

Memorandum of Understanding between the CIA and the DOJ pertaining to the

reporting of Federal Crimes (hereinafter MOU) has served to create a scenario in which

federal officials, in particular:

1)      CIA officers engaged in covert operations under official (diplomatic) cover

working from the American Consulate in Osaka and the American Embassy in Tokyo

Japan in collaboration with their counterparts at relevant administrative centers in the

Washington DC area; and

2)      DOJ officials in the Civil Rights Division and Criminal Division

have been afforded an excessively permissive degree of discretionary power enabling

them to ignore and/or pass the responsibility (i.e., for handling the complaint) internally

from one administrative agency to another in a tailor made bureaucratic labyrinth that

facilitates said passing of responsibility in a nontransparent manner, and incorporates a

preemptive recourse to plausible deniability on the basis of the need to protect "state

secrets", while concurrently deceiving the American citizen submitting the complaint, in

a manner such as to lead said citizen to believe that the matter was being investigated

and the like, thereby perpetuating the circumstances constituting the background against

which the violations were committed in the first place, and therefore facilitating further

such violations.

269. Plaintiff alleges that the Executive Branch has demonstrated a deliberate

disregard for the due process rights of the Plaintiff, and moreover, has preemptively

implemented bureaucratic countermeasures seeking to dissuade or prevent American

citizens such as Plaintiff whose rights protected by the U.S. Constitution have been

violated by federal officials from seeking redress ("through the appropriate channels",

etc.). In effect, the Executive Branch, through the promulgation of the aforementioned

MOU and EO 12333 together with the adoption of practices such as stationing cover

CIA officers as American Citizen Services Officers have provided CIA officers such as

Schaeffer et al. with a license to mislead American Citizens overseas seeking to report

alleged federal crimes committed against them by CIA officers. The same could be said

of officials at the DOJ, in light of the misleading written reply the DOJ sent to Plaintiff.

Plaintiff invokes the private cause of action authorized by *Bivens* and present his claim

through the vehicle represented in the precedent set by Monell v. Department of Social

Services, 436 U.S. 659 (1978) with respect to the implication of official policies,

customs and practices in such violations.

270. More specifically, with respect to policy, examining the first page of the

aforementioned MOU, for example, it can be seen that there are a number of exceptions

that render the procedural guidelines set forth in said MOU inapplicable. That is to say,

the reporting guidelines of the MOU themselves are subordinated to a second set

of—apparently classified—procedures "agreed upon between the Attorney General and

the head of the department or agency concerned".

271. Said MOU requires, in section I. Introduction, that:

> *"senior officials of the Intelligence Community…report to the*
>
> *Attorney General possible [emphasis added] violations of the*
>
> *federal criminal laws by employees… as provided in procedures*
>
> *agreed upon by the Attorney General and the head of the*
>
> *department or agency concerned, in a manner consistent with the*
>
> *protection of intelligence sources and Methods, as specified in*
>
> *those procedures."*

272. Here, while the threshold triggering a reporting requirement is indeed set very low by the use of the term "possible", on the one hand, the subordination of said reporting to the dictates of the phrase "in a manner consistent with the protection of intelligence sources and Methods, as specified in those procedures", with the aforementioned "those procedures" referring to said apparently already classified procedures "agreed upon between the Attorney General and the head of the department or agency concerned", on the other hand, renders the reporting requirements completely opaque.

273. Moreover, "I. Introduction" of said MOU continues by indicating that

"Title 28, United States Code, Section 535 (b) requires that":

> *[a]ny information, allegation, or complaint received in a department*
>
> *or agency of the executive branch of government relating to violations*
>
> *of title 18 involving Government officers and employees shall be*
>
> *expeditiously reported to the Attorney General by the head of the*
>
> *department or agency unless—*
>
> *(1) the responsibility to perform an investigation with respect thereto*
>
> *is specifically assigned otherwise by another provision of law; or*
>
> *(2) as to any department or agency of the Government, the Attorney*
>
> *General directs [emphasis added] otherwise with respect to a*
>
> *specified class of information, allegation, or complaint.*

274. Here, while the threshold triggering a reporting requirement is again indeed set very low by the use of the phrase, "any information, allegation, or complaint received in a department of the executive branch of government", it is necessary to examine in detail the implications set for in the exceptions (1) and (2) following "unless".

275. The first exception, (1), relates to "another provision of law" taking

precedence in the case that investigative responsibility has been delegated thereby. With

respect to the CIA, the establishment of the CIA/OIG by U.S. Code Title 50, Chapter 46

§ 3517 would appear to correspond to such a provision of law. The most directly

relevant portions of said law establishing the CIA/OIG appear to be the following:

> *(c) Duties and responsibilities*
>
> *It shall be the duty and responsibility of the Inspector General*
>
> *appointed under this section—*
>
> *(1) to provide policy direction for, and to plan, conduct, supervise,*
>
> *and coordinate independently, the inspections, investigations, and*
>
> *audits relating to the programs and operations of the Agency to*
>
> *ensure they are conducted efficiently and in accordance with*
>
> *applicable law and regulations;*
>
> *(2) to keep the Director fully and currently informed concerning*
>
> *violations of law and regulations, fraud and other serious problems,*
>
> *abuses and deficiencies that may occur in such programs and*

*operations, and to report the progress made in implementing*

*corrective action;*

*(3) to take due regard for the protection of intelligence sources and*

*methods in the preparation of all reports issued by the Office, and, to*

*the extent consistent with the purpose and objective of such reports,*

*take such measures as may be appropriate to minimize the disclosure*

*of intelligence sources and methods described in such reports*


276. For future reference, Plaintiff would like to draw attention to the gist of

the passages stating:


*(1) "investigations... relating to the programs and operations of the*

*Agency to ensure they are conducted... in accordance with applicable*

*law";*

*(2) "to keep the Director fully and currently informed concerning*

*violations of law..., and to report the progress made in implementing*

*corrective action"*

*(3) to take due regard for the protection of intelligence sources and*

*methods in the preparation of all reports issued by the Office, and, to*

*the extent consistent with the purpose and objective of such reports,*

*take such measures as may be appropriate to minimize the disclosure*

*of intelligence sources and methods described in such reports*

277. Though a primary objective of the CIA/OIG is to conduct investigations aimed at ensuring that the CIA is operating in accordance with the law, the reference to "protection of intelligence sources and methods" in conjunction with the reference to "the purpose and objective of such reports", etc., seems to present cause for concern. That is to say, while the "purpose and objective" of CIA/OIG reports is not subordinated to the "protection of intelligence sources and methods", the manner and extent to which the requirement to "take such measures as may be appropriate to minimize the disclosure of intelligence sources and methods described in such reports" impedes the reporting of violations of law by CIA officers is an important primary concern in the instant case. Here, it bears noting that since the CIA/OIG has not once contacted Plaintiff, it is not possible for Plaintiff to ascertain whether any reports have been issued; moreover, the CIA/OIG has not even sent an official notification acknowledging receipt of two reports submitted directly thereto by Plaintiff.

278. Meanwhile, the second exception in the MOU, (2), appears to include a grammatical error masked by a typographical error. The phrase "Attorney General directors otherwise" would appear to be written in error for "the Attorney General has directed otherwise". The reasons are obvious but, first of all, the temporal frame of reference in the case of the present tense, "directs" would be wrong because the report (i.e., the "*[a]ny information, allegation, or complaint received in a department or agency of the executive branch of government relating to violations of title 18 involving Government officers and employees*") would have already have been "received" and presumably "reported" to the Attorney General barring the existence of a pre-issued directive instructing otherwise. Accordingly, the phrase can only refer to the situation in which the Attorney has made a directive in advance "as to any department or agency of the Government... with respect to a specified class of information, allegation, or complaint".

279. Here, the issue becomes a question as to what is meant by "a specific class of information, allegation, or complaint", on the one hand, and whether that means that the aforementioned "*information, allegation, or complaint*" pertained to information, an

allegation, or complaint "*relating to violations of title 18 involving Government officers and employees*" is not reported at all; that is to say, to neither the Attorney General nor the CIA/OIG. There is no alternative to the reporting regime presented above, which raises the later question. That is to say, if the Attorney General has directed the Director of the CIA to have any such "*information, allegation, or complaint*" reported internally to the CIA/OIG, there would appear to be ample scope for discretionary decision making within the CIA's bureaucracy to divert the reporting of such "*information, allegation, or complaint*", preventing the reporting thereof to the CIA/OIG. An American citizen in the position of Plaintiff has no way to confirm the status one way or another, aside from recourse to the Judicial Branch. In other words, what officials in the CIA's bureaucracy have the discretionary decision making authority to determine whether or not an allegation of a federal crime meets the criteria requiring the reporting to the CIA/OIG thereof as such. This is yet another reason why there should be a blanket prohibition on the posting of covert CIA officers under official cover as American Citizen Services Officer, as they represent an opaque covert level of unaccountable bureaucracy.

280. In regard to the above-described exception (2), Plaintiff would like to

propose a hypothetical question to the Court. What reporting action would the MOU

mandate in the case of a complaint submitted by a private citizen (i.e., Plaintiff) alleging

unlawful misconduct by CIA officers that involved violations of the rights of Plaintiff

protected by the U.S. Constitution as well as information disclosing "intelligence

sources and methods"? Implanting the above-described hypothetical question into the

scenario in which the report (by Plaintiff) was made to a covert CIA officer posted

under official cover as American Citizen Services Officer makes the inherent conflicts

of interest and multilayered opacity in the bureaucracy readily apparent.


281. Presumably, the hypothetical scenario would in fact be covered by

exception (1), and the allegations investigated by the CIA/OIG. However, in the instant

case, Plaintiff was compelled, due to continual unabated harassment, to further submit a

complaint to his representative in the House of Representatives, Barbara Lee, and when

that proved to be an utterly ineffective and frustrating waste of time and effort, followed

through by lodging a complaint directly with the DOJ, not being advised that I should

report the alleged violations to the CIA/OIG until eventually contacting the office of

then head of the Senate Select Committee on Intelligence, Senator Dianne Feinstein.

282. The stage prior to my submitting the complaint to the DOJ presents at least the following three possible scenarios with respect to the federal officials concerned:

- first, Schaeffer deliberately decided not to report the allegations "through the proper channels";

- second, Schaeffer did report the complaints through the proper channels, but his superiors, whom Plaintiff presumes would include "senior officials of the Intelligence Community", such as the Director of the CIA, did not report the complaints to the CIA/OIG

- third, Schaeffer's superiors did report the allegations to the CIA/OIG, but the OIG failed to conduct an investigation and/or implement appropriate corrective measures.

283. The stage after Plaintiff submitted the complaint to the DOJ presents a range of other possible situations, none of which represent a dutiful and proper handling of the complaint by the DOJ. Moreover, in light of the continuation of the harassment after the DOJ mailed Plaintiff the written response described above, even though two of

the more egregiously offending individuals had been removed from Plaintiff's

immediate surroundings, it is apparent that the CIA did not implemented any changes

aimed at reducing the scale of the covert operations being conducted in Plaintiff's

immediate surroundings that presented the conditions that were the primary cause

facilitating the incidents in the first place, they'd simply made some personnel changes.


284. Without going into further detailed analysis of the aforementioned MOU,

suffice it to say that the very existence of said MOU attests to the fact that the Executive

was clearly aware that there exists a clear and present danger of American intelligence

officials committing federal crimes against American citizens overseas in countries

where said intelligence officials are engaged in covert operations.


285. Accordingly, the promulgation of a policy (i.e., the MOU) that on its face

is purported to be an oversight mechanism of a sort intended to prevent unlawful

misconduct and promote the carrying out of justice, but also includes stipulations that

appear to render the most central and important provisions of said MOU ineffective by

subordinating said provisions to classified procedures intended to prevent exposure of

the very existence of the intelligence officials committing the alleged Constitutional

violations, seems intended to preempt the holding accountable of intelligence officials

committing federal crimes. That would appear to violate the rights of Plaintiff to due

process protected by the U.S. Constitution. That is to say, the policy itself is drafted in a

manner aimed at facilitating the cover up of Constitutional violations committed by

American intelligence officials against American citizens overseas, in the name of

protecting "intelligence sources and methods".

286. As described above regarding the hostile and threatening emails from

Roughan, which are representative of the hostile disposition of all the CIA officers

about whom allegations are set forth herein, that Roughan sent Plaintiff in relation to his

blog posts about Roughan, many of the alleged acts of invasion of privacy and

harassment occurred after Plaintiff had reported—through what Plaintiff assumed were

the proper channels, starting with the American Consulate—rogue CIA officers acting

in their individual capacity.

287. Here, there is a possibility that, in order to conceal the (already revealed)

classified identity of a rogue CIA officer that is engaged in covert operations and whose

cover is also classified in conjunction with the effort to "protect intelligence sources and

methods" per the MOU and EO12333, said CIA officer being the subject of a citizen

report alleging the commission of federal crimes, the CIA customarily has the thus

reported CIA officer carry on as if there had not been a report alleging the commission

of a federal crime by said CIA officer. The MOU and EO12333 are too vague to

interpret one way or the other, but such a customary practice would amount to the

adoption of a policy preemptively condoning the willful neglect of the commission of a

violation of the right to privacy, for example, secured by the Constitution of the United

States and the disregard of any complaint submitted in relation thereto, thus facilitating

the further continual violation of same by the very menacing presence of the CIA

officials that have committed the alleged violations of Plaintiff's rights secured by the

U.S. Constitution, including Plaintiff's liberty interests. As such, said MOU and EO

12333 (and correlated classified procedures) have an exceedingly broad scope.


288. The fact that individuals that Plaintiff has complained about in the past

have repeatedly reappeared in my immediate surroundings, with one incident involving

Dickinson, Mike, and Turner resulting in my calling the local police to the Starbucks,

clear demonstrates that appropriate corrective measures have not been implemented.

289. Since it has been impossible for Plaintiff to know what is going on in the

Executive Branch in relation to his complaints, Plaintiff has mailed a letter and sent two

emails directly to President Obama at the White House. Plaintiff has received no reply

from the White House.


290. Plaintiff also notes that he has subsequently submitted two (to date)

reports to the CIA/OIG thus far in relation to matters pertaining to the instant case.

Plaintiff has not received a single acknowledgement that the reports were received, let

alone any indication as to the status of investigation. Furthermore, it should be noted

that the CIA/OIG did make public statements in relation to the recent scandalous

misconduct of CIA officials involved in illegally accessing the computers of Senate

staffers attached to the Senate Select Committee on Intelligence. Plaintiff believes that

the policies related to the handling of the allegations he presented to the CIA/OIG have

not facilitated Plaintiff's receiving a proper response from the government agency in

question, violating Plaintiff's rights to due process protected under the U.S.

Constitution.


291. Plaintiff asserts that, even under the implausible circumstance that the

Executive Branch can at present continue claim with valid legal basis that there exists a

"classified relationship" between Plaintiff and the CIA, the CIA/OIG cannot deny that

Plaintiff has submitted reports thereto alleging the commission of federal crimes by CIA

officials against Plaintiff, and should be obligated to provide an official response, even

if it refers to a national security exception regarding the degree of (non)disclosure of

relevant information, as in the case of the declined Privacy Act request.


292. The policies and practices examined herein represent a deliberate attempt

to obstruction Plaintiff's seeking of justice in relation to the alleged federal crimes

committed against him by federal officials, and therefore represent a denial of due

process, and violate Plaintiff's liberty interests including the protection against

government intrusion by facilitating the furtherance of the near daily continual

harassment by covert CIA officers   that was the substance of the initial allegations

made by Plaintiff to the American Consulate in Osaka.


293. Plaintiff, having read the above-described EOs and policies, has come to

the conclusion that the common thread running therethrough pertaining to the

"protection of intelligence sources and methods" is being used by the Executive to

preemptively subvert the original functions of government agencies, such as American

Citizen Services Officer, to the secretly established covert agenda of the CIA without

due consideration of the various and several rights of American citizens residing

overseas protected by the U.S. Constitution.

294. To reiterate, the "protection of intelligence sources and methods" appears

to be serving as the justification for not even acknowledging that a complaint has been

made to the CIA/OIG alleging the commission of federal crimes by CIA officials

against an American citizen overseas, despite a history of such crimes. A same or

similar pattern is found in the lack of responsiveness to complaints related to the CIA by

the Consular officials serving as American Citizen Services Officers, and is accentuated

by the eventual decision to cut off all personal contact, requiring that I file an FOIA

request even to learn the identity of the current American Citizen Services Officer.

Meanwhile, it took approximately eleven months to receive the above-described written

reply from the DOJ.

295. Accordingly, there is a question as to whether customs and practices

facilitated by the above-described EO and MOU afford an excessive scope of discretion

with respect to the determination as to whether or not to investigate alleged violations

by federal officials, such as covert CIA officers, of the Constitutional rights of an

American residing overseas.

296. As to EO 12333, the wording fails to impose strict controls over the use of

information obtained under the provisions thereof in a presumably lawful manner from

being diverted for use in unlawful purposes, and the mere mentioning that

Constitutionally protected rights are not to be violated would appear to be too vague to

have the apparently intended effect.

297. More specifically, in the instant case, there would appear to be two

categories of personage defined in EO 12333 to which Plaintiff could be presumed to

belong. The first category would be as an applicant for employment with the CIA, as

per the aforementioned application Plaintiff filed online in April 2009, and would only

have applied after said application was filed and for a short duration thereinafter within

which the CIA could have contacted Plaintiff regarding his application for a position

with the CIA as an independent contractor. The second category would be as a private

American overseas that has been targeted by an international criminal organization of

which the American intelligence agencies were aware.

298. Here, although Plaintiff may be deemed to fall under the above-described

categories for the narrow purposes associated with said categories, information obtained

about me through electronic and physical surveillance was diverted for use in the

unlawful purpose of attempting to displace Plaintiff from Kyoto by CIA officers, their

cohorts from the intelligence services of other countries and locally recruited Japanese

proxies (i.e., so-called "agents").

299. In the instant case, individual CIA officers such as Peterka, Roughan and

Paquette were deliberately engaged in carrying out, acting in their individual capacity as

rogue federal officials, conspiratorial criminal acts with respect to which they were fully

cognizant of the Constitution violations they were committing; however, the

insufficiently prohibitive wording of EO 12333 and other configurational deficiencies

with the related policies contributed to producing an environment conducive to

intelligence officers and the intelligence community assuming that an excessively broad

degree of discretion was afforded by said EO 12333 and other policies than is

permissible under the Constitution of the United States of America, thereby constituting

policies that facilitated the alleged violations of the rights of Plaintiff protected by the

U.S. Constitution.


300. For example, having had Privacy Act requests denied by the CIA, NSA,

etc., on the basis of national security exemptions, Plaintiff would include Executive

Order 13526 (hereinafter "EO 13256") as a policy supporting the labyrinth-like

bureaucracy that the Executive has constructed in order to facilitate the concealment of

wrongdoing, including the violation of the rights of American citizens overseas

protected by the U.S. Constitution, by officials of the Executive branch of the

government of the United States of America, as well as complaints directly related

thereto submitted to various agencies of the Executive Branch.


301. Meanwhile, there is a conspicuous lack of a formal Administrative

Procedure for filing complaints such as those by Plaintiff starting with the visit to the

American Consulate in Osaka, Japan. That would seem to represent a deliberate

omission, again with the above-described aim of concealment of wrongdoing, etc.


302. Accordingly, taken severally and considered in concert, the

above-described official acts, including policy promulgation, etc., of U.S. government

officials demonstrate policy-based customs and practice that facilitate self-serving

bureaucratic interests as opposed to regulating the dutiful performance of the functions

owed to the American citizens according to the public office occupied by said officials,

thus facilitating the violation of Plaintiff's rights protected under the U.S. Constitution.

303. At this point, it is necessary to revisit the DOJ's handling of Plaintiff's

complaints with respect to the stipulations set forth in Executive Order 12333 and the

Memorandum of Understanding between the DOJ and CIA on the reporting of federal

crimes as well as the customs and practices associated therewith.

304. Though the classified status of the procedures drawn up by the Attorney

General are unknown to Plaintiff, there would seem to be a systemic deficiency in

relation thereto that produces a disincentive for covert CIA officers posted under official

cover as American Citizen Services Officers to fulfill the corresponding fiduciary duty

to American citizens incumbent thereupon; thus, said procedures must also be presumed

to be culpably inadequate. Moreover, in light of past egregious violations of the civil

rights of American citizens overseas by rogue CIA officers, only a deliberate refusal

to implement remedial policies could account for the lack thereof. Such a deliberate

refusal to implement remedial measures has facilitated the violation of Plaintiff's

aforementioned civil rights. Such remedial policies and remedies would, as a matter of

course, encompass a corresponding regime for the training of covert CIA officers posted

under official cover as American Citizen Services Officers.


305. The DOJ's actions and refusal thereof (i.e., to launch an investigation into

Plaintiff's allegations) facilitated by said culpably inadequate policies, customs and

practices, demonstrated deliberate indifference to Plaintiff's plight and served to

facilitate further such harassment by CIA officers and their proxies which should

otherwise have been prevented. Such inadequacy has resulted in the egregious violation

of Plaintiff's right to privacy protected under the Fourth Amendment, and rights to due

process protected under the Fifth Amendment as well as the Fourteenth Amendment of

the U.S. Constitution. *Bivens* provides the authority to bring a civil action for said

violations, and *Monell* claims provide the proper vehicle therefor.

IX

SIXTH CAUSE OF ACTION

(*Bivens* 4, *Monell* 2: Procedural Due Process, Substantive Due Process;

Fifth Amendment, and Fourteenth Amendment of the U.S. Constitution)


306. Plaintiff incorporates herein, as though fully set forth, all of the allegations

contained in paragraphs 1 through 305, above, as though fully set forth.


307. In the Fifth Cause of Action, Plaintiff has attempted to focus on the nexus

of policies and practices/customs as enabling deprivation of Plaintiff's aforementioned

civil rights. Here, Plaintiff wishes to focus more narrowly on the role of the policies in

depriving Plaintiff of his right to procedural due process. The above-described attempts

by Plaintiff to file a complaint alleging violations of his rights protected by the U.S.

Constitution, including, for example, the right to privacy, were met with dead ends,

non-responsiveness and deception on the part of the federal agencies receiving

Plaintiff's complaints, including the DOS, DOJ and CIA/OIG.


308. Furthermore, while the above-described MOU and EO 12333 have been

established, no formal Administrative Procedure has been established for enabling

American citizens overseas to report alleged violations by CIA officers of rights of an

American citizen overseas protected by the U.S. Constitution. The absence of a formal

Administrative Procedure at each of said federal agencies is conspicuous in the light of

past abuses by the CIA such as those described herein as well as the circumstances of

the instant case, and should be seen in stark contrast to the promulgation of both the

aforementioned MOU and EO 12333, the existence of which is a testimony to the

foreknowledge of the respective officials of the Executive Branch agencies with respect

to relevant matters including matters such as those described herein.


309. Moreover, in one way or another, both of the aforementioned MOU and

EO 12333 as well as the apparently classified procedures to be established by the

Attorney General in relation to said MOU would appear to correspond to:


"...*law*[s] *which shall abridge the privileges or immunities of citizens*

*of the United States*"


310. Plaintiff's privacy and dignity have been severely infringed upon by

federal officials including suspected CIA officers, and Plaintiff was entitled to honest

services from the federal officials of each federal agency to which he made repeated and

continual protestations both verbal and in writing seeking to bring an end to the

above-described misconduct of rogue CIA officers and other federal officials, including

deprivations of Plaintiff's rights secured by the U.S. Constitution. Plaintiff alleges that

such denial of honest services was due at least in part to the fact that no official

Administrative Procedure for receiving such complaints as the aforementioned

complaints made by Plaintiff whereas the history of similar abuses by rogue CIA would

seem to require that a corresponding Administrative Procedure be established in order

to protect the rights of American Citizens overseas as secured by the U.S. Constitution.

Said MOU and EO 12333 have been promulgated in a manner such as to deprive,

preemptively and in stealth, American citizens' aggrieved by violations of their rights

secured by the U.S. Constitution of recourse to an appropriate Administrative Procedure

to address said grievances.


311. The absence of a formal administrative procedure at any of the

corresponding Departments of the Executive Branch thus facilitated the unabated

continuation of said misconduct violating Plaintiff's due process rights protected by the

U.S. Constitution. Accordingly, Plaintiff alleges that the absence of a formal

Administrative Procedure at any of the Departments of the Executive Branch is itself

the cause of creating a bureaucratic environment of permissiveness that facilitated

continual violations of Plaintiff's rights secured by the U.S. Constitution, violations that

should have otherwise been halted by sufficient government action in relation to the

reporting thereof through the "appropriate channels" by means of a formal

Administrative Procedure therefor. That is to say, though Plaintiff was informed of the

existence of "appropriate channels" therefor, said "appropriate channels" were not

specifically identified to Plaintiff; moreover, Plaintiff was not provided access thereto in

the form of an official Administrative Procedure. Plaintiff has been deprived of his right

to procedural due process protected under the Fifth Amendment of the U.S. Constitution

in a manner facilitated by the promulgation of said MOU and EO 12333 in violation of

the Privileges or Immunities Clause of the Fourteenth Amendment of the U.S.

Constitution. *Bivens* provides a cause of action against such violations, and a *Monell*

claim provides the proper vehicle therefor.

X

SEVENTH CAUSE OF ACTION

(Obstruction Of Justice, pursuant to

18 USC 1505: Obstruction of proceedings before departments, agencies, and

committees;

18 USC 1512: Tampering with a witness, victim, or informant;

18 USC 1514 Civil action to restrain harassment of a victim or witness; and

18 USC 1519: Tampering with evidence)

Plaintiff incorporates herein, as though fully set forth, all of the allegations

contained in paragraphs 1 through 311, above, as though fully set forth.

312. Among a number of such examples, one example of tampering with and

harassing a victim (i.e., Plaintiff) can be seen in the harassment and attempts to

intimidate and threaten by Roughan in personal emails and the like as well as his

presumed assumption of a false identity bearing my name to make derogatory

comments on my blog. Roughan had repeatedly demanded that I remove posts

describing him as a CIA officer and his related acts against Plaintiff violating Plaintiff's

rights secured by the U.S. Constitution, and repeatedly insinuated that Plaintiff's

allegations against him and the CIA were indicative that Plaintiff had mental health

problems.

313. Another example of tampering can be seen in the continual attempts to

dissuade Plaintiff from pursuing legal action by deceiving Plaintiff into thinking that the

CIA was about to propose a settlement or reach some agreement accommodating my

demands, such as agreeing to the terms of employment as an independent contractor,

etc., Plaintiff had offered.

314. The CIA projected an ominous and menacing presence through the

continual resurfacing of CIA officers and proxies thereof about whom Plaintiff had

complained, or through the introduction of new CIA officers into Plaintiff's immediate

surroundings who would socialize with Plaintiff at the Starbucks in a manner such as to

suggest that some positive developments were pending, including, for example, that the

of the problematic rogue CIA officers about whom Plaintiff had complained had been

removed. Such false overtures amount to an attempt to influence Plaintiff in a manner

such as to consume his time and divert his efforts toward pursuing legal action, thereby

delaying the filing of this Complaint. That is to say, instead of pursuing legal action,

Plaintiff was instead indirectly encouraged to bide his time await further signs and

developments while socializing with the newly introduced CIA officers, etc.

315. In this respect, the nature of the so-called "classified" relationship

between Plaintiff and the CIA referenced in the refusal of Plaintiff's Privacy Act request

to the CIA requires scrutiny. Plaintiff is skeptical that the full scope thereof is

encompassed by the relationship created on the basis of Plaintiff's application of

employment therewith as an independent contractor.

316. Plaintiff notes that he had contacted Taylor and reported the attack

Plaintiff had suffered at a local bar at which Plaintiff had an appointment to meet a CIA

proxy named Yoshiyuki (reported to Consulate along with mobile telephone number)

whom Plaintiff had met at the Starbucks through Peterka, Mike, and Paquette. Taylor's

reply of December 12, 2007 included the statement, "Sounds like you need to find a

new crowd in Kyoto". Normally, that might sound like reasonable advice, but under the

circumstances, that would simply require Plaintiff to avoid all public venues, such as

cafes, bars and the like, frequented by covert CIA officers and their proxies, who

constitute a group that collectively had sought to colonize civil society in Kyoto.

Plaintiff notes that he raised the issue of civil society in his first email to Schaeffer et al.

It should be noted here that Yoshiyuki was frequently in the company of Mike as well

as Paquette, and there is no question in Plaintiff's mind that he was set up to be attacked

by said CIA officers or their proxies with the complicity of said CIA officers.


317. While Plaintiff is not aware as to whether or not Taylor reported, as

apparently is required under EO 12333, Plaintiff's allegation that he had been subject to

a criminal attack encompassing a conspiracy involving rogue CIA officers. Plaintiff has

noted the correspondence between the appearance of Harris from Thailand and his

attempts to encourage Plaintiff to leave Kyoto for Thailand, and the fact that Taylor and

Kiely had been stationed in Thailand for many years. Furthermore, the time frames

overlap.


318. Here, Plaintiff cites a paragraph from an email to the Consulate (the total

emails of which amounts to more than a hundred pages) addressed to Snider that

Plaintiff sent on October 20, 2011 to the American Consulate in Osaka, the email

having subsequently been provided to the DOJ as well:

*After being attacked in the bar called the HUB, the next time I was in there I was talking to a guy named Marcus, a German doing something at Kyoto University in the Science, and obviously an intelligence dweeb. We were talking about the attack when I was compelled to come out and say loudly that Glenn was in the CIA, whereupon Marcus tried to deny that and quickly change the subject to the guy who had attacked me, telling me he was Moroccan and trying to get me interested in other information. More recently, after the topic again came up with a Dan Douglass assuming a higher profile, apparently more time to spend at the café after losing his job, whereupon he also tried to put me on the trail of the Moroccan guy, telling me the guy was studying martial arts and that Dan, too, had found him to be an individual with a chip on his shoulder. In summary, both Marcus and Dan tried to steer me onto a revenge trail against my attacker in order to divert my attention from analyzing the setup and those behind it.*

319. Examples of CIA officers newly introduced (or reintroduced) into

Plaintiff's immediate surroundings include Blackman (depending on when Plaintiff can

be characterized as having "victim" status), Dickinson, Laverne, Douglass, Dalsky,

Bray, and O'Day, and most recently Zimbleman. In each case, initially there would be

cordiality and a certain degree of empathy being projected toward Plaintiff, but then

things would not advance, and hostility and ulterior motives begin to surface. Without

exception, all were attempting to convince me to leave Kyoto, with the implication that

things were going to be tough for me in a hostile environment teeming with CIA et al.

aiming to recruit spies from among the Japanese citizens, etc., present in the civil

society venues frequented by Plaintiff.


320. It bears repeating that the incidents continued after Plaintiff reported the

rogue CIA officers to the Consulate, started blogging about the scenario and informed

the Consulate, reported the problems to the DOJ, etc. There is a modus operandi

wherein the CIA has adopted tactics aimed at skirting local law because it is difficult

and costly to seek redress through the judiciary in Japan, and continually violated

Plaintiff's rights protected by the Constitution because they thought they could continue

to get away with it, partly due to the bureaucratic/policy nexus that has been

implemented to facilitate evasion of accountability, making it basically impossible for

aggrieved individual American citizens overseas such as Plaintiff to put an end to the

harassment without making recourse to the Judicial Branch, which represents an

extreme burden to Americans residing overseas.

321. Among aforementioned re-introduced individuals is O'Day, for example.

The emails we exchanged related to translation of a few sentences for her in relation to a

lawsuit she is involved in due to a traffic accident in which she was injured. More

recently O'Day had been complaining to Plaintiff about her work situation and asking

for legal advice. Plaintiff didn't have much advice to offer, but the gist of the matter

related to her supervisor, the head of the Applied Linguistics Department at Kyoto

Prefectural Medical College, where O'Day has a temporary position as an English

instructor. Although O'Day was contemplating taking legal action, on several occasions

when Plaintiff mentioned that he was in the midst of trying to put together a lawsuit

against the U.S. government, O'Day repeatedly advised against doing so, saying it

would be best to avoid that.

322. Though Plaintiff had initially thought that might be a sign O'Day had been

resurfaced by the CIA in order to facilitate a settlement, the CIA apparently had simply

intended O'Day as both a delaying mechanism and a representative of a status quo

scenario that appealed to them. It should be noted that when Plaintiff says resurfaced, he

means after O'Day had been removed from Plaintiff's immediate surroundings after

Plaintiff had complained about her to the Consulate, she subsequently reappeared.

Plaintiff first encountered O'Day at the Starbucks in or around early 2012, though she

had been a resident of Kyoto for many years.

323. When Plaintiff first complained to the Consulate about O'Day, it was

partly due to some of her early questioning about Plaintiff's appeal of the verdict of

court of the first instance to the Osaka High Court. Plaintiff suspected that she may have

been party to a plot to corrupt Plaintiff's attorney—who had been less than cooperative

at times—in his lawsuit against the city of Kyoto for illegally denying our son entry into

the neighborhood nursery school. The only foreigners whose children were enrolled

were intelligence officers, including David Dalsky of the CIA, David Chandler of the

MI6, and two members of France's overseas intelligence agency. Before complaining

about her to the Consulate, Plaintiff had sent her a message through her Facebook

account explicitly stating that he knew she was a CIA office and considered her to be

hostile. She resurfaced and projected a degree of empathy so effectively that Plaintiff

felt bad for sending her the highly offensive comment, and subsequently deleted it.

Eventually, however, Plaintiff was compelled due to suspect conduct she evinced, to

escalate the level of complaint (brief description to CIA/OIG).

324. Plaintiff alleges that the Zimbleman emails, as described in some detail

above, fall under the same category and also represent conduct corresponding to

tampering with a victim. Here, it must be emphasized that the CIA has deployed against

me numerous officers—who in turn have deployed proxies—said CIA officers including

three psychologists and another with a degree in psychology: Dalsky has a PhD in

psychology, Zimbleman has a PhD in psychology, O'Day is working on her PhD in

psychology, and Bray has an undergraduate degree in psychology. All of said

individuals have tried to elicit empathy from Plaintiff in one manner or another as part

of their respective schemes to manipulate Plaintiff.

325. Plaintiff also alleges that the misleading conduct seen in the treatment he

received from the DOJ, including the above-described written reply signed by

Kappelhoff, constitutes tampering with a victim. Plaintiff was misleadingly provided

with a useless email address to an uninvolved office in the DOJ, the aforementioned

written reply mischaracterized Plaintiff's allegations, and belittled the alleged crimes, adding insult to injury in an apparent attempt to dissuade Plaintiff from pursuing the allegations via the Judicial Branch, which in retrospect appears always to have been the only option from the start, practically by design.

326. The first instance of tampering with evidence has been described by Plaintiff in the second report he submitted to the CIA/OIG and relates to the hacking into Plaintiff's Hotmail account to carry out a selective deletion of all emails exchanged between Plaintiff and Paquette before 2007, some of which included Plaintiff addressing issues related to the CIA/MI6 and the use of religion for subversive purposes in Kyoto, said selective deletion being coordinated with the subsequent abandonment by Paquette of his long-term personal email account, presumably aiming to thereby render the evidentiary emails inaccessible: gcpaquette@cs.com.

327. Plaintiff had been extremely shocked to find the emails missing from his Hotmail account, because he is certain that he had saved them in a user-created folder. As is shown by the existence of the email dating to 2003 from Peterka, Plaintiff had actively been storing such correspondences in respective folders created by Plaintiff. In

the case of Paquette, there is a partial email from June 2007 that is the earliest

remaining record of email communications between Paquette and Plaintiff, and the next

email is not until May 2008, which indicates that all of the emails between those dates

were also deleted.

328. In October of 2014 Plaintiff became aware of media reports indicating that

the CIA was seeking permission to delete email correspondences of non-senior officials.

Plaintiff noted that in the following paragraph from the aforementioned report (dated

October 28, 2014) to the CIA/OIG:

> *First, as noted on my blog, I have learned that the CIA has*
>
> *requested permission to delete email correspondences of rank-and-file*
>
> *officers. In the case I have presented to you thus far, emails are*
>
> *practically the only material evidence I have, and any relevant emails*
>
> *of the following individuals would obviously be corroborating*
>
> *material evidence to this case...*

329. At the risk of portraying the instant case in a more important light than it

may merit in the public's eye at this stage prior to its formally getting underway,

Plaintiff was earnestly concerned that the CIA's proposal was partly targeting the

evidence yet to be discovered in the course of the instant case, which Plaintiff has long

since informed the Executive Branch of his intent to file.


330. Assuming that Holder authorized interception of Plaintiff's electronic

communications and physical surveillance under the provisions of EO 12333, perhaps at

different points in time for different reasons corresponding to the respective relevant

clauses of EO 12333, it has to be assumed that he would have an abiding interest in the

situation. It goes without saying that once the Attorney General authorizes the collection

of data on a private American citizen overseas under the provisions of EO 12333, the

collected data becomes highly sensitive.


331. In fact, the following sections of EO 12333 set forth specific provisions

related to the collection of information on U.S. persons.


- "1.3 *Director of National Intelligence* (b)(9)(B)",

- "2.3. *Collection of Information*"

- "2.4. *Collection techniques*"

- "2.5 *Attorney General Approval*" and

- "2.8 *Consistency With Other Laws*"

332. Here, the circumstances of the instant case give rise to the question as to whether the prescribed procedures were followed as well as the question of the propriety of said procedures. With respect to the above-described incidents related to Roughan and others, Plaintiff doubts that the procedures could have been followed, but would not be surprised should evidence revealed during discovery disprove that doubt. The question as to whether the procedures are defined in a manner rigorous enough to have prevented the alleged abuses would remain, in either case. That is due to the fact that the procedures outlined in EO 12333 are themselves further dependent on other procedures that would appear to be classified, and the procedures presented to the public are too vague to permit an accurate assessment as to the adequacy thereof. This problem represents yet another aspect of the instant case that can only be illuminated through the Court's adoption of CIPA-like procedures.

333. The DOJ mislead Plaintiff to believe that his complaints were being taken

seriously. Plaintiff was under the impression that an investigation was already underway, and was shocked by the written reply signed by Kappelhoff. Moreover, not only did the DOJ refuse to launch an investigation, they delayed replying to Plaintiff for eleven months while dealing with Peterka and Paquette in conjunction with the CIA and other agencies of the Executive Branch, apparently subjecting them to some form of administrative discipline.

334. That is to say, not only did the DOJ's aforementioned written reply mislead Plaintiff in a manner such as to persuade Plaintiff to believe that his civil rights secured by the U.S. Constitution had not been violated by CIA officers against whom Plaintiff had made allegations, including Peterka and Paquette, the DOJ had presumably (based on the MOU, etc.) been engaged in a non-public investigation of the allegations made by Plaintiff, said non-public investigation resulting in some form of administrative discipline against Peterka and Paquette, on the one hand, and a fraudulent misrepresentation of the actual state of affairs to Plaintiff, on the other.

335. Justice was thereby deliberately denied to Plaintiff by the DOJ, apparently with the aim of covering up, in collusion with the CIA and other federal agencies, the

alleged violations by rogue CIA officers of Plaintiff's rights secured by the U.S.

Constitution. Plaintiff's complaints described, for example, multiple violations by rogue

CIA officers of his right to privacy protected under the U.S. Constitution, and should

have resulted in the DOJ's launching of a criminal investigation of Plaintiff's

allegations.

336. Here, it bears mentioning that it is inconceivable that even the paralegal,

Callahan, let alone Kappelhoff, would have been unaware of the fact that civil rights

violations are actionable under *Bivens*. In fact, the Executive Branch had reached a

settlement, in 2009, with the plaintiff, Richard Horn, in the above-cited case of Horn v.

Huddle, in which the defendant Huddle was sued as a rogue CIA official after a

protracted court case of approximately fifteen years.

337. Therefore, the DOJ not only deliberately ignored violations of the

Plaintiff's rights protected by the Constitution of the United States of America, the DOJ

obstructed justice by issuing a misleading, deceptive reply after delaying for the

protracted period of eleven months during which other misleading acts were committed

by DOJ officials, with the aim of covering up readily apparent federal crimes committed

by rogue federal officials, instead of launching a criminal investigation into the

allegations thereof.


338. Furthermore, with regard to the CIA/OIG, assuming that the complaints

were forwarded to the CIA/OIG through the Consulate (Schaeffer et al., etc.), either the

CIA/OIG did not investigate the complaints and order appropriate corrective measures,

or the CIA/OIG did investigate and order appropriate corrective measures that were

subsequently not implemented as ordered. The later would seem to represent an

obstruction of justice on the part of those tasked with implementing corrective measures

ordered as a result of the investigation of the allegations by the CIA/OIG, while the

former (i.e., refusal to investigate) would as well, if the allegations set forth by Plaintiff

correspond to violations of his rights protected by the U.S. Constitution.


339. Finally, assuming that the protestations made verbally in person at the

Consulate and complaints Plaintiff subsequently emailed to Schaeffer et al. correspond

to violations of Plaintiff's rights protected by the U.S. Constitution, the failure to

forward said complaints to the CIA/IG would also seem to clearly represent an attempt

to obstruct justice by preventing the allegations from being brought to the attention of

the department authorized by law to conduct an investigation of said allegations. Again,

the goal in that case, too, would appear to be to cover up the unlawful conduct by rogue

CIA officers, etc., reported by Plaintiff.


340. Plaintiff also would like to note that, had a formal investigation of the

allegations he made been launched, it would presumably have been a criminal

investigation pertaining to federal crimes committed by covert CIA officials involving

"intelligence sources and methods", wherefore a court case resulting therefrom would

have automatically involved CIPA procedures.


341. The above-described acts constitute violations of 18 U.S. Code § 1505, 18

U.S. Code § 1512, and 18 U.S. Code § 1519, which provide respective private rights of

action.

XI

EIGHTH CAUSE OF ACTION

(*Bivens* 5: First Amendment, and Ninth Amendment of the U.S. Constitution)

342. Plaintiff incorporates herein, as though fully set forth, all of the allegations contained in paragraphs 1 through 341, above, as though fully set forth.

343. There are daunting challenges posed by the compelling need to describe the socio-political circumstances under which Plaintiff has been aggrieved by violations by rogue CIA officers and a slew of other federal officials of his civil rights secured by the U.S. Constitution; however, it is in said circumstances that the crux of the Ninth Amendment violations is to be found. Part of the challenge lies in the fact that a number of the variables are so far in the background the shared heritage of Americans that they have not been specifically articulated in terms of rights and immunities in the U.S. Constitution; thus, Plaintiff finds the argument that the Ninth Amendment provides recourse for addressing such scenarios as they arise to be compelling.

344. First, Plaintiff reiterates that the sheer scale of the so-called "covert"

operations of the CIA here in Kyoto should shock the conscience of the court,

regardless of the grievances presented by Plaintiff, as said operations are evocative of

the term neo-colonialism, as seen in some forms of academic discourse, due to their

state-funded nature, all-encompassing scope, and apparent aim to have a transformative

impact on Japanese civil society, which in turn links the CIA to a project that could

readily be described as having characteristics associated with imperialism. The United

States of America is a Republic that was founded through a fight against the imperialist

British Empire to secure the freedoms enshrined in the Constitution of the United States

of America.

345. Fundamentally, Plaintiff's grievances have arisen as a result of his calling

attention to aspects of the CIA's operations here in Kyoto Japan that contravene

deep-rooted American values, and law. Upon noticing that Plaintiff had not only

become aware of the operation(s) in which the CIA officers were engaged, but letting

said officers know that Plaintiff not only had become aware, but taking them to task

philosophically in relation thereto, he was targeted by rogue CIA officers as an obstacle

that would terminally impede the achievement of their respective personal goals in

Kyoto.

346. The operations grasped by Plaintiff were varied, but encompassed some

obvious attempts by the CIA et al. to infiltrate officers into every niche of civil society

in Kyoto—whether they could speak Japanese or not were culturally literate or

not—along with an over-the-top concentrated effort on the Starbucks cafes as staging

grounds that saw groups of CIA officer engaged in an activity that to Plaintiff's mind

evoked what philosopher Jurgen Habermas (hereinafter "Habermas")has described as

"representative publicness". In short, the CIA et al. were engaged in a collective effort

to project their respective status as individuals that had viable lives in civil society in

Kyoto, apparently with the aim of supporting the efforts of said CIA officers to recruit

Japanese civilians as spies to act against Japan: the targeted recruits country of birth and

citizenship, and Plaintiff's country of residence.

347. Aside from thoroughly infiltrating the higher education system, the CIA et

al operations also encompassed an emphasis on modern culture, with the CIA sending

various semi-talented musicians and dancers to perform at local night-life venues and

attempt to create a "scene", so to speak. Since the CIA et al. were apparently

intentionally composed of individuals that knew nothing about the history and culture of

Japan, Plaintiff adduces that the focus on modern culture was to serve as both a cover

for infiltrating officers as well as supporting an alternative to the wealth of traditional

cultural pursuits and activities to be found in the ancient cultural capital of Kyoto. The

CIA can be said to be ubiquitous in Kyoto civil society.

348. Plaintiff asserts that he has always had every right to lead a normal life in

civil society in Kyoto, Japan, without needing to be concerned about operations by

covert CIA officers, in accordance with the various precedents quoted, for example, in

(Ingraham v. Wright, (1977) No. 75-6527):

*'The liberty preserved from deprivation without due process*

*included the right 'generally to enjoy those privileges long recognized*

*at common law as essential to the orderly pursuit of happiness by free*

*men.'( Meyer v. Nebraska, 262 U.S. 390, 399 (1923))*

*The right of personal security is also protected by the Fourth*

*Amendment, which was made applicable to the States through the*

*Fourteenth because its protection was viewed as "implicit in `the*

*concept of ordered liberty' . . . enshrined in the history and the basic*

*constitutional documents of English-speaking peoples." Wolf v.*

*Colorado, 338 U.S. 25, 27 -28 (1949).*

*It has been said of the Fourth Amendment that its "overriding*

*function . . . is to protect personal privacy and dignity against*

*unwarranted intrusion by the State." Schmerber v. California, 384 U.S.*

*757, 767 (1966).*

349. The agenda of the CIA here in Kyoto—and Japan in general—is largely

motivated by geopolitics, which is not shocking. The specific parameters of the

operations and the apparent objectives, however, are shocking and contradictory to

basic values of civilization in the twenty-first century, values such as those set forth in

both the Constitution of the United States of America and the Constitution of Japan.

350. As described above, Plaintiff has since come to understand that almost all

of the Westerners Plaintiff has interacted with personally in Kyoto over the years have

been intelligence officers (CIA, MI6, etc.). In fact, the scale of the CIA-coordinated

operations of Western intelligence agencies in Kyoto made it apparent that the CIA et al.

constituted a veritable class unto themselves. As a student of East Asian history and

languages, it appears Plaintiff was to be excluded from that class because the knowledge

he'd acquired informed interests that were intrinsically opposed to the readily apparent

operations aimed at subverting civil society in the ancient cultural and religious capital

of Kyoto, operations the scale of which should shock the conscience of the court. In

short, Plaintiff was targeted by the CIA for displacement from Kyoto as an obstacle

impeding the achievement of the corresponding personal goals of the individual rogue

CIA officers. The personal goals of each said rogue CIA officer may have been

informed by the political goals of their supervisors, who in turn appear to have provided

bureaucratic cover shielding said rogue CIA officers from scrutiny with respect to their

violations of Plaintiff's civil rights secured by the U.S. Constitution.


351. The following passage is from a facsimile Plaintiff sent to the DOJ in

February 2012:


*I want to reiterate that Kyoto is and will remain my home,*

*and I will not tolerate the presence of illicit media outlets and other*

*debased activities by intelligence networks that have no legitimate*

*business here. The primary business that the intelligence community*

198

*should be interested in here is dismantling international organized*

*crime networks, but the people I continually have to report are all*

*trying to collaborate with organized crime, building new networks.*

*Civil society is a sphere that is protected under the law from*

*government intervention, and that is the fundamental concept*

*underpinning civil rights, to my understanding. Japan is a democratic*

*state under constitutional rule of law. The people in the intelligence*

*networks that I'm calling to account are in violation of many of the*

*laws of Japan, not to mention the laws of the United States with*

*respect to harassing Americans residing abroad.*

352. Several aspects of the CIA's agenda here in Kyoto undoubtedly involve

religion-and-the-state issues, as documented on Plaintiff's blog, in a manner totally at

odds with the American Constitutional doctrine of separation of Church and State as

well as the protection of freedom of religion. In all fairness, it is not only the United

States, but also the United Kingdom, and France, for example, that are infiltrating their

intelligence officers into Kyoto with the aim of propagating Christianity.

1. Religion and the State

- Long Island University's Global College Friends World Program, Japan

- Dougill and Shinto/Sakamoto Ryoma (e.g., associated with the proto-theocratic 19th century movement to "Revere the Emperor, Expel the Barbarians" associated with the Meiji Restoration)

- Dougill and the "hidden Christians"

2. Mass media disinformation/false promotion of "covert" CIA officers

- Japan Today and Osaka's Mayor/Governor Toru Hashimoto ((mis)appropriated Sakamoto Ryoma, named his political party after the Meiji Restoration ("Ishin"), the English rendition of which has since been changed from "Restoration" Party to "Innovation" Party)

- Japan Times and Eric Johnson's article describing Nara as colony of Korea

- Japan Times Kris Kosaka piece on Lotman

3. Local presence in Kyoto vis-a-vis English language print media/CIA-fronts intended to project a false image of the existence of a thriving "expat community" in Japanese civil society in Kyoto

English language media/expat scene venues:

- Kansai Time Out

- Kyoto Journal

- Kyoto Visitor's Guide

- Papa John's (café) "The Flame" open mike

(https://www.youtube.com/watch?v=ab0bCRg9dsQ)

- Writers in Kyoto (This represents the most recent suspected attempt of the CIA

and MI6 to reassert the "representative publicness". Plaintiff learned of its existence

through an article in the Japan Times by suspected CIA officer Johnston

(http://www.japantimes.co.jp/news/2015/05/10/national/writers-kyoto-offers-expats

-forum-discuss-state-publishing-japan/#.VcYW8_ntlBd), and it held its first

meeting in April 2015. The blog is a clear example of the type of self-promotion of

so-called covert intelligence officers as authoritative individuals capable of

representing the state of the art of their respective fields, in this case; at least eight

of the individuals listed as "writers" on the site have been described by Plaintiff in

his blog or mentioned in emails to the DOJ, etc.:

(http://www.writersinkyoto.com/featured-writers/). Plaintiff believes that the

establishment of such group can also be seen partially as a psychological warfare

tactic directed at Plaintiff, in response to his blogging about said officers. Another

example of the low intensity psychological warfare campaign (in its online

manifestation) against Plaintiff can be seen in the recent advertising on Facebook

(during July 2015) of the suspected CIA front "Deep English", which Plaintiff has

exposed on his blog, operated by Douglass, and of a book published by CIA/G2

front "Deep Kyoto" authored by suspected CIA officer Ted Taylor, who is also

listed on the CIA/MI6 front Writers in Kyoto site and whom Plaintiff has also

exposed on his blog in relation to the event The Flame sponsored by suspected CIA

front Papa John's Café (http://kyoto-inside-out.blogspot.jp/search?q=ted+taylor).


353. Aside from the major newspapers, the market for English language

publications is diminishingly small, because there simply are not a large number of

speakers of English in Kyoto, for example, aside from the veritable diaspora of Western

intelligence officers masquerading as an "expat community".


354. Japan is a country with a Constitution that was written by Americans

after WWII, and modelled on the U.S. Constitution. Japan has a democratic polity and a

free-market economy. Japanese citizens enjoy the full-range of civil liberties as those of

Americans, and Plaintiff has the right to enjoy said same civil liberties free from

harassment by American intelligence officials.

355. The attempt to monopolize civil society involves the creation of a comprehensive, exclusionary network of intelligence officers and their agents. Plaintiff was targeted in a preemptive manner because one the CIA grasped that Plaintiff would not agree to become part and parcel to such fundamentally anti-American and hostile machinations against civil society in an allied country with the above-described modern political and economic characteristics, he was deemed to be a threat to their ability to continue their personal lives in Kyoto as part of the would-be comprehensive intelligence officers/agents network.

356. Although the network is increasingly active in self-promotion on the Internet, as demonstrated by the recent establishment of the "Writers in Kyoto" blog, including suspected CIA officers that are actually based in Tokyo, such as Japan Times columnist Amy Chavez, as guests, the members of said network has largely been withdraw from the central part of the city in which Plaintiff resides and conducts his daily activities, presumably because the CIA is anticipating Plaintiff's filing of this Complaint after Plaintiff submitted two separate reports to the CIA/OIG expressing his intent to file this Complaint, for example.

357. Plaintiff has presented ample evidence on his blog (and in communications sent in complaint to respective federal officials) demonstrating that the CIA et al. have undertaken premediated countermeasures to protect that would-be monopoly in Kyoto civil society against private American citizens like myself that are area experts with fluency in the language, etc., to whom many of the ruses would be readily apparent upon even a cursory amount of scrutiny. For example, reading a single book—Sakamoto Ryoma and the Meiji Restoration, by Marius Jansen—would alert the reader to the misappropriations of Sakamoto Ryoma (i.e., by Dougill and Hashimoto). Here, in relation to the apparent attempts promote Hashimoto's political appeal among the English speaking community by JapanToday, it should be noted that Hashimoto's past ties with Japanese organized crime figures are well documented.

358. In fact, the common thread between published writing of Dougill and the course in the Long Island University (hereinafter "LIU") Global College Friends World program taught by Houser relates to the now infamous Japanese politician Hashimoto: first, Hashimoto's father was a Burakumin said to have been connected to organized crime; and second, Hashimoto has attempted to blatantly misappropriate the Meiji

204

Restoration as well as one of its leading historical figures—Sakamoto Ryoma—and

Sakamoto's eight-point plan he proposed in relation to the restoration of the emperor as

sovereign in the turmoil at the end of the Edo Period. Hashimoto has since been

criticized publically by Vice President Biden for remarks in relation to WWII that have

drawn condemnation internationally, and continues to be ostracized by American

politicians, such as the Mayor of San Francisco.


359. Meanwhile, Plaintiff exposed, in reader comments made to articles on

Hashimoto in JapanToday, the evident ploys adopted by Hashimoto and coinciding with

the CIA/MI6 agenda evident in the published writings of Dougill and the course Houser

had been teaching at the LIU Global College Friends World Program, as they unfolded

in real-time during election campaigning. Plaintiff's comments in the 'readers'

comments' section were subsequently deleted with no basis in the Terms of Agreement

of JapanToday, and Plaintiff subsequently exposed JapanToday and its parent company

GPlus Media as a CIA-front media company on his blog. Although Plaintiff had

contacted the offices of JapanToday to complain, exchanging emails with Betros, he

refused to supply me with a copy of the Terms of Use in Japanese, for example. Not

having a Terms of Use agreement in Japanese is a violation of Japanese law, but

Plaintiff did not have the time or resources to file a civil action against GPlus Media and

JapanToday, as there is no Pro Se system in Japan other than for small claims court.


360. The following passage discussing Betros and JapanToday is from an email

Plaintiff sent to the Callahan several months before receiving the DOJ's written reply:


*Further, note that all in all, the practices and acts inhering in*

*the circumstances relating to my complaint against JapanToday would*

*seem to be consistent with aspects of the previous incidents in relation*

*to which I have submitted complaints against CIA officers. That is to*

*say, they represent incidents of intelligence officers making illicit*

*incursions into civil society and violating people's civil rights under*

*the laws of both the host country of Japan and the United States.*

*In relation to the organized crime connections of Mr.*

*Hashimoto, there would seem to have been an attempt by JapanToday*

*to offer him indirect support by deleting articles that elicited*

*unflattering comments in the days running up to the election. Mr.*

*Betros deleted the article I complained about after only 10 days,*

*whereas Mr. Betros had stated in one of the emails relating to the*

*Kyodo News articles deletion that the minimum period is 2 weeks. At*

*least I did something right in jumping on that complaint and getting a*

*record of the response. I've been remiss and far too lax in tackling this*

*sort of problem.*

    *The pattern of abuse is clear with respect to the role of these*

*people trying to disable and jam certain functional capacities of civil*

*society that are necessary to the functioning of a democratic society*

*with a regulated free market, etc.*


361. That the CIA was running a covert operation to support Hashimoto, on the

one hand, while the Executive Branch, including Vice President Biden, had been

compelled to denounce the controversial statements and actions of Hashimoto, on the

other hand, is indicative of the double standards and duplicity at play in various aspects

of the instant case. It goes without saying that Plaintiff have a compelling interest in

protecting himself, his family, and Japanese civil society at large from the activities of

the CIA and MI6 aimed at promoting sociopaths with connections to organized crime as

politicians in the Japanese public sphere. The fact, however, that the CIA has been

known to collaborate with organized crime groups in Japan starting after the end of

WWII, is well documented. Plaintiff assumes that Betros deleted the reader comments,

basically a deprivation of our freedom of speech, because the comments were counter to

the CIA's agenda of promoting Hashimoto.


362. Another aspect of the stationing of a small colony of CIA officers in

Kyoto is what appears to be a tendency toward establishing defacto vested rights for

said CIA officers, their families, and their collaborators in Kyoto, thereby instantiating a

defacto feudalistic societal configuration centered on the intelligence agencies and

officers: on the one hand, the CIA et al. (i.e., the CIA and intelligence officers mostly

what one could term Anglo countries: England, Ireland, Australia, Canada, and New

Zealand) are colonizing Japanese civil society in the traditional cultural capital of Japan

with a cast of hundreds; and on the other hand, there appears to be a possibility that

positions in the intelligence agencies may need to be passed on in a form of hereditary

succession by the children of the intelligence officers based on the need to provide for

their physical security in the case that their parents identity has been revealed, etc.

Plaintiff has noted the presence of individuals he has complained about in his

surroundings subsequently, apparently providing for Plaintiff's physical security,

presumably from organized crime. That begs the question of the historical relationship

between the CIA and Japanese organized crime and the significance of that relationship

to the scenario Plaintiff has found in Kyoto, but Plaintiff won't digress further, as his

intent in presenting this information is to make background factors to the allegations in

this Complaint more readily intelligible in terms of the Ninth Amendment, in particular.

363. To recapitulate the crux of the above digression into history, etc.,

Habermas refers to a phenomenon in feudalistic societies he calls "representative

publicness" that Plaintiff's apprehension of the situation in Kyoto brought to mind. It

can only be described as neo-colonial in scale and ethos, particularly in light of the

attempt to propagate Christianity using state actors. The United States is not an imperial

power; however, through the CIA, the Executive Branch of the government of the

United States is engaged in creating a social order with characteristics of feudalism

through undermining the functioning of civil society in a Constitutional democracy with

a free-market economy. Plaintiff's civil rights have been violated by rogue CIA officers

in Kyoto seeking to protect their perceived vested interests as part of the

above-described social order because Plaintiff was targeted by said CIA officers after

having grasped important and essentially un-American aspects of their operations in

Kyoto.

364. Furthermore, the apparent inter-agency collaborative cover-up in the

Executive Branch demonstrates that the Executive Branch presumes it is able to

circumvent the law, both at home and abroad.

365. When Plaintiff encountered Dalsky, he noticed that Dalksy had made it a

point to emphatically use the phrase "I'm all in", more than once. When Plaintiff

subsequently learned of the remarks President Obama made to the Australian

Parliament in promoting his so-called "pivot to Asia" strategy, Plaintiff felt it was a

somewhat hubristic statement that reflected America's preoccupation with its own sense

of predominance and pre-ordained right to impose its will on others. Plaintiff believes

that Dalksy was referencing Obama's statement, which was also used by Petraeus' in

the title of his ill-fated biography. Plaintiff believes it is necessary to question whether

Dalsky was attempting to taunt him and his powerlessness to stop the CIA from

attempting to determine the course of his life.

366. In this context, that is to say, a civil action brought against rogue CIA

officers and other federal officials acting in either their respective capacities as

individuals or officials or both for unlawful intrusions and disruptions of the life of a

private American citizen overseas, it is perhaps necessary to examine aspects of the

president's foreign policy statements with respect to what light they might shed on the

allegations made against the CIA et al. in this Complaint.


*So as two great democracies, we speak up for those*

*freedoms when they are threatened.   We partner with emerging*

*democracies, like Indonesia, to help strengthen the institutions upon*

*which good governance depends.   We encourage open government,*

*because democracies depend on an informed and active*

*citizenry.   We help strengthen civil societies, because they empower*

*our citizens to hold their governments accountable.   And we*

*advance the rights of all people -- women, minorities and indigenous*

*cultures -- because when societies harness the potential of all their*

*citizens, these societies are more successful, they are more*

*prosperous and they are more just.*

[...]

211

*This is the future we seek in the Asia Pacific -- security,*

*prosperity and dignity for all.   That's what we stand for.   That's*

*who we are.   That's the future we will pursue, in partnership with*

*allies and friends, and with every element of American power.   So let*

*there be no doubt: In the Asia Pacific in the 21st century, the United*

*States of America is all in.*

367. Was Dalsky, a PhD in psychology, acting on his own in parroting the

messages of Obama and Petraeus in a manner such as to identify himself with authority

to Plaintiff? Or was Dalsky acting in concert with other rogues in violation of

well-established law? Whatever Dalsky was doing, his message was clear that since he

was "all in", Plaintiff was to be driven "all out" (i.e., displaced from, Kyoto), and that

bringing about such a result was his objective.

368. Secondly, if it is true that O'Day et al. had been attempting to corrupt the

attorney Plaintiff had hired to sue the city for refusing to enroll his son in the

neighborhood nursery school by recruiting said attorney to spy for the CIA in order to

subvert Plaintiff's case, that would be exactly the opposite of "help[ing] strengthen

civil societies, because they empower our citizens to hold their governments accountable", potentially subverting the system of checks and balances in Japan. Furthermore, such an act would constitute a grave intrusion into Plaintiff's life as well as a deprivation of Plaintiff's right to secure representation before the Japanese judiciary; again, there is no Pro Se system in Japan, and Plaintiff was required to secure the services of an attorney in order to file the lawsuit.

369. Next, it is of no small consequence that Christianity is not an "indigenous culture" in Japan; in fact, there has never been an indigenous form of monotheism anywhere in East Asia throughout history. Meanwhile, Kyoto is the world's foremost center of Mahayana Buddhism, and, before the Western incursion that produced the conditions leading to the Meiji Restoration, Japan had seen more than a thousand years of relatively harmonious coexistence between Shinto and Buddhism in a syncretic religious system.

370. Meanwhile, though Japan has very little affinity with America in terms of religious beliefs, it shares a similar Constitution and other values associated with modern socio-economic and political theory. With respect to religion and cultural

heritage, China and Korea are the countries with the closest affinity to Japan, though the

respective traditions in both of said countries have largely been displaced, taking a

minor role compared to trends that have come to hold sway more recently.

371. The fact that Plaintiff has been targeted by CIA officers attempting to

advance themselves in civil society in Kyoto by propagating or otherwise fostering the

spread of Christianity represents a violation of Plaintiff's right to personal liberty

coupled with a violation of the separation of church and state. Aside from Douglass,

other CIA officers that lived at the Villa Tonodan were also engaged in Christianity

propagating activities. John Hart Benson is one, for example, serving as a minister for

conducting Christian wedding ceremonies on the weekends. Plaintiff has not had

problems with Benson, but has documented the involvement of several intelligence

officers, including Douglass, Schultz, and Giffin who appear on the same website and

against which he has made allegations against that were engaged in such activities.

372. With respect to the First Amendment as it pertains to religion, there is an

obverse and a converse, both of which Americans tend to hold sacrosanct in a

sometimes awkward tension. With respect to Plaintiff's allegations against rogue CIA

officers, Plaintiff alleges that among said rogue CIA officers were those attempting to

promote their respective careers in the CIA through propagating Christianity in Kyoto

that have targeted Plaintiff because of his forthright and vocal opposition to the

propagating of religion by state actors, generally speaking; in the instant case, more

specifically of monotheism in Kyoto Japan, with Christianity being the variety of

monotheism Plaintiff observed the CIA et al. attempting to exploit. Plaintiff alleges that

such conduct by rogue CIA officers working overseas as covert state actors and

attempting to propagate Christianity has violated Plaintiff's rights protected under the

First Amendment of the U.S. Constitution and the Ninth Amendment of the U.S.

Constitution. If the CIA has adopted the practice of stationing of covert officers using

Christianity as a cover and engaged in proselytizing, etc., it would likely represent an

outright violation the "establishment clause" of the First Amendment, insofar as the

First Amendment is applicable extraterritorially, and call for an injunction proscribing

such activity; therefore, Plaintiff intends to seek to learn from evidence revealed during

discover, and may seek leave to amend the complaint accordingly.

373. Finally, Paquette often spoke of Koreans as well, including one friend of

his whom he claimed was a patent attorney (Plaintiff works in the intellectual property

field), and mentioned the possibility of connecting us to work together. Plaintiff has noted that the composition of the Japanese organized crime groups is 30% Korean (Zainichi) and 60% Burakumin, groups which correspond to the "minorities" mentioned by President Obama in his above-quoted remarks. If it is proven that Paquette et al. were collaborating with people associated with Japanese organized crime groups and felt that was justified because those people were "minorities" being somehow mistreated by the Japanese government, that would present further obvious threats to private American citizens overseas that were *not* inclined to collaborate with such people associated with organized crime groups. Plaintiff is convinced that evidence revealed through discovery will demonstrate that Paquette was collaborating with Japanese organized crime groups, and that said collaboration was a contributing factor in Paquette's motivation to violate Plaintiff's rights protected by the U.S. Constitution. The same likely holds true for Mike and other CIA officers against whom Plaintiff has made allegations herein.

374. Plaintiff is generally in accord with the foreign policy statements made by President Obama in his remarks to the Australian Parliament; however, the content of said statements is not borne out by the contradictory actions elucidated by Plaintiff in

this Complaint. If rogue CIA officers are undertaking activities of the sort described in

this Complaint, which are all clearly diametrically opposed to American values and the

U.S. Constitution as well as the presidents above-cited remarks, with the aim being to

subvert modern civil society in based on the rule of law, free-market economics, civil

liberties, etc., then it can only be said that said rogue CIA officers as well as the officials

in the Executive Branch that have acted to cover up said acts have also violated

Plaintiff's unenumerated rights secured indirectly by the Ninth Amendment of the U.S.

Constitution.

375. The following passage discussing the CIA et al. in civil society in Kyoto,

including an indirect reference to the incident in which Blackman and Paquette were

aiming to eliminate the competition (i.e., Plaintiff) in the translation field, is taken from

the very first facsimile Plaintiff sent to the DOJ to initiate the complaints against the

CIA, in which he also informed the DOJ of his blog:

> *Note that everything these people do in an area of civil*
>
> *society involves an illegitimate intrusion into the private sphere*
>
> *funded by public funds from the USA and UK aimed at advancing*

*some private agenda, not the public interest. They are engaged in*

*market distorting activities by p[l]anting people in the translation field,*

*which is fairly impacted, where they serve to drive prices down and*

*make work inaccessible. CIA officers occupy all of the prime*

*apartments in the last building I recently moved out of (Villa Tonodan),*

*even though they are there only a couple of months out of the year, etc.*

*Although I'm of course grateful for the protection against organized*

*crime groups (which the CIA helped establish after WWII: Robert*

*Whiting; Tokyo Underworld), aspects of their presence are fairly*

*conspicuous to an observant American.*


376. There was no government agency known as the CIA until 1950, and even

President Truman, who'd signed the order bringing it into existence, repudiated the

course that the agency had taken in a Washington Post article published in 1963:

https://www.cia.gov/library/center-for-the-study-of-intelligence/kent-csi/vol20no1/html/

v20i1a02p_0001.htm The fact is that the federal agency known as the CIA is itself a

relatively recent creation in the history of the United States of America. Meanwhile,

since the establishment of the CIA in 1950, the world has changed tremendously and we

are currently experiencing an era of so-called globalization, which has seen scores of

Americans going abroad to seek their livelihood overseas in one of the many democratic

countries that has a free-market economy and amicable relations with the United States.


377. Plaintiff is a private American citizen, and as such is not subject to the

arbitrary whims of any elected, appointed, or career official of the Executive Branch of

the government of the United States, whether Plaintiff is in the United States or

overseas, including here in Japan. The rights of private American citizens are protected

by the U.S. Constitution, and Bivens has established that remedies for violations of said

rights by federal officials are held to be implied by the U.S. Constitution. The CIA

would appear to be pursuing an agenda in Japan aimed at subverting modernizations

wrought to the Japanese political system as a result of WWII in order to serve

geopolitical aims in the pursuit of which this Complaint demonstrates covert CIA

officers showing a willingness to violate the rights of private American citizens

overseas protected by the U.S. Constitution.


378. The conscience of the court should be shocked by the allegations set forth

in this Complaint. It is almost certain that the Executive will make a motion to dismiss,

invoking the state secrets privilege. In fact, as described in the petition, Plaintiff alleges

that certain policies, customs, and practices have been established in a manner tailored

such as to rely on a presumption of recourse to invocation of the state secrets privilege

before the Judiciary, aiming to use such invocation as a preemptive measure facilitating

the unchecked abuse of power by the Executive, thereby subverting the U.S.

Constitution.

379. One of the questions the allegations against the CIA et al. that Plaintiff has

brought before the Court poses is the question as to where the Constitution draws the

line between Executive Privilege and the rights enumerated by the Constitution of the

United States of America and established through legal precedents as well as the

implied rights "retained by the people" as set forth in the Ninth Amendment of the U.S.

Constitution.

380. Plaintiff is eager to learn the answer to said question, but believes that,

were the allegations set forth in this Complaint to be dismissed in their entirety on the

basis of the Executive Branch's invocation of the state secrets privilege, such dismissal

would amount to: the conferring of an unprecedented degree of absolutist authority to

the Executive Branch that is not provided for in the U.S. Constitution, the rendering the

system of checks and balances mute, and the contravening of the Bill of Rights as well

as the Fourteenth Amendment of the U.S. Constitution. *Biven's* provides a cause of

action with respect to the aforementioned violations by federal officials of Plaintiff's

rights protected by the Constitution of the United States of America.

XII

ATTACHMENT 1

Reference notes, etc., on amendments in Amended Complaint

1.      Plaintiff submits this AMENDED COMPLAINT in order to rectify minor

errors, including typographical, spelling and grammatical, redundancies, etc., and in

order to supplement portions that were found to be incomplete, missing, or otherwise

lacking and found to be in need of further elaboration upon Plaintiff's belated review of

the COMPLAINT.

2.      Plaintiff submitted the complaint initially under some duress due to a

particularly severe bought of insomnia, which was somewhat alleviated after Plaintiff

submitted the 238 page document. The drafting of the COMPLAINT has represented a

substantial burden to Plaintiff, and coupled with the continual low-intensity

psychological warfare operations being conducted by covert CIA officers in Kyoto

against Plaintiff, Plaintiff was somewhat overwhelmed when he initially submitted the

COMPLAINT. Plaintiff began suffering from insomnia approximately 2-3 years ago

and has been prescribed a number of medications including so-called "sleeping pills"

(e.g., Zolpidem) to alleviate the symptoms, but the drugs themselves have side-effects including known impairments of cognitive functions. Plaintiff envisions the possible necessity of further amendment of the COMPLAINT, as per the course of the Proceedings, but submits the present AMENDED COMPLAINT in light of the above-described state of affairs.

3.      Plaintiff respectfully requests the Court's further forbearance regarding any typographical errors and the like in the present AMENDED COMPLAINT, as Plaintiff makes this submission without having been afforded the chance to first print out the entire document and proof it, due to time constraints. Plaintiff hopes that the present revisions help clarify the allegations and facilitate a smooth progression of the Proceedings. Plaintiff will begin reading through this AMENDED COMPLAINT in its entirety soon in order to be prepared to make further revisions or pleadings, as appropriate.

4.      Hereafter follows a partial list of the paragraph numbers of the AMENDED COMPLAINT which have been amended in a manner exceeding correction of obvious omissions and minor errors, etc.: 41, 82, 139, 159, 161, 173, 201, 205, 225, 229, 233, 243, 249, 252, 260, 262, 267, 279, 280, 287, 304, 305, 307, 308, 310, 311, 316, 352.

RELIEF REQUESTED

31. In light of the public's need to know about activities of their government

officials, including those described in this complaint, and insofar as the allegations set

forth herein represent an egregious breach of trust by the Executive Branch against an

American citizen overseas in order to facilitate the pursuit of ends not in accord with the

Constitution of the United States of America through covert means accompanied by a

body of policy as well as corresponding bureaucracy, customs and practices aimed at

preventing the American public from becoming apprised of such official acts, Plaintiff

hereby requests a TRIAL BY JURY.

WHEREFORE, Plaintiff seeks judgment and Relief as follows:

1. For statutory, compensatory and punitive damages according to proof;

2. Damages for emotional distress and mental anguish caused by unlawful infiltration

   and intrusion into Plaintiff's life by CIA officers and proxies;

3. Damages for personal discomfort and annoyance and emotional distress caused by

harassment at cafes, hatching plots against Plaintiff including physical assault,

hacking of Plaintiff's electronics devices, repeated suggestions that Plaintiff leave

Kyoto, etc.;

4. Declaratory relief pertaining to the policies, customs and practices of the CIA, DOS,

and DOJ that have resulted in violations of Plaintiff's Constitutional rights,

including the declaration of EO 12333 and the MOU to exceedingly vague and

therefore failing to meet the requirements un the Constitution corresponding to their

legal status, which Plaintiff gathers is nearly on a par with statutory law;

5. A permanent injunction enjoining defendants from posting CIA officers under the

assumed title of American Citizen Services Officer;

6. A permanent injunction requiring the defendants to take all steps to improve

transparency in the reporting requirements related to federal possible federal crimes

committed by a CIA officer or a proxy thereof against an American citizen overseas;

7. A permanent injunction requiring the Executive Branch and the Legislative Branch

to establish formal administrative procedures for reporting allegations of federal

crimes committed by covert CIA officers, etc., overseas against an American citizen

overseas;

8.  A permanent injunction requiring the CIA/OIG to provide notification to any

American citizen overseas submitting a report to the CIA/OIG alleging unlawful

misconduct against a CIA officer, proxy thereof, etc;

9.  A permanent injunction placing a restraining order on the CIA officers listed as

Defendants in this Complaint as well as proxies and the like thereof not listed in the

instant Complaint but described as being suspect of culpability in conjunction with

the violations relating to allegations set forth in evidential communications

submitted by Plaintiff to the DOS, DOJ and CIA/OIG—and subsequently proven to

be so through the course of these Proceedings—from coming into proximity with

Plaintiff, defining a reasonable daily activity sphere or the like based on a radial

distance from Plaintiff's residence, etc., preferably removing said Defendants and

proxies thereof from the precincts of Kyoto city; and

10. For reasonable attorneys' fees (should Plaintiff retain counsel henceforth),

     investigation and litigation costs reasonably incurred and for such other relief as

     may be appropriate.

Respectfully Submitted,

Darren R. Vasaturo
502 Sun Lotus Ikeji
217 Owaricho, Nakagyoku
Kyoto, Japan 604-0934

Dated: August 21, 2015