UNITED STATES DISTRICT AND BANKRUPTCY COURTS

FOR THE DISTRICT OF COLUMBIA

DARREN R. VASATURO

502 SUN LOTUS IKEJI,

217 OWARICHO, NAKAGYOKU

KYOTO, JAPAN 604-0934

VS.                                    CIVIL ACTION NO. (              )

Suspected CIA Officers:

Sasha Peterka

(Believed to reside in the Berkeley, CA, and Lawrence, KS areas)

Jamie Roughan



(Believed to reside in the Tokyo, Japan, and Chiba, Japan areas)

"Mike" (referred to by Plaintiff as "Falun Gong Mike", last name unknown)

(Believed to reside in Kyoto, Japan)

Glenn Paquette

(Believed to reside in the Seattle, WA area)

Anthony Blackman

(Believed to reside in the Fushimi are of Kyoto, Japan)

Dave Dalsky

(Believed to reside in Kyoto, Japan)

A.J. Dickinson

(Believed to reside in Kyoto, Japan)

Dan Douglass

(Believed to reside in Kyoto, Japan)

Eric Bray

(Believed to reside in the Kyoto, Japan, and Mie, Japan areas)

Dawn O'Day

(Believed to reside in Kyoto, Japan)

Michael Wessel

(Believed to reside in the Minneapolis-St. Paul, MN area)

Peter Laverne

(Believed to reside in the Kyoto, Japan area)

Yahiya Abdelsamad

(Believed to reside in the New York, NY area)

Seth Yarden

(Believed to reside in Cambridge, MA, and to maintain a residence in Kyoto,

Japan)

Preston Houser

(Believed to reside in Kyoto, Japan)

Chris Betros

(Believed to reside in Tokyo, Japan)

Kevin Turner

(Believed to reside in Kyoto, Japan)

Bruce W. Taylor

(Resides in the San Francisco Bay Area, CA)

Dan Kiely

(Believed to reside in Redbank, NJ)

Sean Lotman

(Believed to reside in the Los Angeles, CA, and Kyoto, Japan areas)

Colin Zimbleman

(Believed to reside in the Ventura, CA, and Kyoto, Japan areas)


Suspected CIA officers with official cover as Foreign Service Officers:

Gary Schaefer (US Department of State)

Believed to reside in Tokyo

Marc Snider (US Department of State)

Whereabouts unknown

Sylbeth Kennedy (US Department of State)

Whereabouts unknown


Appointed Officials:

David Petraeus (CIA)

(Former) Director of the CIA

Central Intelligence Agency

Washington, D.C. 20505

Believed to reside in the New York area

John Brennan (CIA)

Director of the CIA

Central Intelligence Agency

Washington, D.C. 20505

David Buckley (CIA)

Office of Inspector General

Central Intelligence Agency

Washington, D.C. 20505

John Kerry (DOS)

Secretary of State

U.S. Department of State

2201 C Street NW

Washington, DC 20520

Eric Holder (DOJ)

(Former) Attorney General

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

Believed to reside in Washington DC


Mark Kappelhoff (DOJ)

(Former) Chief of the Criminal Section, Civil Rights Division

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

Believed to reside in Minnesota area


Keith Alexander (NSA)

National Security Agency

Fort Meade, MD 20755-6711

Believed to reside in Washington DC

Michael Rogers (NSA)

National Security Agency

Fort Meade, MD 20755-6711


DOJ Officials:

Kevin Callahan

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001


Other:

Congresswoman Barbara Lee

1301 Clay Street Suite 1000-N

Oakland, CA 94612


Elaine McKellar (case worker on the staff of Congresswoman Lee)

1301 Clay Street Suite 1000-N

Oakland, CA 94612

COMPLAINT

(For Damages for Violations of Civil Rights, Violations of Honest Services

Fraud, Obstruction of Justice, and Request for Jury Trial)

I

PARTIES

1. Plaintiff Darren Vasaturo, is and was at all times mentioned

herein, a private American citizen residing in Kyoto, Japan. Plaintiff has

resided in Japan since 1997, holds permanent residency status in Japan, and

is married to a Japanese national with whom he has two children, ages 2-

and 4-years-old.

2. Defendant Sasha Peterka (hereinafter "Peterka") was an

acquaintance of Plaintiff's at UC Berkeley, and is a suspected officer in the

Central Intelligence Agency (hereinafter "CIA"); believed to reside in the

Berkeley, CA, and Lawrence, KS areas

3. Defendant Jamie Roughan (hereinafter "Roughan") is an

acquaintance from UC Berkeley and a suspected officer in the CIA; believed

to reside in Tokyo

4. Defendant is known to me only by his first name, Mike

(hereinafter "Mike"), and is a suspected CIA officer to whom I was introduced

by Peterka at the Starbucks in Kyoto. I have generally referred to Mike as

"Falun Gong Mike" because I don't know his last name and in light of the fact

that he practices Tai Chi by the river and once defended Falun Gong at the

Starbucks when a young American was handing out flyers promoting Falun

Gong. He is believed that to reside in Kyoto part of the year, and has

mentioned that he spends time in Vietnam.

5. Defendant Glenn Paquette (hereinafter "Paquette") is a suspected CIA officer Plaintiff met in Kyoto at the Starbucks, where he was introduced to me by Sasha Peterka. Paquette is apparently teaching physics in the Seattle area and operating a translation company.

6. Defendant Anthony Blackman (hereinafter "Blackman") is a suspected CIA officer Plaintiff met in Kyoto at the Starbucks, where he was introduced to me by Paquette; believed to reside in Kyoto

7. Defendant Gary Schaefer (hereinafter "Schaefer") is a suspected CIA case officer operating under official diplomatic cover in the DOS whom Plaintiff met when he visited the American Consulate in Osaka (hereinafter "Consulate"); believed to reside in Tokyo

8. Defendant Marc Snider (hereinafter "Snider"), suspected CIA case officer operating under official diplomatic cover in the DOS; whereabouts unknown

9. Defendant Sylbeth Kennedy (hereinafter "Kennedy"), suspected

CIA case officer operating under official diplomatic cover in the DOS;

whereabouts unknown

10. Defendant Dave Dalsky (hereinafter "Dalsky") is a suspected CIA

officer Plaintiff met in Kyoto at the elementary school where his daughter

and my son were enrolled, and at the Kamogawa river near our residences;

believed to reside in Kyoto

11. Defendant David Petraeus (hereinafter "Petraeus") is a former

Director of the CIA.

(Former) Director of the CIA

Central Intelligence Agency

Washington, D.C. 20505

Believed to reside in the New York area

12. Defendant A.J. Dickinson (hereinafter "Dickinson") is a suspected

CIA officer Plaintiff met at the Starbucks in Kyoto who has recently been

seen here; believe to reside in Kyoto

13. Defendant Kevin Callahan (hereinafter "Callahan") is a paralegal in the Civil Rights Division of the U.S. Department of Justice (hereinafter DOJ).

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

14. Defendant Mark Kappelhoff (hereinafter "Kappelhoff") was the Deputy Attorney General of the Civil Rights Division of the DOJ.

(Former) Chief of the Criminal Section, Civil Rights Division

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

Believed to reside in Minnesota area

15. Defendant Dan Douglass (hereinafter "Douglass") is a suspected

CIA officer Plaintiff met at the Villa Tonodan in Kyoto, believed to reside in

Kyoto.

16. Defendant Eric Bray (hereinafter "Bray") is a suspected CIA

officer Plaintiff met in Kyoto; believed to reside in Kyoto

17. Defendant Dawn O'Day (hereinafter "O'Day") is a suspected CIA

officer Plaintiff met at the Starbucks in Kyoto; believed to reside in Kyoto

18. Defendant Michael Wessel (hereinafter "Wessel") is a suspected

CIA officer Plaintiff met at the Starbucks in Kyoto; believed to reside in the

Minneapolis-St. Paul, MN area

19. Defendant Peter Laverne (hereinafter "Laverne") is a suspected

CIA officer Plaintiff met in Kyoto; believed to reside in the Kyoto area

20. Defendant Yahiya Abdelsamad (hereinafter Abdelsamad) is a

suspected CIA officer Plaintiff met at the Starbucks in Kyoto; believed to

reside in the New York area

21. Seth Yarden (hereinafter "Yarden") is a suspected CIA officer
Plaintiff met in Kyoto; believed to reside in Cambridge, MA

22. Defendant Preston Houser (hereinafter "Houser") is a suspected
CIA officer Plaintiff met at the Starbucks in Kyoto; believe to reside in or
near Kyoto

23. Defendant John Kerry (hereinafter "Kerry") is the U.S. Secretary
of State.

     Secretary of State

     U.S. Department of State

     2201 C Street NW

     Washington, DC 20520

24. Defendant Keith Alexander (hereinafter "Alexander") is a former
Director of the National Security Agency (hereinafter NSA).

(Former) Director of NSA

National Security Agency

Fort Meade, MD 20755-6711

Believed to reside in Washington DC

25. Defendant Michael Rogers (hereinafter "Rogers") is the Director of the NSA.

Director of NSA

National Security Agency

Fort Meade, MD 20755-6711

26. Defendant Eric Holder (hereinafter "Holder") is the former U.S. Attorney General.

(Former) Attorney General

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

Believed to reside in Washington DC

27. Defendant John Brennan (hereinafter "Brennan") is the Director

of the CIA, believed to reside in the DC area.

Director of the CIA

Central Intelligence Agency

Washington, D.C. 20505


28. Defendant Chris Betros (hereinafter) is a suspected CIA officer I

met online through the JapanToday CIA media front; believed to reside in

Tokyo


29. Defendant Kevin Turner (hereinafter "Turner") is a suspected

CIA officer Plaintiff encountered at the Starbucks in Kyoto; believed to

reside in Kyoto


30. Defendant Bruce Taylor (hereinafter "Taylor") is a former friend

from the US Army suspected to have joined the CIA in the 1990s before being

stationed in Thailand and, eventually Tokyo. He currently resides in the San

Francisco Bay Area.

31. Defendant Dan Kiely (hereinafter "Kiely") is a former friend from
the US Army suspected to have joined the CIA in the 1990s before being
stationed in Thailand, and is believed to currently reside in Redbank, New
Jersey.

32. Elaine McKellar (hereinafter, "McKellar) is a case worker on the
staff of House of Representatives Congresswoman Barbara Lee; believed to
reside in the San Francisco Bay Area

33. Congresswoman Barbara Lee

1301 Clay Street Suite 1000-N

Oakland, CA 94612

34. Sean Lotman (hereinafter "Lotman") is a suspected CIA officer
Plaintiff learned about through a CIA propaganda piece in the Japan Times;
believed to reside the Los Angeles, CA, and Kyoto areas.

35. Colin Zimbleman (hereinafter "Zimbleman") is a suspected CIA officer Plaintiff was indirectly introduced to through his wife (sister-in-law to Lotman); believed to reside the Ventura, CA, and Kyoto areas

36. David Buckley (hereinafter "Buckley") is the recently retired CIA Inspector General; believed to reside in the Washington DC area

Office of Inspector General

Central Intelligence Agency

Washington, D.C. 20505

37. Plaintiff believes that other Federal agents, officers, and employees assisted and/or aided and abetted the named Defendants or further participated in the unlawful conduct complained of herein, and Plaintiff will seek leave to amend this complaint to add the names of those persons once the same become known to Plaintiff through discovery.

II

JURISDICTION AND VENUE

38. This suit is brought pursuant to the Fourth Amendment of the
United States Constitution under the authority of *Bivens (Bivens v. Six
Unknown Named Agents Of The Federal Bureau Of Narcotics* (1971), 403
U.S. 388) allowing a personal civil suit brought by Plaintiffs aggrieved by
Fourth Amendment violations by Federal agents and officers acting under
color of law.

39. This suit is also brought pursuant to pursuant to the Fifth
Amendment of the United States Constitution and the Fourteenth
Amendment of the United States Constitution under the authority of *Bivens*
allowing a personal civil suit brought by Plaintiffs aggrieved by Fifth
Amendment violations and Fourteenth Amendment violations committed by
state actors (i.e., Federal agents and officers) committed under color of law.

40. Further, this suit is also brought pursuant to the Fourth

Amendment of the United States Constitution, the Fifth Amendment of the

United States Constitution, and the Fourteenth Amendment of the United

States Constitution of the United States of America under the authority of

*Bivens* allowing a personal civil suit brought by Plaintiffs aggrieved by

Fourth Amendment violations, Fifth Amendment violations, and Fourteenth

Amendment violations facilitated or caused by official policy, custom or

practice, as presented in the form of *Monell* claims (Monell v. Department of

Soc. Svcs., 436 U.S. 658 (1978)).

41. Moreover, this suit is further brought pursuant to 18 USC 1341,

18 USC 1342, 18 USC 1343, 18 USC 1346, and 18 USC 1349 with respect to

the corresponding unlawful conduct of federal officials in at least two, and

more likely three to four, federal departments and agencies, including the

DOJ, the CIA, the NSA, and the DOS that have, through fraudulent

misrepresentations and the like, violated Plaintiffs right and entitlement to

receive honest services from public officials as protected by said statutes.

42. Further, this suit is brought pursuant to 18 USC § 1512 and 18

USC § 1514 with respect to both tampering with Plaintiff as a victim of

violations of rights protected by the US Constitution by CIA officers as well

as harassment of Plaintiff as a victim of violations of rights protected by the

US Constitution by CIA officers and their proxies conducting covert

operation in Kyoto, Japan; in addition, this suit is also brought pursuant to

pursuant to 18 USC 1505 and 18 USC 1519 in conjunction with other aspects

related to Obstruction of Justice by federal officials that have violated

Plaintiff's rights protected by said statutes.

43. In addition, this suit is brought pursuant to the First Amendment

of the United States Constitution and the Ninth Amendment of the United

States Constitution under the authority of *Bivens* allowing a personal civil

suit brought by Plaintiff's aggrieved by Ninth Amendment violations by

Federal agents and officers acting under color of law.

44. Thus, this suit involves a Federal question (28 USC § 1331) and

questions arising under the United States Constitution and laws of the

United States. Here, it further bears noting that the right to judicial review

of the unlawful actions of the agencies in question as described herein is also provided for under title 5 of the United States Code section 702.

45. Venue is appropriate in the District of Columbia, where a number of the Defendants are believed to reside, which is also the location of the DOJ and nearby the headquarters of the CIA and NSA, where one or more of the acts alleged herein took place.

46. If it is determined that venue lies in some other Federal Court in the United States, then the matter should be transferred to that District Court pursuant to 28 USC § 1406(a).

III

OPERABLE FACTS

47. Plaintiff Vasaturo is an American citizen that served in the US Army Signal Intelligence Corps as a Voice Intercept Operator qualified in

the Korean language for four years, during which time Plaintiff held a

TS/SCI security clearance.


48. After receiving an honorable discharged from the army, Plaintiff

re-entered college at the University of California, Berkeley, in January 1987,

where he became acquainted with two of the named defendants and others,

and completed the requirements for a Bachelor's degree in Interdisciplinary

Studies in Social Sciences in 1994 with a focus on East Asian history and

politics; more specifically, 20th century developments with a focus on Korea

as a concrete historical example against which to apply a theoretical

framework encompassing "modernity and identity".


49. In light of the inevitable further disclosure of the identities of

covert CIA officers, "intelligence sources and methods" and the like, Plaintiff

requests, in advance, that the Court adopt CIPA-like procedures for

conducting the proceedings in the instant case, as per the precedent set by

the decision of the appeal to the DC Circuit Court (CASE NO. 09-5311) in

relation to the Horn v. Huddle case heard before this Court (CASE NO. 1 :

94-CV-0 1756-RCL).

50. Plaintiff is not aiming to expose legitimate national security information falling outside of the purview of the likes of the information he has posted on his blog (started in 2010, "Kyoto inside out": http://kyoto-inside-out.blogspot.jp/) in relation to events and persons that have had a direct impact on his life or are engaged in covert operations that pose a direct or indirect threat to the plaintiff and his family as well as civil society in Kyoto, Japan.

51. It goes without saying that the incidents detailed in this Complaint are not considered by Plaintiff to represent legitimate national security information, but federal crimes committed in violation of the US Constitution by rogue CIA officers and federal agents/officials, in addition to official policies, customs and practices, which have facilitated the commission of said crimes and have been implemented by federal officials in supervisory positions or with policy making authority. Plaintiff understands that the identities of covert CIA officers are classified and that such state

secrets are at issue, wherefore Plaintiff has proposed, in advance, that the
Court adopt CIPA-like procedures.

52. Plaintiff has submitted Privacy Act requests to the CIA and NSA
that have been denied on the basis of national security exceptions. Plaintiff
also has a Privacy Act request pending with DOS (Case Control Number
P-2014-09239), which is projected to be finalized in September 2015. Plaintiff
also submitted a Privacy Act request to the DOJ and received a packet of
documents in response thereto; however, said packet of documents consisted
solely of documents that the plaintiff himself had faxed to the DOJ. The DOJ
disclosed no information related to its internal procedures and actions taken
in the processing of the complaint Plaintiff submitted to the Civil Rights
Division of the DOJ, absent the emails to the Special Litigation Department,
some of which were subsequently received via further request.

53. Peterka was an acquaintance from UC Berkeley that the CIA
deployed against me.

54. In 2001 or thereabouts, Plaintiff moved into the Villa Tonodan apartment building, which he later came to understand was densely populated with intelligence officers, who accounted for approximately 50% of the total occupancy.

55. One day while Plaintiff was in Berkeley when visiting the USA, in 2001 or thereabouts, Peterka showed up in the Whole Foods market on that day, and we exchanged email contacts. As Peterka was in graduate school at UC Berkeley at the time, Plaintiff did not find it exceedingly unusual to bump into him by coincidence at a shopping center near the campus. Peterka contacted Plaintiff a couple of years later out of the blue, and said he was planning to visit Japan. Plaintiff had some space at his apartment, so he invited Peterka to stay there, if he wanted to visit Kyoto.

56. Peterka told Plaintiff he was coming to Japan to visit some friends in Tokyo, including another individual from Berkeley named Robert, whose last name Plaintiff can't recall but who had been employed at Lehman Brothers in Tokyo before the crash and had majored in Japanese at UC

Berkeley. Plaintiff became acquainted with Robert through Peterka and in

relation to taking the Japanese Language proficiency test around the year

1999 or 2000, but had not known him at UC Berkeley. The other individuals

Peterka was visiting in Tokyo were employed at Goldman Sachs, and

Plaintiff does not know how he was connected to those people, though

Plaintiff came to suspect that an individual named John to whom he

introduced me was a CIA officer. Peterka told me that John had worked in

the architectural field in Hong Kong before leaving to join Goldman Sachs in

Tokyo, where he was engaged in evaluating commercial real estate

investment opportunities for the firm.


57. Roughan was also an acquaintance from UC Berkeley that the

CIA deployed against me. Roughan showed up at a bus stop in Kyoto, in

another apparent coincidence, though one which Plaintiff did register as

unusual. We exchanged contact information, and would socialize when

Roughan visited Kyoto occasionally. He had also asked Plaintiff to do some

short translation projects for the finance company (Mizuho) he'd been

employed by after his previous employer, Lehman Brothers, went bankrupt

in the financial crash. Plaintiff did translate a couple of short documents for

which he requested translation.

58. Like Peterka, Roughan tried to convince Plaintiff that his fortune

awaited him in Tokyo, but Plaintiff made it amply clear that he wasn't

interested in returning to Tokyo. Subsequently, Plaintiff visited Roughan in

Tokyo during a trip to see my music teacher perform at the National Theater

with other top-level performers, including one designated as a Living

Cultural Treasure. During that trip Plaintiff stayed at Roughan's place for

one night, but the hospitality was somewhat cold comfort. Moreover, though

he'd ample space, he said that he couldn't lodge me for more than one night,

which was fine, but he seemed to suddenly be acting somewhat out of

character. Everything about the interaction during that trip, starting with

the continued sales pitch to Plaintiff on Tokyo coupled with the

less-than-welcoming hospitality, had seemed incongruous.

59. Plaintiff had also met another former acquaintance during that

trip, a former romantic interest that is presently a partner at a major

American law firm in Tokyo. Plaintiff believes that she, too, is working for the CIA (or perhaps the MI6), but does not find anything of relevance to the instant case to present about her at this point. Should discovery reveal any pertinent information pertaining to her involvement, Plaintiff may seek to amend the complaint accordingly.

60. Paquette and Mike were introduced to me by Peterka at the Starbucks in Kyoto.

61. Asaho Kudo (hereinafter "Kudo") is a former girlfriend of Plaintiff's who is suspected of having been recruited by the CIA (most likely Peterka) and deployed against Plaintiff years later in a scheme to undermine Plaintiff's life in Kyoto, said scheme constituting one episode in a continuum comprising related schemes all having the objective of displacing Plaintiff from Kyoto.

62. Prior to lodging a complaint with the American Consulate in Osaka, Plaintiff submitted an online application to the CIA offering to serve

as an independent contractor, stipulating the condition that he would

maintain continuity in the lifestyle he'd been leading, and not interrupt or

undermine the various scholarly and cultural pursuits in which he was

actively engaged.

63. The decision to submit the application was not made out of the

blue, that is to say, without prompting, but on the basis of prompting in the

form of a surreptitious intimation by Paquette that he was acquainted with a

close friend whom Plaintiff did assume had entered the CIA. That friend (to

be named in a subsequent sealed filing) had visited Plaintiff in Japan in the

year 1998 or 1999 while Plaintiff was living in Tokyo. After the problems

with CIA officers in Kyoto escalated to the point of my having to report them

to the DOJ, Plaintiff cc'd said friend's old Hotmail account a number of

emails sent to the Consulate and the DOJ. It appears that he deactivated

that Hotmail account within a year or so after the first such cc'd email.

64. In retrospect, it has become clear that Paquette may have had

more than one motivation for encouraging Plaintiff to submit an application

to the CIA; in particular, with respect to the electronics communications provisions related to applicants found in Executive Order 12333, and triggering a clause therein that could be seen to authorize electronic eavesdropping and the like against Plaintiff.

65. After Plaintiff submitted the aforementioned application, he received no reply from the CIA, which wasn't surprising. However, it was not clear to Plaintiff what the actual disposition of the CIA was in light of developments on the ground, which oscillated between the projection of empathy from CIA officers and positive signs that there might be an effort being made to integrate me into the local intelligence network, on the one hand, and continued harassment, on the other.

66. The first evidence of a concrete example demonstrating that such oscillation had been adopted as a tactic by the rogue CIA officers against Plaintiff after he'd submitted the application to the CIA is found in emails exchanged during Plaintiff's interaction with Blackman. Blackman was an American teaching English whom Paquette introduced to Plaintiff with a

subterfuge related to translation work. Blackman had claimed to be running

a translation company called TSA, which Plaintiff eventually learned didn't

exist. That represented the first blatant falsehood to be exposed in the ruse,

which was intended to interfere with Plaintiff's pursuit of a lawful livelihood,

and diverting Plaintiff's time and effort into a fraudulently represented

non-existent enterprise.

67. The collaborative effort between Paquette and Blackman to

entangle Plaintiff in a humiliating and demoralizing pursuit of a

fraudulently represented offer of work represents the first incident with

respect to which Plaintiff presented material evidence (i.e., the

aforementioned emails) to US government officials demonstrating that rogue

CIA officers were harassing him, with the ultimate aim of displacing him

from Kyoto. There is no possibility that the acts involved could be construed

to be part of a recruiting process by the CIA; they can only be construed as an

unwarranted intrusion and harassment.

68. Having already endured several years of such harassment, after

waiting approximately five months without receiving a formal response from

the CIA to the online application, the above-described collaborative

harassment operation by Paquette and Blackman was the last straw; it

became obvious to Plaintiff that he would have to lodge a complaint of some

sort to forestall further trouble with locally stationed CIA officers and their

proxies.

69. Plaintiff therefore decided upon a course of action of telephoning

the American Consulate in Osaka to make an appointment to meet

personally with consular officials to lodge the complaints. Plaintiff was able

to do so and spoke with Schaeffer, Chief of the American Citizen Services

Section, sometime in the first week of September 2009, as is evident from

follow-up emails Plaintiff sent to Schaeffer as well as Schaefer's eventual

reply.

70. Before continuing, it bears noting that on two occasions Plaintiff

was driven to the point of resorting to making allusion to violence to

Paquette due to Paquette's incessant harassment of Plaintiff at the

Starbucks. Plaintiff did report that, even exaggerated it, to the Consulate. As

an example of the sort of behavior at issue in terms of harassment, Plaintiff

quotes a passage from an email he sent to the Schaeffer et al. on January 7,

2011:

> This particular action relates to a series consisting of
> a first occasion when he basically insinuated that I was a
> latent homosexual, and on another occasion during a brief
> conversation with him and Falun Gung Mike that occurred
> while I was waiting to receive a coffee at the Starbucks.
> During that conversation he mentioned the gays in San
> Francisco, asking me if I'd ever had any problems with
> them. I replied that I hadn't, for the most part, as people
> basically had a live and let live attitude there. He then
> asserted that Mike had been accosted by some gays in San
> Francisco, to which Mike gave him a sidelong glance, with
> no reply. This happened around a time when the yakuza
> had basically stopped sending hostess types to the cafe to try

*to lure me out, and were instead sending people to occupy*

*seats next to me and harass me, males exhibiting what could*

*only be described as behavior and body language intended to*

*be homo-erotic.*

*What Mr. Paquette intended to insinuate, I gather,*

*was that I was in danger of being assaulted by the males*

*exhibiting homosexual tendencies he was sending to harass*

*me in the cafe...*

71. Schaeffer was less than forthcoming with the email reply
confirming the nature and content of our above-described meeting. In fact,
Plaintiff had to take the initiative and raise that point explicitly in an initial
email Plaintiff sent Schaeffer despairing of his non-responsiveness and
imploring him to reply. In his eventual reply, he stated:

*"Rest assured that I have taken your concerns on board and*

*will pass them on through the appropriate channels".*

72. During the meeting with Schaeffer Plaintiff mentioned incidents such as being set up to be physically attacked, in addition to those described above. We discussed other topics relevant to the instant case as well, such as the friend that Paquette had intimated he knew in order to encourage me to apply to the CIA in the first place.

73. In the numerous emails Plaintiff had occasion to send Schaeffer during his tenure as Chief of the American Citizen Services Unit at the American Consulate in Osaka, Plaintiff again mentioned having been physically assaulted, and Plaintiff indicated that he thought that the individuals he'd reported to Schaeffer needed to be subjected to discipline by the (CIA) "IG". Plaintiff had been aware of the existence of the existence of an administrative organ called the IG while serving in the Army. Furthermore, Plaintiff sent Schaeffer a series of emails exchanged with Jamie Roughan (hereinafter "Roughan") demonstrating that Roughan had access to information about me that he could not possibly have known other than through electronic eavesdropping or through a human intelligence network involved in physical surveillance of me and my wife-to-be. That, in

turn, also indicated that the hostile actions of Roughan had been allowed to

continue despite the fact that Plaintiff had reported him for same to the

Consulate previously.

74. Here, it should be noted that the above-described collaborative

operation between Paquette and Blackman is representative of a pattern

that persisted even after Plaintiff complained to Schaeffer. There would be a

lull in harassment, leading me to believe that the complaint had been

effective in exposing wrongs that were corrected. There were also continual

surreptitious signs that maybe the CIA was about to make me an offer at any

time, but that was all smoke and mirrors, aimed to throw me for a loop;

meanwhile, further operations against Plaintiff were afoot.

75. Over the years the CIA has continually introduced a succession of

new individuals into Plaintiff's immediate surroundings in a manner such as

to establish a quasi-cordial relationship with Plaintiff, implying that there

was some process underway toward reconciling the situation. Otherwise,

given my complaints to the American Consulate, it was more than obvious

that Plaintiff wanted nothing to do with the CIA and considered them hostile.

Such individuals subsequently included Laverne, Dickinson, and O'Day", all

of whom with Plaintiff exchanged emails on the basis of various pretenses

presented by said individuals socializing with me at Starbucks.

76. Peterka introduced Plaintiff to Mike, who in turn introduced

Plaintiff to Paquette, Yoshiyuki, Motez, etc., at Starbucks (Sanjo-Ohashi

location). I was subsequently set up to be attacked at a sports bar where I'd

agreed to meet Yoshiyuki for a drink. The attacker was subsequently

purported to be a Moroccan by Douglass, who seemed to be encouraging me

to aggressively pursue the incident as a conflict needing to be resolved by

vengeful violence. Plaintiff did visit the local 'police box', accompanied by

Yoshiyuki, after the manager at the bar had refused to call the police, but

Plaintiff relented with respect to filing a formal complaint when the police

officers informed him that he would have to go a hospital and get a medical

report written up, etc.

77. The Starbucks is a social networking focus of the CIA et al., who

for the most part seemed conspicuously out of place in Kyoto, and had a lifestyle that permitted them to frequent the Starbucks every day to wither away the hours on top of that.

78. Plaintiff became acquainted with Dalksy at the nursery school in Plaintiff's neighborhood where both our children were enrolled. Dalksy has a PhD in psychology and teaches social psychology at Kyoto University. Plaintiff became acquainted with after Bray approached him one day in the neighborhood in which both lived. According to his resume, which is posted online, he has a BA in psychology, and a PhD in education, and teaches English at a local college. Dalsky and Bray were focused on activities in Plaintiff's neighborhood, as opposed to recruiting spies at the Starbucks, for example.

79. Plaintiff encountered Turner with Dickinson and Mike at the Starbucks. Turner markets himself as a new age shaman and operates a website through which he markets videos and classes.

80. Apparently, as an area specialist with fluency in the Japanese language, Plaintiff represented a type of individual that stood in stark contrast to the sports-bar/college-fraternity group ethos being projected by the CIA et al. as representative of Americans/Westerners in Kyoto in general. None of the CIA officers Plaintiff encountered were area specialists knowledgeable of Japanese history, and fewer than 10% of them were fluent in the Japanese language.

81. Accordingly, when Plaintiff had tried to socialize with the individuals at the Starbucks that turned out to be CIA officers, it was clear that there was a disjuncture. Plaintiff had already surmised that Peterka and the aforementioned individuals were CIA officers, etc., but had not discerned what exactly their objectives were. Suffice it to say that the combination of the sports-bar/Irish-pub dumb-it-down telos evident in the group ethos projected by the CIA et al. at the Starbucks were palpably incongruent in the cultural capital of Japan, Kyoto, which, incidentally, has many traditional and modern Japanese drinking establishments, though few cafes that are well lit and stay open late. Peterka must have realized that it

wouldn't be long before Plaintiff had a better grasp of the scenario.

82. The fact that there was a religion angle being cultivated by the CIA et al. came into stark relief when Plaintiff connected Preston Houser and John Dougill, whom could be found among the patrons in the days of the Sanjo-Ohashi Starbucks, with articles they had published in the Kansai Time Out (hereinafter "KTO"). They stopped frequenting the Starbucks, however, after Plaintiff had questioned Dougill about an article he'd published about a renowned rebel figure associated with the Meiji Restoration. Plaintiff had read the seminal monograph (1961) on said figure (Sakamoto Ryoma) by deceased Princeton professor Marius Jansen, a world-renowned historian of Japan, and introduced that book to Dougill. After a brief discussion, during which Dougill attempted to introduce notions associated with Shamanism—traces of which were also evident in the article as well, in interpreting Japanese mythology—it soon became apparent to Plaintiff that Dougill knew next to nothing about Japanese history. Any student of Japanese history would have been familiar with the subject matter that the CIA and MI6 were attempting to exploit in a preposterous

manner for obvious and extremely dubious political purposes.

83. Yarden is an individual that Plaintiff recalls meeting out and about in Plaintiff's old neighborhood, which was not far from where Yarden resided.

84. Recently Plaintiff was contacted by suspected CIA officer, psychologist Colin Zimbleman (hereinafter, "Zimbleman")—via his wife, Misako Inaoka (hereinafter, "Inaoka")—and invited to participate in a literature discussion group (the "Monkey Shoulder Gang", named after a whisky bottle; hereinafter "MSG") including a number of CIA officers as well as officers of other Western countries' intelligence agencies, some of whom Plaintiff had already blogged about.

85. The first such individual is Zimbleman's brother-in-law, Sean Lotman, who is a founding member of MSG and on the mailing list and about whom Plaintiff posted a blog entry approximately two years early (http://kyoto-inside-out.blogspot.jp/2013/05/who-is-sean-lotman-just-some-co

nnected.html), suspecting him of being a CIA officer in relation to an unduly

high-profile in the media, including the Japan Times (i.e., a promotional

article written by another suspected CIA officer, Kris Kosaka (hereinafter,

"Kosaka"), exaggerating Lotman's essentially non-existent accomplishments

as a writer), and the sudden appearance of a contingency of similarly

disposed people (style- and attitude-wise, a veritable affinity group) in

Plaintiff's immediate vicinity, which is a vicinity in which they were

obviously out of place. Other members of the group on the mailing list

include additional suspected intelligence officers about whom I've blogged

(e.g., Canadian, Eric Luong, (hereinafter, "Luong")) as well as an individual

that has at least twice appeared in an event held at a CIA front café that

features and promotes Western intelligence officers stationed in Kyoto and

about which Plaintiff has blogged

(http://kyoto-inside-out.blogspot.jp/2015/01/the-flame-brought-to-you-by-cha

rles.html). Another member, A. Sasaki has also been on Plaintiff's radar in

association with CIA fronts and connected business in the area and in

association with Luong

(http://www.pechakucha.org/presentations/debunking-kyotos-myths), etc.

86. The individual in question with respect to said event it suspected CIA officer Mike Barr (hereinafter, "Barr"). Plaintiff has also noted others on the list in the past, including Ariya Sasaki (hereinafter, "A. Sasaki"), in relation to yet other intelligence/CIA-connected fronts infiltrating the neighborhood in which Plaintiff resides and the vicinity thereof.

87. In fact, all of said individuals were first encountered at one of two Starbucks that Plaintiff frequents, with the exception of Laverne, whom Plaintiff first encountered nearly ten years earlier in Kyoto at a different café located along the river on Imadegawa St. that has since changed management. The above-mentioned individuals all evidenced a degree of frustration with regard to my presence at Starbucks. On the other hand, unlike other suspected CIA officers that would simply leave, the above-named individuals not only persisted in coming to the café but of doing things like advising me against suing the government of the United States, for example (O'Day), in or around November 2014.

88. Another recent incident involved a somewhat hostile exchange about Chinese medicine with Dickinson, who had (mis?)represented himself as a former university teacher that taught aspiring medical students at medical schools about Chinese medicine. A new individual named Peter (last name unknown) that had recently appeared on the scene and described himself as a "medical anthropologist" was present at the exchange. It exposed the hostile subterfuge engaged in by AJ Dickinson and a couple of other CIA officers passing themselves of as esoteric wise men, shamans, etc., apparently as another face of the CIA's strategy to infiltrate and divide-and-conquer Japanese civil society using religion (or a proximity thereof).

89. Peter was an articulate individual, and his story believable, but it was not believable that he attempted to add credibility to AJ Dickinson's cover story by pretending to acknowledge Dickinson in association with academic scholarship in the relevant field. Plaintiff had long since looked into Dickinson's background on the Internet and ascertained that the academia story was suspect, to say the least, as there was not a single

mention of an "AJ Dickinson", etc., in relation to said topics. Plaintiff

subsequently described Peter in a report to the Consulate, and all of the

above-named individuals, in addition to Turner, whose online

pseudo-shamanism CIA-front Plaintiff had long since discovered.


90. Plaintiff would have thought that such individuals such as

Dickinson and Mike (whom Plaintiff has posted a photo of on his blog) should

have been removed from Plaintiff's surroundings immediately after he'd

complained to the Consulate, but that was not the case. Some of the people

were removed temporarily, but then reintroduced later. Circumstances

compelled Plaintiff to escalate the complaints, eventually raising my

concerns in a letter to President Obama, followed by a couple of emails to the

White House.


91. Plaintiff has come to understand that the Starbucks at

Sanjo-Ohashi in Kyoto has been the epicenter of Western intelligence agency

efforts to recruit Japanese as spies in Kyoto to act against their own society

and country, which Plaintiff now makes his home.

IV

FIRST CAUSE OF ACTION

(*Bivens* 1: Fourth Amendment, Fourteenth Amendment)

92. Plaintiff incorporates herein as though fully set forth, all of the allegations contained in paragraphs 1 through 91, above, as though fully set forth.

93. All of the actions and activities taken by the Defendants were taken under color of law and were without lawful authority and were accomplished in violation of clearly established law.

94. The unlawful interception of Plaintiff's electronic communications and/or the dissemination thereof, all of which were performed without Plaintiff's permission, in addition to the unlawful dissemination of information gathered through human intelligence networks,

which were presumably involved in providing for the physical protection of

Plaintiff and his family (including Plaintiff's wife-to-be, who was pregnant

with their first child at the time of the illicit contact from Roughan), violated

Plaintiff's rights protected under Fourth Amendment as well as the

Fourteenth Amendment of the US Constitution.

95. As a result of the unlawful misconduct by the Defendants,

Plaintiff has suffered humility, embarrassment, loss of personal privacy,

emotional distress, and is entitled to compensatory damages in an amount

according to proof, but in excess of the minimal amount for this Court's

jurisdiction. The Defendants acts were willful, malicious and intentional

entitling Plaintiff to punitive damages.

96. Plaintiff's computer has been hacked a number of times, causing

the loss of data, damage to hard disk drives, etc. Some of the email

exchanges between Plaintiff and Paquette, some of said exchanges

discussing the CIA, were deleted from Plaintiff's Hotmail email account,

presumably in conjunction with said hacking. Such deletions are tantamount

to the premeditated destruction of evidence that would be important to a

subsequent investigation or the like related to the allegations against

Paquette et al. set forth in this Complaint, and therefore represent a

violation of 18 USC 1519 against tampering with evidence, in addition to

violating Plaintiff's rights protected by the Fourth Amendment of the US

Constitution.

97. Plaintiff has studied EO 12333 and discerned therein two

authorities that the government could possibly cite as basis for legitimating

the interception of Plaintiffs electronic communications and the carrying out

of physical surveillance of Plaintiff and his family. However, even assuming

that a limited scope of authorities per EO 12333 were applicable, said

authorities would not allow for the diversion for unlawful use of information

obtained during the course of the above-mentioned activities within the

scope authorized by EO 12333. Thus, any unlawful diversion and use of such

information would constitute a violation of the Plaintiff's rights protected

under Fourth Amendment as well as the Fourteenth Amendment of the US

Constitution.

98. Roughan had contacted Plaintiff out of the blue (yet another

coincidence) by email after approximately a year's absence of communication

at a timing shortly after Plaintiff's then girlfriend had become pregnant with

our son and visited the neighborhood maternity clinic a couple of times. In

said contact, Roughan informed Plaintiff of his wife's pending childbirth, but

Plaintiff was suspicious of the coincidental contact in light of the

circumstances, and did not inform Roughan that his girlfriend was pregnant.


99. Next, Roughan sent a second email, but there was a substantial

discrepancy between the time frame described in his first email and the

timing at which he reported his wife as being in the hospital for delivery.

That confirmed Plaintiff's suspicion that Roughan had gained access to

information about Plaintiff's private life that he should not have had access

to, and that his purpose of contacting Plaintiff was to ply Plaintiff for further

information in a manner that can only be described as attempting to "spy" on

Plaintiff. What Roughan specifically thought he stood to gain thereby is

unclear; however, Plaintiff was aware of the fact that Roughan had

expressed envy at Plaintiff's life in Kyoto and given the strong impression

that he also wanted to live in Kyoto.


100. It is not clear as to whether Roughan obtained the information

regarding the possibility that Plaintiff's girlfriend had become pregnant

(after the CIA proxy Kudo who was sent to disrupt Plaintiff's life had an

abortion) via electronic communication interception or human intelligence

network involved in physical surveillance, but it was apparent that he had

come to be in possession of information about Plaintiff's private life that he

should not have had. Moreover, there would be no reason whatsoever for

Roughan to have access to information pertaining to Plaintiff obtained

through interception of electronic communications or physical surveillance of

Plaintiff under EO 12333. Roughan was not involved in the physical

surveilling of Plaintiff for providing physical protection, nor would he have

had any connection to Plaintiff's application for employment, which had

effectively been rejected by that point as far as Plaintiff is concerned.

Plaintiff assumes that Roughan acted on his own in his individual capacity

as a rogue CIA officer colluding with other rogue CIA officers in violating

Plaintiffs rights protected under the Fourth Amendment as well as the

Fourteenth Amendment of the US Constitution.


101. Furthermore, there should be some reasonable limits to the

respective time frame of each applicable clause of EO 12333, particularly

with respect to the clause related to applicants for employment with the CIA.

Plaintiff has stated in emails to Schaeffer et al. that he has hereby

withdrawn his application, etc. As the text of EO 12333 states, the

stipulations set forth therein are not intended to serve as justification for

CIA officers, NSA officials and the like to violate the Constitution of the

United States of America.


102. It bears emphasizing here that the events described above

occurred: after Kudo, who'd been recruited by the CIA as an agent and

deployed to act against Plaintiff, had become pregnant (with Plaintiff's child)

and unilaterally decided to undergo an abortion; and after Plaintiff had

already reported Roughan to the American Consulate in Osaka as a rogue

CIA officer harassing Plaintiff. Plaintiff assumes that he should not have

been contacted again by Roughan after lodging such a complaint against him through official government channels.

103. Plaintiff Vasaturo is also entitled to court costs as well as reasonable attorneys' fees, should he henceforth be represented by an attorney before this Court.

V

SECOND CAUSE OF ACTION

(Conspiracy)

104. Plaintiff incorporates herein, as though fully set forth, all of the allegations contained in paragraphs 1 through 103, above, as though fully set forth.

105. Plaintiff alleges that it was not, in fact, a coincidence that Peterka appeared one day while Plaintiff was visiting Berkeley and

subsequently made several trips to Japan while still a graduate student at

UC Berkeley, ostensibly, to visit me and his friends at Goldman Sachs in

Tokyo. Plaintiff has supplied the email (with header information) from 2003

in which Peterka gave Plaintiff directions to the residence in Tokyo of his

friends working at Goldman Sachs, etc., to the CIA/OIG.

106. Similarly, Plaintiff alleges that it was not, in fact, a coincidence

that Roughan appeared out of the blue at a bus stop while Roughan was

visiting Kyoto in or around 2004. Plaintiff does not know when the

conspiracy to displace him from Kyoto was launched or by whom, but will

seek leave to amend the complaint on the basis of evidence revealed during

discovery. Roughan eventually requested Plaintiff to do some translation

work for Mizuho Finance—Roughan's employer at the time—toward the end

of 2005 or thereabouts.

107. The severally named CIA field officers, including Peterka,

Roughan, Paquette, Blackman et al. conspired among themselves and with

others to undertake actions intended to undermine Plaintiff's ability to lead

a productive life in Kyoto, targeting Plaintiff's social life as well as livelihood,

and thereby violating Plaintiff's privacy and liberty interests protected by

the Fourteenth Amendment, etc., of the Constitution of the United States of

America (*Griswold v. Connecticut*, 381 U.S. 479).


108. Plaintiff suspects that Peterka recruited Kudo, to whom I'd

introduced him along with her brother before she moved to Tokyo. Her

brother had been living in England at the time and was home for a visit.

Plaintiff vaguely recalls Peterka exchanging contact information with one or

both of Kudo and her brother. Kudo was subsequently deployed (years later)

in an operation aimed at breaking up a somewhat long-term relationship

Plaintiff was in at the time that was fairly stable, but not flawless. Kudo

decided to return from Tokyo, where she'd gone to pursue an employment

opportunity, and return to Kyoto to enter graduate school and, expressly, to

be with Plaintiff. Plaintiff had become comfortable with Kudo again, and

allowed the relationship with his then girlfriend to flounder. Kudo's mission

was basically part of the scheme to undermine Plaintiff's life in Kyoto, with

the ultimate objective of displacing him from Kyoto.

109. Though Kudo did seductively succeed in convincing Plaintiff that he should let the relationship he was in flounder and get back together with her, when she subsequently became pregnant with Plaintiff's child and unilaterally decided to undergo an abortion—something she had earlier insisted she would never do, going so far as to claim it was against her religion—the false pretense was irrefutably exposed.

110. Plaintiff was devastated by the turn of events and loss. The fact that the CIA recruited Kudo as an agent to infiltrate Plaintiff's life with the implied intent of marriage and the abort Plaintiff's child is conduct that should shock the conscience of the court, and such acts violate Plaintiff's rights secured by the Fifth Amendment of the US Constitution. Here, Plaintiff makes references to United States Supreme Court case Meyer v. State of Nebraska, (1923), No. 325.

*'No state ... shall deprive any person of life, liberty or property without due process of law.'*

*While this court has not attempted to define with*

*exactness the liberty thus guaranteed, the term has received*

*much consideration and some of the included things have*

*been definitely stated... the right of the individual to contract,*

*to engage in any of the common occupations of life, to acquire*

*useful knowledge, to marry, establish a home and bring up*

*children...*

111. Kudo's behavior prior to the abortion had made Plaintiff suspicious that she had been recruited by the CIA, with Kudo once even making an out of context comment about having "needed the money", but despite those suspicions, Plaintiff would not have believed it beforehand that she would go through with an abortion as described above.

112. Moreover, after the abortion, she tried yet again to interfere with a relationship Plaintiff was building with a woman Plaintiff had subsequently met (Plaintiff's future wife). Kudo appeared out of nowhere near Plaintiff's dwelling while Plaintiff was in the company of his new

girlfriend, whereupon Kudo asserted that she (Kudo) was my still Plaintiff's

girlfriend, etc., in front of Plaintiff's new girlfriend, blatantly trying to break

up our budding relationship on false pretense.


113. Kudo's recruitment by Peterka et al. occurred in the early 2000s,

and her abortion in 2009, in a continuum of conspiratorial attempts to

undermine Plaintiff's life in Kyoto that continues to this day. The

conspiratorial acts described herein have violated Plaintiff's rights secured

under the Fourth, Ninth, and Fourteenth Amendments of the US

Constitution. *Biven's* provides a private cause of action for remedy against

such violations.


114. Upon information and belief, Plaintiff alleges that the

Defendants, and others, not yet known, conspired between and amongst

themselves to unlawfully intercept wire and oral communications of the

Plaintiff and disclose said communications to others within the United

States Government and elsewhere for personal reasons connected to the

objective of displacing Plaintiff from Kyoto.

115. Plaintiff further alleges that his computer was hacked and emails exchanged between Plaintiff and CIA officers, in particular, Paquette, were deleted. It is highly probable that said emails would implicate Paquette, for example, in relation to violations alleged herein against him by Plaintiff. Defendant Paquette subsequently closed his long-held personal email account with CompuServe, presumably to prevent the deleted emails from being revealed through the servers hosting that account.

116. The eavesdropping, etc., continued even after Plaintiff had initiated complaints related thereto through official US government channels, starting with Schaeffer at the American Consulate in Osaka. It is almost certain that the eavesdropping continues to this day. Plaintiff does not know how many instances of the unlawful eavesdropping, etc., in violation of Plaintiff's rights guaranteed under the Fourth Amendment, etc., of the US Constitution have occurred; accordingly, Plaintiff will seek leave to amend this Complaint upon becoming apprised of evidence revealed through discovery.

117. Plaintiff has suffered physical assault, been humiliated and embarrassed and suffered emotional distress, and is entitled to compensatory and punitive damages in an amount according to proof, including reasonable attorneys' fees (should Plaintiff obtain services thereof henceforth) and costs.

118. In light of the contents of the reply Plaintiff received from the DOS Office of the Inspector General (hereinafter "DOS/OIG"), which seem to imply that Schaeffer was in fact a CIA officer posted to the position of American Citizen Services Officer, and corresponds to an apparently well-established practice of providing covert CIA officials ("case officers") with "official cover" (which affords said officers diplomatic immunity), Plaintiff adduces that Schaeffer and the other named consular officials (i.e., Snider and Kennedy) with whom Plaintiff personally exchanged emails (hereinafter, the three are collectively referred to as "Schaeffer et al.") were CIA "case officers" whose responsibilities may have included coordinating the CIA "field officers" (i.e., covert CIA officials without official cover and

diplomatic immunity) that were the perpetrators of the unlawful acts with

respect to which Plaintiff had visited the Consulate to complain about in the

first place. In addition, it is also possible that Schaeffer et al. could have

shielded the individual rogue CIA officials about whose misconduct Plaintiff

had made protestation from scrutiny by the CIA/OIG by not reporting

Plaintiff's allegation "through the appropriate channels" after receiving the

complaints.


119. Initially there was a complete absence of responsiveness, on the

part of Schaeffer, and Plaintiff was compelled to prod a response from

Schaeffer on Plaintiff's own initiative, eventually receiving an email reply

from Schaeffer stating,


> *"Rest assured that I have taken your concerns on board and*
>
> *will pass them on through the appropriate channels".*


120. Here, attention should be drawn to the fact that the instant case

involves an unusual situation in which a federal official (CIA case officer)

had been stationed under the guise of impersonating another federal official

(DOS American Citizen Services Section Chief); wherein, the public office

occupied by the impersonating CIA officer encompasses a fiduciary duty to

American citizens overseas, such as Plaintiff, commensurate therewith. That

is to say, the CIA officer has been caused to assume a false title and

impersonate the role associated with the fictitious title while actually

conducting CIA business. Plaintiff alleges that in the instant case, though

the misleading representations by Schaeffer et al. were made by "email"

instead of postal mail, said CIA practice of causing its covert officers to

assume of the false title of "Chief, American Citizen Services Section", has

thereby resulted in violations of the spirit, if not the letter, of 18 USC 1432.


121. Moreover, the instant case presents circumstances

demonstrating that in posting covert CIA officers to the post of American

Civil Services Officer in order to secure diplomatic immunity for said CIA

officers to protect them from being held accountable for violations of

Japanese law committed in the course of carrying out the covert operations

with which they have been tasked to oversee, the CIA has facilitated the

subversion of the Department of State's office of American Citizen Services

Officer at the Consulate in Osaka by affording said covert CIA officer an

excessive degree of discretionary power. That is evident in light of the

apparently misleading response—and deliberate withholding of otherwise

necessary information from Plaintiff, (e.g., need to report directly to CIA/OIG,

etc.)—with respect to remedying the misconduct of rogue CIA officers

described in the protestations made by Plaintiff.


122. Not only did Schaeffer et al. deny Plaintiff the services

incumbent upon his office, thereby failing to fulfill his fiduciary duty to

Plaintiff, he conspired with others to deny said services in a purposeful

manner to serve personal and political interests. The situation was

perpetuated by the failure of Schaeffer et al. to inform Plaintiff that such

complaints against CIA officers are required to be filed directly with the

CIA/OIG, causing Plaintiff repeatedly file further complaints with the

Consulate, though the complaints were frustratingly ineffective, causing

Plaintiff substantial emotional duress over a period extending into years.

123. Plaintiff alleges that Schaeffer et al. conspired to deflect Plaintiff's complaints, thereby denying Plaintiff his entitlement and right as an American Citizen to receive the services commensurate with said office, for personal reasons associated with promoting their careers in the CIA, etc., intentionally and conspiratorially abusing the undue discretionary power afforded to them under the circumstances.

124. As is evident from the above-described interactions with Peterka and Roughan, a plan had already been launched by rogue CIA officers aiming to displace Plaintiff from Kyoto years before Schaeffer was assigned to the Consulate in Osaka. Peterka and Roughan both had connections to the finance sector in Tokyo: Peterka was sent to displace me from Kyoto partly by trying to lure me back to Tokyo to work for Goldman Sachs; and Roughan, who worked in the finance sector in Tokyo, had also repeatedly informed Plaintiff of job opportunities there, etc., after Plaintiff had performed the aforementioned small translations projects for Mizuho Finance. In fact, he contacted me in January of 2012 mentioning that his wife wanted to talk to me about some translation work. I discussed the document and market rates,

but didn't do the translation. Roughan last contacted Plaintiff by email in

October of 2012 to complain about Plaintiff's blog postings about Roughan's

suspected status as a CIA officer, etc.

125. As described above, Plaintiff has since come to understand that

almost all of the Westerners Plaintiff has interacted with personally in Kyoto

over the years have been intelligence officers (CIA, MI6, etc.). In fact, the

scale of the CIA-coordinated operations of Western intelligence agencies in

Kyoto made it apparent that the CIA et al. constituted a veritable class unto

themselves. Plaintiff was virtually surrounded by Western intelligence

officers from the day he moved into the Villa Tonodan apartments. Under the

circumstances, there was absolutely no possibility that Plaintiff would not

daily come into contact with covert CIA officers in his daily life.

126. As a student of East Asian history and languages, it appears

Plaintiff was to be excluded from that class because the knowledge Plaintiff

had acquired informed his interests and provided a bond of affinity that were

intrinsically opposed to the readily apparent operations aimed at subverting

civil society and rending the social fabric in the ancient cultural and religious

capital of Kyoto. The arbitrary acts against Plaintiff by rogue CIA officers

and proxies acting on behalf of said officers and in the pay of the Executive

Branch of the government of the United States of America should shock the

conscience of the court. It is likely that CIA officials in supervisory roles have

acted so as to cover up the unlawful acts of the rogue CIA officers reported by

Plaintiff, and have thereby facilitated further such violations, said covering

up being carried out for personal and political purposes. It is clear that

political objectives, such as promoting Osaka Mayor Toru Hashimoto

(hereinafter "Hashimoto"), of rogue CIA officers are not necessarily

compatible with the foreign policy being pursued by the United States, which

raises the question as to the degree to which certain aspects of the agenda

being pursued by CIA officers Plaintiff has encountered and exposed

coincides with the official foreign policy of the United States. It is clear,

however, that Plaintiff was targeted in a conspiratorial manner by rogue CIA

officers and continues to be so into the present, as demonstrated by the

recent course of events described herein.

127. In short, Plaintiff has been purposefully targeted by rogue

members of a veritable colonizing class of CIA officers intent on displacing

Plaintiff from Kyoto because said officers wished to infiltrate and control the

spaces inhabited by Plaintiff in his normal everyday existence in Japanese

civil society in the city of Kyoto. It is clear that Plaintiff was considered to be

an obstacle impeding the achievement of the corresponding personal goals of

each respective rogue CIA officer described herein, and continues to be so to

this day. It is almost certain that other rogue CIA officers culpable in the

violations set forth in this Complaint will be revealed during discovery. Such

targeting, etc., represents a flagrant attempt to deprive Plaintiff of his rights

secured by the Fifth Amendment of the US Constitution ((*Snyder v.*

*Massachusetts, 291 U.S. 97 (1934)*); (*Rochin v. California,* 342 U.S. 165, 172,

72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)); ( *Palko v. Connecticut,* 302 U.S. 319,

325-326, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937))) as well as the Fourteenth

Amendment of the US Constitution.


128. Several aspects of that agenda involve religion-and-the-state, as

documented on Plaintiff's blog, are pointedly at odds with the American

Constitutional doctrine of separation of Church and State as well as the

protection of freedom of religion. Not only has Plaintiff been accosted by CIA

officers attempting to hide their pernicious attempts to misappropriate the

Christian religion for use against Japanese civil society, but has met with

personal affronts in relation to his appreciation of Buddhism, in particular.


129. When Plaintiff settled in Kyoto, the CIA et al. were concurrently

operating two prominent local English language print publications: Kansai

Time Out (hereinafter "KTO"), and Kyoto Journal (hereinafter "KJ").

Plaintiff considers said publications to have served two basic functions: first,

they served as vehicles through which Western intelligence agencies

promoted individual intelligence officers that were part of the sprawling

"intelligence community" network and provided them cover as

photojournalists; and second, they served as vehicles through which

disinformation and propaganda could be spread. Said disinformation and

propaganda was generally intended to (dis)inform public opinion, on the one

hand, and propagate a representative paradigm of Americans and American

culture ('Anglo cultural', generally speaking) tailored to project an

intelligibility aimed at furthering the interests of the individual CIA officer's involved.

130. The Japan Times article this link points to demonstrates the interlinkage between the intelligence networks and the English language media":

http://www.japantimes.co.jp/community/2011/05/03/issues/its-innovate-or-die-in-todays-mad-mag-world/#.VaZ3UvntlBd

131. That is, said article features interviews with three (and discusses one more) intelligence officers Plaintiff has had cause to identify on his blog due to obvious disinformation they've published, etc.: CIA officer, Eric Johnston (hereinafter "Johnston "; now a staff columnist with the Japan Times, formerly a KTO contributor), Irish foreign intelligence service G2 Michael Lambe (hereinafter "Lambe"; operates blog called "Deep Kyoto", does PR for KJ, etc.), and C.B. Liddell (hereinafter "Liddell"; author of KTO article on Japanese Freemasonry posted on Plaintiff's blog).

132. Plaintiff's adduces that his presence broke the mold, so to speak, of the uniform paradigm the CIA sought to present, as he provided a stark contrast, demonstrating both fluency in the language, familiarity with history, and an affinity for some manifestations of Japanese culture. Apparently, that made him a target for exclusion by the non-Japanese-speaking, imposter Christians, etc., that the CIA (and MI6) had infiltrated into Kyoto in numbers so large as to shock the conscience of the court. The conspiracy described herein has had the objective of displacing Plaintiff from Kyoto as its recurrent theme.

133. At one point, Plaintiff took the opportunity to question suspected MI6 officer John Dougill, who had published a substantial amount of disinformation, including a piece in KTO about Sakamoto Ryoma that Plaintiff found incomprehensibly dubious. Houser had also published in the same magazine, which shut down in 2007 with its website being sanitized from the Internet, and the blog Deep Kyoto being created at the same time, ostensibly by Lambe, apparently aiming to fill the void, etc.

134. Dougill and Houser stopped going to the Starbucks shortly after

Plaintiff discussed Dougill's article with him and introduced Dougill to

historian Marius Jansen. Plaintiff has discussed some published writings of

Dougill and Houser on his blog, and has gone so far as to post copies of a

couple of not readily accessible KTO articles, including the aforementioned

article by Dougill as well as another on the history of Freemasonry in Japan

by Liddell, in their entirety.

(http://kyoto-inside-out.blogspot.jp/2012/04/who-is-preston-houser.html,

http://kyoto-inside-out.blogspot.jp/2012/04/cia-meddling-in-japans-political.h

tml,

http://kyoto-inside-out.blogspot.jp/2012/04/ciami6-led-pincer-assault-on-civil.

html,

http://kyoto-inside-out.blogspot.jp/2014/08/why-i-have-written-about-freema

sons-3.html).


135. Plaintiff has gone to the trouble of illustrating the

above-described connections because the extent of the CIA's activity here in

Japan is so conspicuous that it should shock the conscience of the court. The

blatant promotion of intelligence operatives through intelligence network

operated/influenced media outlets, including the country's leading English

language newspaper, and otherwise high-profile activities of CIA officers are

so readily apparent to an educated eye as to leave one dumbstruck, and could

not be missed unintentionally. The intelligence officers must have been

aware of that.


136. More recently, the CIA et al. have moved into social media, such

as Facebook, attempting to enable the ludicrous number of officers stationed

in Kyoto, for example, to present themselves as normal citizens to civil

society. Furthermore, they are promoting CIA-front businesses on Facebook

as well, such as "Deep English", ostensibly owned and operated by Douglass

and Aaron Campbell (hereinafter "Campbell"), another veteran of CIA-front

Global College Friends World who appears in screenshots from archived

webpages posted on Plaintiff's blog. The CIA does not seem to care that I

have exposed Douglass and Campbell; they have simply recycled them.


137. Plaintiff has examined a few pieces published in the Japan

Times, which contained outlandishly fallacious (dis)information or

promotional material pertaining to other intelligence officers, on his blog and

duly exposed the CIA officers whose names were on the by-line. The first

such piece was by Johnston , and purported to be about the history of the

first capital of Japan, Nara:

(http://kyoto-inside-out.blogspot.jp/2011/10/who-is-eric-johnston.html).

The second piece was by an associate professor of law at Doshisha University,

Colin P.A. Jones (hereinafter "Jones") that included blatant

misrepresentations of the Japanese agricultural co-op and a conspicuous

absence of discussion about the highly subsidized American agribusiness

sector, lacking even the semblance of balance, and representing a

propaganda piece promoting the Trans-Pacific Partnership:

(http://kyoto-inside-out.blogspot.jp/2014/10/who-is-colin-p-jones.html). The

third was by suspected CIA officer Kris Kosaka (hereinafter "Kosaka"), and

was a purely promotional piece on suspected CIA officer Sean Lotman, and

aimed to impart Lotman's personage with a false stature as a literary

figure/photographer, belying a scheme to promote his false ascent in

Japanese civil society:

(http://kyoto-inside-out.blogspot.jp/2013/05/who-is-sean-lotman-just-some-co

nnected.html). Lotman has a substantially non-existent history—let alone

career—as a writer, and Plaintiff had previously noted other suspect

promotional pieces by Kosaka.


138. There is a particular significance to Plaintiff regarding the

article by Kosaka, because Lotman had married a woman whose family runs

a noodle shop in Plaintiff's neighborhood, and the article was published

subsequent to Plaintiff's protestations filed with Schaeffer et al. regarding

Dalsky and Bray, and blog posts about Bray and Dalksy that addressed

issues specific to Plaintiff's neighborhood. Plaintiff's neighborhood has been

intensively targeted by the CIA. Plaintiff had considered naming Kosaka as

a defendant in the instant case, but has decided to wait until further

evidence regarding the objectives of the false promotional piece she

published about Lotman are revealed through discovery. Plaintiff has only

seen Lotman once in Kyoto; however, in light of the recent developments

related to Zimbleman, Plaintiff expects substantial evidence to come to light

during discovery.

139. Another example of an attempt to establish a covert CIA officer active in Plaintiff's immediate surroundings as a high-profile member of civil society can be seen in the case of Blackman. After Plaintiff had reported Blackman to the Consulate in relation to the fraudulent offer of translation work, the CIA had him right back to work nearby; Blackman describes himself online as having "co-founded" "the largest English language school (English Buffet) in Kyoto" in 2010 (http://anthonyblackman.brandyourself.com/). Granted, as that is self-promotion, perhaps it simply reflects a degree of desperation on the part of Blackman himself. Blackman subsequently left that school (which is not far from Plaintiff's residence) shortly after Plaintiff posted a blog post including evidential emails and documenting his reappearance. Blackman currently appears to be teaching at a school near his residence (http://www.eieigo.net/%E3%83%9B%E3%83%BC%E3%83%A0/%E8%AC%9 B%E5%B8%AB%E7%B4%B9%E4%BB%8B/). In any case, the school English Buffet is yet another 'intelligence community' front, and Plaintiff can confirm that he has met, several times at the Starbucks, a suspected MI6 officer

named Andy that teaches there.

140. Prior to lodging a complaint with the American Consulate in

Osaka, Plaintiff submitted an online application to the CIA offering to serve

as an independent contractor, stipulating the condition that he would

maintain continuity in the lifestyle he'd been leading, and not interrupt or

undermine the various scholarly and cultural pursuits in which he was

actively engaged.

141. The decision to submit the application was not made out of the

blue without prompting, but on the basis of prompting in the form of a

surreptitious intimation by Paquette that he was acquainted with a close

friend whom Plaintiff did assume had entered the CIA. That friend (to be

named in a subsequent sealed filing) had visited Plaintiff in Japan in the

year 1998 or 1999 while Plaintiff was living in Tokyo. After the problems

with CIA officers in Kyoto escalated to the point of my having to report them

to the DOJ, Plaintiff cc'd said friend's old Hotmail account a number of

emails sent to the Consulate and the DOJ. It appears that he deactivated

that Hotmail account within a year or so after the first such cc'd email.


142. In retrospect, it has become clear that Paquette may have had
more than one motivation for encouraging me to submit an application to the
CIA; in particular, with respect to the electronics communications provisions
related to applicants found in Executive Order 12333, and triggering a
clause therein that could be seen to authorize electronic eavesdropping and
the like against Plaintiff.


143. After Plaintiff submitted the aforementioned application, he
received no reply from the CIA. Although Plaintiff had not expected to
receive a positive reply from the CIA to his offer, it was not clear to Plaintiff
what the actual disposition of the CIA was in light of developments on the
ground, which oscillated between the projection of empathy from CIA officers
and positive signs that there might be an effort afoot to integrate Plaintiff
into the local intelligence network, on the one hand, and continued
harassment, on the other.

144. The first concrete evidence of such oscillation occurring after

Plaintiff submitted the application to the CIA appears in the form of emails

Plaintiff exchanged with Blackman. Blackman was introduced to Plaintiff by

Glenn Paquette for the purpose of making Plaintiff a fraudulent offer of

translation work. After much useless wrangling about rates and various

potential projects and business that came to appear as obvious attempts at

manipulation, Plaintiff eventually called the Japanese client at his

company's office (information provided by Blackman), and discovered that

the job had already been done. Plaintiff also learned that the translation

company called TSA Blackman claimed to be running did not exist,

whereupon Plaintiff confronted Blackman in an email and accused him of

being a CIA officer and harassing Plaintiff. Plaintiff also confronted

Paquette, who denied complicity and placed the blame on Blackman in terms

of a profit motive.


145. The above-described interaction with Blackman represented a

blatant ruse aimed at interfering with Plaintiff's pursuit of a lawful

livelihood, and had caused Plaintiff to divert his time and effort in pursuit of

a fraudulently represented job offer with a non-existent enterprise. Moreover,

the collaborative effort between Paquette and Blackman was a conspiracy

intended to entangle Plaintiff in a humiliating and demoralizing pursuit of

said fraudulently represented offer of work, and presented Plaintiff with the

first material evidence, in the form of emails, that Plaintiff could submit to

US government officials, which Plaintiff assumed were the proper

authorities, in order to clearly demonstrate, with proof, that rogue CIA

officers were harassing him.

146. The further mention of an offer of work by Paquette without

following through as well as same from Roughan led Plaintiff to consider

including a RICO claim, but considering the scope and lack of material

damages, Plaintiff decided against that. Plaintiff was not sure whether other

acts could be tied together with those, such as Kudo's abortion, for example.

Should evidence be revealed during discovery that indicates that violations

of RICO may have occurred, Plaintiff may seek leave to add a RICO claim to

the complaint.

147. Another incident involving Roughan, after the emails he had

sent Plaintiff regarding his wife's pregnancy—which had demonstrated the

existence of a conspiracy as far as Plaintiff was concerned—involved a

threatening series of emails Roughan send Plaintiff trying to intimidate

Plaintiff into removing blog posts Plaintiff had made about Roughan and his

suspected status as a CIA officer and connection to the network of

intelligence officers in Kyoto. Furthermore, Roughan also accused Plaintiff of

operating "an illegal business". Roughan's malicious accusation (and implied

threat of retaliation) clearly demonstrates a preoccupation on Roughan's

part with Plaintiff's livelihood. Roughan chose to threaten and attempt to

intimidate Plaintiff instead of simply filing a civil suit for defamation, which

was basically the false accusation he was making.


148. Moreover, the above-described two incidents involving Roughan

both occurred after Plaintiff had reported him for harassment to the

American Consulate in September 2009, as evidenced by the initial email

exchange with Schaeffer. Apparently, the CIA believes that harassment does

not constitute an invasion of the right to privacy of a private American

citizen residing overseas as secured by the US Constitution.

149. Wessel had been another CIA officer that frequented the Starbucks and had attempted to convince me that Kyoto wasn't the place for me. A woman that I later learned was his girlfriend, named Ai, had apparently been used as a proxy against Plaintiff. She also appears to have been removed from Kyoto at this juncture.

150. Further, it appears that two individuals Plaintiff was friends with while serving in the US Army—Taylor and Kiely—have been indirectly involved in the above described conspiracy to displace Plaintiff from Kyoto. The primary indication of their involvement was the appearance in Kyoto of an individual that went by the name of Scott Harris (hereinafter "Harris"), who claimed to be from Canada and subsequently visited Kyoto several times from Thailand, where he claimed to be working as an English teacher. Plaintiff doesn't know if Harris provided his true name, or if he actually was Canadian, and suspects that Harris may have been a CIA officer. Meanwhile, it would not appear to be unusual for the CIA to have used a proxy from

Canadian intelligence. Plaintiff may seek leave to amend the complaint with respect to Harris, as appropriate, based upon evidence revealed through discovery.

151. Harris tried to sell me on Thailand as a desirable destination, but Plaintiff made it clear to him that Plaintiff wasn't interested in going to Thailand. Plaintiff indicated to Harris that Plaintiff thought Kyoto was the nicest city in Asia, and had reasonably clean air to boot. Plaintiff further emphasized the fact that he was a specialist in East Asian languages who translated patent specifications professionally, and was a student of Japanese history and culture. It appeared to Plaintiff that Harris was partly on a recruiting mission, and partly spying on Plaintiff. Plaintiff has reported the suspected involvement of Taylor, Kiely and Harris to the CIA/OIG in conjunction with the investigation of the complaints set forth herein, though Plaintiff has not yet produced the many pages of emails he exchanged with Harris over a period of several years.

152. Both Taylor and Kiely appear to have joined the CIA and were

stationed in Thailand for many years in the 1990s, with Taylor subsequently doing a stint in Tokyo. Taylor had tried to sell me on the idea of Thailand before he eventually made it to Tokyo. He never visited me in Kyoto during his three-year stint, despite saying that he would and wanting to visit the city. Plaintiff did visit him and his family once or twice in Tokyo.

153. Plaintiff suspect that Taylor and Kiely were involved in dispatching Harris to Kyoto because the best they could do as low-level CIA operatives was to try and convince me to leave by offering an alternative, at the behest of their co-conspirator CIA cohorts. Plaintiff has kept in touch with Taylor over the years, and assumes that he was also acting to protect an old friend. Plaintiff thinks that such practices on the part of the CIA should shock the conscience of the court, and it is with heavy heart that he finds no adequate alternative to naming said individuals as defendants.

154. Scott Harris showed up in Kyoto in 2007, and the first email Plaintiff has from him are dated to June 2007; the last, April 2012. Plaintiff conveyed to Taylor via email complaints about being set up to be physically

assaulted at a local bar Plaintiff had arranged to meet a CIA proxy named

Yoshiyuki whom Plaintiff had met through Mike and Paquette, and other

harassment by CIA officers and other intelligence officers and proxies. In

Taylor's reply of December 12, 2007 to one such email, he stated, "Sounds

like you need to find a new crowd in Kyoto". Normally, that might sound like

reasonable advice, but under the circumstances, that would simply means to

avoid to cafes, bars and the like frequented by covert CIA officers and their

proxies, a group that collectively had sought to colonize civil society in Kyoto.

155. While Plaintiff is not aware as to whether or not Taylor reported,

as apparently is required under EO 12333, Plaintiff's allegation that he had

been subject to a criminal attack encompassing a conspiracy involving rogue

CIA officers. Plaintiff has noted the correspondence between the appearance

of Harris from Thailand and his attempts to encourage Plaintiff to leave

Kyoto for Thailand, and the fact that Taylor and Kiely had been stationed in

Thailand for many years. Furthermore, the various time frames at issue

coincide.

156. Here, Plaintiff cites a paragraph from an email addressed to
Snider that Plaintiff sent on October 20, 2011 to the American Consulate in
Osaka, the email having subsequently been provided to the DOJ as well:

*After being attacked in the bar called the HUB, the*

*next time I was in there I was talking to a guy named Marcus,*

*a German doing something at Kyoto University in the Science,*

*and obviously an intelligence dweeb. We were talking about the*

*attack when I was compelled to come out and say loudly that*

*Glenn was in the CIA, whereupon Marcus tried to deny that*

*and quickly change the subject to the guy who had attacked me,*

*telling me he was Moroccan and trying to get me interested in*

*other information. More recently, after the topic again came up*

*with a Dan Douglass assuming a higher profile, apparently*

*more time to spend at the café after losing his job, whereupon*

*he also tried to put me on the trail of the Moroccan guy, telling*

*me the guy was studying martial arts and that Dan, too, had*

*found him to be an individual with a chip on his shoulder. In*

*summary, both Marcus and Dan tried to steer me onto a*

*revenge trail against my attacker in order to divert my*

*attention from analyzing the setup and those behind it.*

157. At the time, Plaintiff had been under the impression that many

of the CIA officers were Freemasons, for various reasons, including his study

of history. On the other hand, Plaintiff would also refer to Freemasons as a

euphemism for Judeo-Christian co-religionists when discussing Buddhism

and the Western intelligence agencies and officers in Kyoto, as can be seen in

the title of an email exchange with Paquette from 2007, only a trace of which

remains:

> *"republicans, free masons and buddhism, and more!!!!*
>
> *TABOO =_= DELEEEEET_..."*

158. Plaintiff had begun discussed related aspects with Paquette, in

particular, starting around 2005 or thereabouts. For example, Plaintiff

showed Paquette a book he had read by Malcom Barber a British Medievalist,

the book being "The Trial of the Templars", in which Barber examines the

trial by Philip the Fair of France of the "Poor Knights of Christ of the Temple

of Solomon", along with another book Plaintiff was reading, "Counsel to the

President", an autobiographical book by Clark Clifford (with Richard

Holbrooke) recounting Clifford's stint as counsel for President Truman.

Those books served as a basis for discussing religion and the state, the

military industrial complex and President Eisenhower, etc., with the focus

eventually being brought around to Japan and Kyoto. One juxtaposition that

Plaintiff recalls using in a conversation with Paquette—and perhaps in the

deleted email—in regard to the crusading Templars and Freemasons in the

CIA was that the only "temples" that Plaintiff thought Kyoto needed were

Buddhist temples. Paquette did not seem to find that analogy very amusing.

Plaintiff eventually posted a brief entry on his blog (circa 2012) with some of

the relevant references:

http://kyoto-inside-out.blogspot.jp/2012/07/eisenhower-philip-of-france-trum
an-war.html


159. Another reason, however, that Plaintiff broached the question of

Freemasons was the connection that materialized out of nowhere between

Abdelsamad and David Chapman (hereinafter, "Chapman"), a friend from

Berkeley with whom Plaintiff had remained in contact to some extent.

Plaintiff is as certain as a non-Mason can be that Chapman is a Freemason

in light of various circumstances and occurrences during our personal

interactions over the years, which Plaintiff can elaborate on, as necessary. In

short, the connection between Chapman and Abdelsamad and the

subsequent impact thereof on Plaintiff are evidence of Abdelsamad role in

the conspiracy. Plaintiff, as a matter of course, presumes that the connection

between Chapman and Abdelsamad was based on Freemasonry (i.e., that

both are Freemasons), but, even more importantly, that Abdelsamad was a

CIA officer, which Plaintiff believes that evidence revealed during discovery

will prove. Abdelsamad was a student at Kyoto University, at which Glenn

Paquette had been teaching, and he also frequented the Sanjo-Ohashi

Starbucks, occasionally in the company of a woman he said was his wife. It

should be noted that the article in the Kansai Timeout about Freemasonry in

Japan had been published in May, 2008.

160. Another disturbing aspect about Paquette was that he had been

dating female college students that were working as hostesses, and had

attempting to discuss the plight of one or two of such women with Plaintiff.

However, as Plaintiff mentioned in complaints to Schaeffer et al., Paquette

appeared to be intent on promoting the adult entertainment industry

businesses operated by Japanese organized crime groups in the

neighborhood, and attempted to accost Plaintiff when he didn't exhibit an

inclination to be supportive of that sort of attempted misappropriation of the

Starbucks.

161. It should be noted that, in the interim, historically significant

measures have been implemented by the Japanese Government that have

bearing on the instant case. More specifically, the "Organized Crimes

Exclusion Ordinances" that came into effect on April 1, 2011 in Kyoto. In

short, the Ordinances are aimed at excluding organized crime groups from

civil society. Plaintiff has encountered a number of instances in which the

CIA/MI6 et al. appeared to be operating on the premise of cultivating contact

with individuals/groups associated with said organized crime groups.

162. For example, Plaintiff has disclosed findings related to the so-called "college" at which Plaintiff's long-term neighbor Douglass had been working, but with respect to which he had been deceptively secretive about. The Wikipedia entry for LUI Global describes it as "a discrete educational entity of Long Island University", which has since removed all information regarding the "Japan center" from their website, and the Wikipedia article describes it as "suspended". A web-archive page (http://web.archive.org/web/20071217023809/http://www.brooklyn.liu.edu/gl obalcollege/about/history.htm) of the former website of the "Japan center" shows the following paragraph in the introduction.

*Founded by the New York Yearly Meeting of the Society of Friends (Quakers) in 1965, Friends World (now Global College), became nonsectarian in the mid 1970s. In the 1991-92 academic year, Friends World affiliated with Long Island University. Long Island University is accredited by the Commission on Higher Education of the Middle States Association of Colleges and Schools*

163. Here, it should be noted that Plaintiff had posted a link on his blog to a video, which was available on YouTube at the time, which has subsequently been denoted as "private". Given the nature of the situation, Plaintiff decided to post on his blog the version of that video that he had personally downloaded and archived. Plaintiff is fairly certain that every individual featured in said video is an intelligence officer in the CIA et al.

164. In fact, the "Japan Center" of LIU Global College Friends World was a CIA-front organization at which one CIA officer (Houser) had been teaching a course of which the syllabus seems to demonstrate a sympathetic disposition to the situation of the former outcaste class of people known as the Burakumin in Japan, who are predominately found in the Kansai area in which Kyoto is located. According to Japanese police statistics, Burakumin account for 60% of Japanese organized crime groups, ethnic Koreans 30%, with the remaining 10% being Japanese not of Burakumin descent. The "Japan center" was closed in December, 2009

(http://web.archive.org/web/20110824104645/http://www2.brooklyn.liu.edu/g

lobalcollege/worldwide.html). On this web-archive page, it can be seen that

their website hosted links to other CIA et al.-front groups, such as English

languages publications Kansai Timeout, Deep Kyoto, Kansai Scene, and the

Kyoto Visitors Guide.

165. The Starbucks at Sanjo-Ohashi is located approximately one

mile north of the corporate headquarters of the largest organized crime

group in Kyoto. The group operates numerous drinking establishments and

sex shops in the vicinity, the latter being opened after an elementary school

in the neighborhood had been closed under questionable circumstances in

1995. One aspect of the Starbucks is that it has been targeted by the

proprietors of such businesses to fish for clients.

166. Douglass had also been employed at said "Global College", which

in fact consisted merely of a rented small two-floor house in a residential

district inaccessibly far up in the hills to the northwest of the city center. I

had known Douglass for many years, as he had lived two doors down in the

same apartment building, Villa Tonodan, where Plaintiff had resided for

approximately ten consecutive years. In retrospect, Plaintiff has come to

understand that the occupancy of Villa Tonodan was comprised of at least

1/2 intelligence officers from the CIA/MI6 et al. Said individuals include, for

example, John Benson, Frank Carter, Paul Crouse, Ryan Buttigieg, and

several others with whom I'd been personally acquainted but no longer recall

their names. Plaintiff was virtually surrounded by Western intelligence

officers while residing in that building.


167. With regard to the scope of the CIA's operations here in Kyoto,

there are other networks that I have not exposed only to a minor degree. One

is the network associated with suspected CIA officer John Einarsen and the

Kyoto Journal, which has become a digital only publication in recent years,

and another to the event called The Flame, which is held at the Papa John's

café, which is owned and operated by suspected CIA officer Charles Roche.

Both of those networks are long established, with the two named individuals

having first arrived in Kyoto in the 1970-80s, I believe.


168. Brian Schultz (aka Brian Uneme, a suspected South African

intelligence officer hereinafter referred to as "Schultz") was a suspected CIA

proxy connected to the Kyoto Journal network who had been studying the

shakuhachi, a Japanese bamboo flute that I also study. He sometimes took

lessons from Preston Houser, whom I suspect may have been operating

behind the scenes coordinating Schultz efforts to interest me in the Kyoto

Journal group, etc. Schultz had invited me to join a monthly meeting of the

Kyoto Journal crowd held by Wachs at a small temple (as I recall) near the

Yoshida shrine. I declined, as I was fully engaged with my own scholarly and

cultural pursuits, and mentioned that I considered the Kyoto Journal to be a

form of superficial, glossy photo-journalism that was basically incompatible

with the pursuit of genuine scholarship.


169. Here it bears noting that the network established by the CIA et

al. basically seems to have an officer involved in every cultural pursuit that

is found in Kyoto (a not insignificant number); that is to say, the CIA and

cohort intelligence agencies appear to be attempting to monopolize the social

scene in civil society by establishing a comprehensive network encompassing

the entirety thereof. Accordingly, said CIA et al. are effectively engaged in a

strategy that is premised on creating networks that are dependent on the ability of the intelligence officers to exclude (or incorporate) private citizens such as Plaintiff that happen thereupon.

170. In this regard, the case of Houser is illustrative with respect to Plaintiff's plight, as both of us study the same form of traditional Japanese music associated with Zen Buddhism and are familiar with its history. That is part of the reason that Plaintiff felt compelled to expose Houser after discovering in his published writings some misrepresentations of the history of the musico-religious tradition which had political import. That is a common tactic I've illustrated elsewhere, as described above with respect to disinformation on the history of Nara in the Japan Times, for example.

171. Furthermore, with respect to Houser, it will now be necessary for Plaintiff to explain all of this to Houser's teacher, who was a student of Plaintiff's teacher. Plaintiff has made polite excuses why he has been unable to accept the open invitation to visit Houser's teacher at his residence in Kyoto because of this situation, though Plaintiff has performed ensemble

pieces with Houser's teacher's wife, who plays string instruments, in a couple of practice sessions, and met Houser's teacher occasional at musical events.

172. Plaintiff notes that he has never personally had any problems with Houser, and has interacted with him on a superficial basis in civil society in a cordial manner. Accordingly, Plaintiff's allegations against Houser have to do with whether he was involved in coordinating the activities of a proxy from South Africa who was an occasional student of his, Brian Schultz (aka Brian Uneme). The same is true for Wachs, whom Plaintiff has never met, but heard about through Schultz.

173. It bears drawing out the fact that an individual interested in culture, tradition and history for their intrinsic value would have to go against their conscience to engage in the type of betrayal of the tradition by disseminating disinformation about it for political purposes, such as in the case of Houser. Meanwhile, because Houser was not a scholar of East Asian history and language when he joined the CIA, he would have been more

receptive to the notion at the time of his deployment to Japan. Plaintiff has repeatedly made it clear to a succession of CIA officers as well as government officials at multiple agencies that he did not approve of the pernicious sociopathic activity of the sort he has documented on his blog; therefore, it is obvious that Plaintiff would not act his conscience to partake in depraved acts.

174. Over the course of the past five years since first visiting the American Consulate in Osaka to make protestations in person about harassment by rogue CIA officers, a succession of newly introduced or re-introduced individual CIA officers and proxies have appeared at the Starbucks and attempted to engage me in a cordial manner, apparently with the aim of further spying on me and/or delaying Plaintiff's efforts to draft this Complaint by leading Plaintiff to believe that the CIA was about to accept his earlier offer to serve in the capacity of independent contractor. Plaintiff attempted to engage such individuals in good faith, but their disposition would sometimes change suddenly, becoming overtly hostile at times, belying a subterfuge or ulterior motive.

175. CIA officers that were newly introduced after Plaintiff had initiated his complaints with Schaeffer et al. include, for example, Dalksy and Bray. Plaintiff first encountered Dalsky at the riverside where I practice the shakuhachi and take my children to play (at the time, only our son had been born). He was there with his daughter. Plaintiff had come down with a particularly virulent cold, so wasn't playing the shakuhachi that day. He made a somewhat untoward snidely comment when I told him I was sick, which I played off as a joke, but was immediately put on guard.

176. The next time Plaintiff saw Dave was at the nursery school Plaintiff had to sue the city in order to gain admission. Dave's daughter was only granted a one-day a week attendance at the school because it is crowded, and it seemed in order that I mention that Plaintiff had been forced by circumstances to sue the city of Kyoto to get my son into the nursery school. That discussion worked its way around to the topic of history and Kyoto, and Plaintiff mentioned Marius Jansen's book on the Meiji Ishin. Plaintiff also offered to send David Dalsky and another guy (suspected MI6

officer David Chandler, associate professor at Doshisha University) whose

daughter was attending the same nursery school a link; here, the

response—this time from both individuals—was that neither of them wanted

to exchange email addresses, and that seemed rather unusual, not to

mention unsociable.

177. The next time Plaintiff talked to Dalsky Plaintiff mentioned that

the mayor of Kyoto had lost a pair of civil suits that had been brought

against him for his illicitly provide funds to companies affiliated with

Burakumin organized crime groups, and mentioned that Plaintiff was

having problems with some CIA officers. He seemed somewhat taken aback,

and Plaintiff didn't see him around for a couple of weeks.

178. When Dalsky did show up, once again along the banks of the

Kamogawa river, his disposition was noticeably altered, and after talking for

a few minutes, during which he brought the conversation around to his

situation at Kyoto University and some problems he had there, he revealed

to Plaintiff that he was suffering from bipolar disorder. Plaintiff offered my

sympathies, and he started talking about his medications, saying that they helped take the edge off. He offered the medications (three types) to Plaintiff, saying that they helped take the edge off. Plaintiff responded that he needed his edge, and politely declined, but accepted a few pills from him when he insisted, with Plaintiff saying that Plaintiff would look the pills up on the Internet to see what they were.

179. The conversation then turned to a specific episode that Dalsky described as having occurred at Kyoto University. He started by mentioning that there was an intramural sports team that was called "the gangsters", and claimed that he had once pulled a fire alarm near his office because he thought that the Chinese occupying in the next room were spying on him. He presented the story in a convincing manner, evincing a palpable degree of emotional instability and edge, but Plaintiff always had the impression that Dalsky was engaged in some sort of impromptu performance, and recalls thinking that Dalsky would be a decent spy, if he had a legitimate target.

180. Plaintiff played along with the skit, asking Dalsky why the Chinese would want to spy on him, whereupon his countenance changed expression, and he said, "that's just it, they weren't, I was delusional", or words to that effect. Plaintiff then mentioned that there certainly were problems at Kyoto University, and described his experience in dealing with Paquette. Plaintiff explained how Paquette appeared to have been recruiting his students and colleagues at the university as agents for the CIA, and deploying some them against Plaintiff at the Starbucks. As it had become obvious that Dalsky was trying to convey the message that Plaintiff might be clinically delusional, Plaintiff also mentioned that he suspected Paquette might also be a Freemason that had infiltrated the CIA, etc. Dalsky professed his faith (Christian, Plaintiff presumed), and asked Plaintiff if he was deeply religious.

181. At this point, Dalsky said something to insinuate that when Plaintiff talked about the CIA and what not Dalsky thought that maybe Plaintiff was demonstrating that he was out of touch with reality. Plaintiff responded that he was certainly not delusional, and emphasized that he had

to resort to filing a complaint with the DOJ to have Paquette

removed. Dalksy became reflective for a moment, and eventually asked that

Plaintiff return his medications, claiming that they were expensive, and that

his wife didn't give him much pocket money since they had bought a

condominium. He then emphasized that he was "all in, man", which Plaintiff

subsequently learned was a phrase that echoed a statement made by

President Obama regarding the so-called "pivot to Asia" as well as the title of

Petraeus' ill-fated biography.

182. Plaintiff attempted to report Dalsky to the Japanese police, but

was told that since I had returned the drugs, there was no proof, and that the

exact nature of the drugs would be at issue. Plaintiff also attempted to report

the incident to the administration of Kyoto University, to no apparent effect.

183. Plaintiff subsequently looked up Dalsky's email address at the

university and sent the following email discussing religion—which he had

raised—and various connections between religion, intelligence agencies

(including the CIA) and organized crime as well as scholarship, including

links to specific works, while the encounters were fresh in mind. Dalsky did

not send Plaintiff a reply to the following email, even though Plaintiff

provided the social psychology professor who had attempted to manipulate

Plaintiff psychologically in part by making an appeal to religion, and in part

by insinuating that he was delusional, plenty of material with which to

follow through in relation to those maneuvers in rhetorical space. It was

apparent that Dalksy was not going to present Plaintiff with any emails

which might subsequently serve as evidence, but the following email

illustrates important context as well as the good faith efforts Plaintiff has

continually made to engage the CIA officers with respect to the matters at

hand.

> *Please excuse the sudden intrusion via email.*
>
> *My mind is a little blunted at present due to whatever*
> *physical ailment I have, which seems to be affecting my brain*
> *a little, so your big question about religion wasn't processed*
> *as quickly as it might otherwise have been.*

*Anyway, you asked me if I was religious, and I
thought I should write this out while it was on my mind. I
certainly can't say that I am religious compared to some
people—like Muslims that pray five times a day—though I
guess I'm more religious than others. I am not necessarily
against religion per se. On the other hand, with respect to the
religion in which I am currently most interested—Mahayana
Buddhism—one important teaching relates to the
accommodation of the thoughts of others, including religious
beliefs. In that manner, Buddhism is a fairly open religion,
and what is sometimes referred to as a "doctrine of
accommodation" is an aspect of Buddhism that contributed to
the development of a syncretic belief system in Japan. There
is, perhaps, a built-in recognition (some might call it an
insight) of the anthropological origins of religion, in that
doctrine. Maybe that is an aspect in which I find resonance.*

*At any rate, you seem to show a little aversion to my
talking critically about the incomprehensible publishing of*

*highly flawed research by Americans that are putting out a bigoted agenda against Buddhism, sometimes anti-Japan overall. Anyway, here is a link to the now retired professor whose book I recommended to you.*

*http://www.umich.edu/~iinet/media3/cjs/10-11/borgen_20101014/*

*Maybe I'm stereotyping, but it seems likely to me that he is Jewish. I've met many Jews in academia. As I mentioned though, he is a normal scholar whose research does not reflect a warped epistemology or attempt to manipulate the reader by withholding information, etc. His work has opened up the horizon [f]or students of the relevant subject matter, and in a manner that critically examines the misuse of superstition and lies by what was in effect a politically powerful priest caste family against a scholar. That is also noteworthy, because the pseudo-scholars I am trashing would seem intent on fashioning themselves as a sort of priest caste.*

*Anyway, the point is that religious bias probably has no place in scholarship. That is not to say that research supporting or elaborating a certain belief system is not valid. That is not the type of content that I am addressing with respect to the three individuals connected to Columbia University. And I have already addressed some similar problems in the work of a PhD from Oxford, so there is a pattern. That guy is a British MI6 agent, who recently published a book on Christians in Japanese history. His PhD is in Slavic studies, however, so it is little wonder that his knowledge of Japan is limited.*

*Incidentally, there used to be a problem in Kyoto with transient Israelis selling cheap jewelry, etc., on the streets, working through an Israeli guy that was connected to the yakuza. They were eventually shut down about 6-7 years ago. I don't know if you had arrived in Kyoto before they were already gone. They had basically colonized the walkways, glad to see them gone.*

*By the way, here is another link, to the talk by the*

*other author, Robert Whiting on the yakuza, the CIA, etc.*

*http://fora.tv/2012/02/16/Tokyo_Underworld_2012_An_Eveni*

*ng_with_Robert_Whiting*

*The historical connection between the CIA and the*

*yakuza / right wing nationalists is also not something that I*

*have imagined.*

184. Dalsky has subsequently approached me once or twice along the river, the last time a couple of months ago, when he muttered something about belonging to the IRS, not the CIA, and that Plaintiff shouldn't mess with the IRS.

185. Bray had also approach Plaintiff during approximately the same time frame. Apparently, Bray lived in the same neighborhood, and seemed to be trying to convince Plaintiff to leave. Bray indicated that he was divorced from his wife, who was Japanese, but that they had a son who went to the same schools in the neighborhood that my son would attend. He indicated

that the schools didn't measure up to the hype of their reputation, which

Plaintiff knew nothing about beforehand. Bray also said that his son was

working a lousy job at a local restaurant (El Fogon), and had decided to go to

go to college in the USA.

186. Bray seemed to be trying to convey that the path he had chosen

was a dead end, but that there was still hope for Plaintiff if Plaintiff didn't

make the same mistakes as him, such as educating my children at the local

schools.

187. Plaintiff talked a fair amount about my experience with the city

in having to sue the city to get my son into the nursery school, and he

suggested that I didn't really want to go there and should drop the suit. Bray

said that there were a lot of "rich people" in the neighborhood, and he

complained that after NHK—the national public broadcaster—had done a

documentary on the outstanding school system in the neighborhood, a lot of

apartment buildings were built and people started moving in for the schools.

188. Plaintiff was in shock, but silently. Bray seemed to be saying: "There went the neighborhood!" It hadn't dawned on him, perhaps, that he was, to some extent, talking about Plaintiff. Although Plaintiff hadn't known that there had been a documentary made about the schools there, etc., Plaintiff was one of the people living in an apartment building, and certainly couldn't be bracketed into the economic class of "rich people", considering that the apartment Plaintiff lives in is, in fact, rent-subsidized. Plaintiff didn't bother to follow through with emailing Bray, though he provided Plaintiff with his business card.

189. Other such individuals that Plaintiff encountered, and then encountered again (and sometimes again, etc.), include Dickinson (last emails 2010), Laverne (last emails 2013), and O'Day, last emails 2014).

190. Plaintiff has described interactions with O'Day to a limited extent in a report to the CIA/OIG, the most recent of which occurred subsequent to Plaintiff having lodged protestations in the form of emails to the American Citizen Services Officer (or other Consular officials monitoring

the email) regarding her spying on me, etc., at the Starbucks, with one case

of her explicitly advising me against filing a lawsuit against the US

government. Plaintiff also suspects O'Day of having been involved in a plot to

recruit the attorney Plaintiff hired when it became necessary to file a lawsuit

against the city government of Kyoto for refusing to admit Plaintiff's son to

the neighborhood nursery school, where the children of CIA officer Dalsky,

and MI6 officer David Chandler, and a couple of French foreign intelligence

officers.

191. After O'Day resurfaced and evidenced further suspect conduct

(described below), Plaintiff did some research on her online and discovered

that she was associated with the network of intelligence officers (CIA, MI6,

G2, etc.) connected to the Kyoto Journal, and had been promoted as a

photographer herself in an event held in 2002. Plaintiff has posted a link

(http://kyotokawaraban.boo.jp/ibento/) to the event held in 2002 in Kyoto in

which O'Day was exhibiting her photography along with a long list of other

intelligence officers, including: Aaron Berman, Albie Sharpe, Dylan Rice,

Jacoba Akazawa, John Ashburne, John Einarsen, Lisa Mahoney Beltran,

Micah Gample, Paul Crouse, Robert Kowalczyk, and Tom Collins. Paul

Crouse had been a resident at the Villa Tonodan at the time, and Plaintiff

was acquainted with him and his wife. Plaintiff has already mentioned

Einarsen and the Kyoto journal, with which others listed above were also

associated, and should further indicate that he has posted a blog entry on

John Ashburne, who has published sponsored propaganda pieces in the Wall

St. Journal promoting the policies of the now infamous mayor of Osaka,

Hashimoto.


192. Dickinson, meanwhile, had also introduced Plaintiff, while

Plaintiff's wife was pregnant with our son, to a Japanese woman, Kuniko

Sato (hereinafter "Sato", that was planning to go to graduate school in the

United States. Dickinson appeared to be attempting to interest me in the

woman romantically, deliberately trying to sabotage Plaintiff's marriage and

family.


193. Here, Plaintiff cites the Supreme Court case Moore v. City of

East Cleveland 431 U.S. 494 (1977):

*Our decisions establish that the Constitution protects*

*the sanctity of the family precisely because the institution of*

*the family is deeply rooted in this Nation's history and*

*tradition. It is through the family that we inculcate and pass*

*down many of our most cherished values, moral and cultural.*

194. Plaintiff exchanged email addresses with Sato and helped her with the 'statement of purpose' she was preparing to append to her application to the Maxwell School at Syracuse University, learning what he could about her before she disappeared, apparently because Plaintiff did not show a romantic interest. Like Kudo, Sato has no presence on the Internet.

195. Plaintiff is aware of the fact that CIA officers are trained to deceive, and although the CIA has no police powers, it is not clear as to how they are trained to handling incidental interaction with private American citizens in an overseas area in which they are conducting a cover operation. It is clear, however, even from Executive Order 12333 (hereinafter EO

12333) and the like, that CIA officers are expressly prohibited from engaging

in acts that violate the rights of American citizens overseas protected by the

Constitution.


196. The planning and execution of the various plots against Plaintiff,

starting with the contrivance of having Peterka pretend to coincidentally

bump into Plaintiff in Berkeley, California and then travelling to Japan to

try to convince Plaintiff to pursue a career in the finance sector in Tokyo

with Goldman Sachs, clearly represent part of a conspiratorial pattern of

activity aimed at displacing Plaintiff from Kyoto, encompassing various

schemes and ploys over many years through to the present.


197. Bringing the narrative into the present, most recently, Plaintiff

was contacted by suspected CIA officer psychologist and invited to

participate in the literature discussion group, MSG, including a number of

suspected CIA officers as well as suspected officers of other countries'

intelligence agencies, some of whom Plaintiff had already blogged about.

198. The first such individual is Zimbleman's brother-in-law, Sean Lotman, who is a founding member of MSG and on the mailing list, and about whom Plaintiff has posted a blog entry (approximately two years ago), as described above.

199. Here, it should be noted that Plaintiff had met Zimbleman's wife, Inaoka, after leaving the "Kodomo Miraikan", which is a children's play center/library, etc. Plaintiff and his wife and children had visited, with our children in tow on the way to the park along with another mother from the nursery school and her children, including a classmate of Plaintiff's son. Inaoka seems to have been acquainted with the other mother, who introduced us. Inaoka gave Plaintiff her business card, on which she first wrote her email address and the name of her husband and son as well as her mobile number. Plaintiff emailed her, and received a reply from Zimbleman.

200. Other members of the group on the MSG mailing list include additional suspected intelligence officers about whom Plaintiff has blogged (e.g., Canadian, Eric Luong) as well as suspected CIA officer Barr, who has

appeared at least twice in an event held at a CIA front café that features and

promotes Western intelligence officers stationed in Kyoto and about which

Plaintiff has blogged

(http://kyoto-inside-out.blogspot.jp/2015/01/the-flame-brought-to-you-by-cha

rles.html). Another member, A. Sasaki has also been on Plaintiff's radar in

association with CIA fronts and connected business in the area and in

association with Luong

(http://www.pechakucha.org/presentations/debunking-kyotos-myths), etc.


201. Plaintiff has only communicated with Zimbleman through email,

with the planned meeting having been cancelled due to Zimbleman's coming

down with the "flu", which later said to be diagnosed as pneumonia,

whereupon the meeting was cancelled for the entire summer. Nonetheless,

the encounter appears to represent another possible instance of attempting

to bait Plaintiff by holding out the possibility of reconciliation, etc., and the

CIA coming to terms with Plaintiff. Such incidents have been a continual

distraction to Plaintiff, diverting his energy from researching the law and

court precedents related to the drafting of this Complaint, and been a source

of continual emotional distress to Plaintiff.

202. Furthermore, there were two other occurrences that share

respective tangential connections with the encounter with Zimbleman;

Plaintiff, suspects that they may have been coordinated in conjunction

therewith.

203. Within a day or two of contact from Zimbleman, Plaintiff was

approached in the Sanjo-Ohashi Starbucks by an individual calling himself

"Steve" and claiming to be an Englishmen that had been residing in

Australia for fourteen years who was in Kyoto as a volunteer through his

church, being affiliated with a Filipino Evangelical church in Kyoto called

Assembly Kyoto Church as well as some Koreans, including a professor at

Doshisha University (a Christian university:

https://www.doshisha.ac.jp/en/information/history/neesima/neesima.html).

He basically tried to missionize Plaintiff, inviting him to Bible studies and

the like, and sought to gain Plaintiff's agreement to his missionary presence

and activities, ignoring to hear what Plaintiff taught him about Japanese

religion and Christianity in Japan (and Korea), and not emailing Plaintiff in

relation to books regarding which Plaintiff had offered to send links. He

appeared again even more determined with an equally intransigent

disposition, trying to evangelize Plaintiff.


204. Plaintiff is convinced that Steve was an intelligence officer

acting as a proxy on behalf of someone, but the precise reasons are not clear.

Plaintiff notes that his blog post on Lotman also describes Lotman cohort

and suspected CIA officer Manny Santiago, who claims to be an ordained

Christian minister, and apparently has incorporated as such, though his

activity as demonstrated though his presence online evinces nothing

connected to Christianity.


205. Plaintiff suspects that it may have been connected to an attempt

to recruit Plaintiff on the basis of gaining Plaintiff's ascension to participate

in the Christianizing cause of Doshisha University. However, with respect to

EO 12333, for example, if the above-described scenario (i.e., coordinated

recruitment attempt) were true, it would represent a bad faith attempt, at