the very least, because it would run against Plaintiff's conscience and values,

which have been clearly and emphatically set forth on Plaintiff's blog and in

emails, etc., to the Consulate, DOJ, etc. To be clear, while Plaintiff would not

object to teaching at Doshisha, for example—were he qualified to do so—he

would not agree to do so under the condition that his pedagogy promote a

version of history, etc., biased in favor of Christianity or any other ideological

priority of the CIA. Obviously, that would not be compatible with academic

freedom, etc., and would represent an attempt to subvert the goals of higher

education with a pedagogy based on a religious and/or political subterfuge.

That does seem to represent part of the CIA's agenda; accordingly, it should

have been obvious that Plaintiff would not be interested, and would thus

represent harassment, in the form of an overture made in bad faith.


206. Meanwhile, considering that Plaintiff does not have a PhD, and

that Doshisha is not a university that would not necessarily be

compatible—let alone optimal—with respect to Plaintiff's scholarly interests

if Plaintiff were to pursue a PhD at this stage in life, being 54 years old and

having a family to support, the nature of the stealth offer to enter the CIA

circle associated with Doshisha is unclear. Moreover, it should be noted that for approximately thirteen years Plaintiff has been studying a form of music associated with the Rinzai school of Zen, the head temple of which, Shokokuji, is located directly north of the old imperial palace grounds. The Doshisha campus itself was built on grounds appropriated from Shokokuji temple during the early Meiji era when Buddhism was subject to persecution with the "restoration" of the emperor as sovereign. Accordingly, in as much as Plaintiff can be considered to practice Buddhism, it is possible that the harassment he has been subjected to also violates his rights protected under the First Amendment of the US Constitution.

207. Another possible coordinated ploy can be seen in the random contact Plaintiff received via Facebook from a young woman with a Chinese name (沈铭钦) residing in Kyoto who had started a Facebook account during the same time frame, and invited me to be her friend on June 12, 2015. Plaintiff checked her friend list, because he didn't recognize her name, and noticed that Frank Carter (hereinafter "Carter")—a CIA officer that was a resident of Villa Tonodan whom Plaintiff has mentioned in that regard on his

blog and who is also a friend of suspected CIA officer, Doshisha University

professor Tim Craig, etc.—and suspected CIA officer Fanon Wilkins

(hereinafter "Wilkins"), an associate professor of American Studies at

Doshisha University whom Plaintiff has noticed at the Starbuck on occasion

and who appears in this photo

(http://3.bp.blogspot.com/-5uDf1L59Y0I/U09oinwg1xI/AAAAAAAAIKg/GKHLdi_U-FQ/

s1600/2014-04-15+16.54.06.jpg) of an English bible study meeting at Doshisha

(to which Steve invited Plaintiff), were on her Friends list, so Plaintiff

accepted her invitation to see what was in store. At present, there are a total

of nine people on her friend list noting affiliations with Doshisha University.


208. Though Plaintiff had seen Wilkins at the café before as he

appears on his Doshisha profile, Wilkins showed up in the guise in which he

appeared on his Facebook page (since changed), with sunglasses and a

baseball cap covering his bald head, etc. Plaintiff does not believe that was

another coincidence, and considered it to form part of a continuum he

considered to be an overture starting with the meeting with Misako Inaoka,

followed by the email from her husband, Zimbleman. Plaintiff has contacted

Wilkins through Facebook messaging, and Wilkins has denied being a CIA officer.

209. Accordingly, assuming that there is a connection between the above-described series of events (Chinese woman with connections to the Doshisha network befriending me on Facebook, Zimbleman/Lotman, Steve the evangelical missionary) seems to represent yet another unwarranted intrusion into Plaintiff's life, and is tantamount to being a form of psychological warfare ('harassment' doesn't adequately capture the scope and sophistication). Plaintiff has suffered emotional distress to the point of distraction, but eventually has pieced together the likely scenario as presented above.

210. Given the involvement of suspected CIA officer Lotman and Canadian intelligence officer Luong about whom Plaintiff had blogged prior to the encounter with Zimbleman, the fact that Zimbleman is the brother-in-law of Lotman and works at Doshisha, and that Plaintiff has submitted two reports to the CIA/OIG and disclosed his blog, Plaintiff can

only question the functioning of the CIA/OIG. Under the circumstances,

Plaintiff presumes that Zimbleman is a CIA officer; therefore, he should not

have been permitted to approach me, even indirectly.

211. Plaintiff would expect, on the basis of his reports to the CIA/OIG

and the DOJ, that such encounters would have been proscribed as a result of

Plaintiff's allegations as well as the information contained in Plaintiff's blog.

Plaintiff should be well-known to all CIA officers and proxies thereof in

Kyoto, including Zimbleman, Barr and the suspected CIA proxy A. Sasaki,

who are on the emailing list of the literature discussion group. Several of the

names are new to Plaintiff, but there is reason to suspect that they may be

CIA officers, MI6 officers or respective proxies thereof: Jeremy Rappleye,

William Hall, Kaylie Palmer, Hallam Udell, and Maana Sasaki.

212. Plaintiff has blogged about Jones, who teaches at Doshisha

University, because of blatant propaganda he has published in the Japan

Times, but has long been aware of other suspected CIA officers that are

professors at Doshisha University, such as Susan Pavloska, who is also

associated with the Kyoto Journal.

213. Aside from the continual non-responsiveness and deception of the consular officials at the American Consulate in Osaka, it appears that said consular officials were actually CIA "case officers" operating under diplomatic cover, with a high likelihood of involvement in coordinating the covert operations of the CIA "field officers" in Kyoto about whose unlawful acts I had complained. Accordingly, they may bear responsibility for their actions in a supervisory role in the conspiracy.

214. The above-described harassment of Plaintiff in Kyoto commenced in approximately 2003 and continues to this day. The numerous complaints and protests Plaintiff has made regarding the continual violation by rogue CIA officers of Plaintiff's civil rights protected under the Bill of Rights of the Constitution of the United States of America, including violations of Plaintiff's rights secured by the Fourth, Fifth and Fourteenth Amendments of the US Constitution, have been met with deception and non-responsiveness by federal officials conspiring to cover up the alleged

violations as well as the allegations themselves. The authority of *Bivens*

provides for a private cause of action with respect to such violations.

## VI

## THIRD CAUSE OF ACTION

(Honest Services Fraud, pursuant to 18 USC 1341/1342/1343/1346/1349)

215. Plaintiff incorporates herein, as though fully set forth, all of the

allegations contained in paragraphs 1 through 214, above, as though fully set

forth.

216. Plaintiff first made allegations to the US government about the

alleged violations of Plaintiff's rights secured by the US Constitution by

visiting the American Consulate in person, after making an appointment

therefor in advance with the express intent to directly make protestations to

the responsible Consular official (Schaeffer) about harassment by CIA

officers in Kyoto and their proxies, including allegations that Plaintiff's civil

rights corresponding to rights protected by the Fourth and Fourteenth

Amendments of the US Constitution had been violated.


217. In a reply Plaintiff eventually received from Schaeffer to a

follow-up email Plaintiff sent to Schaeffer complaining about

non-responsiveness with respect to an initial email Plaintiff had sent to

Schaeffer requesting acknowledgement regarding the matters raised by

Plaintiff during the in-person consultations with him at the Consulate, said

follow-up email including a list of names of CIA officers and proxies thereof

alleged to have committed the violations, Schaeffer emailed me a reply

stating,


> *"Rest assured that I have taken your concerns on board*
>
> *and will pass them on through the appropriate channels".*


218. In the light of continuation of the harassment and other events

that transpired after the aforementioned visit to the Consulate (and over the

course of the succeeding five years into the present), Plaintiff adduces that

either:

- Schaeffer deliberately decided not to report the allegations "through the proper channels";

- Schaeffer did report the complaints through the proper channels, but his superiors receiving said complaints, whom I presume would include "senior officials of the Intelligence Community", such as the Director of the CIA, did not report the allegations to the CIA/OIG;

- Schaeffer's superiors did report the allegations to the CIA/OIG, but the OIG failed to conduct an investigation and/or find that corrective measures were required by law; or

- The CIA/OIG received the report of the allegations, conducted an investigation and ordered corrective measures in accordance with the law, but the implementation thereof was deliberately obstructed.

219. Schaeffer et al. (i.e., CIA officials posing as American Citizen Services Officers) appear to have been duty-bound by law (including the Memorandum of Understanding between the CIA and DOJ on reporting federal crimes (hereinafter "MOU") as well as Executive Order 12333

(hereinafter "EO12333") to report the federal crimes alleged by Plaintiff,

Schaeffer et al.

220. Due to the continued harassment after the aforementioned visit

to the Consulate, Plaintiff was compelled to continually submit emails to the

American Citizen Services officer (Schaeffer et al.) for years, detailing

further violations of rights of Plaintiff protected by the Fourth and

Fourteenth Amendments of the US Constitution.

221. Accordingly, due to the failure of the Executive Branch to cause

its CIA officials to cease harassing Plaintiff, Plaintiff adduces that the

continued non-responsiveness from Schaeffer et al. is indicative that they

were not treating the allegations with the requisite levity according to the

law. In fact, not once was Plaintiff told that he should report such allegations

directly to the CIA/OIG, for example, which Plaintiff later discovered was the

required action. Accordingly, the representation by Schaeffer regarding

"pass[ing] along" of "[my] *concerns*" "through the appropriate channels" is

considered by Plaintiff to be a fraudulent representation of the actual course

of action taken by Schaeffer, and the pattern of (non)responsiveness

thereinafter by Schaeffer et al. to represent a further manifestation of the

deliberate course of inaction that had been adopted by Schaeffer et al., in

violation of the law.

222. The "concerns" of Plaintiff referred to by Schaeffer correspond

to federal crimes committed by federal officials against Plaintiff—an

American citizen residing overseas pursuing lawful employment in an allied

state with a Constitutional Democracy (based on a US-imposed Constitution,

in fact) as the form of government and a free-market economy. Aside from the

fact that the CIA has no police powers to begin with, Plaintiff's right secured

by the Fourth and Fourteenth Amendments of the US Constitution are

inviolable.

223. Moreover, it is possible that the non-responsiveness and

deception on the part of the Schaeffer et al. was part of a deliberate ploy

aimed at the gathering of "intelligence" on me—by encouraging my

continued submission of complaints directly to the Consulate, disclosing

details of my life and inner thoughts, etc.—as opposed to having me submit

the complaints directly to the CIA/OIG, said "intelligence" being used to

formulate further schemes of harassment by the CIA and its proxies aimed

at displacing me from Kyoto.

224. In this regard, it must be emphasized that the CIA has deployed

against me numerous officers—who in turn have deployed proxies—said CIA

officers including two psychologists and another with a degree in psychology:

Dalsky has a PhD in psychology, O'Day is working on her PhD in psychology,

and Bray has an undergraduate degree in psychology. A succession of such

schemes has been conducted against Plaintiff one after another over a period

spanning more than ten years, some of which are detailed herein and others

(some described on Plaintiff's blog or in emails to DOS/DOJ) for which leave

will be sought to amend this petition as further evidence thereof comes to

light during discovery.

225. Furthermore, with respect to Schaeffer et al., who appear to

have been CIA case officers stationed at the American Consulate in Osaka

under diplomatic (official) cover as American Citizen Services Officers, it is

not clear whether said Defendants should also be sued as a Department of

State Official acting in their official capacity in addition to rogue CIA officers

acting as individuals. Plaintiff has filed an FOIA request with the DOS, as

described elsewhere herein, but is not apply to adduce at this point whether

Schaeffer et al. were acting in a manner such as to deliberately violate

official policies or whether said official policies (customs and practices) were

culpably inadequate.


226. The failure to adequately remedy the situation after Plaintiff

made protestations in person followed by continual submission of further

complaints to the Osaka Consulate prompted then promoted Plaintiff to try

contacting his congressional representative in the House of Representatives,

Congresswoman Barbara Lee. The response Plaintiff received from the

staffers in Congresswoman Lee's offices in Oakland California and

Washington DC was unsatisfactory, and disappointing, to say the least, with

the case worker I'd been assigned, Elaine McKellar, eventually asking me

just what it was that I wanted them to do during a final telephone call

Plaintiff made to the Congresswoman's office. Plaintiff believes that, with

respect to elected officials such as Congresswoman Lee, too, it would seem

that an American should expect to be able to turn to their Congressional

representative as much as an American Citizen Services Officer to receive

the proper information as to the manner in which to proceed with making

such allegation; that is to say, to report the allegations directly to the

CIA/OIG.

227. Plaintiff was dumbfounded at the response he received from

McKellar. It should be noted that McKellar was one of several of the

congresswoman's staffers with whom Plaintiff exchanged emails, etc.

Accordingly, Plaintiff has attempted to request a remedy that would ensure

that all Congressional Representatives and members of the Senate are

aware of the fact that the CIA/OIG is the destination to which allegations

against CIA officers should be made and required to inform their

constituents thereof.

228. The runaround Plaintiff received through Congresswoman Lee's

staffers was an utter waste of time and effort, causing no small degree of

emotional duress to Plaintiff. Plaintiff believes that it is necessary for the

Court to examine whether the office of Congresswoman Lee had been aware

of the information related to the necessity to file a report directly with the

CIA/OIG that Plaintiff received from the office of Senator Feinstein, in order

to ensure that American citizens overseas facing a situation such as that

faced by Plaintiff are provided with accurate information from the offices of

their Congressional representatives in a timely manner about the required

administrative steps to take.

229. Accordingly, Plaintiff then took the course of action that seemed

to be the logical next step in contacting the Civil Rights Division of the DOJ.

The misleading response and misdirection Plaintiff met with from the DOJ

served to prolong the harassment, while leading Plaintiff to believe that

relief in the form of an investigation was underway. In fact, Plaintiff

encountered intensified harassment over the course of the ensuing eleven

months before receiving the brief and dismissive written response, dated

May 8, 2012, that went so far as to mischaracterize the allegations.

230. The blithe reply from Kappelhoff (signed by Kappelhoff, written by Callahan) of the DOJ that was mailed to me includes several baffling statements that belittled and mischaracterized my complaints, and would appear to have been aimed at discouraging my further pursuit of the matter as being misguided and baseless, and attempt to misdirect me. As a matter within the scope of common legal knowledge that an attorney at the DOJ working in relation to civil rights, it should have been obvious to Mr. Kappelhoff that CIA officers have demonstrated a propensity to abuse their office and violate the rights of American citizens overseas protected by the US Constitution. Plaintiff has learned of numerous Bivens actions, for example, that have been filed against CIA officers heretofore, and even of cases in which American citizens overseas have been murdered by local CIA proxies, allegedly with the approval of their CIA officer handlers: for example, the cases of Charles Horman and Frank Teruggi (and another which I noted in a report to the DOS).

231. The letter that Kappelhoff mailed me describes the scope of civil

rights abuses in an excessively narrow manner, apparently with the aim of excluding consideration of the federal crimes committed by the CIA officers described in the evidence Plaintiff submitted to the DOJ. That is, though it should have been readily apparent that at the very least Plaintiff had alleged violations of his rights secured under the Fourth Amendment as well as the Fourteenth Amendment of the US Constitution. Said violations had been perpetrated by CIA officials in violation of clearly established federal law, and were therefore obviously actionable under Bivens.

232. Plaintiff was nonetheless treated in a manner such as to suggest that he had submitted unintelligible, uneducated and unfounded complaints with no basis in the law.

233. The written reply signed by Kappelhoff implies that because the CIA officers were not "law enforcement officers", there were no violations of Plaintiff's civil rights. However, Plaintiff is aware of the fact that a violation of the rights protected under the Bill of Rights of the US Constitution represents a violation of "civil rights". Kappelhoff did not describe a viable

excuse not to launch an investigation, he simply deflected Plaintiffs

allegations in a dishonest manner with the intention to deceive Plaintiff and

deny him of his right to seek justice.


234. The evidence Plaintiff submitted may have been acted on in a

secretive way by the Executive Branch in, for example, removing Paquette

from Plaintiff's immediate surroundings, but no criminal investigation was

launched and injuries suffered by Plaintiff were not remedied; in fact,

Plaintiff was humiliated and embarrassed by the written reply signed by

Kappelhoff, further compounding Plaintiff's injuries, and Plaintiff was

abandoned by his government to cope with the CIA sociopaths about whose

misconduct he'd complained whose mere presence was menacing.


235. Furthermore, Callahan had intentionally misled Plaintiff into

believing that an investigation would be conducted when he provided

Plaintiff with an email address (as mentioned by Plaintiff on his blog shortly

thereafter:

http://kyoto-inside-out.blogspot.jp/2012/04/non-responsive-doj-new-influx-of-

cia.html) to the Special Litigation Department of the Criminal Division for

the purpose of making further submissions of evidence or detailing

complaints. However, Plaintiff subsequently discovered that the violations

alleged in his complaints do not fall under the remit of said Department in

the first place, as shown on their webpage on the DOJ website

(http://www.justice.gov/crt/about/spl/):


*"The Special Litigation Section is one of several Sections in*

*the Civil Rights Division. We work to protect civil rights in the*

*following areas: 1) the rights of people in state or local institutions,*

*including: jails, prisons, juvenile detention facilities, and health care*

*facilities for persons with disabilities; 2) the rights of individuals*

*with disabilities to receive services in their communities, rather than*

*in institutions; 3) the rights of people who interact with state or local*

*police or sheriffs' departments; 4) the rights of youth involved in the*

*juvenile justice system; 5) the rights of people to have safe access to*

*reproductive health care clinics; and 6) the rights of people to practice*

*their religion while confined to state and local institutions. We can*

*also act on behalf of people at risk of harm in these areas."*

236. Moreover, Plaintiff never received a single response to any of the multiple emails he sent to said email address detailing relevant events, personages, etc. Accordingly, the provision of said email address to the Special Litigation Department of the Criminal Division of the DOJ in and of itself represents a deliberate act of misdirection, as that office is not tasked with handling complaints such as those presented by Plaintiff.

237. Here, Plaintiff notes that the FBI's response to his Privacy Act request indicated that there had been no investigation by the FBI, as there were no records whatsoever indexed to Plaintiff's name.

238. Meanwhile, Paquette, who had been one of the primary sources of harassment and recurrent trouble, appeared to have met with disciplinary action, as Plaintiff does not recall having seen him for several months before he radically altered his emailing habits, including the cancellation of his long-standing email account. I subsequently discovered that my Hotmail

account had been hacked and significant emails I'd exchanged with Paquette

prior to 2007 deleted, emails in which I had discussed the CIA.

239. Insofar as Mark Kappelhoff et al. not only refused to launch an

investigation of the alleged violations, but belittled and humiliated Plaintiff

for having submitted a complaint in the first place, and denigrated the

import of the alleged violations detailed in the complaint, instead of serving

to put an end to the violations of Plaintiff's civil rights, the DOJ became a

party thereto.

240. Aside from the fraudulent misleading written response to my

complaints from the DOJ misrepresenting the facts I'd presented in the

complaint, the DOJ also failed to provide notification to the effect that I

should submit further concerns of violations by CIA officers of my rights

protected by the US Constitution directly to the CIA/OIG. Accordingly, the

instant case poses not only a question as to the scope of discretion pertaining

to the decision as to whether or not to launch an investigation in relation to

allegations made by Plaintiff, but also a question as to the status of the acts

of intentional misrepresentation made by federal officials to Plaintiff with

the intent to deceive Plaintiff, despite his entitlement to receive honest

services from said DOS (i.e., nominally DOS officials, actually CIA officers

operating under diplomatic cover) and DOJ officials.

241. While the CIA officers that are subjects of the instant complaint

were acting as rogues in their respective capacity as individuals, the DOJ

officials were acting in their official capacity. In the case of inter-agency

collusion among officials occupying supervisory positions, as posited below,

the extent of the conspiracy described above takes on new proportions that

should shock the conscience of the court. The interface where official policy

becomes conducive to covering up violations by CIA officers of the rights of

Americans overseas as protected by the US Constitution is another issue

that is addressed under a separate cause of action with reference to *Monell.*

242. Furthermore, Plaintiff notes that Buckley did make public

responses in relation to the recent scandalous conduct of CIA officials

involved in illegally accessing the computers of Senate staffers attached to

the Senate Select Committee on Intelligence. Meanwhile, Plaintiff has not even received acknowledgement of receipt of complaints (two) filed.

243. The written reply signed by Kappelhoff that Plaintiff was mailed by the DOJ was a fraudulent reply intended to deceive Plaintiff into believing that his complaints had no basis in the law. The misdirection by Callahan's providing an email address to a department not responsible for handling such complaints was also a fraudulent indication that an investigation would be launched or was underway. The statement by Schaeffer that my complaints of civil rights violations would be reported "through the appropriate channels" was a fraudulent representation, and the repeated failure to inform Plaintiff that he should submit such complaints directly to the CIA/OIG was a deliberate attempt to prevent Plaintiff's complaints from reaching the CIA/OIG. Finally, the DOS decision to implement an automated reply system in 2014, instead of continuing to reply directly to Plaintiff's emails, represents an attempt to evade accountability for further culpability as well as a continuation of the refusal to provide honest services. Again, the American Citizen Services Officers (Schaeffer et

al.) never once advised Plaintiff to submit his complaints directly to the

CIA/OIG, which would have immediately put an end to my reporting the

allegations to the Consulate. 18 USC 1341, 18 USC 1342, 18 USC 1343, 18

USC 1346, and 18 USC 1349 provide respective private rights of action for

such violations.


244. Plaintiff notes that he has submitted a FOIA request to the DOS

(Case Control Number F-2014-21617) regarding regulations and standard

operating procedures pertaining to the handling by American Citizen

Services Officers of complaints from an American citizen overseas alleging

violations by CIA officers of the rights of an American citizen overseas

secured under the US Constitution, with an estimated completion date of

December 31, 2015.


VII

FOURTH CAUSE OF ACTION

(*Bivens* 2: Deprivation of right and entitlement to honest services from

public officials, pursuant to the Bill of Rights, etc., of the Constitution of the

United States of America)


245. Plaintiff incorporates herein, as though fully set forth, all of the

allegations contained in paragraphs 1 through 244, above, as though fully set

forth. It is clear from the foregoing description in relation to violations of 18

USC 1346 that each of the aforementioned officials acting in their official

capacity was also acting in their individual capacity in a manner

demonstrating that they could only have been fully cognizant of the

violations of Plaintiff's right secured by the Constitution that they were

intentionally committing as they were committing said violations, yet they

committed said violations nonetheless. Such acts include acts constituting

violations defined in terms of "equal protection" and "due process", as

protected by the Fourth Amendment of the US Constitution, the Fifth

Amendment of the US Constitution, and the Fourteenth Amendment of the

US Constitution (*Bolling v. Sharpe*, 347 U.S. 497 (1954)). This is brought into

stark relief against the background of the state of affairs (as described below

in more detail) created by the CIA in which the CIA officers in Kyoto, due to

their sheer numbers and scale of their so-called "covert operation" represent

a veritable class of people unto themselves, and Plaintiff has been

discriminated against because he not only was not a part of that class, but

because of his initially implicit and subsequently explicit refusal to

participate in what Plaintiff has explicitly characterized and publically

denounced as sociopathic behavior that is obviously against both American

values and Plaintiff's conscience.


246. Accordingly, in addition to the above-cited federal statute 18

USC 1346 pertaining to Honest Services Fraud, Plaintiff's right and

entitlement to receive honest services from federal officials is secured by the

Bill of Rights, etc., of the US Constitution. Therefore, considering that

Plaintiff is a Pro Se litigant and is not well-versed in case law related to the

extra-territoriality of federal statutes, including 18 USC 1346, Plaintiff

invokes *Bivens,* which provides a cause of action with respect to the

above-described violations.

VIII

FIFTH CAUSE OF ACTION

(*Bivens* 3: Monell-type claims with respect to violation of rights protected

under Fifth Amendment of the Constitution of the United States of America

and the Fourteenth Amendment of the Constitution of the United States of

America)


247. Plaintiff incorporates herein, as though fully set forth, all of the

allegations contained in paragraphs 1 through 246, above, as though fully set

forth.


248. The policies of the various departments and agencies of the

Executive Branch described below as well as the customs and practices of the

CIA, DOJ, and DOS have facilitated or directly caused violations of Plaintiffs

civil rights protected by the Bill of Rights of the US Constitution.


249. The custom of the CIA of posting covert officers using diplomatic

status as a cover for their true identity has facilitated and resulted in the

violation of Plaintiffs due process rights protected under the US Constitution by federal officials acting under the color of law. More specifically, the protestations Plaintiff made in person with the American Consulate in Osaka, Japan, continually over a period of approximately five years from 2009 to 2014 since first visiting the Consulate in person were repeatedly ignored, or dealt with in an ad hoc manner so as to deceive and misdirect Plaintiff.

250. The deception encompasses the deliberate withholding of the fact that Plaintiff should have been filing such protestations directly with the CIA/OIG, even after the Plaintiff had mentioned in an email to the Consulate that he believed the CIA officers whose conduct was at issue needed to be disciplined by the (CIA) IG. Plaintiff had learned of the existence of an administrative office called the Inspector General while serving in the US Army, but had no detailed understanding thereof relevant to the federal agencies at issue in the instant case.

251. Said deliberate withholding of vital information from the

Plaintiff constitutes a practice that violates Plaintiffs due process rights

protected by the US Constitution.

252. Plaintiff has submitted a FOIA request to the DOS (Case

Control Number F-2014-21617) regarding regulations and standard

operating procedures pertaining to the handling by American Citizen

Services Officers of complaints from an American citizen overseas alleging

violations by CIA officers of the rights of an American citizen overseas

secured under the US Constitution, with an estimated completion date of

December 31, 2015.

253. The implications of the above-described customs and practices

facilitating violations of rights of Americans overseas as protected by the US

Constitution are manifold.

254. First, regarding the CIA, the unlawful conduct of CIA and other

Executive Branch officials embodies an implicit a message to the effect that,

"We are the CIA on official government business, and we don't care if you

don't like what we're doing here in the country of your residence; moreover,

we will continue to harass you because you are impeding the progress of our

presidentially authorized covert operation(s)" is implied by the practice of

ignoring complaints and permitting the offending officers and their proxies

to continue to carry on as if nothing had happened, their very presence a

menace to Plaintiff.

255. Secondly, the attempt to deflect Plaintiff's allegations into

channels where they would not be heard or registered (i.e., prevent the

relevant authorities from becoming aware of the complaints) enabled the

CIA officers about whose misconduct Plaintiff had made allegations about to

continue, unabated, as if the complaints had not been made. Such deliberate

and planned non-responsiveness was an attempt to facilitate the

perpetuation of the conditions enabling the misconduct that was the subject

matter of the complaints, and by extension, the continuance of the types of

harassment described in said complaints as well. Such deliberate failure to

rectify the conditions that had given rise to the need to file the complaints in

the first place not only further prolonged, but compounded the injuries

inflicted suffered by Plaintiff due to the presence of rogue CIA officers whose

misconduct had not been checked.

256. The mere presence of said rogue CIA officers and/or proxies is a

menacing cause of continuous psychological distress to Plaintiff, and the US

governments' brazen ignoring of the complaints made by Plaintiff as an

American citizen alleging misconduct against its officials has served to

compound the distress. Apparently, the Executive Brach deems that it is

permitted to engage in such brazen conduct due to the need to "protect

intelligence sources and methods", which serves as a preemptive meme

permitting the implementation of policies that pose an inherent risk to the

health and welfare of its own citizens overseas.

257. In this regard, Plaintiff has endured, over the course of

approximately ten years, the menacing presence of a cast of covert CIA

officers openly occupying a diverse range of stations in civil society under

obviously under false pretenses, a cast so large it should shock the conscience

of the court. The last five years of harassment Plaintiff has endured can be

attributed to the failure of the Executive Branch to immediately respond to

the allegations Plaintiff laid out, in person, to Schaeffer in 2009, and so forth.

The policies, customs and practices promulgated by the Executive Branch in

relation to the CIA, the DOJ, the DOS and other federal agencies are at least

partially to blame for said failure, and by extension, the injuries suffered by

Plaintiff due to the alleged violations of Plaintiff's rights secured by the US

Constitution.


258. An obvious and inherent conflict of interest arises when a covert

CIA officer, such as Schaeffer, for example, is posted to the position of Chief

of Citizen Services Section at a consular facility and an American citizen

overseas has had cause to report violations by CIA officers and their proxies

of his rights protected by the Constitutional Of the United States to said

consular facility. Under such circumstances, a CIA officer such as Schaeffer

would be motivated by personal and political interests to seek to promote his

work as a CIA officer and the agenda of the CIA in order to further his own

career, etc., especially if he were a "case officer" that had been involved in

coordinating the activities of the CIA "field officers" and proxies thereof

against whom the American citizen has made allegations in the first place. Plaintiff is under the impression that the career interest of Schaeffer et al. corresponds to a financial interest as defined under 18 USC 208, and that any dishonest act alleged herein deemed to be coordinated with a career advancement/preservation goal would therefore concurrently constitute corresponding violations of that 18 USC 208 as well. Plaintiff will seek leave to amend the complaint accordingly, on the basis of evidence revealed during discovery.

259. Accordingly, the custom of posting CIA case officers under official cover as American Citizen Services Officer should be prohibited generally, and particularly in developed, allied, constitutional democracies with a thriving civil society. The deliberate failure to rectify the problems related to complaints made through protestations by Plaintiff should shock the court as much as the expansive scope of covert CIA operations in Kyoto that Plaintiff has only partially documented on his blog to date.

260. Because there is a well-documented clear and present danger

arising where the respective spheres of activity of private American citizens

overseas and covert CIA officers overlap to due to the existence of an obvious

conflict of interest arising between the government's assigning of a covert

intelligence operative to fill an official post encompassing a fiduciary duty to

American citizens. Not only has the Executive Branch ignore said danger

and refuse to implement remedial measures on the basis of incidents such as

those described above (i.e., Charles Horman, Frank Teruggi), but

implemented policies aimed at facilitating the covering up of an incidents

that might result due to said deliberate negligence

261. That is to say, the danger posed to the health and welfare of

American citizens overseas by adopting the above-described customs and

practices related to the stationing of covert CIA officers to the post of

American Citizen Services Officer was intentionally ignored during the

planning and implementation of relevant policies, and the purposeful

ignoring of said danger by the Executive Branch was facilitated by the

implementation of secondary policies enabling the Executive to cover up its

activities in the case that said activities result in the violation of the rights of

American citizens overseas protected by the US Constitution. The existence

of the conflict of interest is readily attested to by the succinct reply Plaintiff

received from the Ms. Pam Young of the DOS/OIG regarding the

non-responsiveness, misdirection and the like of Schaeffer et al, as follows.

> *Dear Mr. Vasaturo:*

> *The OIG has reviewed your complaint and we have*
> *determined that the appropriate agency to address your*
> *concerns is the Central Intelligence Agency, Office of*
> *Inspector General (CIA/OIG).   Your information has been*
> *forwarded to that office for action; reference number*
> *H20141106.*

> *Please contact CIA/OIG for any future inquiries regarding*
> *this matter, reference hotline number H20141106.   You may*
> *contact the agency by mail at:*

> > *Office of Inspector General*
> > *Central Intelligence Agency*
> > *Washington, D.C. 20505*

*Thank you for bringing this matter to our attention.*


*OIG Hotline Staff*

*U.S. Department of State*

*Office of Investigations*

*800-409-9926*


*This email is UNCLASSIFIED.*


262. Such customs were adopted with disregard to the inherent

threat posed to Americans overseas due to the clear and present danger of a

conflict arising in the overlapping spheres of activity between private

American citizens and covert CIA officers targeting the civil society of Japan,

in the instant case, or another constitutional democracy with a free-market

economy. Such overlapping spheres of activity present an obvious condition

conducive the arising of situations in which a CIA officer aiming to exclude

the private American citizen from his or her sphere of activity would commit

acts violating of the rights said private American citizen protected by the US

Constitution, as per numerous examples of past abuses committed by CIA

officers against American citizens overseas, including private individuals as

well as federal officials assigned to other agencies, such as the Drug

Enforcement Agency (DEA). Therefore, such customs should have been

precluded, in advance.

263. Furthermore, the implementation of policies that can be seen to

embody preemptive countermeasures aimed at deflecting, through various

bureaucratic and other means, complaints such as those lodged by Plaintiff

alleging federal crimes committed by CIA officers, thereby perpetuating the

conditions giving rise to the alleged violations, conditions resulting from the

adoption of policies, customs and practices that should not have been under

consideration in the first place represents a violation of due process rights

protected by the US Constitution. Such policies add a layer of supervision

and control over such government activities related to the handling of

allegations pertaining to the commission of federal crimes by federal officials,

etc. Plaintiff has no way of surmising what violations that might further

entail, but will seek leave to amend the complaint as evidence comes to light through discovery.

264. As of October, 2013, the Consulate ceased communicating with me directly (in person), and instead deployed an automated response system with a standardized message text in subsequent replies. The sender of the last email I received informing me that Kennedy was no longer assigned to the Consulate did not identify themselves. That was more than likely owing to the fact that I had posted some of the email correspondence identifying Schaeffer et al. When I subsequently requested the identities of the consular officials that have held the post of Citizen Services Officers since the departure of Kennedy, which I was informed of in October of 2013, I was told to submit a FOIA request to the State Department. The adoption of such practice represents an attempt to evade responsibility as well as scrutiny for deliberate refusal to dutifully provide necessary information to which Plaintiff was entitled, and perhaps an attempt to "protect intelligence sources and methods" in the form of the covert identities of the CIA officers stationed under diplomatic cover at the Consulate.

265. Here, the DOS (actually, the CIA, which appears to have coopted the agency of "American Citizen Services Officer" at the American Consulate in Osaka, based on response Plaintiff received from DOS/OIG) deliberately adopted a course of non-communication presumably deemed to be justifiable on the basis of the need to protect "intelligence sources and methods", in this case, extending to the identities of CIA officers stationed under official cover at the American Consulate in Osaka. Again, it bears repeating that such course was adopted without any official at the Consulate even suggesting that Plaintiff report the alleged violations to the CIA/OIG, which, gathering from reply Plaintiff received from the office of Senator Dianne Feinstein, appears to have been necessary information to which Plaintiff was entitled to be informed of by the American Citizen Services Officer, i.e., Schaeffer et al.

266. The fact that the above-described customs and practices may themselves be said to correspond to "intelligence sources and methods" by the Executive Branch, and therefore to require protection as "state secrets", is not a valid basis upon which to grant immunity to the federal government

against the liability it bears for violations committed by its officials of the rights of American citizens overseas protected by the US Constitution.

267. The DOS's actions as well as the refusal thereof demonstrated by the deliberate indifference to Plaintiffs plight served to facilitate further harassment by CIA officers and their proxies. Said deliberate actions and inactions of the DOS constitute a deprivation of Plaintiff's rights to due process in violation of the Fourteenth Amendment of the U.S. Constitution. *Bivens* provides the authority to bring a civil action for said violations.

268. The promulgation by the Executive branch of EO 12333 and the Memorandum of Understanding between the CIA and the DOJ pertaining to the reporting of Federal Crimes (hereinafter MOU) has served to create a scenario in which federal officials, in particular:

1)      CIA officers engaged in covert operations under official (diplomatic) cover working from the American Consulate in Osaka and the American Embassy in Tokyo Japan in collaboration with their counterparts at relevant

administrative centers in the Washington DC area; and

2)      DOJ officials in the Civil Rights Division and Criminal Division

have been afforded an excessively permissive degree of discretionary power

enabling them to ignore and/or pass the responsibility (i.e., for handling the

complaint) internally from one administrative agency to another in a tailor

made bureaucratic labyrinth that facilitates said passing of responsibility in

a nontransparent manner, and incorporates a preemptive recourse to

plausible deniability on the basis of the need to protect "state secrets", while

concurrently deceiving the American citizen submitting the complaint, in a

manner such as to lead said citizen to believe that the matter was being

investigated and the like, thereby perpetuating the circumstances

constituting the background against which the violations were committed in

the first place, and therefore facilitating further such violations.

269. Plaintiff alleges that the Executive Branch has demonstrated a

deliberate disregard for the due process rights of the Plaintiff, and moreover,

has preemptively implemented bureaucratic countermeasures seeking to

dissuade or prevent American citizens such as Plaintiff whose rights

protected by the US Constitution have been violated by federal officials from

seeking redress ("through the appropriate channels", etc.). In effect, the

Executive Branch, through the promulgation of the aforementioned MOU

and EO 12333 together with the adoption of practices such as stationing

cover CIA officers as American Citizen Services Officers have provided CIA

officers such as Schaeffer et al. with a license to mislead American Citizens

overseas seeking to report alleged federal crimes committed against them by

CIA officers. The same could be said of officials at the DOJ, in light of the

misleading written reply the DOJ sent to Plaintiff. Plaintiff invokes the

private cause of action authorized by *Bivens* and present his claim through

the vehicle represented in the precedent set by Monell v. Department of

Social Services, 436 U.S. 659 (1978) with respect to the implication of official

policies, customs and practices in such violations.


270. More specifically, with respect to policy, examining the first

page of the aforementioned MOU, for example, it can be seen that there are a

number of exceptions that render the procedural guidelines set forth in said

MOU inapplicable. That is to say, the reporting guidelines of the MOU themselves are subordinated to a second set of—apparently classified—procedures "agreed upon between the Attorney General and the head of the department or agency concerned".

271. Said MOU requires, in section I. Introduction, that:

> *"senior officials of the Intelligence Community...report to the Attorney General possible [emphasis added] violations of the federal criminal laws by employees... as provided in procedures agreed upon by the Attorney General and the head of the department or agency concerned, in a manner consistent with the protection of intelligence sources and Methods, as specified in those procedures."*

272. Here, while the threshold triggering a reporting requirement is indeed set very low by the use of the term "possible", on the one hand, the subordination of said reporting to the dictates of the phrase "in a manner

consistent with the protection of intelligence sources and Methods, as

specified in those procedures", with the aforementioned "those procedures"

referring to said apparently already classified procedures "agreed upon

between the Attorney General and the head of the department or agency

concerned", on the other hand, renders the reporting requirements

completely opaque.


273. Moreover, "I. Introduction" of said MOU continues by indicating

that "Title 28, United States Code, Section 535 (b) requires that":


*[a]ny information, allegation, or complaint received in a*

*department or agency of the executive branch of government*

*relating to violations of title 18 involving Government officers*

*and employees shall be expeditiously reported to the Attorney*

*General by the head of the department or agency unless—*

*(1) the responsibility to perform an investigation with respect*

*thereto is specifically assigned otherwise by another*

*provision of law; or*

*(2) as to any department or agency of the Government, the*

*Attorney General directors [emphasis added] otherwise with*

*respect to a specified class of information, allegation, or*

*complaint.*

274. Here, while the threshold triggering a reporting requirement is again indeed set very low by the use of the phrase, "any information, allegation, or complaint received in a department of the executive branch of government", it is necessary to examine in detail the implications set for in the exceptions (1) and (2) following "unless".

275. The first exception, (1), relates to "another provision of law" taking precedence in the case that investigative responsibility has been delegated thereby. With respect to the CIA, the establishment of the CIA/OIG by U.S. Code Title 50, Chapter 46 § 3517 would appear to correspond to such a provision of law. The most directly relevant portions of said law establishing the CIA/OIG appear to be the following:

*(c) Duties and responsibilities*

*It shall be the duty and responsibility of the Inspector*

*General appointed under this section—*

*(1) to provide policy direction for, and to plan, conduct,*

*supervise, and coordinate independently, the inspections,*

*investigations, and audits relating to the programs and*

*operations of the Agency to ensure they are conducted*

*efficiently and in accordance with applicable law and*

*regulations;*

*(2) to keep the Director fully and currently informed*

*concerning violations of law and regulations, fraud and other*

*serious problems, abuses and deficiencies that may occur in*

*such programs and operations, and to report the progress*

*made in implementing corrective action;*

*(3) to take due regard for the protection of intelligence*

*sources and methods in the preparation of all reports issued*

*by the Office, and, to the extent consistent with the purpose*

*and objective of such reports, take such measures as may be*

*appropriate to minimize the disclosure of intelligence sources*

*and methods described in such reports*

276. For future reference, Plaintiff would like to draw attention to the gist of the passages stating:

*(1) "investigations... relating to the programs and operations of the Agency to ensure they are conducted... in accordance with applicable law";*

*(2) "to keep the Director fully and currently informed concerning violations of law..., and to report the progress made in implementing corrective action"*

*(3) to take due regard for the protection of intelligence sources and methods in the preparation of all reports issued by the Office, and, to the extent consistent with the purpose and objective of such reports, take such measures as may be appropriate to minimize the disclosure of intelligence sources and methods described in such reports*

277. Though a primary objective of the CIA/OIG is to conduct investigations aimed at ensuring that the CIA is operating in accordance with the law, the reference to "protection of intelligence sources and methods" in conjunction with the reference to "the purpose and objective of such reports", etc., seems to present cause for concern. That is to say, while the "purpose and objective" of CIA/OIG reports is not subordinated to the "protection of intelligence sources and methods", the manner and extent to which the requirement to "take such measures as may be appropriate to minimize the disclosure of intelligence sources and methods described in such reports" impedes the reporting of violations of law by CIA officers is an important primary concern in the instant case. Here, it bears noting that since the CIA/OIG has not once contacted Plaintiff, it is not possible for Plaintiff to ascertain whether any reports have been made; moreover, the CIA/OIG has not even sent an official notification acknowledging receipt of two reports submitted directly thereto by Plaintiff.

278. Meanwhile, the second exception in the MOU, (2), appears to

include a grammatical error masked by a typographical error. The phrase

"Attorney General <u>directors</u> otherwise" would appear to be written in error

for "the Attorney General <u>has directed</u> otherwise". The reasons are obvious

but, first of all, the temporal frame of reference in the case of the present

tense, "directs" would be wrong because the report (i.e., the "*[a]ny*

*information, allegation, or complaint received in a department or agency of*

*the executive branch of government relating to violations of title 18 involving*

*Government officers and employees")* would have already have been

"received" and presumably "reported" to the Attorney General barring the

existence of a pre-issued directive instructing otherwise. Accordingly, the

phrase can only refer to the situation in which the Attorney has made a

directive in advance "as to any department or agency of the Government...

with respect to a specified class of information, allegation, or complaint".


279. Here, the issue becomes a question as to what is meant by "a

specific class of information, allegation, or complaint", on the one hand, and

whether that means that the aforementioned "*information, allegation, or*

*complaint*" related to "*relating to violations of title 18 involving Government*

*officers and employees*" is not reported at all; that is to say, to neither the

Attorney General nor the CIA/OIG. There is no alternative to the reporting

regime presented above, which raises the later question. That is to say, if the

Attorney General has directed the Director of the CIA to have any such

"*information, allegation, or complaint*" reported internally to the CIA/OIG,

there would appear to be ample discretion within the CIA's bureaucracy to

divert the reporting of such "*information, allegation, or complaint*",

preventing the reporting thereof to the CIA/OIG. An American citizen in the

position of Plaintiff has no way to confirm the status one way or another,

aside from recourse to the Judicial Branch.

280. In regard to the above-described exception (2), Plaintiff would

like to propose a hypothetical question to the Court. What reporting action

would the MOU mandate in the case of a complaint submitted by a private

citizen (i.e., Plaintiff) alleging unlawful misconduct by CIA officers that

involved violations of the rights of Plaintiff protected by the US Constitution

as well as information disclosing "intelligence sources and methods"?

281. Presumably, the hypothetical scenario would in fact be covered by exception (1), and the allegations investigated by the CIA/OIG. However, in the instant case, Plaintiff was compelled, due to continual unabated harassment, to further submit a complaint to his representative in the House of Representatives, Barbara Lee, and when that proved to be an utterly ineffective and frustrating waste of time and effort, followed through by lodging a complaint directly with the DOJ, not being advised that I should report the alleged violations to the CIA/OIG until eventually contacting the office of then head of the Senate Select Committee on Intelligence, Senator Dianne Feinstein.

282. The stage prior to my submitting the complaint to the DOJ presents at least the following three possible scenarios with respect to the federal officials concerned:

- first, Schaeffer deliberately decided not to report the allegations "through the proper channels";

- second, Schaeffer did report the complaints through the proper channels,

but his superiors, whom Plaintiff presumes would include "senior

officials of the Intelligence Community", such as the Director of the CIA,

did not report the complaints to the CIA/OIG

·   third, Schaeffer's superiors did report the allegations to the CIA/OIG, but

the OIG failed to conduct an investigation and/or implement appropriate

corrective measures.


283. The stage after Plaintiff submitted the complaint to the DOJ

presents a range of other possible situations, none of which represent a

dutiful and proper handling of the complaint by the DOJ. Moreover, in light

of the continuation of the harassment after the DOJ mailed to me the

written response described above, even though two of the more egregiously

offending individuals had been removed from my immediate surroundings,

means that the CIA did not implemented any changes aimed at reducing the

scale of the covert operations being conducted in my immediate surroundings

that presented the conditions that were the primary cause facilitating the

incidents in the first place, they'd simply made some personnel changes.

284. Without going into further detailed analysis of the aforementioned MOU, suffice it to say that the very existence of said MOU attests to the fact that the Executive was clearly aware that there exists a clear and present danger of American intelligence officials committing federal crimes against American citizens overseas in countries where said intelligence officials are engaged in covert operations.

285. Accordingly, the promulgation of a policy (i.e., the MOU) that on its face is purported to be an oversight mechanism of a sort intended to prevent unlawful misconduct and promote the carrying out of justice, but also includes stipulations that appear to render the most central and important provisions of said MOU ineffective by subordinating said provisions to classified procedures intended to prevent exposure of the very existence of the intelligence officials committing the alleged Constitutional violations, seems intended to preempt the holding accountable of intelligence officials committing federal crimes. That would appear to violate the rights of Plaintiff to due process protected by the US Constitution. That is to say, the policy itself is drafted in a manner aimed at facilitating the cover up of

Constitutional violations committed by American intelligence officials

against American citizens overseas, in the name of protecting "intelligence

sources and methods".

286. As described above regarding the hostile and threatening emails

from Roughan, which are representative of the hostile disposition of all the

CIA officers about whom allegations are set forth herein, that Roughan sent

Plaintiff in relation to his blog posts about Roughan, many of the alleged acts

of invasion of privacy and harassment occurred after Plaintiff had

reported—through what Plaintiff assumed were the proper channels,

starting with the American Consulate—rogue CIA officers acting in their

individual capacity.

287. Here, there is a possibility that, in order to conceal the revealed

identity of a rogue CIA officer that is engaged in covert operations and whose

cover is classified in conjunction with the effort to "protect intelligence

sources and methods" per the MOU and EO12333 that is the subject of a

citizen report alleging federal crimes, the CIA customarily has the thus

reported CIA officer carry on as if there had not been a report alleging the

commission of a federal crime. The MOU and EO12333 are too vague to

interpret one way or the other, but such a customary practice would amount

to the adoption of a policy preemptively condoning the willful neglect of the

commission of a violation of the right to privacy secured by the Constitution

of the United States and the submission of the complaint thereof, and

moreover further the continual violation of same by the very menacing

presence of the CIA officials that have committed the alleged violations of

Plaintiff's rights secured by the US Constitution, including Plaintiff's liberty

interests.


288. The fact that individuals that Plaintiff has complained about in

the past have repeatedly reappeared in my immediate surroundings, with

one incident involving Dickinson, Mike, and Turner resulting in my calling

the local police to the Starbucks, clear demonstrates that appropriate

corrective measures have not been implemented.


289. Since it has been impossible for Plaintiff to know what is going

on in the Executive Branch in relation to his complaints, Plaintiff has mailed

a letter and sent two emails directly to President Obama at the White House.

Plaintiff has received no reply from the White House.


290. Plaintiff also notes that he has subsequently submitted two (to

date) reports to the CIA/OIG thus far in relation to matters pertaining to the

instant case. Plaintiff has not received a single acknowledgement that the

reports were received, let alone any indication as to the status of

investigation. Furthermore, it should be noted that the CIA/OIG did make

public statements in relation to the recent scandalous misconduct of CIA

officials involved in illegally accessing the computers of Senate staffers

attached to the Senate Select Committee on Intelligence. Plaintiff believes

that the policies related to the handling of the allegations he presented to the

CIA/OIG have not facilitated Plaintiff's receiving a proper response from the

government agency in question, violating Plaintiff's rights to due process

protected under the US Constitution.


291. Plaintiff asserts that, even under the implausible circumstance

that the Executive Branch can at present continue claim with valid legal basis that there exists a "classified relationship" between Plaintiff and the CIA, the CIA/OIG cannot deny that Plaintiff has submitted reports thereto alleging the commission of federal crimes by CIA officials against Plaintiff, and should be obligated to provide an official response, even if it refers to a national security exception regarding the degree of (non)disclosure of relevant information, as in the case of the declined Privacy Act request.

292. The policies and practices examined herein represent a deliberate attempt to obstruction Plaintiff's seeking of justice in relation to the alleged federal crimes committed against him by federal officials, and therefore represent a denial of due process, and violate Plaintiff's liberty interests including the protection against government intrusion by facilitating the furtherance of the near daily continual harassment by covert CIA officers   that was the substance of the initial allegations made by Plaintiff to the American Consulate in Osaka.

293. Plaintiff, having read the above-described EOs and policies, has

come to the conclusion that the common thread running therethrough

pertaining to the "protection of intelligence sources and methods" is being

used by the Executive to preemptively subvert the original functions of

government agencies, such as American Citizen Services Officer, to the

secretly established covert agenda of the CIA without due consideration of

the various and several rights of American citizens residing overseas

protected by the US Constitution.


294. To reiterate, the "protection of intelligence sources and methods"

appears to be serving as the justification for not even acknowledging that a

complaint has been made to the CIA/OIG alleging the commission of federal

crimes by CIA officials against an American citizen overseas, despite a

history of such crimes. A same or similar pattern is found in the lack of

responsiveness to complaints related to the CIA by the Consular officials

serving as American Citizen Services Officers, and is accentuated by the

eventual decision to cut off all personal contact, requiring that I file an FOIA

request even to learn the identity of the current American Citizen Services

Officer. Meanwhile, it took approximately eleven months to receive the

above-described written reply from the DOJ.

295. Accordingly, there is a question as to whether customs and practices facilitated by the above-described EOs afford an excessive scope of discretion with respect to the determination as to whether or not to investigate alleged violations of the Constitutional rights of an American residing overseas by federal officials, such as covert CIA officers.

296. As to EO 12333, the wording fails to impose strict controls over the use of information obtained under the provisions thereof in a presumably lawful manner from being diverted for use in unlawful purposes, and the mere mentioning that Constitutionally protected rights are not to be violated would appear to be too vague to have the apparently intended effect.

297. More specifically, in the instant case, there would appear to be two categories of personage defined in EO 12333 to which Plaintiff could be presumed to belong. The first category would be as an applicant for employment with the CIA, as per the aforementioned application Plaintiff

filed online in April 2009, and would only have applied after said application

was filed and for a short duration thereinafter within which the CIA could

have contacted Plaintiff regarding his application for a position with the CIA

as an independent contractor. The second category would be as a private

American overseas that has been targeted by an international criminal

organization of which the American intelligence agencies were aware.


298. Here, although Plaintiff may be deemed to fall under the

above-described categories for the narrow purposes associated with said

categories, information obtained about me through electronic and physical

surveillance was diverted for use in the unlawful purpose of attempting to

displace Plaintiff from Kyoto by CIA officers, their cohorts from the

intelligence services of other countries and locally recruited Japanese proxies

(i.e., so-called "agents").


299. In the instant case, individual CIA officers such as Peterka,

Roughan and Paquette were deliberately engaged in carrying out, acting in

their individual capacity as rogue federal officials, conspiratorial criminal

acts with respect to which they were fully cognizant of the Constitution

violations they were committing; however, the insufficiently prohibitive

wording of EO 12333 and other configurational deficiencies with the related

policies contributed to producing an environment conducive to intelligence

officers and the intelligence community assuming that an excessively broad

degree of discretion was afforded by said EO 12333 and other policies than is

permissible under the Constitution of the United States of America, thereby

constituting policies that facilitated the alleged violations of the rights of

Plaintiff protected by the US Constitution.


300. For example, having had Privacy Act requests denied by the CIA,

NSA, etc., on the basis of national security exemptions, Plaintiff would

include Executive Order 13526 as a policy supporting the labyrinth-like

bureaucracy that the Executive has constructed in order to facilitate the

concealment of wrongdoing, including the violation of the rights of American

citizens overseas protected by the US Constitutional, by officials of the

Executive branch of the government of the United States of America, as well

as complaints directly related thereto submitted to various agencies of the

Executive Branch.

301. Meanwhile, there is a conspicuous lack of a formal
Administrative Procedure for filing complaints such as those by Plaintiff
starting with the visit to the American Consulate in Osaka, Japan. That
would seem to represent a deliberate omission, again with the
above-described aim of concealment of wrongdoing, etc.

302. Accordingly, taken severally and considered in concert, the
above-described official acts, including policy promulgation, etc., of US
government officials demonstrate policy-based customs and practice that
facilitate self-serving bureaucratic interests as opposed to regulating the
dutiful performance of the functions owed to the American citizens according
to the public office occupied by said officials, thus facilitating the violation of
Plaintiff's rights protected under the US Constitution.

303. At this point, it is necessary to revisit the DOJ's handling of
Plaintiff's complaints with respect to the stipulations set forth in Executive

Order 12333 and the Memorandum of Understanding between the DOJ and

CIA on the reporting of federal crimes as well as the customs and practices

associated therewith.

304. Though the classified status of the procedures drawn up by the

Attorney General are unknown to Plaintiff, there would seem to be a

systemic deficiency that disincentive to fulfill the fiduciary duty owed to

American citizens incumbent upon their office; thus, such policies and

procedures must also be presumed to be culpably inadequate. Moreover, in

light of past egregious violations of the civil rights of American citizens

overseas by rogue CIA officers, only a deliberate refusal can be surmised as

the reason why remedial policies aimed at preventing such violations have

not been implemented. Such a deliberate refusal to implement remedial

measures has facilitated the violation of Plaintiff's aforementioned civil

rights.

305. The DOJ's actions and refusal thereof (i.e., to investigate

Plaintiff's allegations) facilitated by said culpably inadequate policies,

customs and practices as demonstrated by the deliberate indifference to

Plaintiff's plight served to facilitate further harassment by CIA officers and

their proxies. Such inadequacy has resulted in the violation of Plaintiff's

rights protected under the Fifth Amendment and the Fourteenth

Amendment of the US Constitution. *Bivens* provides the authority to bring a

civil action for said violations, and Monell-type claims provide the proper

vehicle therefor.

IX

SIXTH CAUSE OF ACTION

(*Bivens* 3, Procedural due process:

Fifth Amendment, Fourteenth Amendment)

306. Plaintiff incorporates herein, as though fully set forth, all of the

allegations contained in paragraphs 1 through 305, above, as though fully set

forth.

307. The above-described attempts by Plaintiff to file a complaint alleging violations of his rights protected by the US Constitution were met with dead ends, non-responsiveness and deception on the part of federal agencies including the DOS, DOJ and CIA/OIG.

308. Furthermore, no formal Administrative Procedure has been established in relation to the reporting of alleged violations by CIA officers of rights of American citizens overseas protected by the US Constitution. The absence of a formal administrative procedure at each of said federal agencies is conspicuous in the light of past abuses by the CIA such as those described herein as well as the circumstances of the instant case, and is in stark contrast to the existence of both the aforementioned MOU and EO 12333.

309. Moreover, in one way or another, both of the aforementioned MOU and EO 12333 as well as the apparently classified procedures to be established by the Attorney General in relation to said MOU would appear to correspond to:

"...*law*[s] *which shall abridge the privileges or immunities of*

*citizens of the United States*"


310. Plaintiff's privacy and dignity have been severely infringed upon

by federal officials including suspected CIA officers, and Plaintiff was

entitled to honest services from the federal officials of each federal agency to

which he made repeated and continual protestations both verbal and in

writing seeking to bring an end to the above-described misconduct of rogue

CIA officers and other federal officials. Plaintiff alleges that such denial of

honest services was due at least in part to the fact that no official

Administrative Procedure for receiving such complaints as the

aforementioned complaints made by Plaintiff whereas the history of similar

abuses by rogue CIA would seem to require that a corresponding

Administrative Procedure be established in order to protect the rights of

American Citizens overseas as secured by the US Constitution.


311. The absence of a formal administrative procedure at any of the

corresponding Departments of the Executive Branch thus facilitated the

unabated continuation of said misconduct violating Plaintiff's rights

protected by The Bill of Rights of the US Constitution. Accordingly, Plaintiff

alleges that the absence of a formal administrative procedure at any of the

Departments of the Executive Branch is itself the cause of creating a

bureaucratic environment of permissiveness that facilitated continual

violations of Plaintiff's rights secured by the US Constitution, violations that

should have otherwise been halted by sufficient government action in

relation to the reporting thereof through the appropriate channels by means

of a formal Administrative Procedure therefor. *Bivens* provides a cause of

action against such violations.

X

SEVENTH CAUSE OF ACTION

(Obstruction Of Justice, pursuant to

18 USC 1505: Obstruction of proceedings before departments, agencies, and

committees;

18 USC 1512: Tampering with a witness, victim, or informant;

18 USC 1514 Civil action to restrain harassment of a victim or witness; and

18 USC 1519: Tampering with evidence)

Plaintiff incorporates herein, as though fully set forth, all of the allegations contained in paragraphs 1 through 311, above, as though fully set forth.

312. Among a number of such examples, one example of tampering with and harassing a victim (i.e., Plaintiff) can be seen in the harassment and attempts to intimidate and threaten by Roughan in personal emails and the like as well as his presumed assumption of a false identity bearing my name to make derogatory comments on my blog. Roughan had repeatedly demanded that I remove posts describing him as a CIA officer and his related acts against Plaintiff violating Plaintiff's rights secured by the US Constitution, and repeatedly insinuated that Plaintiff's allegations against him and the CIA were indicative that Plaintiff had mental health problems.

313. Another example of tampering can be seen in the continual

attempts to dissuade Plaintiff from pursuing legal action by deceiving
Plaintiff into thinking that the CIA was about to propose a settlement or
reach some agreement accommodating my demands, such as agreeing to the
terms of employment as an independent contractor, etc., Plaintiff had
offered.

314. The CIA projected an ominous and menacing presence through
the continual resurfacing of CIA officers and proxies thereof about whom
Plaintiff had complained, or through the introduction of new CIA officers
into Plaintiff's immediate surroundings who would socialize with Plaintiff at
the Starbucks in a manner such as to suggest that some positive
developments were pending, including, for example, that the of the
problematic rogue CIA officers about whom Plaintiff had complained had
been removed. Such false overtures amount to an attempt to influence
Plaintiff in a manner such as to consume his time and divert his efforts
toward pursuing legal action, thereby delaying the filing of this Complaint.
That is to say, instead of pursuing legal action, Plaintiff was instead
indirectly encouraged to bide his time await further signs and developments

while socializing with the newly introduced CIA officers, etc.

315. In this respect, the nature of the so-called "classified" relationship between Plaintiff and the CIA referenced in the refusal of Plaintiff's Privacy Act request to the CIA requires scrutiny. Plaintiff is skeptical that the full scope thereof is encompassed by the relationship created on the basis of Plaintiff's application of employment therewith as an independent contractor.

316. Plaintiff notes that he had contacted Taylor and reported the attack Plaintiff had suffered at a local bar at which Plaintiff had an appointment to meet a CIA proxy named Yoshiyuki (reported to Consulate along with mobile telephone number) whom Plaintiff had met at the Starbucks through Peterka, Mike, and Paquette. Taylor's reply of December 12, 2007 included the statement, "Sounds like you need to find a new crowd in Kyoto". Normally, that might sound like reasonable advice, but under the circumstances, that would simply mean that all civil society venues, including cafes, bars and the like frequented by covert CIA officers and their

proxies, a group that collectively had sought to colonize civil society in Kyoto, had to be avoided by Plaintiff. Plaintiff notes that he raised the issue of civil society in his first email to Schaeffer et al. It should be noted here that Yoshiyuki was frequently in the company of Mike as well as Paquette, and there is no question in Plaintiff's mind that he was set up to be attacked by said CIA officers or their proxies with the complicity of said CIA officers.

317. While Plaintiff is not aware as to whether or not Taylor reported, as apparently is required under EO 12333, Plaintiff's allegation that he had been subject to a criminal attack encompassing a conspiracy involving rogue CIA officers. Plaintiff has noted the correspondence between the appearance of Harris from Thailand and his attempts to encourage Plaintiff to leave Kyoto for Thailand, and the fact that Taylor and Kiely had been stationed in Thailand for many years. Furthermore, the time frames overlap.

318. Here, Plaintiff cites a paragraph from an email (amounting to a total more than a hundred pages) addressed to Snider that Plaintiff sent on October 20, 2011 to the American Consulate in Osaka, the email having

subsequently been provided to the DOJ as well:

> *After being attacked in the bar called the HUB, the*
>
> *next time I was in there I was talking to a guy named Marcus,*
>
> *a German doing something at Kyoto University in the Science,*
>
> *and obviously an intelligence dweeb. We were talking about the*
>
> *attack when I was compelled to come out and say loudly that*
>
> *Glenn was in the CIA, whereupon Marcus tried to deny that*
>
> *and quickly change the subject to the guy who had attacked me,*
>
> *telling me he was Moroccan and trying to get me interested in*
>
> *other information. More recently, after the topic again came up*
>
> *with a Dan Douglass assuming a higher profile, apparently*
>
> *more time to spend at the café after losing his job, whereupon*
>
> *he also tried to put me on the trail of the Moroccan guy, telling*
>
> *me the guy was studying martial arts and that Dan, too, had*
>
> *found him to be an individual with a chip on his shoulder. In*
>
> *summary, both Marcus and Dan tried to steer me onto a*
>
> *revenge trail against my attacker in order to divert my*

*attention from analyzing the setup and those behind it.*

319. Examples of CIA officers newly introduced (or reintroduced) into Plaintiff's immediate surroundings include Blackman (depending on when Plaintiff can be characterized as having "victim" status), Dickinson, Laverne, Douglass, Dalsky, Bray, and O'Day, and most recently Zimbleman. In each case, initially there would be cordiality and a certain degree of empathy being projected toward Plaintiff, but then things would not advance, and hostility and ulterior motives begin to surface. Without exception, all were attempting to convince me to leave Kyoto, with the implication that things were going to be tough for me in a hostile environment teeming with CIA et al. aiming to recruit spies from among the Japanese citizens, etc., present in the civil society venues frequented by Plaintiff.

320. It bears repeating that the incidents continued after Plaintiff reported the rogue CIA officers to the Consulate, started blogging about the scenario and informed the Consulate, reported the problems to the DOJ, etc. There is a modus operandi wherein the CIA has adopted tactics aimed at

skirting local law because it is difficult and costly to seek redress through the
judiciary in Japan, and continually violated Plaintiff's rights protected by
the Constitution because they thought they could continue to get away with
it, partly due to the bureaucratic/policy nexus that has been implemented to
facilitate evasion of accountability, making it basically impossible for
aggrieved individual American citizens overseas such as Plaintiff to put an
end to the harassment without making recourse to the Judicial Branch,
which represents an extreme burden to Americans residing overseas.

321. Among aforementioned re-introduced individuals is O'Day, for
example. The emails we exchanged related to translation of a few sentences
for her in relation to a lawsuit she is involved in due to a traffic accident in
which she was injured. More recently she had been complaining to me about
her work situation and asking for legal advice. I didn't have much advice to
offer her, but the gist of the matter related to her supervisor, the head of the
Applied Linguistics Department at Kyoto Prefectural Medical College, where
she has a temporary position as an English instructor. Although she was
contemplating taking legal action, on several occasions when I mentioned

that I was in the midst of trying to put together a lawsuit against the US government, she repeatedly advised against doing so, saying it would be best to avoid that.

322. Though I'd initially thought that might be a sign she had been resurfaced by the CIA in order to facilitate a settlement, the CIA apparently had simply intended her as both a delaying mechanism and a representative of a status quo scenario that appealed to them. It should be noted that when Plaintiff says resurfaced, he means after the individual had been removed from Plaintiff's immediate surroundings after Plaintiff had complained about her to the Consulate, and then she reappeared later. Plaintiff first encountered O'Day at the Starbucks in or around early 2012, though she had been a resident of Kyoto for many years.

323. When Plaintiff first complained to the Consulate about O'Day, it was partly due to some of her early questioning about Plaintiff's appeal of the verdict of court of the first instance to the Osaka High Court. Plaintiff suspected that she may have been party to a plot to corrupt Plaintiff's

attorney—who had been less than cooperative at times—in his lawsuit

against the city of Kyoto for illegally denying our son entry into the

neighborhood nursery school. The only foreigners whose children were

enrolled were intelligence officers, including David Dalsky of the CIA, David

Chandler of the MI6, and two members of France's overseas intelligence

agency. Before complaining about her to the Consulate, Plaintiff had sent

her a message through her Facebook account explicitly stating that he knew

she was a CIA office and considered her to be hostile. She resurfaced and

projected a degree of empathy so effective that Plaintiff felt bad for sending

her the highly offensive comment, and subsequently deleted it. Eventually,

however, Plaintiff was compelled due suspect conduct she evinced, to

escalate the level of complaint (brief description to CIA/OIG).


324. Plaintiff alleges that the Zimbleman emails, as described in

some detail above, fall under the same category and also represent conduct

corresponding to tampering with a victim. Here, it must be emphasized that

the CIA has deployed against me numerous officers—who in turn have

deployed proxies—said CIA officers including three psychologists and

another with a degree in psychology: Dalsky has a PhD in psychology,

Zimbleman has a PhD in psychology, O'Day is working on her PhD in

psychology, and Bray has an undergraduate degree in psychology. All of said

individuals have tried to elicit empathy from Plaintiff in one manner or

another as part of their respective schemes to manipulate Plaintiff.

325. Plaintiff also alleges that the misleading conduct seen in the

treatment he received from the DOJ, including the above-described written

reply signed by Kappelhoff, constitutes tampering with a victim. Plaintiff

was misleadingly provided with a useless email address to an uninvolved

office in the DOJ, the aforementioned written reply mischaracterized

Plaintiff's allegations, and belittled the alleged crimes, adding insult to

injury in an apparent attempt to dissuade Plaintiff from pursuing the

allegations via the Judicial Branch, which in retrospect appears always to

have been the only option from the start, practically by design.

326. The first instance of tampering with evidence has been

described by Plaintiff in the second report he submitted to the CIA/OIG and

relates to the hacking into Plaintiff's Hotmail account to carry out a selective

deletion of all emails exchanged between Plaintiff and Paquette before 2007,

some of which included Plaintiff addressing issues related to the CIA/MI6

and the use of religion for subversive purposes in Kyoto, said selective

deletion being coordinated with the subsequent abandonment by Paquette of

his long-term personal email account, presumably aiming to thereby render

the evidentiary emails inaccessible: gcpaquette@cs.com.

327. Plaintiff had been extremely shocked to find the emails missing

from his Hotmail account, because he is certain that he had saved them in a

user-created folder. As is shown by the existence of the email dating to 2003

from Peterka, Plaintiff had actively been storing such correspondences in

respective folders created by Plaintiff. In the case of Paquette, there is a

partial email from June 2007 that is the earliest remaining record of email

communications between Paquette and Plaintiff, and the next email is not

until May 2008, which indicates that all of the emails between those dates

were also deleted.

328. In October of 2014 Plaintiff became aware of media reports indicating that the CIA was seeking permission to delete email correspondences of non-senior officials. Plaintiff noted that in the following paragraph from the aforementioned report (dated October 28, 2014) to the CIA/OIG:

> *First, as noted on my blog, I have learned that the CIA has requested permission to delete email correspondences of rank-and-file officers. In the case I have presented to you thus far, emails are practically the only material evidence I have, and any relevant emails of the following individuals would obviously be corroborating material evidence to this case...*

329. At the risk of portraying the instant case in a more important light than it may merit in the public's eye at this stage prior to its formally getting underway, Plaintiff was earnestly concerned that the CIA's proposal was partly targeting the evidence yet to be discovered in the course of the

instant case, which Plaintiff has long since informed the Executive Branch of his intent to file.

330. Assuming that Holder authorized interception of Plaintiff's electronic communications and physical surveillance under the provisions of EO 12333, perhaps at different points in time for different reasons corresponding to the respective relevant clauses of EO 12333, it has to be assumed that he would have an abiding interest in the situation. It goes without saying that once the Attorney General authorizes the collection of data on a private American citizen overseas under the provisions of EO 12333, the collected data becomes highly sensitive.

331. In fact, the following sections of EO 12333 set forth specific provisions related to the collection of information on US persons.

- "1.3 *Director of National Intelligence* (b)(9)(B)",

- "2.3. *Collection of Information*"

- "2.4. *Collection techniques*"

- "2.5 *Attorney General Approval*" and

- "2.8 *Consistency With Other Laws*"


332. Here, the circumstances of the instant case give rise to the question as to whether the prescribed procedures were followed as well as the question of the propriety of said procedures. With respect to the above-described incidents related to Roughan and others, Plaintiff doubts that the procedures could have been followed, but would not be surprised should evidence revealed during discovery disprove that doubt. The question as to whether the procedures are defined in a manner rigorous enough to have prevented the alleged abuses would remain, in either case. That is due to the fact that the procedures outlined in EO 12333 are themselves further dependent on other procedures that would appear to be classified, and the procedures presented to the public are too vague to permit an accurate assessment as to the adequacy thereof. This problem represents yet another aspect of the instant case that can only be illuminated through the Court's adoption of CIPA-like procedures.

333. The DOJ mislead Plaintiff to believe that his complaints were being taken seriously. Plaintiff was under the impression that an investigation was already underway, and was shocked by the written reply signed by Kappelhoff. Moreover, not only did the DOJ refuse to launch an investigation, they delayed replying to Plaintiff for eleven months while dealing with Peterka and Paquette in conjunction with the CIA and other agencies of the Executive Branch, apparently subjecting them to some form of administrative discipline.

334. That is to say, not only did the DOJ's aforementioned written reply mislead Plaintiff in a manner such as to persuade Plaintiff to believe that his civil rights secured by the Bill of Rights of the US Constitution had not been violated by CIA officers against whom Plaintiff had made allegations, including Peterka and Paquette, the DOJ had presumably (based on the MOU, etc.) been engaged in a non-public investigation of the allegations made by Plaintiff, said non-public investigation resulting in some form of administrative discipline against Peterka and Paquette, on the one hand, and a fraudulent misrepresentation of the actual state of affairs to

Plaintiff, on the other.

335. Justice was thereby deliberately denied to Plaintiff by the DOJ,
apparently with the aim of covering up, in collusion with the CIA and other
federal agencies, the alleged violations by rogue CIA officers of Plaintiff's
rights secured by the US Constitution. Plaintiff's complaints described
multiple violations by rogue CIA officers of his right to privacy protected
under the Bill of Rights of the US Constitution, and should have resulted in
the DOJ's launching of a criminal investigation of Plaintiff's allegations.

336. Here, it bears mentioning that it is inconceivable that even the
paralegal, Callahan, let alone Kappelhoff, would have been unaware of civil
rights violations under *Bivens*. In fact, the Executive Branch had reached a
settlement with the plaintiff in the above-cited case of Horn v. Huddle, in
which the defendant Huddle was sued a rogue CIA official, in 2009, after a
protracted court case.

337. Therefore, the DOJ not only deliberately ignored violations of

the Plaintiff's rights protected by the Constitution of the United States of
America, the DOJ obstructed justice by issuing a misleading, deceptive reply
after delaying for the protracted period of eleven months during which other
misleading acts were committed by DOJ officials, with the aim of covering up
readily apparent federal crimes committed by rogue federal officials, instead
of launching a criminal investigation into the allegations thereof.


338. Furthermore, with regard to the CIA/OIG, assuming that the
complaints were forwarded to the CIA/OIG through the Consulate (Schaeffer
et al., etc.), either the CIA/OIG did not investigate the complaints and order
appropriate corrective measures, or the CIA/OIG did investigate and order
appropriate corrective measures that were subsequently not implemented as
ordered. The later would seem to represent an obstruction of justice on the
part of those tasked with implementing corrective measures ordered as a
result of the investigation of the allegations by the CIA/OIG, while the
former (i.e., refusal to investigate) would as well, if the allegations set forth
by Plaintiff correspond to violations of his rights protected by the US
Constitution.

339. Finally, assuming that the protestations made verbally in person at the Consulate and complaints Plaintiff subsequently emailed to Schaeffer et al. correspond to violations of Plaintiff's rights protected by the US Constitution, the failure to forward said complaints to the CIA/IG would also seem to clearly represent an attempt to obstruct justice by preventing the allegations from being brought to the attention of the department authorized by law to conduct an investigation of said allegations. Again, the goal in that case, too, would appear to be to cover up the unlawful conduct by rogue CIA officers, etc., reported by Plaintiff.

340. Plaintiff also would like to note that, had a formal investigation of the allegations he made been launched, it would presumably have been a criminal investigation pertaining to federal crimes committed by covert CIA officials involving "intelligence sources and methods", wherefore a court case resulting therefrom would have automatically involved CIPA procedures.

341. The above-described acts constitute violations of 18 U.S. Code §

1505, 18 U.S. Code § 1512, and 18 U.S. Code § 1519, which provide

respective private rights of action.


XI

## SEVENTH CAUSE OF ACTION

(*Bivens* 4: First Amendment, Ninth Amendment)


342. Plaintiff incorporates herein, as though fully set forth, all of the

allegations contained in paragraphs 1 through 341, above, as though fully set

forth.


343. There are daunting challenges posed by the compelling need to

describe the socio-political circumstances under which Plaintiff has been

aggrieved by violations of his civil rights secured by the Bill of Rights of the

US Constitution by rogue CIA officers and a slew of other federal officials;

however, it is in said circumstances that the crux of the Ninth Amendment

violations, which seem to exceed the scope encompassed by the Bill of Rights, is to be found. Part of the challenge lies in the fact that a number of the variables are so far in the background the shared heritage of Americans that they have not been specifically articulated in terms of rights and immunities in the US Constitution; thus, Plaintiff finds the argument that the Ninth Amendment provides recourse for addressing such scenarios as they arise to be compelling.

344. First, Plaintiff reiterates that the sheer scale of the so-called "covert" operations of the CIA here in Kyoto should shock the conscience of the court, regardless of the grievances presented by Plaintiff, as said operations are evocative of the term neo-colonialism, as seen in some forms of academic discourse, due to their state-funded nature, all-encompassing scope, and apparent aim to have a transformative impact on Japanese civil society, which in turn links the CIA to a project that could readily be described as having characteristics associated with imperialism. The United States of America is a Republic that was founded through a fight against the imperialist British Empire to secure the freedoms enshrined in the

Constitution of the United States of America.

345. Fundamentally, Plaintiff's grievances have arisen as a result of his calling attention to aspects of the CIA's operations here in Kyoto Japan that contravene deep-rooted American values, and law. Upon noticing that Plaintiff had not only become aware of the operation(s) in which the CIA officers were engaged, but letting said officers know that Plaintiff not only had become aware, but taking them to task philosophically in relation thereto, he was targeted by rogue CIA officers as an obstacle that would terminally impede the achievement of their respective personal goals in Kyoto.

346. The operations grasped by Plaintiff were varied, but encompassed some obvious attempts by the CIA et al. to infiltrate officers into every niche of civil society in Kyoto—whether they could speak Japanese or not were culturally literate or not—along with an over-the-top concentrated effort on the Starbucks cafes as staging grounds that saw groups of CIA officer engaged in an activity that to Plaintiff's mind evoked

what philosopher Jurgen Habermas (hereinafter "Habermas")has described

as "representative publicness". In short, the CIA et al. were engaged in a

collective effort to project their respective status as individuals that had

viable lives in civil society in Kyoto, apparently with the aim of supporting

the efforts of said CIA officers to recruit Japanese civilians as spies to act

against Japan: the targeted recruits country of birth and citizenship, and

Plaintiff's country of residence.


347. Aside from thoroughly infiltrating the higher education system,

the CIA et al operations also encompassed an emphasis on modern culture,

with the CIA sending various semi-talented musicians and dancers to

perform at local night-life venues and attempt to create a "scene", so to speak.

Since the CIA et al. were apparently intentionally composed of individuals

that knew nothing about the history and culture of Japan, Plaintiff adduces

that the focus on modern culture was to serve as both a cover for infiltrating

officers as well as supporting an alternative to the wealth of traditional

cultural pursuits and activities to be found in the ancient cultural capital of

Kyoto. The CIA can be said to be ubiquitous in Kyoto civil society.

348. Plaintiff asserts that he has always had every right to lead a normal life in civil society in Kyoto, Japan, without needing to be concerned about operations by covert CIA officers, in accordance with the various precedents quoted, for example, in (Ingraham v. Wright, (1977) No. 75-6527):

*'The liberty preserved from deprivation without due process included the right 'generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.'( Meyer v. Nebraska, <u>262 U.S. 390, 399</u> (1923))*

*The right of personal security is also protected by the Fourth Amendment, which was made applicable to the States through the Fourteenth because its protection was viewed as "implicit in 'the concept of ordered liberty' . . . enshrined in the history and the basic constitutional documents of English-speaking peoples." Wolf v. Colorado, 338 U.S. 25, 27 -28 (1949).*

*It has been said of the Fourth Amendment that its*

*"overriding function . . . is to protect personal privacy and*

*dignity against unwarranted intrusion by the State."*

*Schmerber v. California, 384 U.S. 757, 767 (1966).*

349. The agenda of the CIA here in Kyoto—and Japan in general—is

largely motivated by geopolitics, which is not shocking. The specific

parameters of the operations and the apparent objectives, however, are

shocking and contradictory to basic values of civilization in the twenty-first

century, values such as those set forth in both the Constitution of the United

States of America and the Constitution of Japan.

350. As described above, Plaintiff has since come to understand that

almost all of the Westerners Plaintiff has interacted with personally in Kyoto

over the years have been intelligence officers (CIA, MI6, etc.). In fact, the

scale of the CIA-coordinated operations of Western intelligence agencies in

Kyoto made it apparent that the CIA et al. constituted a veritable class unto

themselves. As a student of East Asian history and languages, it appears

Plaintiff was to be excluded from that class because the knowledge he'd

acquired informed interests that were intrinsically opposed to the readily

apparent operations aimed at subverting civil society in the ancient cultural

and religious capital of Kyoto, operations the scale of which should shock the

conscience of the court. In short, Plaintiff was targeted by the CIA for

displacement from Kyoto as an obstacle impeding the achievement of the

corresponding personal goals of the individual rogue CIA officers. The

personal goals of each said rogue CIA officer may have been informed by the

political goals of their supervisors, who in turn appear to have provided

bureaucratic cover shielding said rogue CIA officers from scrutiny with

respect to their violations of Plaintiff's civil rights secured by the Bill of

Rights of the US Constitution.


351. The following passage is from a facsimile Plaintiff sent to the

DOJ in February 2012:


*I want to reiterate that Kyoto is and will remain my*

*home, and I will not tolerate the presence of illicit media*

*outlets and other debased activities by intelligence networks*

*that have no legitimate business here. The primary business*

*that the intelligence community should be interested in here*

*is dismantling international organized crime networks, but*

*the people I continually have to report are all trying to*

*collaborate with organized crime, building new networks.*

*Civil society is a sphere that is protected under the*

*law from government intervention, and that is the*

*fundamental concept underpinning civil rights, to my*

*understanding. Japan is a democratic state under*

*constitutional rule of law. The people in the intelligence*

*networks that I'm calling to account are in violation of many*

*of the laws of Japan, not to mention the laws of the United*

*States with respect to harassing Americans residing abroad.*

352. Several aspects of the CIA's agenda here in Kyoto undoubtedly

involve religion-and-the-state issues, as documented on Plaintiff's blog, in a

manner totally at odds with the American Constitutional doctrine of

separation of Church and State as well as the protection of freedom of

religion. In all fairness, it is not only the United States, but also the United

Kingdom, and France, for example, that are infiltrating their intelligence

officers into Kyoto with the aim of propagating Christianity.


1. Religion and the State

- Long Island University's Global College Friends World Program, Japan

- Dougill and Shinto/Sakamoto Ryoma (e.g., associated with the

    proto-theocratic 19th century movement to "Revere the Emperor, Expel the

    Barbarians" associated with the Meiji Restoration)

- Dougill and the "hidden Christians"

2. Mass media disinformation/false promotion of "covert" CIA officers

- Japan Today and Osaka's Mayor/Governor Toru Hashimoto

((mis)appropriated Sakamoto Ryoma, named his political party after the

Meiji Restoration ("Ishin"), the English rendition of which has since been

changed from "Restoration" Party to "Innovation" Party)

- Japan Times and Eric Johnson's article describing Nara as colony of Korea

- Japan Times Kris Kosaka piece on Sean Lotman

## 3. Local presence in Kyoto vis-a-vis English language print media/CIA-fronts intended to project a false image of the existence of a thriving "expat community" in Japanese civil society in Kyoto

English language media/expat scene venues:

- Kansai Time Out

- Kyoto Journal

- Kyoto Visitor's Guide

- Papa John's (café) "The Flame" open mike

- Writers in Kyoto (This represents the most recent attempt of the CIA and MI6 to reassert the "representative publicness". The blog is a clear example of the type of self-promotion of so-called covert intelligence officers as authoritative individuals capable of representing the state of the art of their respective fields, in this case; at least eight of the individuals listed as "writers" on the site have been described by Plaintiff in his blog or mentioned in emails to the DOJ, etc.: http://www.writersinkyoto.com/featured-writers/) Plaintiff believes that the establishment of such group can also be seen partially as a psychological warfare tactic directed at Plaintiff, in response to his

blogging about said officers.

353. Aside from the major newspapers, the market for English language publications is diminishingly small, because there simply are not a large number of speakers of English in Kyoto, for example, aside from the veritable diaspora of Western intelligence officers masquerading as an "expat community".

354. Japan is a country with a Constitution that was written by Americans after WWII, and modelled on the US Constitution. Japan has a democratic polity and a free-market economy. Japanese citizens enjoy the full-range of civil liberties as those of Americans, and Plaintiff has the right to enjoy said same civil liberties free from harassment by American intelligence officials.

355. The attempt to monopolize civil society involves the creation of a comprehensive, exclusionary network of intelligence officers and their agents. Plaintiff was targeted in a preemptive manner because one the CIA

grasped that Plaintiff would not agree to become part and parcel to such

fundamentally anti-American and hostile machinations against civil society

in an allied country with the above-described modern political and economic

characteristics, he was deemed to be a threat to their ability to continue their

personal lives in Kyoto as part of the would-be comprehensive intelligence

officers/agents network.

356. Although the network is increasingly active in self-promotion

on the Internet, as demonstrated by the recent establishment of the "Writers

in Kyoto" blog, including suspected CIA officers that are actually based in

Tokyo, such as Japan Times columnist Amy Chavez, as guests, the members

of said network has largely been withdraw from the central part of the city in

which Plaintiff resides and conducts his daily activities, presumably because

the CIA is anticipating Plaintiff's filing of this Complaint after Plaintiff

submitted two separate reports to the CIA/OIG expressing his intent to file

this Complaint, for example.

357. Plaintiff has presented ample evidence on his blog (and in

communications sent in complaint to respective federal officials)

demonstrating that the CIA et al. have undertaken premediated

countermeasures to protect that would-be monopoly in Kyoto civil society

against private American citizens like myself that are area experts with

fluency in the language, etc., to whom many of the ruses would be readily

apparent upon even a cursory amount of scrutiny. For example, reading a

single book—Sakamoto Ryoma and the Meiji Restoration, by Marius

Jansen—would alert the reader to the misappropriations of Sakamoto

Ryoma (i.e., by Dougill and Hashimoto). Here, in relation to the apparent

attempts promote Hashimoto's political appeal among the English speaking

community by JapanToday, it should be noted that Hashimoto's past ties

with Japanese organized crime figures are well documented.


358. In fact, the common thread between published writings of

Dougill and Houser relates to the now infamous Japanese politician

Hashimoto: first, Hashimoto's father was a Burakumin said to have been

connected to organized crime; and second, Hashimoto has attempted to

blatantly misappropriate the Meiji Restoration as well as one of its leading

historical figures—Sakamoto Ryoma—and Sakamoto's eight-point plan he

proposed in relation to the restoration of the emperor as sovereign in the

turmoil at the end of the Edo Period. Hashimoto has since been criticized

publically by Vice President Biden for remarks in relation to WWII that have

drawn condemnation internationally, and continues to be ostracized by

American politicians, such as the Mayor of San Francisco.


359. Meanwhile, Plaintiff exposed, in reader comments made to

articles on Hashimoto in JapanToday, the evident ploys adopted by

Hashimoto and coinciding with the CIA/MI6 agenda evident in the published

writings of Dougill and the course Houser had been teaching at the LIU

Global College Friends World Program, as they unfolded in real-time during

election campaigning. Plaintiff's comments in the 'readers' comments' section

were subsequently deleted with no basis in the Terms of Agreement of

JapanToday, and Plaintiff subsequently exposed JapanToday and its parent

company GPlus Media as a CIA-front media company on his blog. Although

Plaintiff had contacted the offices of JapanToday to complain, exchanging

emails with Betros, he refused to supply me with a copy of the Terms of Use

in Japanese, for example. Not having a Terms of Use agreement in Japanese

is a violation of Japanese law, but Plaintiff did not have the time or resources

to file a civil action against GPlus Media and JapanToday, as there is no Pro

Se system in Japan other than for small claims court.


360. The following passage discussing Betros and JapanToday is

from an email Plaintiff sent to the Callahan several months before receiving

the DOJ's written reply:


*Further, note that all in all, the practices and acts*

*inhering in the circumstances relating to my complaint*

*against JapanToday would seem to be consistent with aspects*

*of the previous incidents in relation to which I have*

*submitted complaints against CIA officers. That is to say,*

*they represent incidents of intelligence officers making illicit*

*incursions into civil society and violating people's civil rights*

*under the laws of both the host country of Japan and the*

*United States.*

*In relation to the organized crime connections of Mr.*

*Hashimoto, there would seem to have been an attempt by*

*JapanToday to offer him indirect support by deleting articles*

*that elicited unflattering comments in the days running up to*

*the election. Mr. Betros deleted the article I complained about*

*after only 10 days, whereas Mr. Betros had stated in one of*

*the emails relating to the Kyodo News articles deletion that*

*the minimum period is 2 weeks. At least I did something*

*right in jumping on that complaint and getting a record of the*

*response. I've been remiss and far too lax in tackling this sort*

*of problem.*

*The pattern of abuse is clear with respect to the role*

*of these people trying to disable and jam certain functional*

*capacities of civil society that are necessary to the functioning*

*of a democratic society with a regulated free market, etc.*

361. That the CIA was running a covert operation to support

Hashimoto, on the one hand, while the Executive Branch, including Vice

President Biden, had been compelled to denounce the controversial

statements and actions of Hashimoto, on the other hand, is indicative of the

double standards and duplicity at play in various aspects of the instant case.

It goes without saying that Plaintiff have a compelling interest in protecting

himself, his family, and Japanese civil society at large from the activities of

the and MI6 aimed at promoting sociopaths with connections to organized

crime as politicians in the Japanese public sphere. The fact, however, that

the CIA has been known to collaborate with organized crime groups in Japan

starting after the end of WWII, is well documented. Plaintiff assumes that

Betros deleted the reader comments, basically a deprivation of our freedom

of speech, because the comments were counter to the CIA's agenda of

promoting Hashimoto.


362. Another aspect of the stationing of a small colony of CIA officers

in Kyoto is what appears to be a tendency toward establishing defacto vested

rights for said CIA officers, their families, and their collaborators in Kyoto,

thereby instantiating a defacto feudalistic societal configuration centered on

the intelligence agencies and officers: on the one hand, the CIA et al. (i.e., the

CIA and intelligence officers mostly what one could term Anglo countries:

England, Ireland, Australia, Canada, and New Zealand) are colonizing

Japanese civil society in the traditional cultural capital of Japan with a cast

of hundreds; and on the other hand, there appears to be a possibility that

positions in the intelligence agencies may need to be passed on in a form of

hereditary succession by the children of the intelligence officers based on the

need to provide for their physical security in the case that their parents

identity has been revealed, etc. Plaintiff has noted the presence of

individuals he has complained about in his surroundings subsequently,

apparently providing for Plaintiff's physical security, presumably from

organized crime. That begs the question of the historical relationship

between the CIA and Japanese organized crime and the significance of that

relationship to the scenario Plaintiff has found in Kyoto, but Plaintiff won't

digress further, as his intent in presenting this information is to make

background factors to the allegations in this Complaint more readily

intelligible in terms of the Ninth Amendment, in particular.


363. To recapitulate the crux of the above digression into history, etc.,

Habermas refers to a phenomenon in feudalistic societies he calls

"representative publicness" that Plaintiff's apprehension of the situation in

Kyoto brought to mind. It can only be described as neo-colonial in scale and

ethos, particularly in light of the attempt to propagate Christianity using

state actors. The United States is not an imperial power; however, through

the CIA, the Executive Branch of the government of the United States is

engaged in creating a social order with characteristics of feudalism through

undermining the functioning of civil society in a Constitutional democracy

with a free-market economy. Plaintiff's civil rights have been violated by

rogue CIA officers in Kyoto seeking to protect their perceived vested

interests as part of the above-described social order because Plaintiff was

targeted by said CIA officers after having grasped important and essentially

un-American aspects of their operations in Kyoto.

364. Furthermore, the apparent inter-agency collaborative cover-up

in the Executive Branch demonstrates that the Executive Branch presumes

it is able to circumvent the law, both at home and abroad.

365. When Plaintiff encountered Dalsky, he noticed that Dalksy had

made it a point to emphatically use the phrase "I'm all in", more than once.

When Plaintiff subsequently learned of the remarks President Obama made

to the Australian Parliament in promoting his so-called "pivot to Asia"

strategy, Plaintiff felt it was a somewhat hubristic statement that reflected

America's preoccupation with its own sense of predominance and

pre-ordained right to impose its will on others. Plaintiff believes that Dalksy

was referencing Obama's statement, which was also used by Petraeus' in the

title of his ill-fated biography. Plaintiff believes it is necessary to question

whether Dalsky was attempting to taunt him and his powerlessness to stop

the CIA from attempting to determine the course of his life?


366. In this context, that is to say, a civil action brought against

rogue CIA officers and other federal officials acting in either their respective

capacities as individuals or officials or both for unlawful intrusions and

disruptions of the life of a private American citizen overseas, it is perhaps

necessary to examine aspects of the president's foreign policy statements

with respect to what light they might shed on the allegations made against

the CIA et al. in this Complaint.

> *So as two great democracies, we speak up for those*
>
> *freedoms when they are threatened.   We partner with*
>
> *emerging democracies, like Indonesia, to help strengthen*
>
> *the institutions upon which good governance depends.   We*
>
> *encourage open government, because democracies depend on*
>
> *an informed and active citizenry.   We help strengthen civil*
>
> *societies, because they empower our citizens to hold their*
>
> *governments accountable.   And we advance the rights of all*
>
> *people -- women, minorities and indigenous cultures --*
>
> *because when societies harness the potential of all their*
>
> *citizens, these societies are more successful, they are more*
>
> *prosperous and they are more just.*

> [...]

> *This is the future we seek in the Asia Pacific --*
>
> *security, prosperity and dignity for all.   That's what we*

*stand for.   That's who we are.   That's the future we will*

*pursue, in partnership with allies and friends, and with*

*every element of American power.   So let there be no doubt:*

*In the Asia Pacific in the 21st century, the United States of*

*America is all in.*


367. Was Dalsky, a PhD in psychology, acting on his own in parroting

the messages of Obama and Petraeus in a manner such as to identify himself

with authority to Plaintiff? Or was Dalsky acting in concert with other

rogues in violation of well-established law? Whatever Dalsky was doing, his

message was clear that since he was "all in", Plaintiff was to be driven "all

out" (i.e., displaced from, Kyoto), and that bringing about such a result was

his objective.


368. Secondly, if it is true that O'Day et al. had been attempting to

corrupt the attorney Plaintiff had hired to sue the city for refusing to enroll

his son in the neighborhood nursery school by recruiting said attorney to spy

for the CIA in order to subvert Plaintiff's case, that would be exactly the

opposite of "help[ing] strengthen civil societies, because they empower our

citizens to hold their governments accountable", potentially subverting the

system of checks and balances in Japan. Furthermore, such an act would

constitute a grave intrusion into Plaintiff's life as well as a deprivation of

Plaintiff's right to secure representation before the Japanese judiciary; again,

there is no Pro Se system in Japan, and Plaintiff was required to secure the

services of an attorney in order to file the lawsuit.


369. Next, it is of no small consequence that Christianity is not an

"indigenous culture" in Japan; in fact, there has never been an indigenous

form of monotheism anywhere in East Asia throughout history. Meanwhile,

Kyoto is the world's foremost center of Mahayana Buddhism, and, before the

Western incursion that produced the conditions leading to the Meiji

Restoration, Japan had seen more than a thousand years of relatively

harmonious coexistence between Shinto and Buddhism in a syncretic

religious system.


370. Meanwhile, though Japan has very little affinity with America

in terms of religious beliefs, it shares a similar Constitution and other values

associated with modern socio-economic and political theory. With respect to

religion and cultural heritage, China and Korea are the countries with the

closest affinity to Japan, though the respective traditions in both of said

countries have largely been displaced, taking a minor role compared to

trends that have come to hold sway more recently.


371. The fact that Plaintiff has been targeted by CIA officers

attempting to advance themselves in civil society in Kyoto by propagating or

otherwise fostering the spread of Christianity represents a violation of

Plaintiff's right to personal liberty coupled with a violation of the separation

of church and state. Aside from Douglass, other CIA officers that lived at the

Villa Tonodan were also engaged in Christianity propagating activities. John

Hart Benson is one, for example, serving as a minister for conducting

Christian wedding ceremonies on the weekends. Plaintiff has not had

problems with Benson, but has documented the involvement of several

intelligence officers, including Douglass, Schultz, and Giffin who appear on

the same website and against which he has made allegations against that

were engaged in such activities.

372. With respect to the First Amendment as it pertains to religion, there is an obverse and a converse, both of which Americans tend to hold sacrosanct in a sometimes awkward tension. With respect to Plaintiff's allegations against rogue CIA officers, Plaintiff alleges that among said rogue CIA officers were those attempting to promote their respective careers in the CIA through propagating Christianity in Kyoto that have targeted Plaintiff because of his forthright and vocal opposition to the propagating of religion by state actors, generally speaking; in the instant case, more specifically of monotheism in Kyoto Japan, with Christianity being the variety of monotheism plaintiff observed the CIA et al. attempting to exploit. Plaintiff alleges that such conduct by rogue CIA officers working overseas as covert state actors and attempting to propagate Christianity has violated Plaintiff's rights protected under the First Amendment of the US Constitution and the Ninth Amendment of the US Constitution. If the CIA has adopted the practice of stationing of covert officers using Christianity as a cover and engaged in proselytizing, etc., it would likely represent an

outright violation the "establishment clause" of the First Amendment,

insofar as the First Amendment is applicable extraterritorially, and call for

an injunction proscribing such activity; therefore, Plaintiff intends to seek to

learn from evidence revealed during discover, and may seek leave to amend

the complaint accordingly.


373. Finally, Paquette often spoke of Koreans as well, including one

friend of his whom he claimed was a patent attorney (Plaintiff works in the

intellectual property field), and mentioned the possibility of connecting us to

work together. Plaintiff has noted that the composition of the Japanese

organized crime groups is 30% Korean (Zainichi) and 60% Burakumin,

groups which correspond to the "minorities" mentioned by President Obama

in his above-quoted remarks. If it is proven that Paquette et al. were

collaborating with people associated with Japanese organized crime groups

and felt that was justified because those people were "minorities" being

somehow mistreated by the Japanese government, that would present

further obvious threats to private American citizens overseas that were *not*

inclined to collaborate with such people associated with organized crime

groups. Plaintiff is convinced that evidence revealed through discovery will

demonstrate that Paquette was collaborating with Japanese organized crime

groups, and that said collaboration was a contributing factor in Paquette's

motivation to violate Plaintiff's rights protected by the US Constitution. The

same likely holds true for Mike and other CIA officers against whom Plaintiff

has made allegations herein.

374. Plaintiff is generally in accord with the foreign policy statements

made by President Obama in his remarks to the Australian Parliament;

however, the content of said statements is not borne out by the contradictory

actions elucidated by Plaintiff in this Complaint. If rogue CIA officers are

undertaking activities of the sort described in this Complaint, which are all

clearly diametrically opposed to American values and the US Constitution as

well as the presidents above-cited remarks, with the aim being to subvert

modern civil society in based on the rule of law, free-market economics, civil

liberties, etc., then it can only be said that said rogue CIA officers as well as

the officials in the Executive Branch that have acted to cover up said acts

have also violated Plaintiff's unenumerated rights secured indirectly by the

Ninth Amendment of the US Constitution.

375. The following passage discussing the CIA et al. in civil society in Kyoto, including an indirect reference to the incident in which Blackman and Paquette were aiming to eliminate the competition (i.e., Plaintiff) in the translation field, is taken from the very first facsimile Plaintiff sent to the DOJ to initiate the complaints against the CIA, in which he also informed the DOJ of his blog:

> *Note that everything these people do in an area of*
> *civil society involves an illegitimate intrusion into the private*
> *sphere funded by public funds from the USA and UK aimed*
> *at advancing some private agenda, not the public interest.*
> *They are engaged in market distorting activities by p*[l]*anting*
> *people in the translation field, which is fairly impacted,*
> *where they serve to drive prices down and make work*
> *inaccessible. CIA officers occupy all of the prime apartments*
> *in the last building I recently moved out of (Villa Tonodan),*

*even though they are there only a couple of months out of the*

*year, etc. Although I'm of course grateful for the protection*

*against organized crime groups (which the CIA helped*

*establish after WWII: Robert Whiting; Tokyo Underworld),*

*aspects of their presence are fairly conspicuous to an*

*observant American.*


376. There was no government agency known as the CIA until 1950,

and even President Truman, who'd signed the order bringing it into

existence, repudiated the course that the agency had taken in a Washington

Post article published in 1963:

https://www.cia.gov/library/center-for-the-study-of-intelligence/kent-csi/vol2

0no1/html/v20i1a02p_0001.htm The fact is that the federal agency known as

the CIA is itself a relatively recent creation in the history of the United

States of America. Meanwhile, since the establishment of the CIA in 1950,

the world has changed tremendously and we are currently experiencing an

era of so-called globalization, which has seen scores of Americans going

abroad to seek their livelihood overseas in one of the many democratic

countries that has a free-market economy and amicable relations with the
United States.

377. Plaintiff is a private American citizen, and as such is not subject
to the arbitrary whims of any elected or career official of the Executive
Branch of the American government. The rights of private American citizens
are protected by the US Constitution, and Bivens has established that
remedies for violations of said rights by federal officials are held to be
implied by the US Constitution. The CIA would appear to be pursuing an
agenda in Japan aimed at subverting modernizations wrought to the
Japanese political system as a result of WWII in order to serve geopolitical
aims in the pursuit of which this Complaint demonstrates covert CIA officers
showing a willingness to violate the interests of private American citizens
overseas protected by the Bill of Rights of the US Constitution.

378. The conscience of the court should be shocked by the allegations
set forth in this Complaint. It is almost certain that the Executive will make
a motion to dismiss, invoking the state secrets privilege. In fact, as described

in the petition, Plaintiff alleges that certain policies, customs, and practices

have been established in a mannered tailored such as to rely on a

presumption of recourse to invocation of the state secrets privilege before the

Judiciary, aiming to use such invocation as a preemptive measure

facilitating the unchecked abuse of power by the Executive, thereby

subverting the US Constitution.

379. One of the questions the allegations against the CIA et al. that

Plaintiff has brought before the Court poses is the question as to where the

Constitution draws the line between Executive Privilege and the rights

enumerated by the Bill of Rights and established through legal precedents as

well as the implied rights "retained by the people" as set forth in the Ninth

Amendment of the US Constitution.

380. Plaintiff is eager to learn the answer to said question, but

believes that, were the allegations set forth in this Complaint to be dismissed

in their entirety on the basis of the Executive Branch's invocation of the

state secrets privilege, such dismissal would amount to: the conferring of an

unprecedented degree of absolutist authority to the Executive Branch that is
not provided for in the US Constitution, the rendering the system of checks
and balances mute, and the contravening the Bill of Rights as well as the
Ninth Amendment. *Biven's* provides a cause of action with respect to the
aforementioned violations by federal officials of Plaintiff's rights protected by
the Constitution of the United States of America.

XII

Relief Requested


31. In light of the public's need to know about activities of their

government officials, including those described in this complaint, and insofar

as the allegations set forth herein represent an egregious breach of trust by

the Executive Branch against an American citizen overseas in order to

facilitate the pursuit of ends not in accord with the Constitution of the

United States of America through covert means accompanied by a body of

policy as well as corresponding bureaucracy, customs and practices aimed at

preventing the American public from becoming apprised of such official acts,

Plaintiff hereby requests a TRIAL BY JURY.


WHEREFORE, Plaintiff seeks judgment and Relief as follows:

1. For statutory, compensatory and punitive damages according to proof;


2. Damages for emotional distress and mental anguish caused by unlawful

infiltration and intrusion into Plaintiff's life by CIA officers and proxies;

3.  Damages for personal discomfort and annoyance and emotional distress

    caused by harassment at cafes, hatching plots against Plaintiff including

    physical assault, hacking of Plaintiff's electronics devices, repeated

    suggestions that Plaintiff leave Kyoto, etc.;

4.  Declaratory relief pertaining to the policies, customs and practices of the

    CIA, DOS, and DOJ that have resulted in violations of Plaintiff's

    Constitutional rights, including the declaration of EO 12333 and the

    MOU to exceedingly vague and therefore failing to meet the requirements

    un the Constitution corresponding to their legal status, which Plaintiff

    gathers is nearly on a par with statutory law;

5.  A permanent injunction enjoining defendants from posting CIA officers

    under the assumed title of American Citizen Services Officer;

6.  A permanent injunction requiring the defendants to take all steps to

    improve transparency in the reporting requirements related to federal

possible federal crimes committed by a CIA officer or a proxy thereof

against an American citizen overseas;

7.  A permanent injunction requiring the Executive Branch and the

Legislative Branch to establish formal administrative procedures for

reporting allegations of federal crimes committed by covert CIA officers,

etc., overseas against an American citizen overseas;

8.  A permanent injunction requiring the CIA/OIG to provide notification to

any American citizen overseas submitting a report to the CIA/OIG

alleging unlawful misconduct against a CIA officer, proxy thereof, etc;

9.  A permanent injunction placing a restraining order on the CIA officers

listed as Defendants in this Complaint as well as proxies and the like

thereof not listed in the instant Complaint but described as being suspect

of culpability in conjunction with the violations relating to allegations set

forth in evidential communications submitted by Plaintiff to the DOS,

DOJ and CIA/OIG—and subsequently proven to be so through the course

of these Proceedings—from coming into proximity with Plaintiff, defining

a reasonable daily activity sphere or the like based on a radial distance

from Plaintiff's residence, etc., preferably removing said Defendants and

proxies thereof from the precincts of Kyoto city; and


10. For reasonable attorneys' fees (should Plaintiff retain counsel henceforth),

investigation and litigation costs reasonably incurred and for such other

relief as may be appropriate.


Respectfully Submitted,


Darren R. Vasaturo
502 Sun Lotus Ikeji
217 Owaricho, Nakagyoku
Kyoto, Japan 604-0934


Dated: July 24, 2015